UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

HOLLY DENISE JARVIS,

                Plaintiff,

v.                                                                          5:25-CV-01168
                                                                              (BKS/ML)

OFFICER GLYNN, OFFICER DORCHESTER,
SUPERVISOR JASON WELLS, and SYRACUSE
POLICE DEPARTMENT,

                Defendants.

---

APPEARANCES:                                                OF COUNSEL:

HOLLY DENISE JARVIS
  Plaintiff, *Pro Se*
105 Rider Ave
Apt 1
Syracuse, New York 13207

MIROSLAV LOVRIC, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

Plaintiff Holly Denise Jarvis ("Plaintiff") commenced this *pro se* action against

Defendants Officer Glynn, Officer Dorchester, Supervisor Jason Wells, and Syracuse Police

Department (collectively "Defendants") alleging violations of her civil rights. (Dkt. No. 1.)

Plaintiff did not pay the filing fee and seeks leave to proceed *in forma pauperis* ("IFP"). (Dkt.

Nos. 5, 6.)  For the reasons set forth below, I (1) grant Plaintiff's IFP application, and (2)

recommend that the Complaint be accepted in part for filing and dismissed in part.

## I.      BACKGROUND

Construed as liberally[1] as possible, the Complaint alleges violations of Plaintiff's civil rights by Defendants. (*See generally* Dkt. No. 1.)  Plaintiff also filed an "Affidavit in Support" that recites essentially the same facts as the Complaint. (Dkt. No. 1-1.)

Specifically, the Complaint alleges that on or about January 16, 2023, Plaintiff engaged in a "verbal dispute" in her home with her adult son. (Dkt. No. 1 at ¶ 6.)  "Plaintiff, who had been drinking, became emotional and used wasp spray . . ." some of which landed on her son. (*Id*.)  In the course of the altercation, "Plaintiff suffered a laceration to her arm, not caused by her son.  Concerned for her wellbeing, her son called 911 for medical help." (*Id*. at ¶ 7.)

The Complaint goes on to allege that Defendants, all identified as members of the Syracuse Police Department, subsequently entered Plaintiff's home "without a warrant, without consent, and absent exigent circumstances." (Dkt. No. 1 at ¶ 8.)  Plaintiff asserts that she "specifically told officers she did not want them inside because of loose cats and because she was cleaning up chemicals." (*Id*. at ¶ 9.)  One of the Defendants, who is not identified in the Complaint, "physically pushed Plaintiff inside her residence against her will." (*Id*.)

Multiple Defendants then "dragged Plaintiff outside, threw her to the ground, and handcuffed her injured arm despite visible bleeding." (*Id*. at ¶ 11.)  As set forth in the Complaint, "Plaintiff was forced into an ambulance and transported against her will to a hospital off Fly Road, where she was later released after refusing medical treatment." (*Id*. at ¶ 13.)  The Complaint further asserts that Plaintiff was issued an appearance ticket for Obstruction of Governmental Administration and Harassment in connection with the incident, but that these

---

[1]      The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 19P94)).

charges were later dismissed. (*Id*. at ¶ 14.)

The Complaint lists multiple causes of action: (1) unlawful entry; (2) excessive force; (3) false arrest; (4) malicious prosecution; (5) "Unlawful Seizure and Forced Medical Transport" when "Defendants unlawfully detained Plaintiff by forcing her into an ambulance despite her refusal of treatment"; and (6) retaliation in violation of the First Amendment. (Dkt. No. 1 at 4-5.) Plaintiff seeks compensatory and punitive damages, in addition to costs associated with this action, along with a "public apology and written retraction of false allegations and the expungement and sealing of all related arrest records." (*Id*. at 5.)

Plaintiff has not paid the filing fee and seeks leave to proceed IFP.

## II.    PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid.  28 U.S.C. § 1914(a).  A court is authorized, however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).[2]  Plaintiff filed an incomplete IFP application on August 26, 2025, that this Court denied on September 29, 2025. (Dkt. Nos. 2, 4.) On October 1, 2025, Plaintiff filed a new IFP application, and filed an updated IFP application on April 28, 2026. (Dkt. No. 5, 6.)  After reviewing these applications, the Court finds that

---

[2]    The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates.  *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses").  The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria.  *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

3

Plaintiff's October 1, 2025 IFP application (Dkt. No. 5) is moot, and grants Plaintiff's April 28, 2026 IFP application.[3] (Dkt. No. 6.)

## III.    LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court

---

[3]    Plaintiff is reminded that, although her IFP application has been granted, she is still required to pay fees that she may incur in this action, including copying and/or witness fees.

must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim).  "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond."  *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV.    ANALYSIS

### A.  Claims Against Syracuse Police Department

"Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 690 (1978), a municipal . . . department does not have the capacity to be sued as an entity separate from the municipality in which it is located*." White v. Syracuse Police Dep't*, No. 18-CV-1471 (GTS/DEP), 2019 WL 981850 at *3 (N.D.N.Y. Jan. 7, 2019), *rep't and rec. adopted*, 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008); *Turczyn ex rel. McGregor v. City of Utica*, No. 13-CV-1357 (GLS/ATB), 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence.  Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.").

Thus, Defendant Syracuse Police Department is not a proper party which would be

amenable to suit. As a result, I recommend that Plaintiff's claims against Defendant Syracuse Police Department be dismissed.[4]

### B. Claims Against Defendants Glynn, Dorchester, and Wells.

Having recommended dismissal of all claims against the municipal agency defendant, this Court will now address Plaintiff's claims against defendants Glynn, Dorchester, and Wells. As alleged in the Complaint, these individual defendants were all employed by the City of Syracuse Police Department at the time of Plaintiff's January 16, 2023 arrest.

### 1. Fourth Amendment Claims

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. By virtue of its incorporation through the Fourteenth Amendment's Due Process Clause, the Fourth Amendment is binding on state and municipal officers such as Defendants Glynn, Dorchester, and Wells. *See Tsinberg v. City of New York*, No. 20-CV-0749, 2021 WL 1146942, at *10 (S.D.N.Y. Mar. 25, 2021) (citing *City of Ontario v. Quon*, 560 U.S. 746, 750 (2010)).

### a. Warrantless Entry without Probable Cause or Exigent Circumstances

The Fourth Amendment ordinarily requires that police officers obtain a warrant before entering a home without permission. *Lange v. California*, 594 U.S. 295, 298, 141 S. Ct. 2011, 2016 (2021). Consistent with that reading, the United States Supreme Court has held that it is a

---

[4] Although the Complaint does not contain any specific allegations against the Syracuse Police Department, it describes the agency as "responsible for the training, supervision, and conduct of its officers." (Dkt. No. 1 at ¶ 4.) To the extent the Complaint could be interpreted to assert municipal liability under *Monell* for failure to properly train employees, this Court would recommend dismissal of this claim as well, as the single incident described in the Complaint does not allege a broadly applicable policy or custom supporting municipal liability.

"basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459, 131 S. Ct. 1849, 1856, (2011) (internal citations omitted); *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S. Ct. 1284, 1290, 157 L. Ed. 2d 1068 (2004) (". . . the right of a [person] to retreat into [the] home and there be free from unreasonable governmental intrusion stands at the very core of the Fourth Amendment . . .").

That being said, a law enforcement officer may make a warrantless entry when "the exigencies of the situation" create a compelling need. *Lange*, 594 U.S. at 295, 141 S. Ct. at 2013. This exception enables law enforcement officers to handle situations presenting a "compelling need for official action and no time to secure a warrant." *Missouri v. McNeely*, 569 U.S. 141, 149, 133 S.Ct. 1552, 1559, 185 L.Ed.2d 696 (2013). "The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or to take action" without securing a warrant. *Alexander v. City of Syracuse*, 132 F.4th 129, 147 (2d Cir. 2025) (internal citation omitted).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment warrantless entry claim against Defendants Glynn, Dorchester, and Wells.

### b. False Arrest Claim

"In analyzing claims alleging the constitutional tort of false arrest, '[the Court has] generally looked to the law of the state in which the arrest occurred.'" *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433

(2d Cir. 2004)).  "To establish [a claim of false arrest under New York law] the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *Broughton v. State*, 37 N.Y.2d 451, 456 (N.Y. 1975).  Confinement is "otherwise privileged" when probable cause exists, in other words, "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  However, "[p]laintiffs are not required to set forth a lack of probable cause in their complaint."  *Case v. City of New York*, 233 F. Supp. 3d 372, 384 (S.D.N.Y. 2017).  "Whenever there has been an arrest and imprisonment without a warrant, the officer has acted extrajudicially and the presumption arises that such an arrest and imprisonment are unlawful."  *Broughton*, 37 N.Y.2d at 458 (internal citations omitted).  Transportation to a hospital against the patient's wishes may also raise a Fourth Amendment claim.  See *Green v. City of New York*, 465 F.3d 65, 83 (2d Cir. 2006)

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment false arrest and unlawful seizure claims against Defendants Glynn, Dorchester, and Wells.

### c.  Malicious Prosecution Claim

The elements of a Fourth Amendment malicious prosecution claim under § 1983 are

substantially the same as the elements under New York law.  *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003).  To state a malicious prosecution claim under New York law, the plaintiff must allege facts plausibly showing: (1) the initiation of a criminal proceeding; (2) its termination favorably to plaintiff; (3) lack of probable cause; and (4) malice.  *Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010).  In addition, the Second Circuit requires that a plaintiff demonstrate there was a "post arraignment seizure," since a § 1983 malicious prosecution claim is "grounded ultimately on the Fourth Amendment's prohibition of unreasonable seizures."  *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013); *see also Washington v. Cnty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) ("[T]o sustain a § 1983 malicious prosecution claim, there must be a seizure or other perversion of proper legal procedures implicating claimant's personal liberty and privacy interests under the Fourth Amendment.") (internal quotation marks omitted).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment malicious prosecution claims against Defendants Glynn, Dorchester, and Wells.

### d.  Excessive Force

It is well-settled that the Fourth Amendment prohibits the use of excessive force by a police officer during a "seizure" of a free citizen.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989).  In contrast, the Eighth Amendment prohibits cruel and unusual punishment for incarcerated persons.  *See Whitley v. Albers*, 475 U.S. 312, 319 (1986).

"The Fourth Amendment prohibits the use of excessive force in making an arrest, and

9

whether the force used is excessive is to be analyzed under that Amendment's reasonableness standard.'" *Outlaw v. City of Hartford*, 884 F.3d 351, 366 (2d Cir. 2018) (quoting *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015)).  "The 'proper application' of this standard 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Outlaw*, 884 F.3d at 366 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The reasonableness determination must include consideration of the fact that law enforcement officers often are forced to make quick decisions under stressful and rapidly evolving circumstances rendering the calculation of what amount of force is reasonable difficult.  *See Graham*, 490 U.S. at 396-97.  Relevant factors include the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect was actively resisting arrest.  *See Brown*, 798 F.3d at 100 (citing *Graham*, 490 U.S. at 396).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's excessive force claim pursuant to the Fourth Amendment against Defendants Glynn, Dorchester, and Wells.  *See Penree v. City of Utica*, No. 13-CV-1323 (MAD/ATB), 2016 WL 915252, at *8 (N.D.N.Y. Mar. 4, 2016) ("The Fourth Amendment's prohibitions against unreasonable seizures applies equally to how an arrest is carried out, and, therefore, all claims that law enforcement officers have used excessive force ... in the course of an arrest ... should be analyzed under the

Fourth Amendment." (internal quotation marks and citation omitted)).

### e. Failure to Intervene

Plaintiff's Complaint alleges that Defendants Glynn, Dorchester, and Wells were all present during her January 16, 2016 arrest but does not identify the specific officers alleged to have used excessive force against her. "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Liability for failure to intervene pursuant to the Fourth Amendment attaches if police "fail to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Morris v. City of New York*, No. 14-CV-1749, 2015 WL 1914906, at *5 (E.D.N.Y. 2015); *see Sanabria v. Tezlof*, No. 11-CV-6578, 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016) (explaining that liability attaches if an officer "observes or has reason to know ... that a citizen has been unjustifiably arrested").

"[W]here plaintiffs have properly alleged at least one constitutional violation, courts regularly permit such plaintiffs to plead in the alternative as to multiple defendants, finding that such plaintiffs are entitled to discovery to determine which officers participated directly in the constitutional violation." *Lalonde v. City of Ogdensburg*, No. 22-CV-0164 (LEK/DJS), 2023 WL 2537626, at *10 (N.D.N.Y. Mar. 16, 2023) (citing *Matthews v. City of New York*, 889 F. Supp. 2d 418, 444 (E.D.N.Y. 2012)) ("Because plaintiffs properly allege at least one constitutional violation, plaintiffs are entitled to discovery to determine which officers participated directly in the alleged constitutional violation and which officers were present and failed to intervene."); *Durr v. Slator*, 558 F. Supp. 3d 1, 26 (N.D.N.Y. 2021) ("Plaintiff does not allege that either Defendant in particular acted with deliberate indifference by transporting

Plaintiff to the Oneida Police Station rather than the Upstate Emergency Department. As such, Plaintiff is permitted to plead in the alternative that Defendants Clark and Slator failed to intervene in the alleged constitutional violation.").

Although Plaintiff's Complaint does not expressly include this specific cause of action, a liberal construction of Plaintiff's excessive force claims plausibly suggests a contention that one or more law enforcement officers failed to intervene to protect Plaintiff. Therefore, out of an abundance of caution and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's Fourth Amendment failure to intervene claim against Defendants Glynn, Dorchester, and Wells.

### 2. First Amendment Retaliation

"A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.'" *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. School Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)); *Weilburg v. Rodgers*, No. 5:22-CV-435 (BKS/TWD), 2022 WL 2751619, at *4 (N.D.N.Y. July 14, 2022) (collecting cases). Plaintiff must provide more than mere conclusory allegations; she must allege facts that plausibly support an inference of the requisite causal connection between the protected speech and plaintiff's arrest. *See Grossi v. City of New York*, No. 08-CV-1083 (RRM/ALC), 2009 WL 4456307, at *7 (E.D.N.Y. Nov. 4, 2009) (collecting cases where insufficient facts alleged to render causal connection plausible), *rep't and rec. adopted*, 2009 WL 4456307 (E.D.N.Y. Nov. 30, 2009). Plaintiff also must plead and prove the absence of probable cause for

the arrest unless she was arrested in circumstances where "otherwise similarly situated individuals not engaged in the same sort of protected speech" had not been arrested. *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019).

Plaintiff alleges that Defendants "escalated force and arrest in response to Plaintiff's emotional outbursts and yelling, which are protected expressions." (Dkt. No. 1 at 5.) The protected speech covered by First Amendment includes "a significant amount of verbal criticism and challenge directed at police officers." *See City of Houston, Texas v. Hill*, 482 U.S. 451, 461 (1987); *Barkai v. Mendez*, 629 F. Supp. 3d 166, 198 (S.D.N.Y. 2022) (collecting cases).

Out of an abundance of caution, mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff*, 537 F.3d at 191, and without expressing an opinion as to whether Plaintiff can withstand a properly filed motion to dismiss or for summary judgment, I recommend that a response be required to Plaintiff's First Amendment retaliation claim against Defendants Glynn, Dorchester, and Wells.

## V.    OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated

differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641 (RSP/DS), 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997).[5]

Although I have serious doubts about whether Plaintiff can replead to assert actionable claims that I recommend be dismissed here, given that this is the Court's first review of Plaintiff's pleading, out of an abundance of caution and in light of Plaintiff's status as a *pro se* litigant, I recommend that she be permitted leave to amend. If Plaintiff chooses to file an amended complaint, she should note that in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

---

[5]     *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 6) is

**GRANTED**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's

Complaint (Dkt. No. 1) to the extent that it asserts claims against Defendant Syracuse Police

Department,[6] because it fails to state a claim upon which relief may be granted pursuant to 28

U.S.C. § 1915A(b); and it is further respectfully

**RECOMMENDED** that the Court **ACCEPT FOR FILING** Plaintiff's Complaint (Dkt.

No. 1) to the extent that it asserts claims against Defendants Glynn, Dorchester, and Wells

pursuant to (1) the Fourth Amendment asserting (a) Warrantless Entry, (b) False Arrest, (c)

Malicious Prosecution, (d) Excessive Force, and (e) Failure to Intervene; and (2) the First

Amendment asserting Retaliation; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this report and

recommendation on the docket of this case and serve a copy upon the parties in accordance with

the local rules.[7]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within

which to file written objections to the foregoing report.[8]  Such objections shall be filed with the

---

[6]     Any repleading of this claim would need to address municipal liability as outlined in Section IV(A) herein.

[7]     The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[8]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a

Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW**.  28 U.S.C. § 636(b)(1) (Supp. 2013);

Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v.*

*Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).


Dated: May  13, 2026
         Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2019 WL 981850

2019 WL 981850
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,
v.
SYRACUSE POLICE DEPARTMENT, et al., Defendants.

Civil Action No. 5:18-CV-1471 (GTS/DEP)
|
Signed 01/07/2019

**Attorneys and Law Firms**

FOR PLAINTIFF: Jeramie White, Pro se, 18-B-0311, Cayuga Correctional Facility, P.O. Box 1186, Moravia, NY 13118.

ORDER, REPORT, AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1** This is a civil rights action brought by *pro se* plaintiff Jeramie White, a New York State prison inmate, pursuant to 42 U.S.C. § 1983, against the Syracuse Police Department ("SPD") and five of its officers. In his complaint, plaintiff alleges that defendants violated his constitutional rights during the course of his arrest on February 13, 2017. Plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP") have been referred to me for review. Based upon my consideration of those materials, I will (1) grant plaintiff's amended IFP application, (2) recommend dismissal of his claim against the SPD with leave to replead, and (3) recommend that his complaint otherwise be accepted for filing.

I. BACKGROUND
Plaintiff commenced this action on or about December 20, 2018. Dkt. No. 1. According to plaintiff, he and two friends were on their way to play indoor basketball when their vehicle was pulled over for a traffic infraction. *Id.* at 4; Dkt. No. 1-1 at 4. Plaintiff alleges that after the stop, defendant William Kittle forcibly removed White from the vehicle and that Kittle, in addition to defendants Abraham Mamoun and Shawn Hauck, proceeded to use excessive force against him during the course of his arrest. Dkt. No. 1 at 4-5, 6-7; *see also* Dkt. No. 1-1 at 4, 8. Plaintiff further alleges that defendants Altimonda and Fiorini were present and had an obligation to intervene and prevent the unlawful use of force, but failed to do so. *Id.* at 5, 7.

Plaintiff was ultimately arrested and charged with resisting arrest, in violation of N.Y. Penal Law § 205.30, and second-degree obstruction of governmental administration, in violation of N.Y. Penal Law § 195.05. Dkt. No. 1-1 at 4. As relief, plaintiff seeks compensatory and punitive damages in the amount of $1,000,000. Dkt. No. 1 at 8.

A. Plaintiff's Amended IFP Application [1]
When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $400, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP if it determines that he is unable to pay the required filing fee. 28 U.S.C. § 1915(a)(1). [2] Because I conclude that plaintiff meets the requirements for IFP status, his amended application for leave to proceed without prepayment of fees is granted. [3]

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

2019 WL 981850

B. Sufficiency of Plaintiff's Complaint

1. Governing Legal Standard

**\*2** Because I have found that plaintiff meets the financial criteria for commencing this case IFP, I must next consider the sufficiency of the claims set forth in his complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Similarly, 28 U.S.C. § 1915A(b) directs a court to review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("We have found both sections [1915 and 1915A] applicable to prisoner proceedings *in forma pauperis*.").

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g.*, *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at \*2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d. 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for the purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

When reviewing a complaint under section 1915(e), the court is guided by the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2) ).

Case 5:25-cv-01168-BKS-ML   Document 7   Filed 05/13/26   Page 19 of 147
White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)
2019 WL 981850

2. <u>Analysis of Plaintiff's Claims</u>

**\*3** Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located. *See Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing *Orraca v. City of N.Y.*, 879 F. Supp. 148 (S.D.N.Y. 1995) ); *Turczyn ex rel. McGregor v. City of Utica*, No. 13-CV-1357, 2014 WL 6685476, at \*2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *see also Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department."). Although I would ordinarily recommend that, for the sake of judicial efficiency, the court substitute the City of Syracuse in place of the SPD, plaintiff's complaint contains no factual allegations that would support a *Monell* claim against the City of Syracuse. Accordingly, I recommend dismissal of plaintiff's claims asserted against the SPD.

With respect to his remaining claims, although plaintiff makes passing reference to his rights arising under the Eighth and Fourth Amendments, *see* <u>Dkt. No. 1 at 6</u>, it is clear from the factual allegations that he is asserting claims for excessive force and the failure to intervene arising under the Fourth Amendment. *See generally* <u>Dkt. No. 1</u>; *see also Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) ("Arrestees may invoke the Fourth Amendment's prohibition against 'unreasonable' seizures."). In light of the court's obligation to liberally construe a *pro se* litigant's pleadings, I find that plaintiff's complaint should be accepted for filing and the individual officer defendants should be required to respond in accordance with the local rules of practice for this court and the Federal Rules of Civil Procedure. [4]

### C. <u>Whether to Permit Amendment</u>

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this case, while I recommend dismissal of plaintiff's claim against the SPD, plaintiff could potentially amend his complaint to assert a cognizable cause of action against a defendant, such as the City of Syracuse, which is amenable to suit. Accordingly, I recommend that plaintiff be granted leave to amend his complaint. If plaintiff chooses to file an amended complaint, he must clearly and concisely set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted) ).

### II. <u>SUMMARY, ORDER, AND RECOMMENDATION</u>

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 20 of 147

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)
2019 WL 981850

 **\*4** Having reviewed plaintiff's amended application for leave to proceed in this action IFP, I conclude that he has met the applicable requirements for leave to proceed without prepayment of fees, and will therefore grant his application. Turning to the merits of his complaint, to the extent that it names five police officers and alleges a violation of 42 U.S.C. § 1983, I conclude that those claims are not subject to dismissal at this procedural juncture. I recommend a finding, however, that plaintiff's claim against the SPD is legally deficient and subject to dismissal, but that plaintiff should be afforded an opportunity to amend with respect to that claim. Accordingly, it is hereby

ORDERED that plaintiff's amended application for leave to proceed in this action without prepayment of fees (Dkt. No. 6) is GRANTED; and it is further

ORDERED that plaintiff's original application for leave to proceed in this action without prepayment of fees (Dkt. No. 2) is DENIED as moot; and it is further

RECOMMENDED that plaintiff's complaint (Dkt. No. 1) be accepted for filing with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini; and it is further

RECOMMENDED that plaintiff's remaining cause of action against the Syracuse Police Department be otherwise DISMISSED with leave to replead within thirty days of the issuance of an order adopting this recommendation; and it is further

RECOMMENDED that, in the event plaintiff does not choose to file an amended complaint and the above recommendations are adopted, the case should move forward with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[5] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 981850

---

**Footnotes**

1    Plaintiff filed both an original and amended motion to proceed in this action IFP. Dkt. Nos. 2, 6. While the two motions contain slightly different information concerning plaintiff's financial status, only the amended motion contains the required certification from an official at the correctional facility in which plaintiff is confined. *Compare* Dkt. No. 3 *with* Dkt. No. 7. Accordingly, plaintiff's original IFP application is denied as incomplete.

2    The total cost for filing a civil action in this court is $400.00, consisting of the civil filing fee of $350.00, *see* 28 U.S.C. § 1914(a), and an administrative fee of $50.00. Although an inmate granted IFP status is not required to pay the $50.00 administrative fee, he is required to pay, over time, the full amount of the $350.00 filing fee regardless of the outcome of the action. *See* 28 U.S.C. § 1915(b)(3).

3    Plaintiff is reminded that, although his IFP application has been granted, he will still be required to pay fees that he incurs in this action, including copying and/or witness fees.

4    The court expresses no opinion concerning whether plaintiff's claims can survive a properly filed motion to dismiss or motion for summary judgment, or whether he may prevail at trial.

5    If you are proceeding *pro se* and are served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

2019 WL 974824

2019 WL 974824
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,

v.

SYRACUSE POLICE DEPARTMENT; Abraham Mamoun, Syracuse Police Dept.; William Kittle, Syracuse Police Dept.;
Shawn Hauck, Syracuse Police Dept.; Altimonda, Syracuse Police Dept.; and Fiorini, Syracuse Police Dept., Defendants.

5:18-CV-1471 (GTS/DEP)
|
Signed 02/28/2019

**Attorneys and Law Firms**

JERAMIE WHITE, 18-B-0311, Plaintiff, Pro Se, Cayuga Correctional Facility, P.O. Box 1186, Moravia, New York 13118.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this *pro se* civil rights action filed by Jeramie White ("Plaintiff") against the Syracuse Police Department and five of its employees ("Defendants"), is United States Magistrate Judge David E. Peebles' Report-Recommendation recommending that (1) Plaintiff's Complaint be accepted for filing by the Court with respect to Plaintiff's Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini, and (2) Plaintiff's remaining cause of action against the Syracuse Police Department be dismissed with leave to replead within thirty days of the issuance of an Order adopting the Report-Recommendation. (Dkt. No. 9.) Plaintiff did not submit an objection to the Report-Recommendation, and the deadline by which to do so has expired. (*See generally* Docket Sheet.) [1]

Based upon a review of this matter, the Court can find no clear error in the Report-Recommendation: [2] Magistrate Judge Peebles employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein; Plaintiff's Complaint is accepted for filing with respect to his Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini; and Plaintiff's remaining cause of action against the Syracuse Police Department is dismissed with leave to replead within thirty days of the issuance of this Decision and Order.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Peebles' Report-Recommendation (Dkt. No. 9) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint is accepted for filing with respect to Plaintiff's Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini; and it is further

**\*2 ORDERED** that Plaintiff's remaining cause of action against the Syracuse Police Department is **DISMISSED with leave to replead within THIRTY (30) DAYS** of the issuance of this Decision and Order.

Case 5:25-cv-01168-BKS-ML     Document 7     Filed 05/13/26     Page 23 of 147

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)
2019 WL 974824

**ORDERED** that, in the event Plaintiff files an Amended Complaint within the above-referenced thirty-day period, it shall be referred to Magistrate Judge Peebles for review; and it is further

**ORDERED** that, in the event Plaintiff does not file an Amended Complaint within the above-referenced thirty-day period, this action shall move forward with respect to his Fourth Amendment cause of action against Defendants Mamoun, Kittle, Hauck, Altimonda and Fiorini, and the Clerk of the Court is directed to issue summonses and USM-285 forms at that time for service by the U.S. Marshal Service.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 974824

---

**Footnotes**

1    The Court notes that, on January 11, 2019, Plaintiff filed a letter from the City of Syracuse Citizen Review Board dated December 31, 2018, outlining its findings with respect to this matter. (Dkt. No. 10.) In its letter, the Citizen Review Board upheld Plaintiff's claim for excessive force against "Det. One," recommended a written reprimand against that individual, and absolved "Det. Two," "Sgt. One," and "Lt. One" from wrongdoing regarding the use of excessive force. (*Id.*) The Court does not liberally construe this letter as any sort of Objection to the Report-Recommendation.

2    When no objection is made to a report-recommendation, the Court subjects that report-recommendation to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

---

**End of Document**     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2026 Thomson Reuters. No claim to original U.S. Government Works.   2

2014 WL 6685476
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kylie Ann TURCZYN, Deceased, by and through Barbara McGREGOR,
as Administratrix of the Estate of Kylie Ann Turczyn, Plaintiff,
v.
CITY OF UTICA et al., Defendants.

No. 6:13–cv–1357 (GLS/ATB).
|
Signed Nov. 26, 2014.

**Attorneys and Law Firms**

Office of Frank Policelli, Frank Policelli, Esq., of Counsel, Utica, NY, for the Plaintiff.

City of Utica—Corporation Counsel, Mark C. Curley, Esq., Merima Smajic, Esq., Zachary C. Oren, Esq., of Counsel, Utica, NY, for the Defendants.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

## I. *Introduction*

**\*1** Plaintiff Kylie Ann Turczyn, deceased, by and through Barbara McGregor, as administratrix of the estate of Kylie Ann Turczyn, commenced this action against defendants City of Utica, City of Utica Police Dept., and Elizabeth Shanley alleging substantive due process claims pursuant to 42 U.S.C. § 1983 and separate state law causes of action. (Am.Compl., Dkt. No. 12.) Pending is defendants' motion to dismiss for failure to state a claim. (Dkt. No. 19.) For the reasons that follow, the motion is granted in part and denied in part.

## II. *Background*

**A.** *Facts* [1]

Shanley, an Oneida County domestic violence investigator, was at all relevant times assigned by the Police Department to accomplish the goals of reducing "occurrence[s] of domestic violence by increasing reporting and by identifying and tracking repeat victims and/or offenders," and "increas[ing] victims' access to supportive services by encouraging [them] to report their abuse, thereby increasing arrest rates for domestic offenders." (Am.Compl.¶ 10.) On June 22, 2012, Thomas Anderson, Turczyn's former boyfriend and the father of her daughter, broke into Turczyn's home armed with a 9 mm rifle. (*Id.* ¶ 11) Anderson repeatedly shot Turczyn, taking her life in view of their four-year-old daughter, G.T. (*Id.*) Anderson then dispatched himself. (*Id.*)

In the twelve months preceding this horrific event, Turczyn made between five and ten complaints to Utica police officers, "including informing them of a specific threat by Anderson to kill her." (*Id.* ¶ 12.) Turczyn specifically told Shanley "that

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 25 of 147

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)
2014 WL 6685476

Anderson was armed and had threatened to kill her." (*Id.* ¶ 12(d).) Despite their knowledge of domestic violence between Turczyn and Anderson, neither Shanley, New York State Police, nor Utica Police took any steps to arrest Anderson, investigate Turczyn's complaints, or follow-up with Anderson "as is the policy and protocol of the domestic violence unit." (*Id.* ¶ 14.)

On June 18, 2012, Shanley told Turczyn to seek an order of protection, which she attempted to do, but was told by an unknown person at the Oneida County Family Court to return the following day because the court was " 'too busy.' " (*Id.* ¶¶ 15–16.) The following day, Turczyn left a voice message for Shanley, explaining that she was unable to obtain an order of protection and that Anderson had a gun and planned to kill her that week. (*Id.* ¶¶ 16–18.) Despite her knowledge, "Shanley took no action." (*Id.* ¶ 17.) Shanley also mistakenly believed that Turczyn's issues with Anderson were outside of the purview of Utica Police and should, instead, be dealt with by New York State Police; however, "she did not inform any other police agency or take any action herself." (*Id.* ¶¶ 18, 19, 20.)

## B. *Procedural History*
Turczyn commenced this action by filing a complaint on October 31, 2013. (Dkt. No. 1.) Defendants thereafter moved to dismiss, (Dkt. No. 10.) In response, Turczyn filed an amended complaint as of right, which is now the operative pleading. (*See generally* Am. Compl.) In her amended complaint, Turczyn alleges the following causes of action: (1) a denial of substantive due process rights under the Fifth and Fourteenth Amendments due to deliberate indifference; (2) a *Monell* [2] claim against the City; (3) negligence; (4) a "derivative action" on behalf of G.T.; and (5) negligent infliction of emotional distress. (*Id.* ¶¶ 37–74.) Defendants now move to dismiss the amended pleading pursuant to Rules 8(a)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 19.)

## III. *Standard of Review*

**\*2** The standard of review under Fed.R.Civ.P. 12(b)(6) is well settled and will not be repeated here. For a full discussion of the standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP,* 701 F.Supp.2d 215, 218 (N.D.N.Y.2010).

## IV. *Discussion*

### A. *Preliminary Matters*
At the outset, it is noted that some of Turczyn's claims are deemed abandoned by her failure to oppose their dismissal. *See Barmore v. Aidala,* 419 F.Supp.2d 193, 201–02 (N.D.N.Y.2005) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion." (internal citations omitted)); *Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 723 (S.D.N.Y.2005) ("[B]ecause [the] plaintiff did not address [the] defendant's motion to dismiss with regard to [a particular] claim, it [wa]s deemed abandoned and ... dismissed."). In particular, Turczyn squarely opposed dismissal of her substantive due process claim as against Shanley, (Dkt. No. 20 at 8–12), and scarcely, but sufficiently to save the claim from dismissal for abandonment, offered reasons why her substantive due process claim as against the City should survive defendants' motion, (*id.* at 5–7). Aside from the substantive due process claim, Turczyn failed to offer any opposition to defendants' motion, which also sought dismissal of her pendant causes of action. (Dkt. No. 19, Attach. 6 at 31–40 & n. 15.) Accordingly, Turczyn's pendant state law claims, (Am.Compl.¶¶ 59–74), are dismissed.

Additionally, it is clear that the Police Department must be dismissed as urged by defendants, (Dkt. No. 19, Attach. 6 at 2 n. 2), because "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Varela v. City of Troy,* No. 1:10–cv–1390, 2014 WL 2176148, at \*6 (N.D.N.Y. May 22, 2014) (internal quotation marks omitted). As such, all claims as against the Police Department are dismissed.

2014 WL 6685476

The court also notes that both parties have submitted certain evidence that is outside of the pleadings (Dkt. No. 19, Attachs. 3, 4; Dkt. No. 20, Attachs. 1, 2.) Beginning with defendants, they submitted a January 2, 2013 stipulation of discontinuance, which, on its face, purports to memorialize McGregor's agreement to withdraw the notice of claim filed on behalf of Turczyn and to discontinue with prejudice, (Dkt. No. 19, Attach.3), and a December 28, 2012 letter, which appears to memorialize a conversation regarding the discontinuation of legal action and execution of a stipulation, (Dkt. No. 19, Attach.4). Relying on a single out-of-Circuit decision, *see Raines v. Haverford Coll.,* 849 F.Supp. 1009, 1010 (E.D.Pa.1994), which does not appear directly to support their position nor does it give this court confidence that the kinds of documents at issue here were contemplated by that decision, defendants assert that the documents may be considered on their motion to dismiss as "part of the record of this case." (Dkt. No. 19, Attach. 6 at 25 n. 11.) Turczyn argues that defendants' reliance on the stipulation is inappropriate at this juncture, yet she offers the affidavit of McGregor, submitted to dispute the validity of the stipulation, (Dkt. No. 20, Attach.1), without any explanation as to why the court should or may consider it. (Dkt. No. 20 at 12–13.)

**\*3** The court has excluded from its consideration of this motion to dismiss the exhibits offered by defendants as well as the McGregor affidavit. *See* Fed.R.Civ.P. 12(d). The existence of some document or documents that may extinguish a plaintiff's claims, such as a release or stipulation of discontinuance, is an affirmative defense, *see Beede v. Stiefel Labs., Inc.,* No. 1:13–cv–120, 2014 WL 896725, at \*3 (N.D.N.Y. Mar.6, 2014), and " '[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) ... if the defense appears on the face of the complaint,' " *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 145 (2d Cir.2010) (quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998)).

Here, the stipulation defense is not apparent from the face of the amended complaint. Moreover, the court refuses to consider the documents in question as part of the record of this case, a proposition for which no in-Circuit authority has been offered nor has any been discovered by this court. As such, the documents offered by defendants, (Dkt. No. 19, Attachs.3, 4), are not properly before the court, and their argument that Turczyn's claims must be dismissed because of those documents is rejected. McGregor's affidavit, (Dkt. No. 20, Attach.1), which was also improvidently submitted for consideration, is likewise excluded. The court now turns to the merits of defendants' arguments regarding the substantive due process and *Monell* claims.

**B.** *Rule 8*

First, defendants argue that Turczyn's § 1983 due process claim is subject to dismissal under the Rule 8 plausibility analysis —specifically because of Turczyn's failure to allege facts supportive of a sufficient nexus between Shanley's omissions and Turczyn's death. (Dkt. No. 19, Attach. 6 at 23–24.) The court disagrees. The amended complaint plausibly alleges a causal connection between the conduct of defendants—their alleged conscience-shocking failure to protect Turczyn, (Am.Compl.¶ 49)—and her injuries, *i.e.,* the allegations plausibly suggest that defendants' acts were a substantial factor in bringing about Turczyn's injuries. *See Gierlinger v. Gleason,* 160 F.3d 858, 872 (2d Cir.1998) ("[I]n all § 1983 cases[ ] the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."). Accordingly, this argument is rejected.

**C.** *Rule 12(b)(6)*

Defendants argue that Turczyn has failed to state a substantive due process claim as against Shanley or the City. (Dkt. No. 19, Attach. 6 at 220, 26–31.) Defendants contend that Turczyn alleges only passive conduct on the part of Shanley that does not give rise to a substantive due process violation. (*Id.* at 10–12.) More generally, defendants assert that Turczyn has failed to plead facts to show "implicit prior assurances through repeated sustained inaction," and that, even if she did, the state action alleged does not rise to the level of conscience-shocking behavior. (*Id.* at 15–20.) Alternatively, defendants argue that Shanley is entitled to qualified immunity. (*Id.* at 20–23.) With respect to the City, defendants contend that Turczyn has failed to allege facts that support a claim of municipal liability. (*Id.* at 26–31.) For reasons explained below, defendants' motion is denied with respect to Turczyn's substantive due process claim against Shanley, but granted with respect to her *Monell* claim against the City.

**\*4** Only one relevant exception to the general rule that no substantive due process claim lies for a state's failure to protect an individual from private violence, *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103

2014 WL 6685476

L.Ed.2d 249 (1989), potentially applies in this case. That exception imposes liability for failure to protect where state actors in some way affirmatively assist "in creating or increasing the danger to the victim." *Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 428 (2d Cir.2009) (internal quotation marks and citation omitted); *see Pena v. DePrisco,* 432 F.3d 98, 110 (2d Cir.2005). "[R]epeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute 'prior assurances,' rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Okin,* 577 F.3d at 428 (quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 99 (2d Cir.1993)). Moreover, when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct" "even though none of the defendants [is] alleged to have communicated the approval explicitly." *Id.* at 428–29 (quoting *Pena,* 432 F.3d at 111)). In a nutshell, "[t]he affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." *Id.* at 429.

A successful substantive due process claim also requires that the plaintiff show "that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Id.* at 431 (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). A hierarchy of intent provides guidance on the likelihood that a particular harm rises to the necessary level. Intentionally inflicted harms are most likely to meet the standard, while reckless and negligent inflictions of harm are each less likely, in graduated downward steps, to show conscience-shocking state action. *Id.* As for recklessly inflicted injuries, " '[d]eliberate indifference that shocks in one environment may not be so patently egregious in another.' " *Id.* (quoting *Lewis,* 523 U.S. at 850). Accordingly, the inquiry is highly fact specific.

Unlike *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), or *Neal v. Lee County,* Civil Action No. 1:08CV262, 2010 WL 582437 (N.D.Miss. Feb.12, 2010)—cases in which police had limited interaction with either the victim or killer prior to the victim's demise, and upon which defendants rely for dismissal of the claim against Shanley, (Dkt. No. 19, Attach. 6 at 3–5, 7–8)—the allegations here go substantially farther. Turczyn alleges several occasions [3] when Shanley knew of Anderson's threatening acts and did nothing, which arguably communicated to him prior assurances that there would be no penalty to pay for his conduct. (Am.Compl.¶¶ 12–13.) "This is so even though none of the defendants are alleged to have communicated the approval explicitly." *Pena,* 432 F.3d at 111. *Okin* has specifically recognized the liability that may arise under these circumstances. *See* 577 F.3d at 428–29 (explaining that liability under § 1983 attaches when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others" (quoting *Pena,* 432 F.3d at 111)).

 **\*5** The amended complaint also pleads facts that demonstrate, at this juncture, egregious behavior that shocks the contemporary conscience. As in *Okin,* the allegations here tend to show that Shanley, who was tasked with accomplishing certain goals related to curbing domestic violence, was deliberately indifferent as to whether or not Anderson would make good on his multiple threats against Turczyn's life over a twelve-month-period. (Am.Compl.¶¶ 10, 12.) These allegations sufficiently support that Shanley's affirmative conduct was the product of deliberate indifference that shocks the conscience, and would provide a reasonable jury with a valid basis to so find. *See Conradt v. NBC Universal, Inc.,* 536 F.Supp.2d 380, 394–95 (S.D.N.Y.2008).

Finally, Shanley is not entitled to qualified immunity at this juncture. Her argument on this issue is two-fold. First, Shanley asserts that no constitutional violation occurred, and, second, she claims that, even if a constitutional violation occurred, the right was not clearly established. (Dkt. No. 19, Attach. 6 at 20–23.) The first prong of the argument is easily swept aside by reference to the preceding paragraphs that explain that the amended complaint alleges a cognizable substantive due process violation. As for whether or not the right was clearly established, which is a prerequisite to qualified immunity, *see Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), this question has been resolved by the Second Circuit. On the issue, the court has explained that it is "clearly established," under the state-created danger theory, "that police officers are prohibited from affirmatively contributing to the vulnerability of a known victim by engaging in conduct, whether explicit or implicit, that encourages *intentional* violence against the victim, and as that is the substantive due process violation alleged here, qualified immunity does not apply." *Okin,* 577 F.3d at 434. Accordingly, Shanley is not entitled to qualified immunity at this time.

2014 WL 6685476

As for the City, defendants assert that Turczyn has failed to plead a *Monell* claim because the amended complaint merely alleges legal conclusions. (Dkt. No. 19, Attach. 6 at 26–31.) With respect to Turczyn's allegation that the City failed to properly train or supervise its employees, defendants contend that the amended complaint is too conclusory, but that, even if adequately pleaded, Turczyn's municipal liability claim must nonetheless fail because she has not alleged deliberate indifference. (*Id.* at 29–31.)

It is well settled that "the inadequacy of police training may serve as the basis for § 1983 liability ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Oh. v. Harris,* 489 U.S. 378, 380, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The deliberate indifference standard is "stringent" and requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* ——U.S. ——, ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (internal quotation marks and citation omitted). A showing of deliberate indifference requires that: (1) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of N.Y.,* 974 F.2d 293, 297–98 (2d Cir.1992) (quoting *City of Canton,* 489 U.S. at 390 n. 10).

**\*6** Here, because Turczyn has failed to adequately plead that the City's failure to train and supervise amounted to deliberate indifference, she has failed to state a claim of municipal liability. The amended complaint uses the label "deliberate indifference" in reference to Turczyn's municipal liability claim and generically references the City's failure to properly train and supervise, but it fails to allege facts that support either conclusory notion. (Am.Compl.¶¶ 45, 52.) Turczyn's pleading failure mandates dismissal of her *Monell* claim against the City. *See Gauthier v. Kirkpatrick,* Civil Action No. 2:13–cv–187, 2013 WL 6407716, at *10 (D.Vt. Dec.9, 2013) (dismissing failure to train *Monell* claim because the plaintiff failed to plead facts that supported the deliberate difference elements); *Santos v. New York City,* 847 F.Supp.2d 573, 577 (S.D.N.Y.2012); *see also Worrell v. City of N.Y .,* No. 12–CV–6151, 2014 WL 1224257, at *13 (E.D.N.Y. Mar. 24, 2014).

## V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 19) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to all claims alleged as against the City of Utica Police Dept. and the Clerk is directed to terminate the City of Utica Police Dept. from this action; and

**GRANTED** with respect to Turczyn's *Monell* claim against the City (Am.Compl.¶ ¶ 51–58), which is hereby **DISMISSED WITHOUT PREJUDICE,** and the Clerk is directed to terminate the City of Utica from this action; and

**GRANTED** with respect to all of Turczyn's pendant state law claims, (Am.Compl.¶ ¶ 59–74), which are hereby **DISMISSED;** and **DENIED** in all other respects; and it is further

**ORDERED** that the sole remaining defendant, Shanley, shall file an appropriate responsive pleading within the time allotted by the rules; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Andrew T. Baxter in order to schedule further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 29 of 147

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)
2014 WL 6685476

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6685476

---

### Footnotes

1       The facts are presented in the light most favorable to plaintiff.

2       *See Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

3       In fact, Turczyn claims that she lodged five to ten complaints—of which Shanley was aware—with the Utica Police within the twelve months preceding the murder. (Am.Compl.¶¶ 12, 13.) So many occurrences may amount to "repeated [and] sustained inaction ... in the face of potential acts of violence." *Okin,* 577 F.3d at 428.

---

**End of Document**                                                     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1146942
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Leon G. TSINBERG, Plaintiff,
v.
CITY OF NEW YORK, Defendant.

20 Civ. 749 (PAE)
|
Signed 03/25/2021

**Attorneys and Law Firms**

Leon G. Tsinberg, Bronx, NY, Pro Se.

Pamela Ann Koplik, Mark W. Muschenheim, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendant.

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

 **\*1**  Plaintiff Leon G. Tsinberg, a "non-admitted attorney" proceeding *pro se*, sues the City of New York (the "City") under 42 U.S.C. § 1983, alleging constitutional violations arising from the ticketing and towing of his 2009 Nissan Altima (the "Vehicle").

In 2018, while Tsinberg was temporarily living out of state, the Vehicle accumulated several parking tickets, mostly for displaying an expired registration. After Tsinberg failed to respond to those tickets, the City entered default judgments on them. Tsinberg later moved to reopen those judgments, but did not succeed. Then, in January 2019, the City immobilized and towed the Vehicle, which remains in storage accruing storage fees. Tsinberg alleges that these events violated, *inter alia*, his due process rights under the Fourteenth Amendment, his right to be free from excessive fines under the Eighth Amendment, his right to be free from unreasonable seizures under the Fourth Amendment, and his right against double jeopardy under the Fifth Amendment. The City has moved to dismiss all Tsinberg's claims.

Before the Court is the report and recommendation of the Honorable Sarah L. Cave, United States Magistrate Judge, recommending that the City's motion to dismiss be granted. *See* Dkt. 46 ("Report"). For the following reasons, the Court adopts that recommendation in full.

**I. Background**

**A. Factual Background** [1]

The Court adopts the Report's comprehensive account of the facts and procedural history, to which no party objects. The following summary captures the limited facts necessary for an assessment of the issues presented.

In New York City, the Parking Violations Bureau ("PVB") [2] issues and adjudicates summonses for violations of parking and traffic laws. *See* N.Y. Veh. & Traf. Law ("VTL") § 237(1)–(2), (9); N.Y.C. Admin. Code § 19-201 *et seq.* A person accused of a parking violation is first given a summons, *i.e.*, a parking ticket, containing information about the charged offense and how

to contest or pay it. *See* VTL § 238(1); N.Y.C. Admin. Code § 19-204(a). State and City law require that, if the operator of the vehicle is not present at the time of service, notice of the violation must be affixed to the vehicle "in a conspicuous place." VTL § 238(2); N.Y.C. Admin. Code § 19-204(b). In that case, such notice "shall have the same force and effect and shall be subject to the same penalties for disregard thereof as" personal service on the violator. VTL § 238(2); N.Y.C. Admin. Code § 19-204(b).

**\*2** Once a parking summons issues, the recipient may plead guilty and pay the fine, or plead not guilty and receive a hearing date before an administrative law judge ("ALJ"). N.Y.C. Admin. Code §§ 19-202, 19-204, 19-206. A person may so plead by mail, by phone, in person at one of the Department of Finance's "Business Centers," or online, either through the City's website or a "Pay or Dispute" application. *See Schaer v. City of New York*, No. 09 Civ. 7441 (CM), 2011 WL 1239836, at \*7 (S.D.N.Y. Mar. 25, 2011); Report at 3–4. If a party fails to plead or appear, the City may obtain a default judgment sustaining the charge in the summons, fixing the fine, and assessing fees and penalties. *See* N.Y.C. Rules & Regs. tit. 19 §§ 39-05, 39-07, 39-10(d). Once a default judgment is entered, a party may reopen it "only upon written application showing excusable neglect and a substantial defense to the charge." *Id.* § 39-10(i). After a party is found guilty of a parking violation, she may appeal to the PVB Appeals Board. *See* VTL § 242; N.Y.C. Rules & Regs. tit. 19 § 39-12(a), (b)(2). Finally, a party may challenge an adverse decision by the Appeals Board in New York State Supreme Court, by petitioning under Article 78 of the N.Y. C.P.L.R. ("CPLR"). *See* VTL § 243; N.Y.C. Admin. Code § 19-209.

If the owner of a vehicle owes more than $350 in judgments, the City may tow and impound her vehicle to satisfy those outstanding judgments. *See* N.Y.C. Admin. Code § 19-212; N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9). In that case, the owner may be held liable for towing and storage fees associated with the impoundment. *See* CPLR § 8013(c);[3] N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9)(iii)–(vii) (authorizing, among other things, $185 removal fee and $20-per-day storage fee).

Tsinberg spent most of 2018 temporarily living and working in Pennsylvania, where he ran a business out of the Philadelphia International Airport. FAC ¶ 1. During that time, he left the Vehicle parked in the Riverdale neighborhood of the Bronx, where it amassed 11 tickets, five of which are relevant here. *Id.* ¶¶ 1–2; Dkt. 22-3; Dkt. 26 ("Koplik Decl."), Ex. A.[4] The first of those five tickets was for displaying an expired inspection sticker; the other four were for displaying an expired registration sticker. *See* Dkt. 22-3; Koplik Decl., Exs. D–H. Each was issued on a different day between April and October 2018. After Tsinberg failed to respond to them, the City entered a default judgment on each about three months after issuance. *See* Koplik Decl., Exs. D–H; Report at 6–7. Each ticket was originally $65, or $325 total, but, after penalties associated with Tsinberg's failure to plead to or contest the tickets accrued, the total amount owed on the five tickets rose to over $600. FAC ¶ 34; Report at 6–7.

In January 2019, Tsinberg discovered the tickets and the default judgments against him. FAC ¶ 3. He then sought to vacate three of the default judgments by filing disputes through the City's "Pay or Dispute" application and submitting an image of his current, unexpired registration. *See* FAC ¶ 11; Koplik Decl., Exs. D–F. Each application was denied by an ALJ because his application did not show a legally sufficient reason for his failure to respond to the summons, and his proof of current registration did not refute that his car had displayed an expired registration when each summons was issued. *See* Koplik Decl., Exs. D–F.

On January 29, 2019, the City placed an immobilizing "boot" on the Vehicle. FAC ¶ 14. The City affixed a notice to the Vehicle, which provided a telephone number and five physical addresses at which Tsinberg could pay the outstanding judgments. Dkt. 22-4 ("Booting Notice"). The City also affixed an execution to the Vehicle, which stated that the state of New York, or one of its subdivisions, was the judgment creditor, "and/or the debt enforced is for child support, spousal support, maintenance or alimony." FAC ¶ 7; Dkt. 22-2 ("Execution"). The same day, Tsinberg filed an order to show cause ("OTSC") in New York State Supreme Court, seeking to commence an Article 78 proceeding and to obtain a temporary restraining order ("TRO") to prevent the towing of his Vehicle. FAC ¶¶ 5, 8; Dkt. 22-9. He tried to serve the City with the OTSC at two the addresses provided on the Booting Notice, but neither office would accept service. FAC ¶ 10.

**\*3** On January 30, 2019, the City towed the Vehicle. *Id.* ¶ 12. On February 15, 2019, the City placed an "indefinite sales hold" on the Vehicle—meaning that the Vehicle would not be auctioned to satisfy Tsinberg's unpaid judgments—given the pending Article 78 petition. *See id.* ¶¶ 22, 36; Koplik Decl., Ex. R. The Vehicle remains in City storage and has accrued thousands of

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 32 of 147

dollars in storage fees. Reply at 7 n.5 (as of July 28, 2020, total outstanding judgments were $10,397.72). On June 25, 2019, the New York State Supreme Court dismissed Tsinberg's Article 78 petition because he had failed to serve or file any complaint or petition in the matter and to exhaust administrative appeals. Koplik Decl., Ex. Q.

### B. Procedural History

On January 28, 2020, Tsinberg filed a Complaint. Dkt. 2. On May 7, 2020, the City moved to dismiss. Dkts. 15–17. On June 18, 2020, Tsinberg filed the FAC. On August 3, 2020, the City moved to dismiss the FAC, Dkt. 25, and filed a memorandum of law in support, City Mem., and the declaration of Pamela A. Koplik, Esq., *see* Koplik Decl. On August 4, 2020, the Court referred that motion to Judge Cave for a report and recommendation. Dkt. 29. On August 18, 2020, Tsinberg opposed the City's motion. Dkt. 31 ("Pl. Opp'n"). On September 8, 2020, the City replied. *See* Reply.

While the motion to dismiss was pending, Tsinberg sought "preliminary discovery" from the City; the City moved to stay discovery pending a ruling on its motion to dismiss. *See* Dkt. 43 at 1. On November 19, 2020, Judge Cave granted the City's motion to stay, with an exception for the exchange of five narrow categories of information, largely relating to the circumstances surrounding the seizure and storage of the Vehicle. *Id.* at 2–3.

On January 22, 2021, Judge Cave issued the Report, which recommends the dismissal of the FAC with prejudice and without leave to amend. *See* Report at 1, 35. On February 15, 2021, Tsinberg filed objections to the Report. Dkt. 51 ("Objections"). On March 15, 2021, the City responded. Dkt. 54 ("Response").

## II. Legal Standard

### A. Report and Recommendation

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When specific objections are made, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). To accept those portions of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (citing *Wilds v UPS*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003)); *see also Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006).

To the extent that the objecting party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report and recommendation strictly for clear error. *See Dickerson v. Conway*, No. 08 Civ. 8024 (PAE), 2013 WL 3199094, at *1 (S.D.N.Y. June 25, 2013); *Kozlowski v. Hulihan*, Nos. 09 Civ. 7583, 10 Civ. 0812 (RJH), 2012 WL 383667, at *3 (S.D.N.Y. Feb. 7, 2012).

### B. Motion to Dismiss Pursuant to Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

**\*4** Where, as here, the plaintiff is *pro se*, his complaint must be construed "liberally, reading it with special solicitude and interpreting it to raise the strongest claims that it suggests." *J.S. v. T'Kach*, 714 F.3d 99, 103 (2d Cir. 2013) (quoting *Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010)). This mandate "applies with particular force when a plaintiff's civil rights are at issue." *Maisonet v. Metro. Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 348 (S.D.N.Y. 2009). Consistent with that approach, factual allegations made in a *pro se* plaintiff's opposition papers, or the attachments thereto, may be considered "as supplementing the Complaint, at least to the extent they are consistent with the allegations in the Complaint." *George*, 2012 WL 2512964, at \*6 n.7.

However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Maisonet*, 640 F. Supp. 2d at 348 (citation omitted). Thus, even a *pro se* plaintiff "must state a plausible claim for relief." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). The Court need not accept allegations that are "contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005).

## III. Discussion

The Report recommends dismissal of Tsinberg's entire case for failure to state a claim. In many respects, Tsinberg's objections do not engage with any specific aspects of the thoughtful and well-reasoned Report, but reprise, through 35 "claims" spanning nearly 50 pages, general assertions about the sufficiency of the FAC's allegations and principles of constitutional law. Thus, as to much of the Report, review for clear error would be appropriate. *See Dickerson*, 2013 WL 3199094, at \*1. Nevertheless, for the avoidance of doubt, in the interest of thoroughness, and given Tsinberg's *pro se* status, the Court will review the entire Report *de novo*.

The Court addresses Tsinberg's claims in the following order: (1) Fourteenth Amendment Due Process Clause claims; (2) Fifth Amendment Double Jeopardy Clause claim; (3) Eighth Amendment Excessive Fines Clause claim; (4) Fourth Amendment claim; (5) municipal liability claim; (6) Fair Debt Collection Practices Act claim; and (6) state-law claims. Finally, the Court addresses Tsinberg's request for leave to amend the FAC.

### A. Due Process Clause

#### 1. Procedural Due Process

Tsinberg claims that the City's ticketing and towing of his car violated his rights to procedural due process because he received insufficient notice of the tickets, because the dispute mechanism provided by the "Pay or Dispute" application was inadequate, and because his Article 78 proceeding failed to provide adequate post-deprivation remedies. *See* FAC ¶¶ 48–61; Pl. Opp'n ¶¶ 1–11, 18–20.

The Court agrees with the Report that Tsinberg has failed to allege a violation of his rights to procedural due process. Before depriving a person of a liberty or property interest, the state, consistent with due process of law, must use procedures that balance the interests involved in the deprivation. "The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.' " *Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)). The interests to be balanced are: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

**\*5** "Courts in this Circuit have found that, as a general matter, the PVB/Article 78 review process for challenging parking summonses meets the requirements of procedural due process." *Nestle Waters N. Am., Inc. v. City of New York*, No. 15 Civ.

5189 (ALC), 2016 WL 3080722, at *8 (S.D.N.Y. May 25, 2016) (collecting cases), *aff'd*, 689 F. App'x 87 (2d Cir. 2017) (summary order); *see Schaer*, 2011 WL 1239836, at *9 ("The City's administrative parking violations system has been held to be constitutional.") (collecting cases); *Rackley v. City of New York*, 186 F. Supp. 2d 466, 480 (S.D.N.Y. 2002) (The City "provide[s] parking violators ... with more than sufficient process to satisfy the Constitution."). To plausibly allege a procedural due process violation, therefore, Tsinberg must allege some departure from that constitutionally "more than sufficient" process.

Tsinberg has failed to do so. First, he alleges that the City's service of parking summonses by affixing them to his car and mailing them to him was insufficient. That is because he alleges that he failed to receive *actual* notice of the tickets and, because he lived in Philadelphia at the time, the City should have either called or emailed him to give him such notice before the judgments against him were entered. *See* FAC ¶¶ 48–49; Objections at 17, 20–21. But the method of service the City employed here is prescribed by the statutes above, and courts have repeatedly held it to be constitutional. *See* VTL § 238(2); *e.g.*, *Nestle Waters*, 2016 WL 3080722, at *8. Nor was the City obliged to anticipate that Tsinberg might have been out of state for several months, and to depart from its statutorily prescribed method of service to accommodate that absence. Further, as the Report notes, Tsinberg did receive actual notice of the default judgments against him, as evidenced by his challenges thereto, and had both the chance to contest them before the City towed and impounded his Vehicle several weeks later, and to pay them while his Vehicle continued to accumulate storage costs. *See* Report at 19.

Second, Tsinberg alleges that the procedures through which he tried to vacate the default judgments against him were deficient because the "Pay or Dispute" application is flawed in unspecified ways. *See* FAC ¶¶ 48–51; Pl. Opp'n ¶ 10. To the extent that Tsinberg alleges that the City obtained judgments against him through "adjudication via app," that is wrong. As the Report notes, the default judgments were entered in the usual course, and Tsinberg merely tried to vacate them through the "Pay or Dispute" application. *See* Report at 18–19. As to the latter process, Tsinberg was never required to use that method of contesting the judgments—he remained free at all times to file his disputes by mail or in person. *See* City Reply at 3 n.1. His decision to do so, absent any allegation that other such options were unavailable, cannot support a plausible claim for any deprivation of procedural due process.

Third, Tsinberg alleges that, while Article 78 proceedings may, in some cases, provide adequate post-deprivation protections against arbitrary government action, here that was not so because the New York Supreme Court's dismissal of his Article 78 proceeding for failure to serve, failure to file a petition, and failure to exhaust administrative remedies was "merely on a Temporary Restraining Order," and not a "valid, final judgment on the merits." FAC ¶ 55. He also argues that, because the Booting Notice did not provide him with the proper address for service of an Article 78 petition on the City, he was denied procedural due process. Pl. Opp'n ¶¶ 7–9; Objections at 6–7, 9–11, 15–17. As to the first point, Tsinberg's decision to seek a TRO rather than commence an Article 78 proceeding, as well as his failure to serve or file any attending petition or exhaust administrative remedies, resulted from his own decisions, not any procedural impediments erected by the City. *See* Koplik Decl., Ex. Q. Those decisions do not affect the availability of Article 78 proceedings as a sound, post-deprivation guard against erroneous deprivations. "The fact that [a plaintiff] failed properly to pursue the state court action, and that it is now too late to do so, does not affect [the] due process analysis. Where a state law remedy gives a party a meaningful opportunity to challenge the state's action, he is not deprived of due process simply because he failed to avail himself of the opportunity." *Nestle Waters*, 2016 WL 3080722, at *10 (quoting *Rivera-Powell v. N.Y.C. Bd. of Elections*, 740 F.3d 458, 467 n.9 (2d Cir. 2006)); *see Schaer*, 2011 WL 1239836, at *9 ("[T]he Second Circuit has 'held on numerous occasions that an Article 78 proceeding is a perfectly adequate postdeprivation remedy[.]' " (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 985 F.2d 90, 93 (2d Cir. 1996))). [5] As to the second, Tsinberg does not provide any authority for the notion that the City deprived him of due process by failing to provide, on the Booting Notice, the proper address for service of a TRO, rather than the proper address at which to pay his tickets.

**\*6** The Court thus agrees with the Report that the FAC fails to plausibly allege any procedural due process violation. [6]

### 2. Substantive Due Process

Although the FAC did not do so expressly, the Report also construed it to assert a substantive due process claim, but found such claim to be deficient. The Court agrees with that assessment. To violate Tsinberg's substantive due process rights, the City's actions "must have occurred under circumstances warranting the labels 'arbitrary' and 'outrageous.' " *Schaer*, 2011 WL 1239836, at *6 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)). "Only conduct that 'shocks the conscience' qualif[ies] as even potentially violative of plaintiffs' substantive due process rights." *Id.* (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)). Upon *de novo* review, the Court agrees with, and adopts in full, the Report's conclusion that the City's ticketing and towing of Tsinberg's car—all under established and oft-approved state and local law—does not approach this threshold. *See* Report at 23–24. [7] Tsinberg's claim for violation of his substantive due process rights is also dismissed.

### B. Double Jeopardy

Tsinberg next claims that the issuance of several tickets for the same alleged failure to display an unexpired registration sticker subjected him to double jeopardy, in violation of the Fifth Amendment. *See* FAC ¶ 45. The Report recommends dismissing this claim because the Double Jeopardy Clause applies only to criminal proceedings, and Tsinberg has failed to adequately allege that the parking sanctions imposed on him were "so punitive in form and effect as to render them criminal despite [the legislature's] intent to the contrary." Report at 25–26 (quoting *Doe v. Pataki*, 120 F.3d 1263, 1274 (2d Cir. 1997)).

**\*7** Again, the Court agrees with that assessment. The Double Jeopardy Clause protects an individual's right not to be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V, cl. 2. The Supreme Court has held that the "Clause protects only against the imposition of multiple *criminal* punishments for the same offense," and does not apply to civil penalties. *Hudson v. United States*, 522 U.S. 93, 99 (1997). To decide whether a sanction is criminal or criminal, courts apply a two-part test. First, courts consider whether the legislative intent behind the law was punitive: If the intent was " 'not to punish, but to accomplish some other legitimate governmental purpose,' then it has been considered 'nonpenal.' " *Doe*, 120 F.3d at 1273. Second, even where a law was not *designed* to be punitive, courts then must determine whether it is "so punitive either in purpose or effect" that the sanction at issue is "transform[ed] into a criminal penalty." *United States v. Ward*, 448 U.S. 242, 248–49 (1980). The Supreme Court "has not spelled out the precise nature of the second-stage inquiry," *Doe*, 120 F.3d at 1275, but has identified several non-exclusive and non-dispositive factors that may guide it, *see Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963) (identifying, *inter alia*, whether the sanction imposes an affirmative disability or restraint, has historically been considered punishment, and depends on a finding of scienter). At this second stage of the inquiry, the burden is on the party challenging a law to "show by 'the clearest proof' that the sanctions imposed 'are *so punitive in form and effect* as to render them criminal despite [the legislature's] intent to the contrary.' " *Doe*, 120 F.3d at 1274 (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996)).

Here, Tsinberg addresses only the second inquiry, arguing that the collective amount of fines and fees, including storage fees, imposed on him provide "the clearest proof" that the parking sanctions at issue are in fact criminal. *See* Objections at 32–35. The Court disagrees. As the Report cogently explains, the City's parking procedures, including seeking recoupment of storage costs occasioned by the impoundment of delinquent vehicles, serve legitimate, important non-punitive interests. *See* Report at 24, 26 (collecting cases). And Tsinberg does not explain how the accumulation of fines and storage costs, resulting from his own failure to pay the original penalties, can convert otherwise civil sanctions into criminal ones. Indeed, as the Report notes, such a result would be surprising given the substantial New York state authority holding that parking and traffic sanctions are civil, not criminal. *See Dubin v. County of Nassau*, 277 F. Supp. 3d 366, 400 (E.D.N.Y. 2017) (noting that "such a claim would not be plausible given the weight of New York legal authority holding that penalties for traffic infractions are civil and not criminal" and collecting cases). The imposition of parking tickets, and resulting penalties for non-payment, thus is not a criminal punishment to which the Double Jeopardy Clause applies. The Court adopts the Report's recommendation and dismisses Tsinberg's double jeopardy claim.

## C. Excessive Fines

Next, Tsinberg alleges that the magnitude of the civil penalties that have accrued on the parking tickets at issue are impermissible under the Eighth Amendment's prohibition on excessive fines. In support, he argues that, while the $65 fines originally imposed may not be excessive, the accumulation of "fines on fines," including tow, boot, and storage fees, is unconstitutional, and tantamount to "criminal usury." *See* FAC ¶¶ 32–44, 69; Pl. Opp'n ¶¶ 21–27; Objections at 36–40. The Report recommends dismissal of this claim because, even if the Excessive Fines Clause applies here, the fines are not disproportionately excessive. *See* Report at 26–30. The Court agrees with the Report's assessment.

The Second Circuit has established a "two-step inquiry for determining whether a financial penalty is excessive under the Eighth Amendment." *United States v. Viloski*, 814 F.3d 104, 108 (2d Cir. 2016). First, a court must "determine whether the Excessive Fines Clause applies at all," *i.e.*, whether the forfeiture at issue "may be characterized, at least in part, as 'punitive.' " *Id.* at 109. Second, a court must "determine whether the challenged forfeiture is unconstitutionally excessive." *Id.* A fine is constitutionally excessive "if it is grossly disproportional to the gravity of a defendant's offense." *Id.* (quoting *United States v. Bajakajian*, 524 U.S. 321, 334 (1998)).

**\*8** Here, the parties and the Report focus only on the second question, assuming that the Excessive Fines Clause applies in the first instance. The Court therefore assumes without deciding that the Clause applies to the routine application of the City's parking and traffic laws in cases like Tsinberg's. [8] As to the second factor, the Second Circuit has set forth a four-factor test governing the inquiry:

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

*Viloski*, 814 F.3d at 109 (quoting *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015)). Courts may also consider, along with those four factors, "whether the forfeiture would deprive the defendant of his livelihood." *Id.* at 111. In undertaking this analysis, the Supreme Court has admonished that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Bajakajian*, 524 U.S. at 336; *see id.* (courts "should grant substantial deference" to the legislature (citation omitted)).

The Court agrees that Tsinberg has failed to plausibly allege that the fines at issue are "grossly disproportional" to Tsinberg's offenses. Tsinberg does not argue that the $65 parking fines were excessive. *See, e.g.*, FAC ¶ 36; Pl. Opp'n ¶ 11. [9] Instead, he contends that the fines he accrued for failing to address the five $65 tickets, and the resulting fees associated with booting, towing, and storing his Vehicle collectively became disproportionate. *See, e.g.*, Objections at 38–40. Whereas Tsinberg was ticketed $65 per original ticket, or $325 total, those penalties increased to about $640, or another $63 per ticket, after he failed to respond to or pay those tickets. *See* FAC ¶ 34; Koplik Decl., Exs. D–H; Dkt. 22-3. As to the first factor, Tsinberg's offense is the accumulation and failure to resolve several duly issued parking tickets, for which, as several ALJs held, he did not provide any legitimate excuse. *See* Koplik Decl., Exs. D–F. Beyond the five tickets directly at issue here—which Tsinberg still has not paid—he also accrued at least six others in a similar period, for a variety of offenses. *See* Dkt. 22-3. Thus, while negligent or reckless parking violations themselves may not entail a great degree of moral culpability, *see George*, 779 F.3d at 123, Tsinberg's sustained refusal to lawfully address them, well after he undisputedly received notice of them, weighs in the City's favor. As a result, Tsinberg is squarely a member of the "class of persons for whom" such enhanced penalties were principally designed. *Viloski*, 814 F.3d at 109. Without the prospect of escalating fines, violators like Tsinberg would have little reason ever to pay their tickets to the City. The third factor, as to whether the maximum fine was imposed, does not fit well into the parking-ticket context, where there appears to be little discretion over the degree of any given penalty. *Cf. Viloski*, 814 F.3d at 109 (discussing

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 37 of 147

Tsinberg v. City of New York, Not Reported in Fed. Supp. (2021)

imposition of sentence and fine within the context of the criminal Sentencing Guidelines and statutory maximum penalties). Thus, the Court gives it little weight in the analysis. Last, although when Tsinberg's experience is viewed in isolation, his non-payment of five $65 tickets may not have meaningfully harmed the City of New York, the City must process an "overwhelming volume of alleged parking violations." *C.A.U.T.I.O.N., Ltd. v. City of New York*, 898 F. Supp. 1065, 1067 (S.D.N.Y. 1995). Without the ability to enforce timely compliance by scofflaws who might otherwise be disinclined to pay up, it would likely suffer substantial financial harms. The City also has a separate, if less tangible, interest in promoting compliance with its laws, which is undermined even by small-scale disregard like that here.

 **\*9**  Considering the above factors, Tsinberg has not plausibly alleged anything close to a gross disproportion between his offense and the penalties, totaling $315, for his failure to address his many parking tickets. That conclusion accords with the assessment of various other courts to have considered the issue. *See, e.g.*, *Shibeshi v. City of New York*, No. 11 Civ. 4449 (LAP), 2011 WL 13176091, at *2 (S.D.N.Y. Sept. 21, 2011) ("[Plaintiff's] fines totaling $515.16 for four tickets, plus additional fees, are not disproportional."), *aff'd*, 475 F. App'x 807 (2d Cir. 2012) (summary order); *Wemhoff v. City of Baltimore*, 591 F. Supp. 2d 804, 808–09 (D. Md. 2008); *Popescu v. City of San Diego*, No. 06 Civ. 1577 (LAB), 2008 WL 220281, at *4 (S.D. Cal. Jan. 25, 2008) (penalty's increase from $47 to $104 upon nonpayment not excessive). [10]

The same is true of Tsinberg's claim that the City's booting, towing, and impounding of his car, and that the resulting accrual of fees, were excessive. Courts have approved the towing and auctioning of vehicles to satisfy municipal judgments, as state law specifically authorizes. *See, e.g.*, *Berger v. Phila. Parking Auth.*, 413 F. Supp. 3d 412, 420 (E.D. Pa. 2019) (denying Eighth Amendment Excessive Fines claim under *Timbs* for towing and impoundment of vehicle for failure to pay parking tickets); *see also Rackley*, 186 F. Supp. 2d at 469–85 (same under Fourth Amendment and Due Process Clause). Although the value of the car was, at the time of its towing, substantially greater than the amount Tsinberg owed, he remained free at all times to recover the Vehicle by paying the City what he owes it. And even if the City auctions his car to satisfy the judgments at issue, Tsinberg would then have a right to receive any sale proceeds above the outstanding judgments and fees at the time of sale. *See* CPLR § 5234(a). Finally, as to the booting, towing, and storage fees associated with the Vehicle—including the mandatory $20 daily storage fee that has been amassing since January 2019 as a result of Tsinberg's refusal to pay his debts to the City, *see* N.Y.C. Rules & Regs. tit. 34 § 4-08(a)(9)(vii)—Tsinberg fails to explain, except in conclusory terms, why those essentially compensatory fees are unconstitutional. *See, e.g.*, *Potter v. City of Lacey*, No. 20 Civ. 05925 (RJB), 2021 WL 915138, at *1 (W.D. Wash. Mar. 10, 2021) (impoundment fees not excessive because "they can reflect the costs associated with towing and storage"); *see* Objections at 38–40. Accordingly, the Court adopts in full the Report's recommendation that Tsinberg's Eighth Amendment claim, too, be dismissed for failure to state a claim.

### D. Fourth Amendment

Tsinberg also asserts a Fourth Amendment claim related to the towing of the Vehicle, arguing that such towing constituted an unreasonable seizure. *See* FAC ¶¶ 62–67. Specifically, he claims that the City booted and towed his Vehicle "through an automated system ... without an independent review of the underlying facts and circumstances ... by a judge." *Id.* ¶ 65. He also asserts that the inclusion of language regarding child support, spousal support, or alimony on the Execution makes the seizure even more unreasonable. *See id.*; Execution. The Report recommends dismissal of this claim, which the Court adopts.

 **\*10**  The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. By virtue of its incorporation through the Fourteenth Amendment's Due Process Clause, the Fourth Amendment is binding on states and, relevant here, municipalities such as New York City. *See City of Ontario v. Quon*, 560 U.S. 746, 750 (2010). It "applies in the civil context as well" as the criminal. *See, e.g.*, *Soldal v. Cook County*, 506 U.S. 56, 57 (1992) (collecting cases).

A seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018) (quoting *United States v. Jacobson*, 466 U.S. 109, 113 (1984)). The reasonableness of a seizure is the "ultimate standard under the Fourth Amendment." *Soldal*, 506 U.S. at 61 (citation

Tsinberg v. City of New York, Not Reported in Fed. Supp. (2021)

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 38 of 147

omitted). The permissibility of any governmental seizure is thus "judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979).

Tsinberg has failed to plausibly allege that any seizure of his Vehicle was unreasonable. It is undisputed that the City seized Tsinberg's Vehicle based on valid judgments entered against him pursuant to state and local law, and that the seizure was authorized by statute given those outstanding judgments. *See* N.Y.C. Admin. Code § 19-212 (allowing towing of vehicle for which outstanding judgments exceed $350); *see also* VTL § 237(5) (empowering PVB to "enter judgments and enforce them, without court proceedings, in the same manner as the enforcement of money judgments in civil actions in any court of competent jurisdiction or any other place provided for the entry of civil judgment within the state of New York"); FAC ¶ 34 (alleging that $640.59 in fines "caused NYC Admin. Code § 19-212 to trigger this seizure of the property"). Courts have held that the towing and impoundment of vehicles in similar circumstances is reasonable under the Fourth Amendment. *See, e.g.*, *Shibeshi*, 2011 WL 13176091, at *2 ("The City's warrantless seizure of a person's vehicle from a public street due to that person's failure to pay parking ticket fines has been held not to violate the Fourth Amendment in that it is a reasonable seizure, does not implicate core privacy concerns requiring a warrant and, of itself, demonstrates probable cause."); *Yu Juan Sheng v. City of New York*, No. 05 Civ. 1118 (RRM) (VVP), 2009 WL 6871132, at *8 (E.D.N.Y. June 26, 2009) (approving towing and impoundment resulting from default judgments on parking tickets), *report and recommendation adopted*, 2010 WL 3744428 (E.D.N.Y. Sept. 20, 2010); *Rackley*, 186 F. Supp. 2d at 478–79 (same even where City officials erroneously calculated amounts owed to City on multiple dates). Tsinberg does not offer any countervailing authority, or explain why the underlying tickets arising from the same expired registration makes the ultimate seizure, which undisputedly complied with N.Y.C. Admin. Code § 19-212, unreasonable. *See* FAC ¶ 65. [11] The Court therefore also adopts the Report's recommendation on this point and dismisses Tsinberg's Fourth Amendment claim.

### E. *Monell* Liability

**\*11**  Having dismissed each of Tsinberg's § 1983 claims, the Court holds, with the Report, that dismissal of Tsinberg's claim for municipal liability against the City is required as well. A plaintiff cannot establish municipal liability under § 1983 based on a theory of *respondeat superior.* Instead, to hold a municipality liable for its employees' unconstitutional actions, a plaintiff must establish a municipal policy or custom that directly caused the plaintiff to be subjected to a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007); *see City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (the "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). Because *Monell* liability merely extends liability for an underlying constitutional violation to a municipality, without a predicate violation, the Court need not address whether the municipality itself can be liable for such violation. *See, e.g.*, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *see also Salem v. City of New York*, 811 F. App'x 678, 683 (2d Cir. 2020) (summary order) (dismissal of *Monell* claim appropriate where plaintiff had "not plausibly pled any underlying constitutional violation that survives a motion to dismiss"). Here, with the Court's having held that Tsinberg failed to state a claim for any underlying constitutional violation under § 1983, there is no basis to extend any such liability to the City based on an alleged custom, policy, or widespread usage of the City. Tsinberg's *Monell* claim is therefore dismissed.

### F. Fair Debt Collection Practices Act

Tsinberg next asserts that the City's actions violated the Fair Debt Collection Practice Act ("FDCPA"), 15 U.S.C. § 1962 *et seq*. He alleges that the Execution's reference to child support or alimony, as a potential ground for seizure of the Vehicle, was false and harassing under that statute. *See* FAC ¶¶ 62–63; Pl. Opp'n ¶¶ 28–29; Objections at 40. As the Report correctly concluded, that claim fails for at least two reasons. First, the FDCPA does not apply to actions taken by municipal employees, and Tsinberg alleges only that the City of New York, through its employees, affixed the Execution notice to his Vehicle. *See* 15 U.S.C. § 1962a(6)(C) (excluding from definition of "debt collector" any "officer or employee of ... any state"), (8) (defining "state" to include "any political subdivision" thereof). Second, the FDCPA "does not extend to creditors seeking to collect on debts owed to themselves." *Muniz v. Bank of Am., N.A.*, No. 11 Civ. 8296 (PAE), 2012 WL 2878120, at *3 (S.D.N.Y. July

13, 2012) (collecting cases). Here, the City's Execution was issued and posted in connection with its attempts to collect debts Tsinberg owed to the City, not to any other person. The Court thus adopts the Report in full in dismissing Tsinberg's claim for a violation of the FDCPA.

### G. State-Law Claims

Finally, Tsinberg brings claims under state law for conversion, trespass to chattels, and defamation. FAC ¶¶ 68–71. The Report recommends that the Court decline to exercise supplemental jurisdiction over these claims given the Court's dismissal of Tsinberg's federal causes of action. The Court agrees. "District courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citation omitted); *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("[T]he district court may also decide whether to exercise supplemental jurisdiction over this claim; it may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court."); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."). Having dismissed all federal claims over which the Court had original jurisdiction before meaningful discovery has taken place, and far before trial, the Court dismisses Tsinberg's state-law claims, too, without prejudice to his pursuit of those claims in state court.

### H. Leave to Replead

 **\*12**  Last, the Report recommends that Tsinberg not be granted leave to file another amended complaint, and that his claims instead be dismissed with prejudice given the substantive deficiencies in his allegations and his earlier opportunity to amend his complaint after the City moved to dismiss it. Report at 34–35. Tsinberg, in his Objections (but not in his opposition), sought leave to file another amended complaint, after further discovery, to remedy any deficiencies in the FAC. *See* Objections at 48. He does not, however, identify any specific facts that, if pled, could salvage any of his claims. *See id.*

*Pro se* complaints should generally be given leave to amend when there is "any indication that a valid claim might be stated." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) (citation omitted); *see Grullon v. City of New Haven*, 720 F.3d 133, 140 (2d Cir. 2013). But a district court has discretion to deny leave if a revised claim still "could not withstand a motion to dismiss." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). If the problems with a *pro se* plaintiff's claim are "substantive," rather than the result of an "inadequately or inartfully pleaded" complaint, an opportunity to replead would be "futile" and "should be denied." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Thus, "[i]n the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also, e.g.*, *Cuoco*, 222 F.3d at 112 (courts should generally grant a *pro se* plaintiff "leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated"); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim.").

The Court agrees with the recommendation in the Report and will dismiss Tsinberg's claims without leave to amend, and with prejudice. Tsinberg already had one opportunity to amend his complaint, and did so after reviewing the City's arguments, in its first motion to dismiss, explaining why his pleading failed to state a claim. *See, e.g.*, *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 506 (2d Cir. 2014) (upholding dismissal of amended complaint with prejudice where, "following Defendant's first motion to dismiss for failure to state a claim," plaintiff had already amended its complaint once and failed to "resolve its pleading deficiencies in its First Amended Complaint"); *Green v. Niles*, No. 11 Civ. 1349 (PAE), 2012 WL 987473, at \*7 (S.D.N.Y. Mar. 23, 2012). Further, the Court agrees with the Report's assessment that the FAC's substantive deficiencies are such that a third attempt to state a viable claim would be futile. *See, e.g.*, *Binn v. Bernstein*, No. 19 Civ. 6122 (GHW) (SLC),

2020 WL 4550312, at *34 (S.D.N. Y July 13, 2020) (collecting cases denying plaintiffs a "third bite at the apple"), *aff'd*, 2020 WL 4547167 (2d Cir. Aug. 6, 2020).

## CONCLUSION

For the foregoing reasons, the Court adopts the Report in full, grants the City's motion to dismiss, and dismisses Tsinberg's claims without leave to amend. Tsinberg's federal claims are dismissed with prejudice, but his state-law claims are dismissed without prejudice to his ability to pursue them in state court.

**\*13** The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 1146942

---

## Footnotes

1    The Court mainly draws its account of the facts from the Amended Complaint and the documents attached to and discussed in it. Dkt. 22 ("FAC"); *see DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). Given Tsinberg's *pro se* status, the Court also considers the allegations raised in Tsinberg's opposition to the motion to dismiss to the extent consistent with those in the FAC. *See, e.g.*, *George v. Pathways to Hous., Inc.*, No. 10 Civ. 9505 (ER), 2012 WL 2512964, at *6 n.7 (S.D.N.Y. June 29, 2012). To resolve the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

2    What was once called the PVB is now called the "Adjudications Division." *See* Dkt. 27 ("City Mem.") at 2. The Court, however, follows the parties and the Report in generally referring to the agency using its old name, the PVB.

3    In its opening brief, the City misidentified the statute authorizing the imposition of towing and storage fees as VTL § 1224. *See* Dkt. 33 ("Reply") at 7 n.5. It clarified in its reply brief that VTL § 1224 only applies to abandoned vehicles, and that CPLR § 8013(c) is the authorizing statute for the imposition of removal and storage fees in this case. *Id.*

4    Only the first five were subject to final judgments in January 2019, when Tsinberg's car was towed, although several would later become so, leading to $750 more in outstanding judgments. *See* Dkt. 22-3; Report at 7–8.

5    The Report construed Tsinberg's allegations about the adequacy of the Article 78 proceedings as a challenge to the result of that action, and so assessed this issue under the *Rooker-Feldman* doctrine. *See* Report at 19–20. But in the Court's view, Tsinberg's challenge to the procedural adequacy of the Article 78 proceeding, liberally construed, does not necessarily require review of the merits of that action. *See Hoblock v. Albany Cnty. Bd. Of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (*Rooker-Feldman* bars federal court review of merits of state-court judgments). Thus, while the Court agrees with the Report's ultimate conclusion, it departs from the Report insofar as it based its recommendation on the

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 41 of 147

Tsinberg v. City of New York, Not Reported in Fed. Supp. (2021)

application of *Rooker-Feldman.* To the extent Tsinberg does seek review of the merits of the state-court decision at issue, the Court fully agrees with the thoughtful assessment of this issue in the Report.

6       In his Objections, Tsinberg argues, for the first time, that *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002) requires a different result. But parties may not raise new legal arguments for the first time in their objections to a report and recommendation. *See, e.g.*, *Gonzalez v. Garvin*, No. 99 Civ. 11062 (SAS), 2002 WL 655164, at *2 (S.D.N.Y. Apr. 22, 2002) (dismissing objection "because it offers a new legal argument that was not presented in his original petition, nor in the accompanying Memorandum of Law"); *see also Abu-Nassar v. Elders Futures, Inc.*, No. 88 Civ. 7906 (PKL), 1994 WL 445638, at *4 n.2 (S.D.N.Y. Aug. 17, 1994) (rejecting arguments advanced for first time in objections to report because permitting such claims would "undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments"). The Court thus rejects this objection. In any event, as the City notes, *Krimstock* appears inapposite. *See* Response at 3 & n.1.

7       In his Objections, Tsinberg expands on his claim of a substantive due process violation, suggesting that the state has no legitimate interest in enforcing registration requirements and that he was singled out for disfavored treatment when the City placed his car on an "indefinite sales hold" as a result of his Article 78 petition, leading to significant storage fees. Objections at 17–19, 25–32. Again, these new theories are not cognizable in the Court's review of a report and recommendation. *See, e.g.*, *Gonzalez*, 2002 WL 655164, at *2. Even if they were, they do not come close to showing a substantive due process violation. In fact, it appears that it was Tsinberg, not the City, who requested that the Vehicle be placed on a sales hold, which request led to the accumulating storage fees. FAC ¶ 54; *see also* Koplik Decl., Ex. R (sales hold listing "requester" as "Leon G. Tsinberg").

8       *See Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 198–99 (S.D.N.Y. 2019) ("fees and penalties" that "are multiples" of an unpaid tolls were plausibly alleged to be partially punitive); *Dubin*, 277 F. Supp. 3d at 400–02 (Excessive Fines Clause applied to "Drivers' Responsibility Fee" that imposed a mandatory $45 payment on ticketed motorists who received a final disposition other than "not guilty," and recognizing that "administrative and other civil penalties satisfy the [first factor], even if they bear no direct relationship to a criminal prosecution"); *see also Pimental v. City of Los Angeles*, 974 F.3d 917, 922 (9th Cir. 2020) (Excessive Fines Clause applies to "municipal fines," and specifically parking tickets and late penalties, under *Timbs v. Indiana*, 139 S. Ct. 682 (2019), which held that the Clause applies to the states). *But see id.* at 925–29 (Bennett, J., concurring) (disagreeing that Eighth Amendment Excessive Fines Clause "should routinely apply to parking meter violations," noting that the "potential for federal court litigation is endless" and risks "trivializ[ing] the Eighth Amendment, the Fourteenth Amendment, and the Civil Rights Acts"). Given the Supreme Court's recent holding that the Fourteenth Amendment incorporates the Excessive Fines Clause against state and municipal governments, *see Timbs*, 139 S. Ct. 682, courts in the coming years may be called on more often to assess its applicability to cases like this one, and the extent to which these protections police the bounds of municipal fines, fees, and other penalties. Without fuller presentation by the parties, the Court here has no occasion to opine on this threshold question.

9       Tsinberg, for the first time in his Objections, argues that the $65 exceeds a statutory cap of $50 for parking violations set by N.Y. Admin. Code § 19-203(b). *See* Objections at 37. As the City notes, the $65 amount results from a mandatory state surcharge required by VTL § 1809-a, which provides that "[t]he provisions of any other general or special law notwithstanding," any city with more than 100,000 persons, must levy "a mandatory surcharge in addition to any other sentence, fine or penalty otherwise permitted or required, in the amount of fifteen dollars." Response at 7. That provision states that such $15 surcharge "shall not be deemed a monetary penalty for the purposes of ... section 19-203 of the administrative code of the city of New York"—the provision that Tsinberg relies on for this point.

10      Although Tsinberg relies heavily on the Supreme Court's holding in *Timbs* in arguing to the contrary, that case merely held that the Excessive Fines Clause applies to the states. *See* 139 S. Ct. at 691 ("[R]egardless of whether application of the Excessive Fines Clause to civil *in rem* forfeitures is itself fundamental or deeply rooted, our conclusion that the Clause is incorporated remains unchanged"). It did not purport to alter the above analysis.

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 42 of 147

11      Tsinberg is also vague as to how the reference to child support or alimony on the Execution plays into the Fourth Amendment analysis. To the extent he argues that the language on the Execution falsely accuses him of owing child support or alimony, that characterization is wrong. A photograph of the Execution is attached to the FAC. It identifies outstanding child support or alimony as *among* the authorized bases for such an execution, but it does not state that each was the bases for executing on Tsinberg's car. It states: "The judgment creditor is the state of New York, or any of its agencies or municipal corporations *and/or* the debt enforced is for child support, spousal support, maintenance or alimony." Execution (emphasis added). The execution's recitation thus is consistent with the FAC's allegation that Tsinberg does not owe child support, alimony, or spousal support. FAC ¶ 7; *see* Report at 29 (noting that Execution merely recites legally available bases). Even construing the FAC liberally, it is not plausibly alleged that Tsinberg's vehicle was towed based on a misperception that he owed child support, spousal support, or alimony, as opposed to the substantial debts that Tsinberg admits he actually owed to the City for parking infractions.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 915252
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Daniel PENREE and D-M.W., a minor child, by Daniel Penree, his father, Plaintiffs,

v.

CITY OF UTICA, NEW YORK; City of Utica Police Department Chief of Police, Mark
Williams; City of Utica Police Sergeant Watson; City of Utica Police Officer Ciccone; City
of Utica Police Officer Skabinski; John Does and Jane Does, whose identities are yet to be
ascertained, and who are members of the City of Utica Police Department as Officers, Defendants.

6:13-cv-01323 (MAD/ATB)
|
Signed 03/04/2016

**Attorneys and Law Firms**

NORMAN P. DEEP, ESQ., DEEP LAW OFFICE, 6599 Martin Street, Rome, New York 13440, Attorney for Plaintiff Daniel
Penree.

A.J. BOSMAN, ESQ., THE CHILDREN'S RIGHTS INITIATIVE, INC., 6599 Martin Street, Rome, New York 13440,
Attorneys for Plaintiff D-M.W.

ZACHARY C. OREN, ESQ., MARK C. CURLEY, ESQ., MERIMA SMAJIC, ESQ., CITY OF UTICA CORPORATION
COUNSEL, 1 Kennedy Plaza, 2nd Floor, Utica, New York 13502, Attorneys for Defendants.

## MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge

## I. INTRODUCTION

**\*1** On October 23, 2013, Daniel Penree and D-M.W. ("Plaintiffs") commenced this action pursuant to 42 U.S.C. § 1983 and
New York law. *See* Dkt. No. 1. On June 23, 2014, Plaintiffs filed an amended complaint. *See* Dkt. No. 19. In the amended
complaint, Plaintiffs assert claims for excessive force, failure to intervene, and failure to train, supervise, or discipline in
violation of the United States Constitution (the "Constitution"). Additionally, Plaintiff Penree asserts claims for false arrest,
illegal search, and malicious prosecution in violation of the Constitution. *See id.* Plaintiffs also assert claims under New York law
for negligence, gross negligence, and assault and battery, and Plaintiff Penree asserts claims under New York law for malicious
prosecution and false arrest. *See id.* Presently before the Court is Defendants' summary judgment motion pursuant to Rule 56
of the Federal Rules of Civil Procedure, seeking dismissal of this action against them. *See* Dkt. No. 37.

## II. BACKGROUND

Plaintiff Penree is the property owner of the residence located at 1673 Nielson Street in the City of Utica. *See* Dkt. No. 37-6 at
13. In April 2012, he resided there with his two minor children, including infant Plaintiff D-M.W. *See id.* at 13. Plaintiff has not
ever kept any firearms in his house.[1] *See id.* at 15. Danielle Williams is the mother of Plaintiff Penree's children. *See id.* at 17.

Plaintiff Penree and Danielle Williams had a domestic incident on April 22, 2012, which involved Danielle Williams leaving Plaintiff Penree's residence with their children in the early hours of that morning. *See* Dkt. No. 41-3. Plaintiff Penree called the police when he awoke and found that his children were not present in his home. *See* Dkt. No. 37-6 at 16-17. Plaintiff Penree's concern was that Danielle Williams was intoxicated four hours earlier, and she left the residence with the children some time during those early morning hours. *See id.* The police were able to assist Plaintiff Penree in locating his children at the residence of Danielle Williams' parents. *See id.* at 18.

The responding police officers described their interaction that day in the incident reports. *See* Dkt. Nos. 41-2; 41-3. Officer Dzenan Sabanovic responded to Plaintiff Penree's call reporting that Danielle Williams had endangered his children. *See* Dkt. No. 41-2 at 2. Officer Sabanovic stated that he did not have probable cause to call child protective services ("CPS") but that he would check on the children. *See id.* When he arrived at the Williams' residence, he was confronted by Williams who told him to "get the fuck out of here." *See id.*

He left and returned less than an hour later, and he observed Plaintiff Penree exit his vehicle. *See id.* Plaintiff Penree advised Officer Sabanovic that he wanted to get his children back, and they went together to the front door. *See id.* When Danielle Williams came to the door, an argument ensued and culminated in Danielle Williams' mother, Kim Williams, getting a large hammer and raising it above her head like she was going to swing it at them. *See id.* Plaintiff Penree became irate, and Officer Sabanovic repeatedly ordered Kim Williams to drop the hammer, but she refused. *See id.* Eventually, the door was closed and Plaintiff Penree walked away and, according to the report, said "I will fucking kill all of you" before driving away. *See id.* As a result, both Kim Williams and Plaintiff Penree were charged with obstructing governmental administration. *See id.* at 3.

 **\*2**  The last police interaction that day was described by Utica police officer Adam Howe in a separate incident report, and the narrative report was reviewed and electronically signed by Defendant Lieutenant James Watson ("Defendant Watson") on April 22, 2012. *See* Dkt. No. 41-3. According to that report, Officer Howe arrived at the Williams' residence at about the same time that Plaintiff Penree arrived. *See id.* Plaintiff Penree asked for police assistance in delivering several items of clothing, a cell phone, and some infant formula to Danielle Williams and his children at her parents' residence. *See id.* Officer Howe delivered the items to Danielle Williams. *See id.* That was the fifth time the Utica Police Department was called on April 22, 2012 regarding "the ongoing dispute between Penree and Williams." *See id.*

The following day, April 23, 2012, Danielle Williams returned to Plaintiff Penree's residence to bring the children to him. *See* Dkt. No. 41-4. According to Plaintiff Penree, he asked Danielle Williams to leave his residence, and she reacted with violence towards him. *See* Dkt. No. 37-6 at 28. When Danielle Williams continued to be physically aggressive, he physically removed her from his home and took the key to his house from her. *See* Dkt. No. 37-6 at 29-30. He then called 9-1-1 and reported that the mother of his children had attacked him in front of his children. *See* Dkt. No. 45-1 at 39. The police records indicate that they were advised that there were no weapons or alcohol in the house. *See* Dkt. No. 37-3 at 17.

Plaintiff Penree advised the responding police officers that Danielle Williams came after him again in front of his kids. *See id.* at 41. The police officers who initially arrived at Plaintiff Penree's residence are Defendants Joshua Skibinski[2] ("Defendant Skibinski") and Titus Ciccone ("Defendant Ciccone"). *See* Dkt. No. 45-1 at 8. Plaintiff Penree advised them that he had visitation with his kids at that time and had documentation to prove it. *See id.* at 8, 41. He told the officers that the kids were safe, and he asked them to have Danielle Williams removed from his property. *See id.* at 41.

When Defendants Skibinski and Ciccone arrived at the residence, they observed Danielle Williams standing in front of the house on the sidewalk. *See* Dkt. Nos. 41-4; 45-1 at 9. Danielle Williams was known to Defendant Skibinski from previous police interactions. *See* Dkt. No. 45-1 at 9. She complained that she had gotten into a physical altercation with Plaintiff Penree that ended with him on top of her. *See id.* at 10. This altercation was witnessed by Plaintiff D-M.W. *See id.* Danielle Williams described that Plaintiff Penree pushed her out the front door which led to her falling down the stairs. *See* Dkt. No. 41-4.

2016 WL 915252

Defendants Skibinski and Ciccone approached Plaintiff Penree while he was standing on his front porch and asked if they could enter his home. *See* Dkt. No. 41-4 at 3. Plaintiff Penree denied their request to enter the home but spoke with the officers from his porch. *See id.* Defendant Skibiniski asked to see the children to ensure that they were "ok." *See id.* Plaintiff Penree again would not allow the officers to enter his home, but he brought the children out onto the porch so that they could be observed. *See id.* Defendant Skibiniski records in his report that the children "appeared ok." *See id.* Defendant Skibinski observed that the children were not crying, and Plaintiff Penree claims that Defendant Skibinski said "they look good to me." *See id.* at 42-43. Plaintiff Penree then went back into his house with the children, and the officers returned to their car. *See* Dkt. Nos. 37-6 at 36; 45-1 at 42-43.

**\*3** Defendant Skibinski testified that he did not act when the children were outside on the porch of the house because he did not have any reasonable basis to do so. *See* Dkt. No. 45-1 at 23. Further, Defendant Skibinski stated that if the children had not been in the house, the police would not have entered Plaintiff Penree's residence without a warrant. *See id.* at 19. Defendant Skibiniski articulated that his decision to enter the home to make an arrest on April 23, 2012 was because the police "were concerned for the welfare of the children." *See* Dkt. No. 45-1 at 18. Specifically, Defendant Skibinski explained that the police did not know "what the conditions were in the home, there's no way to — who knows if stuff got broken while [Plaintiff Penree and Danielle Williams] were fighting. There could be glass on the floor or he may not have food there for them. They might not have clothes and stuff." *See id.* at 18. The police officers did not attempt to get a warrant to arrest Plaintiff and they did not attempt to call child protective services at any time on April 23, 2012., *See id.* at 34.

According to Plaintiff Penree, the officers left the area of his front door for approximately thirty to forty-five minutes, and, in that time, he was able to put his youngest child down for a nap. *See* Dkt. Nos. 45-1 at 47; 37-6 at 36. During that time, Defendant Skibinski prepared a written complaint for harassment in the second degree, which was reviewed and signed by Danielle Williams. *See* Dkt. No. 41-4 at 3. It was also during this time that Defendant James Watson, a sergeant with the City of Utica Police Department, arrived on the scene. *See* Dkt. Nos. 37-3 at 9; 37-7 at 6-8. Defendant Watson spoke with Defendants Ciccone and Skibinski as well as Danielle Williams about the situation. *See* Dkt. Nos. 37-3 at 9; 37-7 at 9-10. Defendant Skibinski informed Defendant Watson that he had seen the children and that they looked "ok." *See* Dkt. No. 37-7 at 12. The on-scene officers also told Defendant Watson that they were concerned for the children because they felt "[Plaintiff Penree's] mental state maybe wasn't such that he would be able to take care of children at that point." *See id.* at 12. Defendant Watson testified that he had the right to enter into Plaintiff Penree's home because he believed that Plaintiff Penree was under arrest for harassment in the second degree against Danielle Williams. *See id.* at 23.

Danielle Williams did not ever represent to the police officers that the house was her residence. *See* Dkt. No. 45-1 at 25. According to the police report, Danielle Williams did advise that she had an additional key to Plaintiff Penree's home, and her father, Terry Williams, arrived on the scene with that key to the house. *See* Dkt. No.41-4 at 3. Plaintiff Penree heard people coming up the outside stairs to his enclosed mud room and observed Defendant Watson and Terry Williams standing in front of his door with the house key. *See* Dkt. No. 37-6 at 40. Plaintiff Penree yelled out that they were not permitted to enter his house, and he dead bolted the lock to the interior door of the mud room. *See id.* at 40-41.

Plaintiff Penree observed that Defendant Watson and Terry Williams were attempting to open the lock of the interior mud room door that led to the interior of his home. *See id.* at 41. Defendant Watson stated that, while standing inside Plaintiff Penree's mud room, he used the key to attempt to unlock the interior door of that room but he was unsuccessful because Plaintiff Penree "made it back to the door." *See* Dkt. No. 37-3 at 10. Defendant Watson continued to asked Plaintiff Penree to open his door so that they could talk with him, and Plaintiff Penree continued to decline to open the door. *See id.* at 42. The police officers continued in this manner for an additional period of time. *See id.* According to the police reports, it was one hour from the time that Defendants Skibinski and Ciccone first responded to Plaintiff Penree's 9-1-1 call until the time that Defendants Skibinski, Ciccone, and Watson arrested him. *See* Dkt. Nos. 37-3 at 4; 41-4; 41-8. Plaintiff Penree was advised that he was not under arrest, and he asked that everyone leave his property. *See* Dkt. No. 37-6 at 43. He felt threatened at this time. *See id.*

2016 WL 915252

**\*4** Defendants Skibinski, Ciccone, and Watson again entered the enclosed mud room with Danielle Williams and further requested that Plaintiff Penree provide some of her belongings from inside the house. *See* Dkt. No. 41-4 at 3. After Plaintiff Penree refused, the officers had Danielle Williams leave the enclosed mud room while they continued to speak with Plaintiff Penree through the windowed door. *See id.* Eventually, they convinced him to provide some belongings that he would pass through the door. *See id.* Defendants Skibinski, Ciccone, and Watson had contrived this plan to induce Plaintiff Penree into opening the door so that Danielle Williams could make a citizen's arrest. *See* Dkt. No. 45-1 at 16, 26.

While Plaintiff Penree was collecting some of Danielle Williams belongings, Defendants Skibinski, Ciccone, and Watson had her enter the enclosed mud room again so that when the door opened, she could place Plaintiff Penree under a citizen's arrest. *See* Dkt. No. 41-4 at 3. While Defendants were standing inside the mud room, Defendant Skibinski asked Danielle Williams if there were any fire arms in the house, and she responded that "he used to but she didn't know if he still did." *See id.* Before the door was opened, Plaintiff Penree confirmed that he was not under arrest and advised the officers that he was holding Plaintiff D-M.W. *See* Dkt. No. 37-6 at 44. When Plaintiff Penree cracked open his front door, Defendants Skibinski, Watson, and Ciccone forced the door open and further entered Plaintiff Penree's residence. *See* Dkt. Nos. 37-6 at 45; 45-1 at 46. At that point in time, none of the officers said that he was under arrest. *See* Dkt. No. 45-1 at 27-28.

As Defendants were "slamming" the door open, Plaintiff Penree turned and went upstairs to his bedroom with Plaintiff D-M.W. *See* Dkt. No. 37-6 at 45. Defendants proceeded up the stairs after them, and Plaintiff Penree shut his bedroom door and attempted to barricade himself in with his body. *See id.* at 47. Defendants were pushing on the bedroom door and, when Plaintiff Penree heard the door start to break, he feared for his child's safety and moved away from the door. *See id.* Defendants Watson, Skibinski, and Ciccone then entered into the bedroom and deployed taser darts into Plaintiff Penree's back while he was holding Plaintiff D-M.W. *See* Dkt. Nos. 37-6 at 48-49; 41-4 at 3. Both Plaintiffs fell to the ground and Plaintiff D-M.W. sustained a head injury. *See id.* at 49-75.

Plaintiff Penree claims that he was not ever told that he was under arrest prior to being handcuffed. *See* Dkt. No. 37-6 at 48. Defendants do not dispute that they were aware Plaintiff Penree was holding the toddler when they entered the bedroom. *See* Dkt. No. 41-4 at 3. According to the police report, Defendants Watson, Skibinski, and Ciccone discussed the use of force just prior to forcibly pushing further into Plaintiff Penree's residence, and they had decided that, if necessary, the taser was preferable to pepper spray. *See* Dkt. No. 37-3 at 9. Plaintiff DM.W.'s head injury is depicted in photographs. *See* Dkt. No. 37-12 at 2-4. Defendant Watson picked up Plaintiff D-M.W. from the floor, and Plaintiff Penree was then handcuffed by Defendants Ciccone and Watson. *See* Dkt. Nos. 37-3 at 10; 37-6 at 51.

Plaintiff Penree was transported to the police station and complained that the handcuffs were too tight. *See* Dkt. No. 37-6 at 52. Plaintiff Penree was examined by an emergency medical person from the fire department, and Defendant Skibinski prepared and filed the criminal complaint. *See* Dkt. Nos. 37-3 at 15; 41-4 at 3; 41-8. Plaintiff was charged with (1) harassment in the second degree in violation of New York Penal Law § 240.26(1) based upon the complaint filed by Danielle Williams; (2) harassment in the second degree in violation of New York Penal Law § 240.26(1) based upon the complaint filed by Defendant Skibinski; (3) endangering the welfare of a child in violation of New York Penal Law § 260.10(1) based upon Plaintiff Penree's attempt to push the door closed on Defendants and his run up the stairs while holding Plaintiff DM.W.; and (4) resisting arrest in violation of New York Penal Law § 205.30. *See* Dkt. Nos. 37-3; 41-7; 41-8. As a result, an order of protection was issued against Plaintiff Penree ordering him to stay away. *See* Dkt. No. 37-3 at 15. Plaintiff Penree was released on bail that same evening. *See* Dkt. No. 37-3 at 12. On June 15, 2012, Danielle Williams had a dispute with the police department and advised them that she was no longer willing to come to court. *See* Dkt. No. 37-3 at 15.

**\*5** On November 29, 2012, a *Payton* hearing was conducted, *see* Dkt. No. 45-1 at 1-63, and, on November 22, 2013, a city court judge dismissed all the criminal charges against Plaintiff Penree finding that no exigent circumstances existed that would have allowed the warrantless arrest of Plaintiff Penree in his home, *see* Dkt. No. 41-10. The city court judge also found that in thirty to forty-five minutes, the police would have been able to obtain an arrest warrant. *See id.*

2016 WL 915252

On October 23, 2013, Plaintiffs commenced this action alleging violations of their constitutional rights as well as state tort claims. *See* Dkt. No. 1. An amended complaint was filed on June 23, 2014. *See* Dkt. No. 19. Defendants appeared in this action and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, have moved for summary judgment dismissing the amended complaint. *See* Dkt. Nos. 12; 21; 37. For the reasons set forth, Defendants motion is granted in part and denied in part.

### III. DISCUSSION

#### A. Legal Standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the undisputed facts warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must identify those portions of the record which demonstrate that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323. When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Chambers*, 43 F.3d at 36-37 (quotation marks and other citation omitted).

Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex*, 477 U.S. at 324 (citing FED. R. CIV. P. 56(c), (e)). In assessing whether any such issues of material fact exist within the record, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).

#### B. State Tort Claims

Plaintiff Penree alleges a state law claim for false arrest based on his claim that Defendants Watson, Ciccone, and Skibinski arrested him without a warrant and without probable cause, detained him, and transported him against his will. *See* Dkt. No. 19 at ¶¶ 65-66. Plaintiff Penree's eighth cause of action is for malicious prosecution under state law. *See id.* at ¶¶ 75-79. Plaintiffs allege assault claims against Defendants Watson, Ciccone, and Skibinski claiming that Defendants placed them in immediate apprehension of imminent harmful or offensive contact without privilege. *See id.* at ¶¶ 56-58. Plaintiffs also allege that Defendants unlawfully, intentionally, and recklessly touched and battered the Plaintiffs. *See id.* Plaintiffs maintain that Defendant City of Utica and Defendant Police Chief Williams were negligent and, in turn, their negligence caused the offending conduct of Defendants Watson, Ciccone, and Skibinski. *See id.* at ¶¶ 61-63.

Federal courts apply state statutes of limitations to state law claims, *see Vincent v. Money Store*, 915 F. Supp. 2d 553, 560-61 (S.D.N.Y. 2013) (stating that it makes no difference if the state law claims are presented in federal court based on diversity jurisdiction or supplemental jurisdiction), and apply state notice of claim statutes to state law claims as well. *See Reyes v. City of New York*, 992 F. Supp. 2d 290, 300 (S.D.N.Y. 2014) (quoting *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999)). The Second Circuit has stated that New York's General Municipal Law controls when a plaintiff sues a city for tortious conduct, and it also controls those claims against any employee of a city "if the municipality is required to indemnify the defendant pursuant to the General Municipal Law or any other statutory provision and is therefore 'the real party in interest.'" *Conte v. Cty. of Nassau*, 596 Fed. Appx. 1, 5 (2d Cir. 2014) (quoting *Ruggiero v. Phillips*, 292 A.D.2d 41 (4th Dep't 2002)). General Municipal Law § 50-j provides that a city is "liable for ... any duly appointed police officer of such municipality, authority or agency for any negligent act or tort, provided such police officer, at the time of the negligent act or tort complained of, was acting in the performance of his duties and within the scope of his employment." *See also LaGrange v. Ryan*, 142 F. Supp. 2d 287, 295 (N.D.N.Y. 2001) (stating that notice of claim requirements are not limited to just negligence claims but must also be served for "intentional tort actions against police officers."). Defendants have admitted that the individually named officers were employees of the City of Utica. *See* Dkt. Nos. 19 at ¶ 5; 21 at ¶ at 1.

2016 WL 915252

**\*6** The statute of limitations for any state claims for tortious conduct, including false arrest/false imprisonment, malicious prosecution, negligence, gross negligence, assault, and battery against Defendants is one year and ninety days pursuant to New York General Municipal Law § 50-i. In this case, the alleged conduct of negligence, gross negligence, assault, and battery took place on April 23, 2012, and, therefore, the statute of limitations on Plaintiff Penree's state law personal injury claims expired on July 22, 2013, which is three months before Plaintiffs commenced this action. *See* Dkt. Nos. 1, 19. The Court dismisses Plaintiff Penree's fourth and fifth causes of action for negligence, gross negligence, assault, and battery as barred by the statute of limitations.

Plaintiff Penree was arrested and brought to the Utica Police Department where the charges were filed against him. *See* Dkt. Nos. 37-6 at 54; 41-7. Some time later, Plaintiff Penree was able to post bail and was released from police custody on April 23, 2012. *See* Dkt. No. 41-7 at 54, 57. The time limitations of General Municipal Law § 50-i also controls the state tort of false imprisonment/false arrest, which is an intentional tort under state law. *See Peresluha v. City of New York*, 60 A.D.2d 226, 229 (1st Dep't 1977); *see also Rosado v. City of New York*, 713 F. Supp. 124, 126 (S.D.N.Y. 1989) (listing the claim of false imprisonment as an intentional tort). Having been arrested and released from custody on April 23, 2012, Plaintiff Penree had until July 22, 2013 to commence an action under state law for false arrest/false imprisonment, and he did not file his complaint until October 23, 2013. The Court dismisses Plaintiff Penree's state claim for false arrest/false imprisonment because it is also barred by the statute of limitations.

However, Plaintiff D-M.W.'s claims for negligence, gross negligence, assault, and battery are not barred by the one year and ninety day statute of limitations because D-M.W.'s status as an infant tolls the time limitation. *See Cohen v. Pearl River Union Free Sch. Dist.*, 51 N.Y.2d 256, 262-63 (1980). In addition, Plaintiff D-M.W.'s time to serve a late notice of claim is likewise tolled for infancy. *See id.* at 263. Therefore, the Court will address the substance of Plaintiff DM.W.'s negligence, assault, and battery claims. When negligence is claimed against a municipality, it is necessary to determine "whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose." *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 425 (2013). A proprietary function is being carried out when the municipality's "'activities essentially substitute for or supplement traditionally private enterprises.'" *Id.* (quoting *Sebastian v. State*, 93 N.Y.2d 790, 793 (1999)). If the municipal function is proprietary, then the municipality is subject to the ordinary rules of negligence that are applicable to non-governmental parties. *See id.*

If the governmental entity was acting in a governmental capacity, meaning that "its acts are 'undertaken for the protection and safety of the public pursuant to the general police powers,'" then the plaintiff must show that he or she was owed a "special duty." *Id.* (quoting *Sebastian*, 93 N.Y.2d at 793); *see also Velez v. City of New York*, 730 F.3d 128, 135 (2d Cir. 2013). Actions taken "for the protection and safety of the public pursuant to the general police powers" are governmental functions. *Velez*, 730 F.3d at 134-35. The New York Court of Appeals stated that "[p]olice and fire protection are examples of long-recognized, quintessential governmental functions." *Applewhite*, 21 N.Y.3d at 425 (citing *Valdez v. City of New York*, 18 N.Y.3d 69, 75 (2011)).

**\*7** Here, the alleged negligence of Defendant City of Utica and Defendant Williams was taken pursuant to their general police powers, and, therefore, Plaintiff D-M.W. must prove that a special relationship existed between the minor and Defendants City of Utica and Williams. *See Velez*, 730 F.3d at 135 ("The core principle is that to sustain liability against a municipality, the duty breached must be more than that owed the public generally") (internal quotation marks and citations omitted). A "special relationship" requires four elements to be present, which are:

> (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 49 of 147

Penree v. City of Utica, New York, Not Reported in Fed. Supp. (2016)
2016 WL 915252

*Velez*, 730 F.3d at 135. Plaintiff D-M.W. has failed to establish that any of these elements were present, and, without meeting that burden, Plaintiff D-M.W.'s claims for negligence fail. The Court dismisses Plaintiff D-M.W.'s claims for negligence.

Plaintiff D-M.W. also maintains state claims for assault and battery. *See* Dkt. No. 19 at ¶¶ 56-59. Under New York law, assault is "the intentional placing of another in apprehension of imminent harmful or offensive contact," and battery is "(1) bodily contact, which is (2) harmful or offensive in nature, and (3) made with intent." *Merzon v. Cty. of Suffolk*, 767 F. Supp. 432, 448 (E.D.N.Y. 1991). In this case, Plaintiff D-M.W. was being held in his father's arms at the time of the alleged assault and battery. *See* Dkt. No. 37-3 at 10-11, 14. The fact that Defendants Watson, Ciccone, and Skibinski did not act with the specific intent to put Plaintiff D-M.W. in apprehension of either a harmful or offensive bodily contact, or did not act with the specific intent to cause harmful or offensive bodily contact to him, is not fatal to Plaintiff D-M.W.'s claims. Plaintiff D-M.W.'s allegations that these Defendants acted with the requisite intent toward Plaintiff Penree is sufficient to withstand dismissal of his or her claims for assault and battery. *See Parler v. North Ins. Co.*, 129 A.D.3d 926, 928 (2d Dep't 2015) (stating that "the fact that the bar stool made physical contact with [the plaintiff] and not the intended target does not negate the conclusion that the act was done with the intention to commit an assault or a battery."); *Jones v. State*, 96 A.D.2d 105, 110-11 (4th Dep't 1983) (stating that the defendants do not escape liability because the intent was to injure someone else but the plaintiff was unintentionally struck). The Court denies Defendants' motion for summary judgment on Plaintiff D-M.W.'s assault and battery claims.

### C. Fourth Amendment Claims

Plaintiff Penree claims that Defendants Watson, Ciccone, and Skibinski restrained him against his will without probable cause and without a warrant, and Defendants "arrested, detained and transported" him against his will. *See* Dkt. No. 19 at ¶¶ 65-66. According to Plaintiff Penree, the entrance into his home by Defendants Watson, Ciccone, and Skibinski was an unreasonable search and seizure in violation of his constitutional rights. *See id.* at ¶¶ 67-68. Plaintiffs also contend the use of force by Defendants prior to and during Plaintiff Penree's arrest was excessive and objectively unreasonable in violation of Plaintiff Penree's Fourth Amendment rights. *See id.* at ¶¶ 31-36. Finally, Plaintiff Penree's seventh cause of action alleges that Defendants maliciously prosecuted him in violation of the Fourth Amendment. [3] *See id.* at ¶¶ 69-73.

**\*8** The Fourth Amendment of the United States Constitution (the "Fourth Amendment") provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Supreme Court in *Payton v. New York*, 445 U.S. 573, 585 (1980), stated that "[u]reasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the Amendment." The warrantless arrest of a person is a seizure, which the Fourth Amendment requires to be reasonable. *See id.* at 585. Further, the "'physical entry of the home is the chief evil against which the working of the Fourth Amendment is directed.'" *Id.* (quoting *United States v. United States Dis. Court*, 407 U.S. 297, 313 (1972)). A warrantless arrest within the home implicates not only the "invasion attendant to all arrests but also an invasion of the sanctity of the home." *United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978).

The Fourth Amendment's prohibitions against unreasonable seizures applies equally to how an arrest is carried out, and, therefore, "*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Also, the Fourth Amendment provides the basis for a Section 1983 claim that alleges malicious prosecution. *See Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 115 (2d Cir. 1995) (citing *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (concluding that

2016 WL 915252

claims for malicious prosecution are analyzed under the Fourth Amendment and not substantive due process of the Fourteenth Amendment)).

### 1. False Arrest

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, ... is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted). A Section 1983 claim for false arrest/false imprisonment (collectively "false arrest") is analyzed under the law of the state where the arrest occurred. *See Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). "Under New York law, false arrest is considered to be a species of false imprisonment, and the two claims have identical elements." *Mejia v. City of New York*, 119 F. Supp. 2d 232, 252 (E.D.N.Y. 2000) (citing *Singer*, 63 F.3d at 118).

The elements for a Section 1983 claim for false arrest are as follows: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer*, 63 F.3d at 118 (citing *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)); *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).

**\*9** A warrantless arrest, as was the case here, is "presumptively unlawful." *See Raysor v. Port Auth.*, 768 F.2d 34, 40 (2d Cir. 1985) (stating that "the plaintiff need not prove either malice or want of probable cause"); *see also Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007). However, "[t]here can be no federal civil rights claim for false arrest where the arresting officer had probable cause." *Singer*, 63 F.3d at 118 (citing *Bernard*, 25 F.3d at 102). Accordingly, the presumption that a warrantless arrest is unlawful can be rebutted by the defendant if it is established that there was probable cause for the arrest. *See Jenkins*, 478 F.3d at 88. The existence of probable cause is a complete defense, for which the defendant bears the burden of proof. *See Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010); *Weyant*, 101 F.3d at 852 (citing *Bernard*, 25 F.3d at 102).

There is "probable cause to arrest ... when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852 (citations omitted). The standard is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Maryland v. Pringle*, 540 U.S. 366, 370 (2003)) (stating that probable cause protects "'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime'" (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

"[T]he probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Jaegly*, 439 F.3d at 153 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). The significance of those facts can be "enhanced" or "diminished" by the surrounding circumstances of the arrest, *see Jenkins*, 478 F.3d at 90, because the standard is fluid and contextual, *see Delossantos*, 536 F.3d at 159. The circumstances "must be considered from the perspective of a reasonable police officer in light of his training and experience." *Id.*

In determining whether there was probable cause for the arrest, the Court's analysis is not limited to the offense invoked by the arresting officer or the crimes that are ultimately charged, but, instead, probable cause "'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" *Jaegly*, 439 F.3d at 153-54 (quoting *Devenpeck*, 543 U.S. at 152-53). Accordingly, the Court must focus on the "validity of the *arrest*, and not on the validity of each charge." *Id.* at 154. Whether there was probable cause is a question that can be determined as a matter of law on summary judgment "if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852; *see also Jenkins*, 478 F.3d at 88. Summary judgment should be granted in favor of the defendants where the facts, construed in favor of the plaintiff, establish that the officer's probable cause determination was objectively reasonable. *See Jenkins*, 478 F.3d at 88.

2016 WL 915252

In the present case, Defendants Watson, Skibinski, and Ciccone entered into Plaintiff Penree's home with the stated intention to attempt to take Plaintiff Penree into custody based upon Danielle Williams' complaint for harassment in the second degree. *See* Dkt. Nos. 37-7 at 30; 45-1 at 18. Defendants Watson, Ciccone, and Skibinski were attempting to coerce Plaintiff Penree out of his home under the false pretenses of asking for some of Danielle Williams' belongings. *See* Dkt. No. 45-1 at 26. Their plan was to have Danielle Williams tell Plaintiff Penree that he was under citizen's arrest when he opened the interior door of his mud room. *See* Dkt. Nos. 37-3 at 14; 37-7 at 23, 30; 45-1 at 16. When Plaintiff Penree cracked open the door, Defendants claim that Danielle Williams said he was under arrest. *See* Dkt. No. 37-3 at 11. None of the officers said that he was under arrest. *See* Dkt. No. 54-1 at 27-28.

**\*10**  The only argument made by Defendants in their motion for summary judgment is that Defendants had probable cause to arrest Plaintiff Penree for harassment in the second degree based on Danielle Williams' written complaint together with the red marks on her legs, the absence of marks on Plaintiff Penree's arms, and an alleged threat that Plaintiff Penree made the day before "arguably" toward Danielle Williams. *See* Dkt. No. 37-23 at 18-20. [4] "An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest *absent* circumstances that raise doubts as to the victim's veracity." *Singer*, 63 F.3d at 119 (emphasis added); *see also Breitbard v. Mitchell*, 390 F. Supp. 2d 237, 245 (E.D.N.Y. 2005). Probable cause should be found to exist even if the information is incorrect, so long as the reliance was reasonable. *See Bernard*, 25 F.3d at 103.

Here, Danielle Williams claimed to be the victim of a statutory violation, so the Court's inquiry is "whether there were 'circumstances that raise[d] doubts'" as to her veracity. *Rae v. Cty. of Suffolk*, 693 F. Supp. 2d 217, 224 (E.D.N.Y. 2010) (quoting *Singer*, 63 F.3d at 119). To begin with, Defendants admit that they were familiar with Plaintiff Penree and Danielle Williams due to repeated domestic incidents requiring police intervention. *See* Dkt. Nos. 37-3 at 9; 45-1 at 11. The previous domestic incidents listed on the Utica Police Department's records, submitted by Defendants, indicate that Plaintiff Penree had multiple domestic incidents prior to April 23, 2012 where the "caller" reported harassment and other domestic disputes against Plaintiff Penree that were determined to be unfounded by the responding police officers. *See* Dkt. No. 37-5 at 5-7. Those same records indicate that Plaintiff Penree was the *victim* of harassment and other domestic disputes. *See id.* The police record is so replete with these incidents that an overall familiarity with the domestic disputes between Danielle Williams and Plaintiff Penree would indicate to a reasonable officer that Danielle Williams was an unreliable witness.

Also, Danielle Williams' version of the domestic dispute with Plaintiff Penree, as described in the complaint, was vague as to her own violent behavior. *See* Dkt. No. 41-4 at 3. She told Defendant Skibinski that she was arguing with Plaintiff Penree and "they had a physical altercation which lead [sic] to her being on the floor with Dan on top of her." *See* Dkt. No. 45-1 at 10. Her version of events was disputed by Plaintiff Penree's statement to Defendants Skibinski and Ciccone. *See* Dkt. No. 41-4 at 3. Plaintiff Penree called the police and reported that he had been attacked in his home by the mother of his children. *See id.* at 40. When Defendants Skibinski and Ciccone responded, Plaintiff Penree told them Danielle Williams attacked him in front of the children and that he restrained her so that she could not strike him again. *See id.* at 41. He also advised Defendants that he wanted Danielle Williams removed from his property and that he had a custody order to show that he had visitation with his kids at that time. *See id.* While Defendant Watson testified that Plaintiff Penree did not use any foul language at him during their conversations, Danielle Williams is described in the police report as hysterical. *See* Dkt. Nos. 37-3 at 13; 45-1 at 12.

Defendants were aware of Plaintiff Penree and Danielle Williams' domestic disputes on April 22, 2012 where Plaintiff Penree allegedly made a threat to "kill all of you." *See* Dkt. No. 37-3 at 14. The threat was made at the residence of Danielle Williams' parents after her mother retrieved a "large hammer" and threatened to strike Plaintiff Penree and the police officer. *See* Dkt. No. 41-2 at 2. Although the police report documents that Plaintiff Penree was charged with obstructing governmental administration, Plaintiff Penree was not charged with any violations or crimes related to the "threat." *See* Dkt. No. 41-2 at 2. On the evening of April 22, 2012, Defendant Watson reviewed the report related to the fifth and final domestic call from that day related to Plaintiff Penree and Danielle Williams where Plaintiff Penree asked for police assistance to deliver clothing, a cell phone, and infant formula to Danielle Williams. *See* Dkt. No. 41-3.

Penree v. City of Utica, New York, Not Reported in Fed. Supp. (2016)

2016 WL 915252

**\*11** Defendants reliance on this proposed "threat" made the day before as a basis for probable cause to arrest Plaintiff Penree on an unrelated event is insufficient. Plaintiff Penree was not charged with any violations related to his statement. The Court notes that 'the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 415 (2d Cir. 1999) (internal quotations marks and citations omitted) (finding that there is no probable cause based on the plaintiff's statement to a police office that "One day you're going to get yours"). "As a result, provocative speech directed at police officers is protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.* (internal quotation marks and citations omitted) (quoting *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949) (stating that the meaning of a statement must be interpreted within the "context, tone, accompanying action, and a variety of other circumstances")). Here, where the police officer did not charge Plaintiff Penree with any violations for his statement, it is reasonable to believe that the officer did not find the statement to be a direct or immediate threat to him or anyone else. Accordingly, probable cause has not been established as a matter of law based upon Defendants' reliance on a statement made the day before as Plaintiff Penree was walking away from a contentious situation after being threatened with a hammer.

Plaintiff Penree argues his arrest was a violation of his Fourth Amendment rights because Defendants were not authorized under New York law to execute an arrest for a criminal violation that they did not witness. *See id.* at 7-11. Plaintiff Penree is correct that harassment in the second degree is a violation and that police officers are not authorized to make a warrantless arrest for a violation unless the offense takes place in his or her presence. *See* N.Y. CRIM. PROC. LAW § 140.10(1); N.Y. PENAL LAW §§ 10.00(3), 240.26. Under New York law, harassment in the second degree must take place in the officer's presence to provide probable cause to arrest. *See Ramos v. City of New York*, 298 Fed. Appx. 84, 86 (2d Cir. 2008).

However, "a violation of state law does not, *ipso facto*, offend federal law; the Constitution, in other words, is not concerned with the restrictions that New York chooses to place on its police officers." *Mikulec v. Town of Cheektowaga*, 909 F. Supp. 2d 214, 225 (W.D.N.Y. 2012) (citing *Virginia v. Moore*, 553 U.S. 164, 176 (2008)); *see also Hotaling v. LaPlante*, 167 F. Supp. 2d 517, 522 (N.D.N.Y. 2001) (stating that the Fourth Amendment does not require that a police officer "personally witness the conduct upon which he or she relies to establish the existence of probable cause"); *Picciano v. McLoughlin*, 723 F. Supp. 2d 491, 504 (N.D.N.Y. 2010) (finding that a violation of a New York statute does not mean that the arrest lacked probable cause under the Fourth Amendment).

Further, Plaintiff Penree argues that Defendants' actions constituted an unreasonable seizure under the Fourth Amendment because they waited outside his home and "devised a scheme" to induce Plaintiff Penree to open the door to his residence. *See* Dkt. No. 44 at 7-11. The use of trickery or deception by police officers does not necessarily violate a suspect's Fourth Amendment rights. *See United States v. Giraldo*, 743 F. Supp. 152, 154 (2d Cir. 1990) (citing *Lewis v. United States*, 385 U.S. 206 (1966)). Plaintiff Penree does not raise facts that implicate an unlawful coercion because his free choice was not compromised by Defendants' request for Ms. Williams' belongings, even if that request was deceptive. Also, the police are permitted to seize a suspect before entering or after leaving a residence. *See Steagald v. United States*, 451 U.S. 204, 221 (1981) (noting that the need to obtain a search warrant can be avoided by simply waiting for a suspect to leave a residence). Accordingly, the Court does not agree with Plaintiff Penree that the police action of waiting outside of his home or deceiving him violated his rights under the Fourth Amendment.

In any event, the Court finds that Defendants did not meet their burden in establishing that there was probable cause to arrest Plaintiff Penree for harassment in the second degree. Defendants did not show as a matter of law that Defendants Watson, Ciccone, and Skibinski had reasonably trustworthy information to believe that Plaintiff Penree committed a crime against Danielle Williams.

### 2. Unreasonable Search

**\*12** The warrantless entry into a home is presumptively unreasonable under the Fourth Amendment. *See Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984); *Payton*, 445 U.S. at 586. An arrest within the home is "simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances ... even when probable cause is clearly present." *Payton*,

2016 WL 915252

445 U.S. at 589 (citations omitted) (explaining that "the warrant procedure minimizes the danger of needless intrusions" into the home). Absent exigent circumstances, the threshold to a home "may not reasonably be crossed without a warrant." *Id.* at 590. Even an invasion of a "fraction of an inch is too much to be tolerated." *See Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002) (internal quotation marks omitted) (quoting *Kyllo v. United States*, 533 U.S. 27, 37 (2001)). Therefore, to make a lawful entry into a home, the Fourth Amendment requires that probable cause *plus* exigent circumstances exist in order to "overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh*, 466 U.S. at 750; *see also Loria*, 306 F.3d at 1283.

The Fourth Amendment protection accorded to the home includes the curtilage of the home, that is the "area to which extends the intimate activity associated with the sanctity of a [person's] home and the privacies of life." *United States v. Hayes*, 551 F.3d 138, 146 (2d Cir. 2008); *see also United States v. Dunn*, 480 U.S. 294, 300-01 (1987) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). In order to determine whether an area is included in the curtilage of a home and, thus, entitled to the same privacy protections as the home, the courts examine several factors, which are "(1) the area's proximity to the main residence; (2) any enclosure of the property or area; (3) use of the property or area; and (4) steps taken to protect the property or area from view." *Hayes*, 551 F.3d at 146.

The Second Circuit applies these factors and further evaluates curtilage with an objective question, "'whether society would recognize the particular area claimed as within the curtilage of the home,'" and a subjective question, "'whether the defendant has manifested a subjective expectation of privacy in that area.'" *Hayes*, 551 F.3d at 146 (quoting *United States v. Titemore*, 437 F.3d 251, 258 (2d Cir. 2006)). Without this further evaluation, a Fourth Amendment analysis is incomplete because "it is possible that an area might fall within the curtilage of the home, as that concept was defined at common law, but the owner or resident may fail to manifest a subjective expectation of privacy in that area." *Titemore*, 437 F.3d at 258.

Here, Defendants Watson, Skibinski, and Ciccone entered into an area, described by Plaintiff Penree as the mud room, which is attached to the home and completely enclosed by exterior walls and an exterior door with a lock. [5] *See* Dkt. Nos. 37-6 at 39; 37-11 at 6. It is not disputed that initially the exterior door to the mud room was closed. *See* Dkt. Nos. 37-3 at 9; 37-6 at 39. Defendant Watson's report indicates that this door was locked, and he permitted Danielle Williams to open the exterior door with a key that one of her parents brought to the scene. *See* Dkt. Nos. 37-3 at 9; 37-6 at 39.

Defendants Watson, Skibinski, and Ciccone reported that they entered into the enclosed area with Danielle Williams and "encountered another locked door." *See* Dkt. Nos. 37-3 at 9; 37-7 at 21. Defendant Watson permitted Danielle Williams to attempt to unlock the interior door, but Plaintiff Penree prevented her by "dead lock[ing]" that interior door. *See* Dkt. No. 37-3 at 9. Danielle Williams was asked to leave the interior area, and, at some point after, Defendant Watson also used the key to attempt to unlock the interior door, but he was unsuccessful. *See* Dkt. No. 37-3 at 10.

**\*13** Applying the curtilage-determining factors to the subject area, the Court finds that the mud room was "curtilage *per se.*" *Titemore*, 437 F.3d at 258." The mud room is physically attached to the main residence of the home and is enclosed on the other three sides by exterior walls with a roof. *See* Dkt. Nos. 37-6 at 39; 37-11 at 6. The area is described by Plaintiff as his mud room, and the exterior door of this mud room was closed and locked when approached by Defendants. *See* Dkt. No. 37-3 at 9.

However, as noted above, the Court must further evaluate whether Plaintiff Penree "manifested a subjective expectation of privacy in that area." *Hayes*, 551 F.3d at 146. The Court finds Plaintiff Penree's actions of locking the exterior door and referring to the enclosed space as his mud room demonstrates his subjective expectation of privacy in that space. *See* Dkt. No. 37-6 at 38. Further, Plaintiff Penree testifies that the exterior door is the door to his home, *see* Dkt. No. 37-6 at 36, the front door, *see id.* at 38, and the initial door to his home, *see id.* at 39. The undisputed facts in the record, clearly establish Plaintiff Penree's subjective expectation of privacy in his mud room.

Next, the Court turns to whether exigent circumstances justified a warrantless entry into Plaintiff Penree's home. "In determining whether exigent circumstances exist, '[t]he core question is whether the facts, as they appeared at the moment of entry, would

2016 WL 915252

lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action.'" *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011) (quoting *United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008)); *Loria*, 306 F.3d at 1284 (citing *United States v. McDonald*, 916 F.2d 766, 769 (2d Cir. 1990)). This test "is an objective one that turns on the district court's examination of the totality of the circumstances confronting law enforcement agents in the particular case." *McDonald*, 916 F.2d at 769 (citations omitted). The Second Circuit set forth the following factors as guides to determine if such exigent circumstances existed:

> (1) the gravity or violent nature of the offense with which the aspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause ... to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*Loria*, 306 F.3d at 1284 (stating that the list of factors is not an "exhaustive canon"); *see also United States v. Reed*, 572 F.2d 412, 424 (2d Cir. 1978) (adopting the exigent circumstances factors set forth in *Dorman v. United States*, 435 F.2d 385, 392-93 (D.C. Cir. 1970)).

The gravity or violent nature of the underlying offense is a factor that weighs heavily in the determination of whether exigent circumstances exist. *See Welsh*, 466 U.S. at 750-52. However, the Court is mindful that exigent circumstances are not created simply because there is probable cause to believe that a serious crime has been committed. *See Welsh*, 466 U.S. at 753. Moreover "[w]hen the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate." *Id.* at 750. The "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense ... has been committed." *Id.* at 741.

**\*14** Defendants Watson, Ciccone, and Skibinski entered into Plaintiff Penree's home seeking to arrest him for harassment in the second degree pursuant to the domestic complaint by Danielle Williams. *See* Dkt. No. 41-4 at 3. Under New York law, harassment in the second degree is a violation, *see* N.Y. PENAL LAW § 240.26, which "means an offense, other than a 'traffic infraction,' for which a sentence to a term for imprisonment in excess of fifteen days cannot be imposed," N.Y. PENAL LAW § 10.00(3); *see also* N.Y. CRIM. PROC. LAW § 140.10(1). Harassment in the second degree is not a crime, meaning it is not a misdemeanor or a felony, in New York. *See* N.Y. PENAL LAW § 10.00(6). Therefore, the gravity-of-the-offense factor weighs against finding that exigent circumstances existed prior to Defendant officers entering into Plaintiff Penree's home.

The second factor is whether "the suspect is reasonably believed to be armed" because the "[d]elay in arrest of an armed felon may well increase danger to the community ... or to the officers at time of arrest." *See Dorman*, 435 F.2d at 392. This consideration also "bears materially on the justification for a warrantless entry." *Id.* The "mere suspicion or probable cause for belief of the presence of a firearm does not, on its own, *create* urgency." *Harris v. O'Hare*, 770 F.3d 224, 236 (2d Cir. 2014).

The undisputed facts are that while Defendants Watson, Skibinski, and Ciccone were waiting with Danielle Williams in the enclosed mud room of Plaintiff Penree's home, she was asked by Defendants if there were any guns in the house. *See* Dkt. No. 37-3 at 10, 14. She responded that Plaintiff Penree "had hunting guns in the past but wasn't sure if he had any in the house." *See id.* The Court has already determined that the entry into the residence occurred when Defendants entered into the mud room. There was no basis at that time to believe that Plaintiff Penree was armed.

Even if the Court were to consider that the threshold had not been breached when Defendants entered into the mud room, the facts discredit any belief that Plaintiff Penree was armed. First, the police records from the 9-1-1 call document that Plaintiff Penree advised that there were no weapons or alcohol in the house. *See* Dkt. No. 37-3 at 17. Next, Defendants Watson and

2016 WL 915252

Skibinski testified that they were able to observe Plaintiff Penree "every few seconds" while he was moving through his house, and they could see him most of the time. *See id.*; Dkt. No. 37-7 at 19. Defendant Watson and Skibinski could also hear him speaking on the phone to his brother, a police officer, about the circumstances. Dkt. No. 37-3 at 9-10, 14. In their observation of him, Defendants do not claim that they saw a weapon. Defendants also asked Danielle Williams to stand with them in the mud room, which is in close proximity to the locked door, while waiting for Plaintiff Penree to open the door. Defendants' actions do not reflect that they had any concern that she was in immediate danger or that the public at large was in immediate danger from Plaintiff Penree. *See* Dkt. No. 37-3 at 9-10, 14.

Defendant Skibinski described Plaintiff Penree's past interaction with police as "passively aggressed." *See* Dkt. No. 45-1 at 19. Although Plaintiff Penree was observed by Defendants to be agitated in his residence, he was not violent, and he did not use any foul language. *See* Dkt. No. 37-7 at 18, 20. Defendants have failed to present evidence in this case that is sufficient to establish a reasonable belief that Plaintiff Penree was armed, and, accordingly, the second *Dorman* factor also weighs against finding exigent circumstances.

The third factor is whether there was a "clear showing of probable cause" not just "the minimum of probable cause[ ] that is requisite even when a warrant has been issued." *See Dorman*, 435 F.2d at 392-93. A clear showing of probable cause includes "'reasonably trustworthy information,' to believe that the suspect committed the crime involved." *Dorman*, 435 F.2d at 392-93 (quoting *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964)). According to Defendant Watson, Defendants entered into Plaintiff Penree's home to take him into custody on an arrest for harassment in the second degree. *See* Dkt. No. 37-7 at 24. The Court does not find that a clear showing of probable cause existed to justify a warrantless entry. Danielle Williams' version of the altercation is disputed by Plaintiff Penree's report to Defendants. Defendants did not witness the altercation, and, under New York law, a non-warrant arrest for a violation is authorized only when committed in the arresting officer's presence. *See* N.Y. PENAL LAW § 140.10(1)(a).

 **\*15**  Also, Defendant Skibinski testified that he was familiar with Danielle Williams from previous domestic incidents. *See* Dkt. No. 45-1 at 11. Based upon Defendant Skibinski's familiarity with Danielle Williams and Plaintiff Penree's domestic incidents, which are previously described, the Court finds that Defendants could not rely upon Danielle Williams' disputed complaint of a violation as a source of "reasonable trustworthy information" to justify a warrantless entry into Plaintiff Penree's home.

The fourth factor, a strong reason to believe that the suspect is in the premises, is satisfied here and not in dispute. The fifth factor is a likelihood that the suspect will escape if not swiftly apprehended. Defendants contend that they were in hot pursuit of a fleeing suspect, *see* Dkt. No. 37-23 at 33-36, but this assertion is found to be without any basis in the record. Defendants argue that Plaintiff Penree moved to flee inside the threshold of his residence, but this argument fails because Defendants entered into Plaintiff Penree's residence at the time they entered into the mud room. At that time, Plaintiff Penree was not within sight, let alone fleeing. Further, Defendants did not chase Plaintiff Penree from a public location or the scene of a crime into his home such that their "hot pursuit" of him justified a warrantless entry. *See Stanton v. Sims*, 134 S. Ct. 3, 6 (2013) (describing "hot pursuit" as an immediate or continuous pursuit of a "fleeing felon" from the scene of a crime); *United States v. Santana*, 427 U.S. 38, 43 (1976) (finding a true "hot pursuit" is a chase, no matter how long, that is set in motion in a public place).

The sixth factor takes into consideration the peaceful circumstances of the entry because, if entry was not forcible, it shows a "reasonableness of police attitude and conduct." *Dorman*, 435 F.2d at 393. When Defendants Watson, Skibinski, and Ciccone entered the outer entrance into the mud room, the evidence indicates that it was a peaceful entry because they used a key, and then they encountered another locked door preventing further entry into the interior of the home. *See* Dkt. Nos. 37-3 at 9; 37-7 at 21. However, the testimonies of Defendants Watson and Skibinski concentrate on the entry made at the interior door of the mud room, which was a forcible entry further into the home and involved Plaintiff D-M.W., a toddler.

According to Plaintiff Penree, he cracked open his front door while positioning his foot to prevent the door from opening wider. *See* Dkt. Nos. 37-6 at 45; 45-1 at 46. Defendants Watson, Ciccone, and Skibiniski then forcibly pushed the door open, even after the door stopped against his foot, and pressed their way into the home. *See* Dkt. Nos. 37-6 at 45; 45-1 at 46. Therefore, the

2016 WL 915252

Court does not find that Defendants have demonstrated peaceful circumstances that weigh in favor of the reasonable attitude and conduct of Defendants considering the circumstances of the subsequent forcible entry further into the interior of the home.

Considering the factors under *Dorman*, the Court concludes that Defendants have not established that exigent circumstances existed to justify a warrantless entry into Plaintiff Penree's home. "When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant." *Welsh*, 466 U.S. at 751 (internal quotation marks omitted) (quoting *McDonald*, 335 U.S. 451, 459-60 (1948)). Here, Defendants have not established any real immediate and serious consequences.

**\*16** Defendants contend that exigency existed under "the emergency aid doctrine." *See* Dkt. No. 37-23 at 33-34. The emergency aid doctrine is an exigency obviating the requirement of a search warrant, but this doctrine applies when there is a need to "render emergency assistance to an injured occupant or to protect an occupant from *imminent* injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Defendants have failed to establish on the facts, even from their perspective, that their entry was objectively reasonable. Defendants briefly assert this legal argument, but they do not direct the Court to facts that support these contentions.

The police record demonstrates that Defendants were present outside of Plaintiff Penree's home for, at a minimum, an hour before they made a warrantless entry. Defendants Watson, Skibinski, and Ciccone were aware that Defendant Skibinski observed the children and concluded that they were "okay." For a portion of that hour, Defendants Watson, Skibinski, and Ciccone could observe and hear Plaintiff Penree inside of his home as well as Plaintiff D-M.W. Presumably Defendants claim that they needed to provide emergency aid to Plaintiff Penree's children. However, Defendant Watson described his concern for the children because Plaintiff Penree's "mental state *maybe* wasn't such that he would be able to take care of children at that point." Dkt. No. 37-7 at 12. Defendant Skibinski testified that he was concerned for the welfare of the children because the police did not know "what the conditions were in the home, there's no way to — who knows if stuff got broken while [Plaintiff Penree and Danielle Williams] were fighting." *See* Dkt. No. 45-1 at 18. Defendant Skibinski also stated that "[t]here could be glass on the floor or he may not have food there for them," or "[t]hey might not have clothes and stuff." *See id.*

The Court finds that Defendants' speculated concern for the children was not a sufficient basis together with the other factors discussed to establish that emergency aid needed to be rendered inside Plaintiff Penree's home such that an exception should be made to his Fourth Amendment rights.

### *3. Malicious Prosecution*

Plaintiffs' seventh and eighth causes of action are a state law claim and a Section 1983 claim, respectively, alleging that Defendants maliciously prosecuted Plaintiff Penree for resisting arrest, acting in a manner injurious to a child, and two counts of harassment in the second degree. *See* Dkt. No. 19 at ¶¶ 69-79. In order to state a claim for malicious prosecution under Section 1983, a plaintiff must allege the elements under the state law claim and a post arraignment liberty restraint sufficient to implicate the plaintiff's Fourth Amendment rights. *See Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002); *Janetka v. Dabe*, 892 F.2d 187, 189 (2d Cir. 1989) (stating that a Section 1983 claim for malicious prosecution is "governed by state law in the absence of federal common law").

Under New York law, the elements of a malicious prosecution claim are

> (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 57 of 147

Penree v. City of Utica, New York, Not Reported in Fed. Supp. (2016)

2016 WL 915252

*See Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (quoting *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995)); *see also Martinez v. City of Schenectady*, 97 N.Y.2d 78, 84 (2001). Defendants move to dismiss these claims arguing that Plaintiff Penree's criminal proceeding did not terminate in his favor, that there was probable cause for commencing the criminal proceeding, and that there is no evidence of malice by Defendants. *See* Dkt. No. 37-23 at 20-23.

**\*17** The Second Circuit has stated that a "favorable termination is not so much an element of a malicious prosecution claim as it is a prerequisite to commencement of the action." *Janetka*, 892 F.2d at 189 (noting that the requirement of favorable termination prevents inconsistent judgments). A malicious prosecution plaintiff is not required to prove "that the termination of the criminal proceeding was indicative of innocence," *Rothstein v. Carriere*, 373 F.3d 275, 287 (2d Cir. 2004) *see also Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 199 (2000) ("[D]ispositions inconsistent with innocence ... cannot be viewed as favorable to the accused"), but, "the absence of a conviction is not itself a favorable termination," *Martinez*, 97 N.Y.2d at 84.

"As a general rule, under the common law any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action." *Smith-Hunter*, 95 N.Y.2d at 195. However, the common law also provides for an exception to this general rule where the termination of the criminal proceedings is inconsistent with the innocence of the accused. *Id.* at 196; *see also Cantalino v. Danner*, 96 N.Y.2d 391, 395 (2001). Accordingly, the plaintiff's burden when bringing a malicious prosecution claim is to demonstrate a final termination of his or her criminal proceeding that is not inconsistent with innocence. *Rothstein*, 373 F.3d at 287; *see also Cantalino*, 96 N.Y.2d at 395; *Norton v. Town of Brookhaven*, 47 F. Supp. 3d 152, 158 (E.D.N.Y. 2014). These determinations are case specific and are made "under the circumstances of each case." *Cantalino*, 96 N.Y.2d at 396 (citing *Smith-Hunter*, 95 N.Y.2d at 196-97 (describing that the specific circumstances of each case dictate whether a final termination in the plaintiff's favor is inconsistent with innocence)).

Defendants' contention that a final disposition of a criminal proceeding is favorable only when it is "indicative of innocence" is incorrect. Dkt. No. 37-23 at 21; *see also Smith-Hunter*, 95 N.Y.2d at 199-202 (clarifying that the "indicative of innocence" test is not correct). As stated above, Plaintiff Penree is required to show that the criminal proceeding termination was not inconsistent with innocence. The criminal proceedings against Plaintiff Penree were dismissed by a city court judge in a four-page decision outlining the factual circumstances prior to Plaintiff's arrest and concluding that there were no exigent circumstances to enter Plaintiff Penree's residence to arrest him. *See* Dkt. No. 41-10 at 4. The criminal proceeding was dismissed and could not be brought again. *See* Dkt. No. 41-10. There is no indication that the evidence recited would result in a conviction but for the unlawful arrest. *See id.*

To the contrary, the city court judge commented that there was no evidence offered that the children's health, safety, or welfare were in danger. *See id.* The city court judge did not state any facts beyond the forcible entry into Plaintiff Penree's residence. *See id.* Accordingly, the decision dismissing Plaintiff Penree's criminal charges is not inconsistent with innocence. The termination of a criminal proceeding is not unfavorable because "the underlying prosecution did not reach the merits." *Norton v. Town of Brookhaven*, 47 F. Supp. 3d 152, 158 (E.D.N.Y. 2014). Applying New York common law, Plaintiff Penree's criminal proceeding terminated in his favor for purposes of maintaining a malicious prosecution claim.

This case is distinguishable from other cases where dismissals based upon faulty search warrants were not found to be favorable terminations. *See, e.g., Layou v. Crews*, No. 9:11-CV-0114, 2013 WL 5494062, *13 (N.D.N.Y. Sept. 30, 2013); *Martinez*, 97 N.Y.2d at 84-85. In both *Layou* and *Martinez*, the plaintiffs were convicted at their criminal trials, but the convictions were reversed on appeal because the evidence was obtained through faulty search warrants. *See Layou*, 2013 WL 5494062, at *13; *Martinez*, 97 N.Y.2d at 85. The courts found that the criminal proceedings were not favorable terminations because the plaintiffs' convictions at trial were inconsistent with innocence. *See Layou*, 2013 WL 5494062, at *13; *Martinez*, 97 N.Y.2d at 85.

**\*18** Defendants next argue that probable cause to arrest Plaintiff Penree for harassment in the second degree also fulfills the required probable cause element of malicious prosecution. *See* Dkt. No. 37-23 at 22. Defendants further argue that the facts that

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 58 of 147
Penree v. City of Utica, New York, Not Reported in Fed. Supp. (2016)
2016 WL 915252

Plaintiff "would not let the Defendant officers open the house door," continued to hold his toddler child when Defendants forced their way into his residence, pulled his arm away from Defendant Skibinski, and pushed Defendant Watson away constitute probable cause for the charges of harassment in the second degree, resisting arrest, and acting in a manner injurious to a child. *See id.*

In the context of a malicious prosecution claim, there must be probable cause to believe that the plaintiff could be successfully prosecuted, which is distinct from probable cause to arrest a suspect. *See Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999). It is error to "conflate" these two elements. *See id.*; *D'Angelo v. Kirschner*, 288 Fed. Appx. 724, 726-27 (2d cir. 2008). The question before the Court, therefore, is whether there was "'knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'" *Roundseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (quoting *Pandolfo v. U.A. Cable Sys. of Watertown*, 171 A.D.2d 1013, 1013 (4th Dep't 1991)).

The "finding of probable cause to arrest as to one charge does not necessarily defeat a claim of malicious prosecution as to other criminal charges that were resolved in the plaintiff's favor." *Id.* Also, the element of probable cause in a malicious prosecution claim "must relate to the specific crime charged in the criminal proceeding." *Genovese v. County of Suffolk*, No. 10-CV-3470, 2015 WL 5210550, *3 (E.D.N.Y. Sept. 8, 2015).

As discussed above, Defendants did not rebut the presumption that their warrantless entry and arrest was unlawful and in violation of Plaintiff Penree's Fourth Amendment rights. Defendants Watson, Skibinski, and Ciccone illegally entered into Plaintiff Penree's home to arrest him for harassment in the second degree without a warrant, without probable cause, and without exigent circumstances. "The fruit of the poisonous tree doctrine is an evidentiary rule that operates in the context of criminal procedure" to preclude evidence obtained from or as a result of unlawful police activity. *Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999); *see also Costello v. United States*, 365 U.S. 265, 280 (1961). Although the fruit of the poisonous tree doctrine does not apply in Section 1983 claims, *see Townes*, 176 F.3d at 145, evidence obtained illegally that "would clearly not be admissible" cannot then be the basis for probable cause to believe the prosecution could succeed. *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003) ("postulating that the plaintiff's statement, if given without *Miranda* warnings, would not be admissible and "then there would be no probable cause to believe the prosecution could succeed"); *see also Gannon v. City of New York*, 917 F. Supp. 2d 241, 245 (S.D.N.Y. 2013); *Mazyck v. Johnson*, No. 08-CV-548, 2009 WL 2707360, *5 (E.D.N.Y. Aug. 25, 2009) (stating that the Second Circuit was clear in *Boyd* that "the question is not whether there exists probable cause to prosecute, but rather whether there is probable cause to *believe that a prosecution will succeed*").

As to Plaintiff Penree's first charge of harassment in the second degree in violation of New York Penal Law § 240.26(1) based upon the complaint filed by Danielle Williams, the Court finds that Defendants did not establish as a matter of law that there was probable cause to initiate proceedings. First, the Court's finding that Defendants failed to establish that there was probable cause to arrest Plaintiff Penree, "entails the rejection of [Defendants'] present argument about probable cause." *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 413 (2d Cir. 1999).

**\*19** As already stated by the Court, under New York law, a violation must occur in the officer's presence in order for there to be authority to arrest a suspect. *See* N.Y. CRIM. PROC. LAW § 140.10(1); N.Y. PENAL LAW §§ 10.00(3), 240.26. Moreover, "the offense must occur in the officer's presence to provide probable cause to arrest for second-degree harassment." *See Ramos v. City of New York*, 298 Fed. Appx. 84, 86 (2d Cir. 2008). Although the Court previously noted that probable cause to arrest under the Fourth Amendment is not affected by New York law, for purposes of evaluating whether there is probable cause to believe a suspect could be successfully prosecuted, the specific New York statute is determinative. *See D'Angelo v. Kirschner*, 288 Fed. Appx. 724, 726 (2d Cir. 2008); *Posr*, 180 F.3d at 413 (2d Cir. 1999); *Genovese*, 2015 WL 5210550, at *3 (stating that probable cause must relate to the specific crime charged). Here, there was no probable cause to believe that Plaintiff Penree would be successfully prosecuted when his arrest was unlawful pursuant to New York law.

2016 WL 915252

As for the other charges against Plaintiff Penree, they are each based on actions taken after Defendants Watson, Skibinski, and Ciccone entered into the mud room. Because the evidence obtained after Defendants Watson, Skibinski, and Ciccone entered into Plaintiff Penree's mud room without a warrant, without probable cause to arrest, and without exigent circumstances was clearly going to be inadmissible evidence at a criminal trial, there was no reasonable belief that Defendants would be able to successfully prosecute him on those charges. Accordingly, Defendants have failed to establish probable cause as a defense to Plaintiff Penree's claim for malicious prosecution.

In a malicious prosecution claim, the lack of probable cause creates an inference of malice. *See Ramos*, 298 Fed. Appx. at 86 (citing *Boyd*, 336 F.3d at 78); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997). Defendants argument that there was no direct evidence of malice is not persuasive in light of this permissible inference.

### 4. Excessive Force

Plaintiff Penree alleges that the use of force by Defendants Watson, Skibinski, and Ciccone was excessive during his arrest. *See* Dkt. No. 19 at ¶¶ 31-36. Specifically, Plaintiff Penree alleges that the use of a Taser Handheld Conducted Electrical Weapon[6] ("Taser CEW") and the manner in which the handcuffs were applied violated his constitutional rights. *See id.* Further, he alleges that Defendant City of Utica's police department has a policy and practice that directly encourages the misconduct complained of in this case by failing to train, supervise, or control its officers regarding the use of force and by failing to adequately punish and discipline prior instances of similar misconduct. *See id.* Defendants argue that the use of the taser was objectively reasonable because Plaintiff Penree (1) was a large, muscular person, (2) was actively resisting arrest, (3) allegedly threatened officers the day before, and (4) had barricaded himself in his bedroom. *See* Dkt. No. 37-23 at 11.

Where an excessive force claim arises in the context of an arrest, it is the protections of the Fourth Amendment that are invoked. *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989). Accordingly, the Court must apply the reasonableness test of the Fourth Amendment, which is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (quoting *Scott v. United States*, 436 U.S. 128, 137-39 (1978)). The Court does not evaluate the record in hindsight but, instead, from the "perspective of a reasonable officer on the scene." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (internal citations and quotation marks omitted). The reasonableness test must carefully review the totality of the circumstances of each particular case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempted to evade arrest by flight." *See Graham*, 490 U.S. at 396; *see also Tracy*, 623 F.3d at 95-96; *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

**\*20**  In the present case, Defendants Watson, Skibinski, and Ciccone entered into Plaintiff Penree's home to arrest him for harassment in the second degree, *see* Dkt. No. 41-4 at 3, which is an offense that is not a crime under New York law, *see* N.Y. CRIM. PROC. LAW § 140.10(1); N.Y. PENAL LAW §§ 10.00(3), (6). Plaintiff Penree was inside his home with his two small children. *See* Dkt. No. 45-1 at 14. Defendants have not raised or produced any evidence to indicate that there was any danger Plaintiff Penree might flee the home. However, it is undisputed that Plaintiff Penree ran up the stairs and into his bedroom to get away from Defendants, and he attempted to shut the bedroom door on the officers. *See* Dkt. No. 37-6 at 45-47.

Both Defendant Watson and Skibinski stated in their reports that they could see that Plaintiff Penree was holding Plaintiff D-M.W. in his arms and that he was turned away with his back facing the officers. *See* Dkt. No. 37-3 at 10, 14. Plaintiff Penree was in a corner of the room. *See* Dkt. No. 37-3 at 10. Defendant Skibinski stated that he reached out to grab Plaintiff Penree's arm but that Plaintiff Penree pulled his arm away so Defendant Skibinski drew the Taser CEW from its holster, announced "Taser Taser Taser," and deployed it. *See id.* at 14. Defendants' expert report states two probes, each with a barbed dart on the end, were launched out of the Taser CEW at fifty-five meters per second and lodged into Plaintiff Penree's back. *See* Dkt. No. 37-15 at 9. An electrical discharge then flowed between the darts "resulting in widespread loss of voluntary muscle control (or incapacitation) and generalized intense pain." *See id.*

2016 WL 915252

Defendant Watson did not state in the police report that Plaintiff Penree pulled away or pushed Defendant Skibinski but, instead, states that he was grabbing the child when he heard Defendant Skibinski say "Taser." *See id.* at 10. At his deposition, Defendant Watson testified that he was not pushed but that "there was some pushing, some of that." *See* Dkt. No. 37-7 at 31. Plaintiff Penree testified that at no time did Defendants tell him he was under arrest prior to being handcuffed, but Defendants did tell him to stop resisting when he tried to shut them out of the bedroom. *See* Dkt. No. 37-6 at 48. Plaintiff Penree also claims that Defendants did not give any warning before deploying the Taser CEW. *See id.* at 49. Plaintiff claims that he voluntarily moved away from blocking the door but that, as soon as they came into the bedroom, he was shot with the Taser CEW. *See id.* Defendants argue in their brief, and the police report supports, that Defendants Watson, Skibinski, and Ciccone concluded that Plaintiff Penree was a threat of safety to the officers and planned to use the Taser CEW over the pepper spray before they forced entry through the mud room door. *See* Dkt. Nos. 37-3 at 9; 37-23 at 13.

It is possible that a jury could find that the use of the Taser CEW was reasonable, but it is also possible that a jury could find that the use of the Taser CEW was not a reasonable response to the circumstances. *See Amnesty*, 361 F.3d at 124 (finding that the reasonableness of the forced used in that case was one for the jury); *Jackson v. City New York*, 939 F. Supp. 2d 235, 254 (E.D.N.Y. 2013) (identifying the significant dispute between the officers' story that the plaintiff was resisting arrest and the plaintiff's story that she was defensively struggling against the officer's unlawful arrest). Accordingly, the Court finds that the determination as to the objective reasonableness of the force used is one to be made by a jury following a trial.

**\*21** With regard to Plaintiff Penree's claim that the manner in which he was handcuffed was unreasonable, the Court finds that Defendants have established as a matter of law that the handcuffing of Plaintiff Penree did not involve an unreasonable amount of force, and Plaintiff Penree did not raise any genuine questions of material fact in opposition. In order for handcuffs to be effective, they must be reasonably tight. *See Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008). However, "overly tight handcuffing can constitute excessive force." *Id.* at 468. "To assess a claim for excessive force based on handcuffing, the court should consider evidence that: '1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists.'" *Pelayo v. Port Auth.*, 893 F. Supp. 2d 632, 642 (S.D.N.Y. 2012) (quoting *Matthews v. City of New York*, 889 F. Supp. 2d 418, 441-42 (E.D.N.Y. 2012)). The force used must be sufficiently serious or harmful to be actionable in a claim for excessive force. *See Pelayo*, 893 F. Supp. 2d at 642; *Drummond v. Castro*, 522 F. Supp. 2d 667, 678 (S.D.N.Y. 2012).

Plaintiff Penree testified that while he was being transported by car to the police station, he complained that the handcuffs were too tight. *See* Dkt. No. 37-6 at 56. He described that he has big wrists. *See id.* When Plaintiff arrived in the booking area, his handcuffs were loosened, which occurred about five minutes after arriving at the police station. *See id.* Different handcuffs were then used that were not too tight. *See id.*

In opposition to Defendants' motion, Plaintiffs argue that the timing for when Defendants placed two linked sets of handcuffs on Plaintiff Penree is in dispute. *See* Dkt. No. 44 at 17. However, even assuming Plaintiffs' time line of events, the handcuffs were apparently not too tight until Plaintiff Penree was sitting on his hands during the transport to the police station, and the handcuffs were loosened shortly after arrival. *See* Dkt. No. 37-6 at 52, 55-56. Further, Plaintiff Penree indicated that he had some redness on his wrist but does not claim to have any other injury as a result. *See* Dkt. No. 37-6 at 55. He did not receive any medical treatment for his wrists at the police station, and he does not have any outstanding medical bills for treatment. *See* Dkt. No. 37-6 at 53, 60-61. The Court finds that Plaintiff did not submit evidence that could lead a reasonable juror to find that Defendants used excessive force in the application of the handcuffs. *See Drummond*, 522 F. Supp. 2d at 679.

**D. Fourteenth Amendment**

Plaintiff D-M.W. also claims that Defendants Watson, Skibinski, and Ciccone used excessive force against him when they discharged the Taser CEW. *See* Dkt. No. 19 at ¶¶ 31-36. Defendants argue that they did not cause any physical injury to Plaintiff D-M.W. *See* Dkt. No. 37-23 at 23-25. According to Defendants the electrical current would travel only between the two probes of the Taser CEW and, therefore, no electrical current would have injured Plaintiff DM.W. *See* Dkt. No. 37-23 at 23-25. In

2016 WL 915252

the alternative, Defendants argue that, even if there was causation, their actions were not conscience shocking in violation of his Fourteenth Amendment rights. *See id.* at 25-27. Plaintiffs argue that there was a seizure of Plaintiff D-M.W. in violation of his constitutional rights because he was deprived of his ability to leave the room through his custodial parent, Plaintiff Penree. *See* Dkt. No. 44 at 22.

A seizure under the Fourth Amendment is "'an intentional acquisition of physical control.'" *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990) (quoting *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989)). Fourth Amendment seizure is not "police action that simply *causes* a particular result." *Id.* at 795 (clarifying further that the intention requirement is not met by the deliberateness with which a given action is taken). Seizure under the Fourth Amendment "does not occur whenever there is a governmentally caused termination of an individuals' freedom of movement, ... but only when there is a governmental termination of freedom of movement *through means intentionally applied.*" *Brower*, 489 U.S. at 596-97. The restraint of liberty must result from an attempt to gain control of the particular individual. *See Landol-Rivera*, 906 F.2d at 795 (citing *Brower*, 489 U.S. at 596).

 **\*22**  Defendants use of the Taser CEW against Plaintiff Penree was not a Fourth Amendment seizure of Plaintiff D-M.W. because Plaintiff D-M.W. was not the intended object when they aimed the Taser CEW. *See id.* at 795 (stating that the plaintiff's decedent was not seized when he was not the object of the police bullet that struck him). Defendants Watson, Skibinski, and Ciccone did not intend to terminate Plaintiff D-M.W.'s freedom of movement when they deployed the Taser CEW, and, accordingly, he was not seized under the Fourth Amendment.

Plaintiffs further argue the "custodial seizure" of Plaintiff D-M.W. *See* Dkt. No. 44 at 22. In support of this contention, Plaintiffs cite *Wallace v. Poulos*, Civil Action No. DKC 2008-0251, 2009 WL 3216622 (D. Md. Sept. 29, 2009). In that case, the plaintiff father was the sole custodian of the infant plaintiff when the defendant police officers executed a temporary protective order that was falsely-obtained by the infant plaintiff's mother. The defendant police officers wrongly believed that the order transferred custody of the infant plaintiff to the biological mother, who did not have any custodial rights or visitation. *See id.* After an altercation with the defendant police officers, the plaintiff father was arrested and the infant plaintiff was taken from the home and given into the custody of the biological mother by the defendant police officers. *See id.* at \*12. The court found that the infant plaintiff was seized by the defendants under these circumstances because the plaintiff father was not permitted to direct the temporary custody of the infant plaintiff. *See id.*

Here, the facts are distinguishable because Plaintiff Penree does not claim to have sole custody of his children. He and Danielle Williams have shared custody and/or visitation of their children pursuant to a custody order. *See* Dkt. No. 45-1 at 8, 41. At the time that Plaintiff Penree was under arrest and taken into custody, Danielle Williams, Plaintiff D-M.W.'s legal custodian and parent, was present and took her children into her custody. *See* Dkt. No. 37-3 at 10. Plaintiffs have failed to show that Plaintiff D-M.W. was seized under the Fourth Amendment by Defendants when his mother rightfully took him into her care.

Having determined that there was no Fourth Amendment seizure of Plaintiff D-M.W., the Court must consider Plaintiff D-M.W.'s excessive force claims under substantive due process of the Fourteenth Amendment.[7] *See Tierney v. Davidson*, 133 F.3d 189, 199 (2d Cir. 1998) (citing *Graham*, 490 U.S. at 394-95) (stating that where there is not a seizure or arrest, excessive force claims are governed by the Due Process Clause of the Fourteenth Amendment); *Piper v. City of Elmira*, 12 F. Supp. 3d 577, 587 (W.D.N.Y. 2014). The Second Circuit applies the four-part test of *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973), to determine whether the force applied was excessive under the Fourteenth Amendment. *See Tierney*, 133 F.3d at 199.

> Those factors are: '[1] the need for the application of force, [2] the relationship between the need and the amount of force that was used, [3] the extent of injury inflicted, and [4] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'

*Id.* (quoting *Johnso*n, 481 F.2d at 1033).

Case 5:25-cv-01168-BKS-ML     Document 7     Filed 05/13/26     Page 62 of 147

Penree v. City of Utica, New York, Not Reported in Fed. Supp. (2016)
2016 WL 915252

**\*23**  In this case, the Court cannot conclude that Plaintiff D-M.W.'s claim fails as a matter of law after considering these four factors. It is a question for the jury to consider the circumstances and determine whether there was a need to apply force and to weigh the relationship between that need with the force used. Plaintiff D-M.W. sustained a physical injury to his head as a result of Defendants' actions, and he was examined by emergency medical responders at the scene. *See* Dkt. Nos. 37-3 at 10; 37-6 at 49; 37-12 at 2, 4. Plaintiffs allege that Plaintiff D-M.W. sustained injury from the electrical current released from the Taser CEW. *See* Dkt. No. 37-6 at 49. Defendants argue that his claim should be dismissed because they have submitted unopposed expert's opinion that the electricity from the Taser CEW would take the path of least resistance between the two probes. *See* Dkt. No. 37-15 at 4. According to Defendants, this expert's opinion precludes Plaintiffs from showing any injury and so the claim fails. *See id.* As noted, Plaintiff DM.W's alleged injuries were not limited to just electrocution but also included a head injury. Therefore, Plaintiff D-M.W's excessive force claim does not fail for lack of electrocution injury. Further, a jury could reject the expert opinion proffered by Defendants. After all, a jury is free to refuse to credit an expert's opinion even when there is no expert rebuttal. *See Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 398 (S.D.N.Y. 2010); *Giles v. Rhodes*, 171 F. Supp. 2d 220, 226-27 (S.D.N.Y. 2001) (citing *Powers v. Bayliner Marine Corp.*, 83 F.3d 789, 798 (6th Cir. 1996)).

While standing in Plaintiff Penree's mud room, Defendants Watson, Ciccone, and Skibinski discussed the potential use of force, concluding that the use of the Taser CEW was better than the use of pepper spray because of the children's presence inside. *See* Dkt. No. 37-3 at 9.[8] The evidence shows that Defendants could visualize Plaintiff D-M.W. in Plaintiff Penree's arms at the time they forcibly entered through the interior door and when the Taser CEW was deployed. *See* Dkt. No. 37-3 at 10-11, 14. Defendants have failed to establish as a matter of law that a jury could not find that the deployment of the Taser CEW under these circumstances to be shocking to the conscience. Therefore, the Court denies Defendants' motion for summary judgment on Plaintiff D-M.W.'s constitutional claim of excessive force. *See Piper*, 12 F. Supp. 3d at 87 (stating that the issue is not how likely it is a jury could find a Fourteenth Amendment violation but whether a jury could not reach that conclusion); *Masihuddin v. Gavin*, No. 10 Civ. 06006, 2014 WL 1091157, \*5 (S.D.N.Y. Mar. 17, 2014).

### E. Municipal Liability

Plaintiffs allege a claim against the City of Utica, the City of Utica Police Department, and Police Chief Mark Williams for failure to train, supervise, and discipline Defendants Watson, Skibinski, and Ciccone in their use of force when making arrests. *See* Dkt. No. 19 at ¶¶ 43-54. Further, Plaintiffs allege that Defendants City of Utica, City of Utica Police Department, and Williams made policies or procedures to inadequately train, supervise, or discipline the members of its police officers, which caused excessive force to be used against both Plaintiffs. *See id.* Defendants contend that they have established through the submission of training certificates and proof that the Utica Police Department has been an accredited agency by the New York State Accreditation Council, which requires compliance with 133 standards, that their policies and procedures were adequate in training, supervising, and disciplining their officers. *See* Dkt. No. 37-23 at 37-38. Defendants also contend that Plaintiffs' claims fail because there is no showing of the requisite deliberate indifference to the constitutional rights of citizens. *See id.*

**\*24**  As an initial matter, it appears that Plaintiffs may have voluntarily discontinued their action against the City of Utica Police Department, but, to the extent that they did not, the Court dismisses Plaintiffs' complaint against the City of Utica Police Department. In New York, departments are administrative arms of a municipal corporation and are not separate legal entities capable of being a party to a lawsuit. *See Baker v. Willett*, 42 F. Supp. 2d 192, 198 (N.D.N.Y. 1999); *Loria v. Town of Irondequoit*, 775 F. Supp. 599, 606 (W.D.N.Y. 1990).

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), the Supreme Court established that municipalities and local governments can be sued directly under Section 1983 for monetary, declaratory, or injunctive relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." A governmental custom, even if it "has not received formal approval through the body's official decision[-]making channels," is equally actionable under Section 1983. *Id.* at 691 (reasoning that the practices of state officials could be so well settled that they "constitute a 'customs or usage' with the force of law" (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

2016 WL 915252

Here, Plaintiffs do not allege that there is a written policy or ordinance that is itself unconstitutional but that Defendants City of Utica and Williams' deliberate indifference created a custom of its police officers carrying out their duties in an unconstitutional manner. *See* Dkt. No. 19 at ¶¶ 44-54. A city can be liable under these circumstances "where the city is aware that its policy may be unconstitutionally applied by inadequately trained employees but the city consciously chooses not to train them, ... or where the city's official policy on the reasonable use of force in arrests is valid, but the city's actual practice is to use excessive force." *Amnesty Am.*, 361 F.3d at 125-26.

Where, as here, the allegations focus on a city employee's single tortious action, "the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself." *Id.* at 126. In this case, there is no proof, and the parties do not argue, that the acts were "taken by, or attributable to, one of the city's policymakers." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83 (1986) (finding that a single act by a policymaker with final authority can establish Section 1983 liability for an unconstitutional policy)). The mere delegation of authority by the policymakers to a subordinate does not implicate liability against the municipality because that would be the equivalent of respondeat superior liability. *Id.* However, liability can be shown by proving that "'the authorized policy makers approve[d] a subordinate's decision and the basis for it.'" *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion)).

Of course, a policymaking official can be implicated by direct evidence that they ordered a subordinate's action. *See id.* There is no evidence in this case that this occurred. A policymaking official can also be implicated through a subordinate's conduct by showing "that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Id.* (citing *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992)). "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city "policy or custom" that is actionable under § 1983.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

**\*25** Unless the unconstitutional incident includes proof that it was caused by an *existing*, unconstitutional municipal policy by a policymaker, "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). The existence of an unconstitutional policy, and its origin, must be proven separately to have a valid claim. *See id.* at 824. Further, where "the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.*

Plaintiffs claim to demonstrate a ratified policy of inadequate training and supervision by Defendants City of Utica and Williams through their deliberate indifference to Defendants Watson, Skibinski, and Ciccone's unconstituional acts towards Plaintiffs. *See* Dkt. Nos. 19 at ¶¶ 43-54; 44 at 26. Plaintiffs assert that the alleged use of excessive force by Defendants Watson, Skibinski, and Ciccone is attributable to the municipal Defendants because, at his deposition in this case, Defendant Williams found his officers' actions on April 23, 2012 were proper. *See* Dkt. No. 44 at 26. Ostensibly, Plaintiffs' theory is that the municipal Defendants were deliberately indifferent to the possibility that Defendants Watson, Skibinski, and Ciccone were prone to use excessive force. According to Plaintiffs, "this indifference was demonstrated by the failure of the City defendants to exercise reasonable care in investigating claims of police brutality in order to supervise the officers in the proper use of force." *Fiacco v. City of Rensselaer*, 783 F.2d 319, 326 (2d Cir. 1986).

Plaintiffs rely soley on Defendant Williams' review of the alleged excessive force at issue in this civil rights lawsuit to establish that the municipal Defendants were deliberately indifferent to these practices. *See* Dkt. No. 44 at 26. "[T]he existence of a policy of nonsupervision amounting to deliberate indifference to constitutional rights cannot be established by inference soley from evidence of the occurrence of the incident in question." *See id.* at 328; *see also City of Oklahoma City*, 471 U.S. at 824. Therefore, Defendant Williams' "deliberate indifference" to Plaintiffs' allegations alone cannot establish an inference of a municipal policy. *See Fiacco*, 783 F.2d at 328 (stating that a plaintiff cannot prevail on such a claim without other evidence). Plaintiffs' sole reliance on this evidence to prove a municipal policy of inadequate supervision is fatal. *See City of Oklahoma*, 471 U.S. at 824.

2016 WL 915252

Moreover, Plaintiffs' claim that Defendants City of Utica and Williams' policy and procedure of inadequate training caused the excessive force of unjustified tasing of Plaintiff Penree is also flawed. *See* Dkt. No. 19 at ¶¶ 45-49. In *City of Canton*, the Supreme Court established municipal liability under Section 1983 for its failure to train its employees. *See id.* at 387-90. "[A] municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training." *Amnesty Am.*, 361 F.3d at 129 (citing *City of Canton*, 489 U.S. at 387-90). To establish liability due to the inadequacy of a municipality's training program, a plaintiff must (1) "identify a specific deficiency in the city's training program," (2) "establish that [the identified] deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation," and (3) establish that the failure to train constitutes deliberate indifference to the plaintiff's constitutional rights. *See id.* at 129.

 *26  In this case, Plaintiffs have not provided any evidence of the City of Utica Police Department's training programs, and Plaintiffs have not identified a specific deficiency in a training program or a close causal relationship to the constitutional injuries sustained. These required elements ensure that "'the officer's shortcomings ... resulted from ... a faulty training program' rather than from the negligent administration of a sound program." *Id.* at 129 (quoting *City of Canton*, 489 U.S. at 391) (concluding that to state a failure to train claim under Section 1983, the plaintiffs are required "to prove that the deprivation occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor"). Without some evidence showing how the training was performed and without evidence showing how the training, if performed correctly, could have prevented the constitutional violations alleged, no reasonable jury "could conclude that the excessive force occurred as a result of training deficiencies." *Amnesty Am.*, 361 F.3d at 130.

For these reasons, the Court dismisses the claims against Defendants City of Utica and Williams.

### G. Qualified Immunity

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Tracy v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Kelsey v. Cty. of Schoharie*, 567 F.3d 50, 60-61 (2d Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). The Court is mindful that qualified immunity is "'an entitlement not to stand trial or face the other burdens of litigation,'" and that this privilege is "'effectively lost if a case is erroneously permitted to go to trial.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The Court applies a two-part inquiry to determine whether the doctrine of qualified immunity bars a suit against government officials. *See Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006). The Court considers whether the facts, construed in favor of the party asserting the injury, "demonstrate a violation of a constitutional right." *See id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court must also determine "whether the officials' actions violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). It is within the Court's discretion to decide the order these two prongs are considered. *See Pearson v. Callahan*, 555 U.S. 223, 243 (2009).

"A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The plaintiff can successfully defeat the defense of qualified immunity on summary judgment by raising a genuine issue of material fact. *See Jones v. Parmley*, 465 F.3d 46, 63 (2006) (finding that a question of material fact precludes the court's finding as a matter of law that the defendants are entitled to qualified immunity); *Usavage v. Port Auth.*, 932 F. Supp. 2d 575, 593 (S.D.N.Y. 2013) (citing *Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2013)).

A clearly established constitutional right is one that's "contours" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). An official's actions are not protected by qualified immunity by virtue of the fact that his or her action in question has not previously been held unlawful.

2016 WL 915252

*See id.; Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) ("An officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury"). "[I]f decisions from this or other circuits clearly foreshadow a particular ruling on the issue," the Court may treat the law as clearly established. *See Terebesi*, 764 F.3d at 231 (internal quotation marks omitted) (stating that the courts "consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law" in determining whether the law is clearly established) (quoting *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997)).

### 1. Fourth & Fourteenth Amendments

**\*27** Defendants assert that Plaintiff Penree's Fourth Amendment rights and Plaintiff D-M.W.'s Fourteenth Amendment rights "are no longer clearly established because the current law conflicts with the Fourteenth Amendment Rights of the Domestic Violence victim under a state created danger Substantive Due Process theory." Dkt. No. 37-23 at 29. According to Defendants, they are entitled to qualified immunity against all of Plaintiffs' Fourth and Fourteenth Amendment claims because there is a lack of clearly established law. *See id.* The Second Circuit has established "that the Due Process Clause may be violated when police officers' *affirmative* conduct–as opposed to passive failures to act–creates or increases the risk of private violence, and thereby enhances the danger to the victim." *Okin v. Village of Cornwall-On-Hudon Police Dep't*, 577 F.3d 415, 428-29 (2d Cir. 2009) ("The affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence").

In *Okin*, the court applied this state-created danger doctrine to a domestic violence situation. *See id.* In that case, the police responded to the plaintiff's complaint of being beaten and choked, and the police proceeded to have a conversation about football with the aggressor. *See id.* at 430. The aggressor also told one of the defendant officers that he was not able to "help it sometimes when he smacks [the plaintiff] around," and the defendants did not make an arrest. *See id.* There, the defendants also responded to numerous occasions of domestic incident complaints by the plaintiff without filing a domestic incident report, interviewing the aggressor, or making an arrest. *See id.* Under those circumstances, the Court found that there was a reasonable view of the evidence to support a finding that the defendants' actions were affirmative reassurances to the aggressor that no action would be taken against him for his acts of violence against the victim. *See id.*

Without any support, Defendants argue that Plaintiffs' asserted Fourth and Fourteenth Amendment Rights are no longer clearly established because their rights are in conflict with the *Okin* decision from Second Circuit. *See* Dkt. No. 37-23 at 28-33. It is Defendants' contention that they had to choose between securing the safety of domestic violence victims and Plaintiffs' constitutional rights secured by the Fourth and Fourteenth Amendments. *See id.* The Court finds that Defendants have no legal or logical basis for this assertion. The establishment of case law that police officers, through affirmative acts of creating and increasing the risk of domestic violence against a victim, violated that victim's constitutional rights does not change or effect the clarity of established rights under the Fourth and Fourteenth Amendments. The *Okin* decision does not imply that an alleged domestic violence offender has lesser constitutional rights under the Fourth or Fourteenth Amendments.

### 2. Excessive Force

With regard to Defendants' specific contention that they are entitled to qualified immunity on Plaintiffs' claims of excessive force, they argue that "qualified immunity operates to protect officers from the sometimes hazy border between excessive and acceptable force." *See* Dkt. No. 37-23 at 36. Qualified immunity is an affirmative defense and, as such, Defendants bear the burden of proving that the privilege of qualified immunity applies. *See Coolick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012). The Court finds that Defendants' abbreviated arguments fail to raise any factual or legal support for their entitlement to qualified immunity against Plaintiffs' claims of excessive force. Accordingly, the Court denies their motion for summary judgment on the invocation of qualified immunity against Plaintiffs' excessive force claims. [9]

**\*28** Even if the Court were to find that Defendants met their prima facie burden, the Court would find that Plaintiffs have raised questions of material fact that must be resolved by a jury prior to determining whether it would have been clear to a

2016 WL 915252

reasonable officer that his conduct was unlawful in this situation. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks and citations omitted) (quoting *Tennessee v. Garner*, 471 U.S. at 8).

Courts have described the use of a taser to be more than a trivial use of force but less than deadly force. *Towsley v. Frank*, No. 5:09-cv-23, 2010 WL 5394837, *10 (D. Vt. Dec. 28, 2010) (citing *Mattos v. Aragano*, 590 F.3d 1082, 1087 (9th Cir. 2010)). The use of a taser is a "'serious intrusion into the core of the interests protected by the Fourth Amendment.'" *Id.* (quoting *Mattos*, 590 F.3d at 1087). The law is clearly established that any "significant degree of force ... should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer." *Tracy*, 623 F.3d at 98 (citing *Henderson v. Munn*, 439 F.3d 497, 502-03 (8th Cir. 2006); *Vinyard v. Wilson*, 311 F.3d 1340, 1348-49 (11th Cir. 2002); *Headwaters Forest Def. v. Cty. of Humboldt*, 276 F.3d 375, 286 (9th Cir. 2002); *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994)).

In 2011, the Ninth Circuit found that the police officer's use of a taser was an excessive use of force and a constitutional violation. *See Mattos*, 661 F.3d at 451. There, the officers gave no warning that the taser would be used, the suspects had no weapons, and there were children present in the home. *See id.* The court found a constitutional violation under those circumstances even factoring in that the situation was potentially dangerous. *See id.* at 451. In that case, the court found that "an officer's failure to warn, when it is plausible to do so, weighs in favor of finding a constitutional violation." *Id.* ("[T]he fact that [the defendant] gave no warning to [the plaintiff] before tasing her pushes this use of force far beyond the pale"); *see also Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (considering that if it was feasible to give a warning that the use of force was imminent if there was not compliance and a warning was not issued, then the facts weigh against a finding of reasonable force); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) ("The absence of any warning–or of facts making clear that no warning was necessary– makes the circumstances of this case especially troubling")).

In 2009, the Eighth Circuit found that "it is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *See Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009). In 2010, the Tenth Circuit held that the law was clearly established in 2003 that an officer "could not use his Taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning." *See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 667 (10th Cir. 2010).

Accepting Plaintiff Penree's version of the facts, he was repeatedly told that he was not under arrest, and he was not told that he was under arrest until being handcuffed. *See* Dkt. No. 37-6 at 48. Further, according to Plaintiff Penree, he had moved away from the bedroom door and was no longer actively resisting their entrance. *See id.* at 45-47. Defendants were aware that Plaintiff Penree was holding a toddler and facing the corner of the bedroom. *See id.*; Dkt. No. 41-4 at 3. Defendants had discussed the potential use of force and the preference for the Taser CEW prior to any alleged resistance. *See* Dkt. No. 37-3 at 9. Plaintiff Penree claims that his interactions with Defendants had been calm and no profanity was being used up until the time the officers forcibly entered the mud room door. *See* Dkt. Nos. 37-7 at 18, 20; 45-1 at 12. Also, a significant factor in this case, was that Defendants did not give Plaintiffs any warnings before using the Taser CEW. Plaintiff claims that as soon as Defendants came through his bedroom door, he was tased. *See* Dkt. Nos. 37-6 at 48-49; 41-4 at 3. Accordingly, the Court finds that Defendants have not established that they are entitled to the privilege of qualified immunity.

### 3. False Arrest

**\*29** Defendants' argue that they are entitled to qualified immunity on Plaintiff Penree's claim that he was falsely arrested because there was arguable probable cause for his arrest. *See* Dkt. No. 37-23 at 35. Plaintiff Penree's right to be free of arrest without probable cause was clearly established at the time of his arrest. *See Jenkins*, 478 F.3d at 87 (citing *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)). Arguable probable cause exists when officers of reasonable competence could disagree on whether there was probable cause. *See Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010); *Escalera v. Lunn*, 361 F.3d 737,

2016 WL 915252

743 (2d Cir. 2004); *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002). Arguable probable cause does not mean "almost" probable cause. *See Jenkins*, 478 F.3d at 87. Considering, as the Court must, the information possessed by Defendants Watson, Skibinski, and Ciccone at the time of the arrest, the Court finds that there are questions of material fact that must be resolved by a jury before qualified immunity for false arrest can be determined.

Defendants contend that there was arguable probable cause to arrest Plaintiff Penree on the charge of harassment in the second degree based upon Danielle Williams written complaint describing that she was pushed down to the ground and out the door, which caused her to fall down some stairs. *See* Dkt. No. 37-23 at 18-20, 36. The Court has already determined that Defendants failed to rebut the presumption that the warrantless arrest was unlawful. The Court found that there is a question of material fact as to whether Danielle Williams' statement to Defendants Skibinski and Ciccone was reasonably reliable under the circumstances. The Court finds this question of fact precluding summary judgment on probable cause also precludes a legal finding on qualified immunity for the unlawful arrest claim. Therefore, the Court denies Defendants' motion for summary judgment on Plaintiff Penree's claim for false arrest in violation of his Fourth Amendment rights.

### 4. Malicious Prosecution

Defendants contend that they are entitled to qualified immunity against Plaintiffs' claims for malicious prosecution because arguable probable cause existed for all the charges brought against Plaintiff Penree. *See* Dkt. No. 37-23 at 22-23, 35-36. Probable cause in the context of a malicious prosecution claim is "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Jackson v. City of New York*, 939 F. Supp.2d 235, 250 (E.D.N.Y. 2013) (internal quotation marks and citations omitted) (quoting *Rounseville v. Zahl*, 13 F.3d 625, 629-30 (2d Cir. 1994)).

The Court finds that Defendants have failed to establish that they are entitled to qualified immunity against Plaintiff Penree's malicious prosecution claims. Construing the evidence in favor of Plaintiffs, no reasonably competent officer could agree that there was probable cause to successfully prosecute Plaintiff Penree. As the Court set forth in its discussion of malicious prosecution, New York law is determinative when evaluating the probable success for a prosecution of each specific crime. *See Genovese v. Cty. of Suffolk*, No. 10–CV–3470, 2015 WL 5210550, at *3. Under New York law, police officers are not authorized to arrest a suspect for harassment in the second degree unless the violation is witnessed by the officer. *See* N.Y. CRIM. PROC. LAW § 140.10(1); N.Y. PENAL LAW § 10.00(3), 240.26. By New York statute, if the alleged violation takes place outside of the officer's presence, there is no probable cause to arrest. *See Ramos v. City of New York*, 298 Fed. Appx. 84, 86 (2d Cir. 2008). Based upon the fact that there was no probable cause to arrest pursuant to statute, the Court finds that there was no arguable probable cause to believe that Plaintiff Penree could successfully be prosecuted pursuant to that unlawful arrest. *See Boyd*, 336 F.3d at 77.

**\*30** There is also no arguable probable cause to believe that Plaintiff Penree could be successfully prosecuted for the remaining criminal charges filed against him because each of those charges are based upon acts that were taken after Defendants Watson, Skibiniski, and Ciccone illegally entered into Plaintiff Penree's residence. Without a warrant, without probable cause, and without exigent circumstances, any evidence of Plaintiff Penree's actions were not going to be admissible as evidence at any criminal trial. *See id.* Therefore, Defendants are not entitled to dismissal under qualified immunity.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and, for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Dkt. No. 37) is **GRANTED in part and DENIED in part**;[10] and the Court further

2016 WL 915252

**ORDERS** that Plaintiff Penree's state law claim for false arrest is **DISMISSED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiff Penree's claim for false arrest pursuant to 42 U.S.C. § 1983 is **DENIED**; and the Court further

**ORDERS** that Plaintiff Penree's state law claims for assault and battery are **DISMISSED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiff D-M.W.'s claims for assault and battery are **DENIED**; and the Court further

**ORDERS** that Plaintiff Penree's claims for negligence and gross negligence are **DISMISSED**; and the Court further

**ORDERS** that Plaintiff D-M.W.'s claims for negligence and gross negligence are **DISMISSED**; and the Court further

**ORDERS** that Plaintiff Penree's claim for excessive force pursuant to 42. U.S.C. § 1983 against Defendant City of Utica and Defendant Mark Williams is **DISMISSED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiff Penree's claim for excessive force pursuant to 42 U.S.C. § 1983 related to the use of the Taser CEW against Defendant Watson, Defendant Ciccone, and Defendant Skibinski is **DENIED**; and the Court further

**ORDERS** that Plaintiff Penree's claim for excessive force pursuant to 42 U.S.C. § 1983 related to the use of handcuffs against Defendant Watson, Defendant Ciccone, and Defendant Skibinski is **DISMISSED**; and the Court further

**ORDERS** that Plaintiff D-M.W.'s claim for excessive force pursuant to 42 U.S.C. § 1983 against Defendant City of Utica and Defendant Mark Williams is **DISMISSED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiff D-M.W.'s claim for excessive force pursuant to 42 U.S.C. § 1983 against Defendant Watson, Defendant Ciccone, and Defendant Skibinski is **DENIED**; and the Court further

**ORDERS** that Plaintiff Penree's and Plaintiff D-M.W.'s claims for failure to train, supervise, or discipline pursuant to 42 U.S.C. § 1983 against Defendant City of Utica and Defendant Mark Williams is **DISMISSED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiff Penree's claim for unreasonable search pursuant to 42 U.S.C. § 1983 is **DENIED**; and the Court further

 **\*31** **ORDERS** that Defendants' motion for summary judgment as to Plaintiff Penree's claim for malicious prosecution pursuant to 42 U.S.C. § 1983 is **DENIED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiff Penree's state claim for malicious prosecution is **DENIED**; and the Court further

**ORDERS** that Plaintiffs' claims against Defendant City of Utica Police Department are **DISMISSED**; and the Court further

**ORDERS** that Defendant City of Utica and Defendant Mark Williams are **DISMISSED** from this action; and the Court further

**ORDERS** that Plaintiffs' claims against John Does and Jane Does are **DISMISSED**; and the Court further

Case 5:25-cv-01168-BKS-ML     Document 7     Filed 05/13/26     Page 69 of 147

Penree v. City of Utica, New York, Not Reported in Fed. Supp. (2016)
2016 WL 915252

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 915252

---

**Footnotes**

1       Unless otherwise indicated, facts are presented in the light most favorable to Plaintiffs.

2       Although the caption names City of Utica Police Officer Skabiniski, the correct spelling is "Skibinski."

3       Plaintiffs also maintain claims against Defendants Watson, Ciccone, and Skibinski for failure to intervene and prevent the harm caused by the unconstitutional acts of another police officer. *See* Dkt. No. 19 at ¶¶ 37-42. Defendants have not move for summary judgment on this claim.

4       Defendants do not raise any argument that there was probable cause to arrest related to any other violation or crime. *See* Dkt. No. 37-23 at 19-20. Also, Defendants have not proceeded with the theory that Plaintiff Penree was under a citizen's arrest. *See id.*

5       The area is described by Defendant Watson and Defendant Skibinski as an "enclosed porch," and Defendant Ciccone described the area as a foyer and the exterior door as the "main door to the dwelling." *See* Dkt. No. 37-3 at 9, 11, 14.

6       The conducted electrical weapon used by Defendant Skibinski against Plaintiff Penree was a TASER X26. *See* Dkt. No. 37-15. The Taser CEW can cause death or serious injury. *See* Dkt. No. 41-11. The CEW is intented to temporarily incapacitate a person. *See id.*

7       Plaintiffs only argue a violation Plaintiff D-M.W.'s Fourteenth Amendment rights in their memorandum of law despite their contention that Plaintiff D-M.W. was seized. *See* Dkt. No. 44 at 20-22.

8       In the Second Circuit, a defendant can be a direct participant if he or she "authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014). In *Terebesi*, the Court found that individuals who plan for a search or seizure that results in an unconstitutionally excessive use of force can be liable under Section 1983. *See id.* ("Even if the plan expressly contemplated only a search, the same Fourth Amendment protections would apply").

9       Although Defendants raise immunity under New York law against Plaintiffs' claims for negligence and gross negligence, Defendants do not raise immunity under New York law against Plaintiff D-M.W.'s claim for assault and battery.

10      Those claims that have not been dismissed are as follows: (1) Plaintiff Penree's claim for malicious prosecution under state law and under the Fourth Amendment; (2) Plaintiff D-M.W.'s claim for assault and battery; (3) Plaintiff Penree's claim for excessive force under the Fourth Amendment; (4) Plaintiff D-M.W.'s claim for excessive force under the Fourteenth Amendment; (5) Plaintiff Penree's claim for false arrest under the Fourth Amendment; and (6) Plaintiff Penree's claim for unlawful entry under the Fourth Amendment.

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1914906

2015 WL 1914906
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Peggy MORRIS, Plaintiff,

v.

The CITY OF NEW YORK, et al., Defendants.

No. 14–cv–1749 (JG)(LB).
|
Signed April 27, 2015.

**Attorneys and Law Firms**

Peggy Morris, St. Albans, NY, pro se.

Zachary W. Carter, Corporation Counsel of the City of New York, by: Rosemari Y. Nam, New York, NY, for Defendants.

*MEMORANDUM AND ORDER*

JOHN GLEESON, District Judge.

**\*1** Peggy Morris brought this action against the City of New York (the "City"), several New York Police Department officers (the "NYPD Defendants"), judicial defendants, and private defendants under 42 U.S.C. §§ 1982, 1983, 1985, and 1988, as well as various sections of the United States Code and additional state law claims. On May 1, 2014, I dismissed Morris's § 1982 and § 1985 claims. I also dismissed the § 1983 claims against the private and judicial defendants, and allowed the § 1983 claims against the City and the NYPD Defendants [1] to proceed. Order (ECF No. 4) at 8–10. Morris moved for reconsideration of my decision dismissing the private defendants. On August 8, 2014, I granted that motion in part and reinstated the claims against Serena A. May, McCrary's Justice Center, Dawnett Simpson–Clark, [2] the Law Offices of Salami Oyakhilome, P.C., and Sadatu Salami–Oyakilome. Order (ECF No. 16) at 1–2.

On October 10, 2014, the City moved to dismiss Morris's remaining § 1983 claims. I heard oral argument on April 13, 2015, at which Morris appeared by telephone. For the reasons discussed below, Morris's false arrest claims against arresting officers Marcantonio, Skobla, and Villanueva may proceed. All other claims against the City and the NYPD Defendants are dismissed.

BACKGROUND

For the purposes of the memorandum, I assume a familiarity with the facts as outlined in my decision dated May 1, 2014. The facts underlying Morris's claims stem from a series of interactions with the NYPD Defendants that culminated in Morris's arrest on August 22, 2013. What follows is a brief summary of the claims that are the subject of this motion to dismiss.

Morris alleges that the NYPD Defendants violated her constitutional rights by failing to intervene in several disputes arising from an "illegal eviction" campaign against Morris (see Compl. ¶¶ 48–59) and by arresting her on August 22, 2013, in violation of her Fourth Amendment rights. *See id.* ¶¶ 60–80. She also claims the NYPD Defendants violated her rights to free speech and due process under the First and Fourteenth Amendments. *Id.* ¶¶ 90, 94. Morris alleges the NYPD officers "engaged in a joint venture and formed agreement to violate [Morris's] rights" and "assisted each other and the civilian protagonists in performing

2015 WL 1914906

the various described conduct lending their physical presence and support and the authority of their office to each other during the said events in order to accomplish a false arrest in furtherance of unlawful ends." *Id.* ¶ 83. As for the City, Morris claims that it failed to train and supervise the NYPD Defendants (*id.* ¶¶ 99–103) and created a policy or custom under which the unconstitutional practices occurred. *Id.* ¶ 105.

DISCUSSION

A. *Standard of Review*

*Pro se* complaints are held to less stringent standards than pleadings drafted by attorneys. This means I am required to read Morris's *pro se* complaint and opposition liberally and "interpret them to raise the strongest arguments that they suggest." *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006) (internal quotations omitted). This is especially true where the pro se plaintiff asserts civil rights violations. *See Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008).

 **\*2**  In deciding a motion to dismiss, "I must assume the truth of all well-pleaded factual allegations, draw all inferences in the light most favorable to the plaintiff[ ], and grant the motion only if the complaint so viewed fails 'to raise a right to relief above the speculative level.' " *Allstate Ins. Co. v. Lyons,* 843 F.Supp.2d 358, 367 (E.D.N.Y.2012) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). The complaint need not provide "detailed factual allegations," *Twombly,* 550 U.S. at 555, but it must be supported by more than "mere conclusory statements." *Ashcroft v. Iqbal,* 556 U.S. 662, 663 (2009). In deciding a motion to dismiss, a court considers "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken ...." *Thomas v. City of New York,* No. 12–cv–6327 (JG), 2014 WL 1312006, at \*2 (E.D.N.Y. Mar. 31, 2014) (quoting *Samuels v. Air Transp. Local* 504, 992 F.2d 12, 15 (2d Cir.1993)).

B. *The Section 1983 Claims*

Section 1983 imposes civil liability on anyone who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983. It "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." *Morris–Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005). "[T]he core purpose of § 1983 is 'to provide compensatory relief to those deprived of their federal rights by state actors.' " *Hardy v. New York City Health and Hosps. Corp.,* 164 F.3d 789, 795 (2d Cir.1999) (quoting *Felder v. Casey,* 487 U.S. 131, 141 (1988)).

In addition to arguing that Morris fails to state claims under § 1983 for constitutional violations, the police officer defendants assert the defense of qualified immunity. Qualified immunity shields governmental officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Poe v. Leonard,* 282 F.3d 123, 131 (2d Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

 1. *The False Arrest and Threatened Arrest Claims*

The Fourth Amendment's prohibition of unreasonable search and seizure requires that any arrest made without a warrant be based on probable cause to believe that some offense is being (or has been) committed by the arrested person. *See, e.g., United States v. Fisher,* 702 F.2d 372, 375 (2d Cir.1983) (citing cases). A warrantless arrest in the absence of probable cause violates the Fourth Amendment. "[A] plaintiff claiming false arrest must show, *inter alia,* that the defendant intentionally confined him without his consent and without justification." *Covington v. City of New York,* 171 F.3d 117, 122 (2d Cir.1999) (internal quotations omitted). If probable cause existed, the arrest is considered privileged and the officer has a "complete defense to an action for false arrest whether that action is brought under state law or under § 1983." *Weyant,* 101 F.3d at 852 (internal quotations and citation omitted); *see also Singer v. Fulton County Sheriff,* 63 F.3d 110, 118–19 (2d Cir.1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."). Additionally, "[t]he question of

whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant,* 101 F.3d at 852.

**\*3** "Probable cause exists if police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *United States v. Cole,* 26 F. App'x 45, 46–47 (2d Cir.2001) (internal quotations omitted). Generally, if an arresting officer is made aware of a criminal charge by the victim, there is probable cause. *See Singer,* 63 F.3d at 119; *see also Miloslavsky v. AES Engineering Soc., Inc.,* 808 F.Supp. 351, 355 (S.D.N.Y.1992) ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth."), *aff'd* 993 F.2d 1534 (2d Cir.1993).

As mentioned above, the arresting officers claim they are entitled to qualified immunity. On a false arrest claim, qualified immunity protects an arresting officer if he or she can establish that there was "arguable probable cause" to arrest. *See Cerrone v. Brown,* 246 F.3d 194, 203 (2d Cir.2001) ( "[T]he court must grant police officers qualified immunity when the court concludes that the only conclusion a reasonable jury could reach is that reasonable officers would disagree on the constitutionality of the seizure."). Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Morris v. City of New York,* No. 12–cv–3959 (JG), 2013 WL 5781672, at \*5 (E.D .N.Y. Oct. 28, 2013), *aff'd sub nom. Morris v. Silvestre,* No. 14–1188, 2015 WL 1061124 (2d Cir. Mar. 12, 2015) (hereinafter *Silvestre* ) (quoting *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004)).

The defendants argue that Morris's arrest was based on probable cause arising from an allegation in a criminal complaint that "Peggy Morris threw a small television down the stairs from the third floor to the second floor landing, almost hitting the complainants [Dawnett Simpson–Clarke and Tanyalee Murray] and [Clarke's] ten year old son." *See* Nam Decl. (ECF No. 39), Ex. B (Criminal Compl.); Def. Br. 10–11. I can consider the criminal complaint because it is referred to specifically in Morris's complaint, and it is a public record. *See* Compl. ¶ 64; *see also Liang v. City of New York,* No. 10–cv–3089 (ENV)(VVP), 2013 WL 5366394, at \*4–5 (E.D.N.Y. Sept. 24, 2013) ("[O]n a motion to dismiss, a court may only consider [1] the pleading itself, [2] documents that are referenced in the complaint, [3] documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, and [4] matters of which judicial notice may be taken.") (internal quotations omitted).

**\*4** A criminal complaint is generally sufficient to support a finding of probable cause unless there are "circumstances that raise doubts as to the victim's veracity." *Singer,* 63 F.3d at 119. Indeed, there are times when an accuser's veracity should be doubted, such as when there is a preexisting relationship between the victim and the accused. *See Mistretta v. Prokesch,* 5 F.Supp.2d 128, 133 (E.D.N.Y.1998); *see generally* 2 Wayne A. LaFave, *Search and Seizure* § 3.4(a) (5th ed.2012). Morris argues that this is one of those cases. She alleges the arresting officers did not believe Clark's allegations and knew of her previous contentious relationship with Clark. Compl. ¶¶ 64, 85. Morris claims that the nature of her relationship with Clark was something "all the responding officers and Sergeant McCormick knew about," and that Clark had an "axe to grind." Pl. Opp. at 11. [3]

In a previous case where Morris claimed false arrest based on the police officers' knowledge of an antagonistic relationship between Morris and the complainant, I found that officers of reasonable competence could disagree about whether there was probable cause and dismissed Morris's complaint on the grounds of qualified immunity. *See Silvestre,* 2013 WL, at \*5–7. In *Silvestre,* Morris was arrested when the son of Osborne Miller, Morris's terminally ill domestic partner, made a criminal complaint that Morris had unlawful possession of Miller's bank card and was making unauthorized withdrawals. *Id.* at \*1. In affirming the decision that the officers had arguable probable cause to arrest Morris, the Second Circuit noted that Morris's prosecution was supported by her admission—after an earlier denial—that she would appear on an ATM surveillance video using Morris's bank card. *Silvestre,* 2015 WL, at \*2.

Like *Silvestre,* the present case involves an arrest supported by little more than a "complaint by an individual whose preexisting, antagonistic relationship with Morris was known to the police." *Id.* But in this case, assuming, as I must, the truth of Morris's allegations on a motion to dismiss, I cannot conclude that reasonable officers could disagree on the question of probable cause. Unlike *Silvestre,* where the arrest was supported by Morris's admission about the ATM footage, in this case there are no independent facts that corroborate Clark's allegation. Instead, Morris alleges that the officers had "knowledge of [Clark's] established pattern of making and filing unbelievable and false complaints against [Morris]." Compl. ¶ 85. Morris also alleges that the officers knew of her previous complaints against Clark. She describes previous interactions with the officers in the precinct where she made complaints regarding conduct by Clark and they characterized the complaints as "Bull S__t." Compl. ¶ 51. Morris also argues that "Clark and others" first made this television throwing allegation against her on August 6 by (Pl. Opp. at 5) and that officer Pena from the 113th Precinct heard the allegation on August 20 and told Morris that he did not believe she threw the television. Compl. ¶ 64.

 **\*5**  In sum, Morris has sufficiently alleged that she was arrested without probable cause. Moreover, I conclude that she has alleged facts that "indicate that any reasonably competent officer should have known that [Clark] was an unreliable victim-informant whose statement, under the circumstances, could not form the sole basis for an arrest." *McGee v. Doe,* 568 F. App'x 32, 37–38 (2d Cir.2014), *as amended* (July 2, 2014). As in *McGee,* Morris's complaint alleges that some of the police defendants had longstanding relationships with both Morris and Clark and knew of their ongoing dispute. She has further alleged facts that support an inference that the real reason she was arrested was because the officers were annoyed by her numerous complaints about others. The qualified immunity defense fails at this juncture because if those alleged facts and the reasonable inferences that could be drawn from them are true, then no reasonable law enforcement officer would believe it was permissible to arrest Morris. It may well be necessary to revisit this issue on a motion for summary judgment, when the facts are more fully developed. However, at this stage, for the reasons discussed above, the motion to dismiss the false arrest claims against Marcantonio, Skobla, and Villanueva is denied.

Finally, Morris alleges that Defendant Martinez threatened to arrest her repeatedly and that on August 21, 2013, the day before her arrest, he informed Emergency Medical Service responders that she was a "mentally disturbed individual" before following her down the street as she tried to walk away. Compl. ¶¶ 64–65. However, the mere threat of arrest does not constitute a Fourth Amendment violation. *Bodek v. Bunis,* No. 06–cv–6022L (DL), 2007 WL 1526423, at \*9 (W.D.N.Y. May 23, 2007). Therefore, Morris's Fourth Amendment claim against Martinez is dismissed.

 2. *The Failure to Intervene Claims*
"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) (collecting cases). An officer who fails to intervene is liable for the preventable harm caused by other officers where that officer observes or has reason to know that other officers have committed a constitutional violation, including the use of excessive force or unjustifiable arrest. *See id.* For liability to attach, "there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Id. See also Armstead v. New York City Police Dep't,* No. 13–cv–891 (ENV) (JMA), 2013 WL 1148803, at \*3 (E.D.N.Y. Mar. 19, 2013).

Morris claims that Officers Banks, Bradley, Marmara, and McCormick, who did not arrest her—but also did not intervene to stop her arrest—broke the law. She asserts that they had dismissed previous claims made by Morris as "Bull S__ t complaints" and that her efforts to get protection against those making threatening calls to her were "all in vain," for instance. Compl. ¶¶ 51–52. However, police officers have no affirmative duty to investigate complaints, as the government and its agents are under no general duty to provide public services or protection to individual citizens. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 197 (1989). In addition, filing a complaint with an officer has not been found to be enough to give rise to a special relationship in which the officer has a duty to protect the complainant. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 534 (2d Cir.1993).

2015 WL 1914906

**\*6** Morris also asserts that the officers at the station on August 22, 2013 had knowledge that her arrest was unjustified and failed to intervene. Pl. Opp. 13. However, Morris cannot establish a claim for failure to intervene, as she cannot overcome to hurdle of qualified immunity. A police officer cannot be held liable for failure to intervene unless such a failure permitted fellow officers to "violate a suspect's clearly established statutory or constitutional rights" and was under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights. *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) (internal quotations omitted). When Morris was brought into the 113th precinct, I cannot say it would have been objectively unreasonable for an observing police officer to believe she had been properly arrested. Therefore, qualified immunity applies to the non-arresting officers.

3. *Municipality Liability*

Morris argues that the City should be held liable for failure to properly train and supervise the NYPD Defendants, and for creating a policy or custom that allows what Morris considers to be false arrests to occur regularly. In a previous action brought by Morris I addressed a very similar claim against the City. *See Morris v. Katz,* No. 11–CV–3556 (JG), 2011 WL 3918965 (E.D.N.Y. Sept. 4, 2011) ("In order to sustain a claim for relief under 42 U.S.C. § 1983 against a municipal defendant such as the City of New York, a plaintiff must show the existence of an officially adopted policy or custom that caused injury and a direct causal connection between that policy or custom and the deprivation of a constitutional right."). As in that case, there are no facts here from which a reasonable jury could find that any of the wrongful acts in which individual officers allegedly engaged were the result of a municipal policy or custom. I therefore grant the motion to dismiss Morris's § 1983 claim against the City.

4. *The First Amendment Claims*

Morris alleges that her First Amendment rights were violated when unidentified "police personnel" and unspecified court officials "silenced" her when she advocated for property rights and spoke out about due process and the court's lack of jurisdiction and that this "resulted in a chilling effect on [her] willingness to speak up as a citizen." Comp. ¶¶ 129–31. To make out a claim for violations of her First Amendment rights, Morris must show: "1) [she] has a right protected by the First Amendment; 2) defendants' actions were motivated or substantially caused by [her] exercise of that right; and 3) defendants' actions effectively chilled the exercise of [her] First Amendment right." *See Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir.2001).

Morris's statement that she experienced a "chilling effect on her willingness to speak up" is not a sufficient injury to establish a First Amendment violation. Morris's First Amendment claim fails because she is required to show "that the defendant's actions had some actual, non-speculative chilling effect." *Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir.2002) (citation omitted). To experience a chilling effect, Morris would have to feel as if she could not speak up because of some specific action taken against her in order to silence her. Morris has alleged no facts to establish that the officers' actions had a real effect on her. To the contrary, Morris alleges that she "is a life-long community advocate" and a housing specialist (Compl.¶ 33), and she shows no intention of ceasing her efforts to prevent unlawful foreclosures and evictions.

CONCLUSION

**\*7** For the reasons discussed above, the motion to dismiss the false arrest claims against arresting officers Marcantonio, Skobla, and Villanueva is denied. The defendants' motion is granted in all other respects. I certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Coppedge v. United States,* 369 U.S. 438, 444–445 (1962).

So ordered.

2015 WL 1914906

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1914906

---

## Footnotes

1   The police officers named in the complaint are defendants Marcantonio, Skobla, Villanueva, McCormick, Martinez, Bradley, Marmara, and Banks.

2   Morris refers to Clark as "Simpson–Clark" and "Clark." The criminal complaint referenced by the City refers to her as "Simpson–Clarke." *See* Nam Decl. (ECF No. 39) Ex. B.

3   Morris also takes issue with the fact that the reasons for arrest were not made clear at the time of arrest, but that is not a requirement for establishing probable cause for an arrest. Probable cause analysis is not limited to the specific charges contemplated or presented by the arresting officer—facts and circumstances known to the officers at time of arrest may be retroactively analyzed and if there was probable cause to arrest for any charge, then no false arrest claim lies. *See Devenpeck v. Alford,* 543 U.S. 146, 152–55 (2004).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4371750

2016 WL 4371750
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Eric SANABRIA, Plaintiff,
v.
DETECTIVE SHAWN TEZLOF, et al., Defendants.

11-CV-6578 (NSR)
|
Signed 08/12/2016

**Attorneys and Law Firms**

Eric Sanabria, Coxsackie, NY, pro se.

Harold L. Moroknek, Marshall, Dennehey, Warner, Coleman and Goggin, Rye Brook, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff Eric Sanabria ("Plaintiff") brings this action under 42 U.S.C. § 1983 for claims of excessive force and illegal seizure in violation of his Fourth Amendment rights, as well as claims for failure to intervene to prevent the use of excessive force and denial of medical care in violation of his Fifth Amendment rights.[1] Plaintiff initially brought this action *pro se* naming as defendants "Warwick Police Department; Chester Police Department; [and] State Police Trooper F?" pursuant to a complaint filed September 7, 2011. (ECF No. 1) On December 30, 2011, the Court dismissed the claims against the Warwick Police Department and Chester Police Department, directed the Clerk to add as defendants the Town of Warwick, the Town of Chester, Detective Tezlof, Detective Hommein, and John Does 1-25. and directed the Towns of Warwick and Chester to assist Plaintiff in identifying John Does 1-25. On May 17, 2013, Plaintiff filed an Amended Complaint dropping the Town of Chester and Detective Hommein as defendants, keeping Tezlof and the Town of Warwick as defendants, and adding as defendants Fredrick M. Hoffmen, Christopher Blackwell, John Radar, Alton Morley, Brian Luthan, Kevin Terry, Felix Oresto, Kevin Harsey, Jason March, Micheal Mooney, Micheal Kearse, and J. Feragola (together with Tezlof, "Individual Defendants") (collectively, including Town of Warwick, "Defendants").[2]

Before the Court is the Defendants' motion to dismiss.[3] For the following reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

**FACTUAL BACKGROUND**

**\*2** The following facts are taken from Plaintiff's Amended Complaint and Motion for Leave to Amend the Complaint. Where warranted, the Court considers additional facts provided in Plaintiff's original complaint, because Plaintiff did not re-plead the entirety of facts put forth in his original complaint. *Farbstein v. Hicksville Pub. Library,* No. CV 02-6438 DRH/MLO, 2006 WL 288251, at \*1 (E.D.N.Y. Feb. 6, 2006), aff'd, 254 Fed.Appx. 50 (2d Cir. 2007) (considering allegations in both the original and amended complaints because plaintiff was *pro se).*

Sanabria v. Detective Shawn Tezlof, Not Reported in Fed. Supp. (2016)
2016 WL 4371750

On March 25, 2010, at approximately 10:30 P.M. in the town of Warwick, NY, Plaintiff was in a taxi cab driven by Plaintiff's friend when he was pulled over by approximately 20 to 25 police officers. (Compl., ECF No. 1, at 3; Amended Compl., ECF No. 34, ¶ 1(a).) The officers, with guns pointed at the vehicle, asked the driver to step out of the vehicle. Detective Shawn Tezlof, Sergeants John Rader and Alton Morely, and Officers Brian Luthan, Kevin Terry, Felix Oresto, Kevin Harsey, Jason Marsh, Michael Mooney, Michael Kearse, and J. Feragola all forced Plaintiff out of the car, pulled him to the ground, handcuffed him tightly, and struck his knee. (Amended Compl., ¶ 1(a).) The officers additionally stepped on Plaintiff's hands and back so that he could not move. (Compl. at 3.) Sergeants Christopher Blackwell, Rader, and Morely, and Detectives Hoffman and Tezlof witnessed these events but did not prevent or stop the officers' actions. (Amended Compl. ¶ 1(b).) Plaintiff was then arrested and brought to the Town of Warwick police station. (Compl. at 3).

Prior to the events of March 25, Plaintiff had been seeing an orthopedist and had plans to undergo a knee replacement surgery. (*Id.*) At the jail, Plaintiff was given minimal medical treatment, including pain medication (naproxen) and a knee brace. (*Id.*) Since the incident, Plaintiff's knee fills up with fluid all of the time and causes difficulty walking. (*Id.*)

## DISCUSSION

### I. Statute of Limitations

Section 1983 claims are subject to a three-year statute of limitations in New York, *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir. 2013); *see also Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 79 (2d Cir. 2015). Plaintiff's Amended Complaint was filed on May 17, 2013, more than three years after the alleged incident. The claims in Plaintiff's Amended Complaint, however, will be deemed timely to the extent they relate back to the original complaint. Specifically, in order to bring claims against the John Doe officers once their identities are discovered, the amended complaint must "relate back" to the original complaint pursuant to Federal Rule of Civil Procedure 15(c). Fed. R. Civ. P. 15(c). However, Federal Rule of Civil Procedure 15(c)(1)(C), which provides one avenue for relation back, "preclude[s] relation back for amended complaints that add new defendants, where the newly added defendants were not named originally because the plaintiff did not know their identities." *Hogan*, 738 F.3d at 517 (citing *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999)). *See Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995) ("As the amended complaint adding the individual police officers does not relate back to the complaint naming the 'John Doe' officers, the claims brought against those officers are untimely."). Therefore, any claim against a John Doe officer newly named in the Amended Complaint cannot relate back to the original complaint under Rule 15(c)(1)(C) [4]

**\*3** Federal Rule of Civil Procedure 15(c)(1)(A), alternatively, permits an amended pleading to relate back when "the law that provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15(c)(1)(A). Under CPLR § 1024, a complaint relates back where: (1) the plaintiff "exercise[d] due diligence, prior to the running of the statute of limitations, to identify the defendant by name"; and (2) the plaintiff "describe[d] the John Doe party in such form as will fairly apprise the party that [he] is the intended defendant." *Hogan*, 738 F.3d at 519 (internal quotations and citations omitted). To meet the first requirement, a plaintiff must "show that he or she made timely efforts to identify the correct party before the statute of limitations expired." *Strada v. City of New York*, No. 11-CV-5735 MKB, 2014 WL 3490306, at \*5 (E.D.N.Y. July 11, 2014) (quoting *Justin v. Orshan,* 14 A.D.3d 492, 492—93, 788 N.Y.S.2d 407 (2d Dep't 2005)) (quotation marks omitted). "These efforts might include, inter alia, serving discovery demands on any known parties or seeking disclosures pursuant to a Freedom of Information Law request." *Bender v. City of New York*, No. 14 CIV. 4386 LTS GWG, 2015 WL 524283, at \*5 (S.D.N.Y. Feb, 10, 2015) (internal citations omitted).

In the instant case, Plaintiff has met the first requirement of § 1024 as he exercised due diligence to identify the John Doe defendants. Plaintiff contends that "a record of correspondence between petitioner and the court, requesting additional information, [exists and] demonstrates due diligence on" his part. (Plaintiff's Opposition to the Motion to Dismiss, ECF No. 66, at 1.) As evidenced by the docket in this case, Plaintiff attempted to amend his complaint multiple times, and each time the amendment was denied for procedural or other deficiencies. (*See* ECF Nos. 17, 23, 25, 32, 34.) The amended complaints Plaintiff attempted to file on May 3 and 4, 2012, contained detailed descriptions of the events and identified the John Doe police

officers by name. (ECF Nos. 17, 25.) Therefore, it cannot be said that Plaintiff did not exercise due diligence in identifying the defendants prior to the expiration of the statute of limitations where he in fact did attempt to file amended complaints that identified the defendants before the statute of limitations expired. Accordingly, Plaintiff has met the first *Hogan* requirement for relation back.[5]

To meet the second requirement, a complaint is "sufficient only if the actual defendants are adequately described and would have known, from the description in the complaint, that they were the intended defendants." *Lebowitz v. Fieldston Travel Bureau, Inc.,* 181 A.D.2d 481, 482 (1992) (internal citations and quotation marks omitted). A complaint can satisfy this requirement with details such as "the date, time, and location of the alleged incident," or "substantial detail concerning the appearance" of the alleged defendants. *Hogan,* 738 F.3d at 519. Plaintiff has additionally met this second requirement. His complaint describes with particularity the date, time, and location of the arrest. In addition, the original complaint names defendants Tezlof and Hoffmen.[6] (Compl. at 3.) "Although Plaintiff did not describe the Defendants in detail, a simple review of the arrest paperwork would have revealed the [officers involved], who undoubtedly knew [the identity of the other officers on scene]. This level of detail is sufficient to have informed [the] John Doe officer[s] that they were the intended Defendants." *Heinz-Wright v. City of New York*, No. 15 CIV. 3269 RRM VMS, 2016 WL 3627323, at *4 (E.D.N.Y. June 3, 2016), *report and recommendation adopted sub nom. Heinz-Wright v. New York,* No. 15CV3269RRMVMS, 2016 WL 3620759 (E.D.N.Y. June 29, 2016). Finally, as explained above, defendants were identified in ECF submissions (i.e., rejected amended complaints) as of May 2012—well within the statute of limitations. Therefore, it cannot be said that had the John Doe defendants read the complaint, they still would not have been apprised that they were the intended parties, and Plaintiff has met both *Hogan* requirements for relation back pursuant to § 1024. As a result, the Amended Complaint relates back to the original complaint and is deemed timely.

## II. Fourth Amendment Seizure/False Arrest

**\*4** "[T]he warrantless arrest of a person is a species of seizure required by the [Fourth] Amendment to be reasonable." *Payton v. New York,* 445 U.S. 573, 585 (1980). The § 1983 claim resting on the Fourth Amendment and resulting from unlawful seizure is false imprisonment. *See Covington v. City of New York,* 171 F.3d 117, 122 (2d Cir. 1999) (citing *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996) ("A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law.").

Defendants argue that, pursuant to the Supreme Court's holding in *Heck v. Humphrey*, because Plaintiff was later convicted on criminal charges, Plaintiff may not recover damages for an unlawful seizure unless his "conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. 477, 487 (1994). However, the holding in *Heck* is explicitly limited to civil suits that would undermine or imply the invalidity of the conviction of the Plaintiff. *Id.* The Second Circuit has made clear that a § 1983 false arrest action only undermines the integrity of criminal proceedings when the prosecution's "only evidence for conviction was obtained pursuant to an arrest." *Covington v. City of New York*, 171 F.3d 117, 123 (2d Cir. 1999) ("[I]n a case where the only evidence for conviction was obtained pursuant to an arrest, recovery in a civil case based on false arrest would necessarily impugn any conviction resulting from the use of that evidence."). However, where there exists "independent evidence upon which a conviction could be obtained that was not in any way tainted by the unlawful arrest," the civil claim would not undermine the proceeding and therefore is not barred by *Heck. Id.*

In the instant case, the Court is unable to determine whether success on Plaintiff's § 1983 claim would "necessarily imply the invalidity" of Plaintiff's conviction for burglary and possession of a weapon, because the Court has no information as to the nature and extent of the evidence that was available and presented against Plaintiff in the criminal proceedings. *Covington,* 171 F.3d at 123; *see also McCord v. City of New York,* No. 13 CIV. 2008 AJN, 2014 WL 2567108, at *3 (S.D.N.Y. June 6, 2014) ("The Court is not equipped to conduct such an analysis in this procedural posture because the parties have provided no basis from which to assess whether any seized evidence or self-incriminating statements were 'essential' to the prosecution's case."). As a result, the Court cannot rule at this stage of the litigation that Plaintiff's civil claims arising from his arrest are barred by *Heck.*

2016 WL 4371750

### III. Excessive Force

"Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is 'objectively unreasonable in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation.' " *Carpenter v. City of New York,* 984 F.Supp.2d 255, 267 (S.D.N.Y. 2013) (quoting *Papineau v. Parmley,* 465 F.3d 46, 61 (2d Cir. 2006)). Granting "a motion to dismiss an excessive force claim is appropriate if, accepting all of the allegations as true, it is clear that the force used by the officers was objectively reasonable under the circumstances." *Messina v. Mazzeo*, 854 F. Supp. 116, 128-29 (E.D.N.Y. 1994) (citing *Roundtree v. City of New York*, 778 F.Supp. 614 (E.D.N.Y. 1991)). "In determining whether the force used in a given arrest is reasonable, courts pay careful attention to the facts and circumstances of each case, including (1) the severity of the crime at issue, (2) whether the arrestee poses an immediate threat to the safety of the officers or others, and (3) whether the arrestee is actively resisting arrest or attempting to flee." *Gersbacher v. City of New York,* 134 F. Supp. 3d 711, 723 (S.D.N.Y. 2015) (citing *Graham v. Connor,* 490 U.S. 386, 396 (1989); *Tennessee v. Garner,* 471 U.S. 1, 8-9 (1985)).

**\*5** Defendants contend that Plaintiff "has failed to allege action by [the Individual Defendants] that would subject them to liability." (Memorandum of Law in Support of Defendants' Motion to Dismiss, Section IV(e).) Accepting Plaintiff's allegations as true for purposes of this motion, the Court cannot conclude that it was objectively reasonable for Defendants to step on Plaintiff's hands and back and strike his knee once Plaintiff was on the ground. (Amended Compl., ¶ 1(a); Compl. at 3.) Additionally, it is not apparent from the pleadings that Plaintiff posed any threat to the officers' safety or that he was resisting arrest. Evidence uncovered during discovery may ultimately prove that Defendants' actions were objectively reasonable, to the extent they occurred as alleged by Plaintiff, but such a determination is best resolved on a motion for summary judgment or at trial. *See, e.g., Landy v. Irizarry*, 884 F. Supp. 788 (S.D.N.Y. 1995) (dismissing plaintiff's excessive force claim on a motion for summary judgment following the Court's review of the evidence, not on a motion to dismiss.)

Moreover, though Plaintiff has failed to allege with particularity which defendant specifically engaged in striking his knee and stepping on his back, he has alleged which defendants were involved in the incident. At this stage, before Plaintiff has had access to discovery, the Court cannot insist that Plaintiff identify which officer specifically engaged in which part of the excessive force incident. Accordingly, Defendants' motion to dismiss Plaintiff's excessive force claim arising from his arrest is denied. [7]

### IV. Failure to Intervene

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Bremen,* 17 F.3d 552, 557 (2d Cir. 1994). Liability may attach where an officer fails to intervene, but observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official. *Id.* For an officer to be held liable, he or she must have had a realistic opportunity to intervene to prevent the violation from happening. *Id.* (citing *O'Neill v. Krzeminski,* 839 F.2d 9, 11-12 (2d Cir. 1988)); *accord Russo v. DeMilia,* 894 F. Supp. 2d 391, 414 (S.D.N.Y. 2012). However, "there can be no failure to intervene claim without a primary constitutional violation." *Forney v. Forney,* 96 F. Supp. 3d 7, 13 (E.D.N.Y. 2015) (citing *Posner v. City of New York,* 11-CV-4859, 2014 WL 185880, at *8 (S.D.N.Y. Jan. 16, 2014)).

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite for an award of damages under § 1983.' " *Provost v. City of Newburgh, 262* F.3d 146, 154 (2d Cir. 2001) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994)). With respect to a claim of failure to intervene, an officer is personally involved in the alleged constitutional deprivation if he was present when it occurred, "yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Russo v. DeMilia,* 894 F. Supp. 2d 391, 414 (S.D.N.Y. 2012) (quoting *Jeffreys v. Rossi,* 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003)). Where the officer is a direct participant in the allegedly unlawful conduct, the failure to intervene theory of liability is inapplicable. *Simon v. City of New York,* No. 09 Cv. 1302 (ENV)(RER), 2011 WL 317975, at *12 (E.D.N.Y. Jan. 3, 2011) (dismissing plaintiff's claim as futile for failure to intervene "because these same officers

2016 WL 4371750

actually arrested her.") (citing *Morgan v. County of Nassau,* No. 09 Cv. 4168 (ADS)(AKT), 2010 WL 2634125, at *9 (E.D.N.Y. July 1, 2010)) *report and recommendation adopted,* No. 09 Cv. 1302 (ENV)(RER), 2011 WL 344757 (E.D.N.Y. Feb. 1, 2011).

**\*6**  Defendants argue that "there has been no evidence adduced to suggest, let alone establish, that any officer knew of a constitutional violation, had an opportunity to prevent a violation, and failed to do so." (Memorandum of Law in Support of Defendants' Motion to Dismiss, Section IV(c).) However, at the motion to dismiss stage, Plaintiff need not present evidence in order for his claims to survive. Plaintiff must simply plead facts from which the Court could conclude, if accepted as true, that a violation has occurred. Plaintiff has alleged that Defendants witnessed the beating of Plaintiff and failed to intervene. Having already held that Plaintiff adequately pleaded a constitutional violation of excessive force and the presence of additional defendants during his arrest, his failure to intervene claim additionally must stand. *See Gersbacher,* 134 F. Supp. 3d at 725 ("The failure to intervene claim is straightforward: because [plaintiff] has adequately pleaded underlying constitutional violations and the presence of multiple NYPD officers during his arrest he may move forward to discovery."). The Court notes, however, that Plaintiff names a number of officers that participated in the arrest and beating as well as failed to intervene. If the officer was a direct participant in the excessive force violation, the failure to intervene theory will be inapplicable. *See Simon,* 2011 WL 317975, at *12. The determination of who was specifically involved in the beating will be left to discovery.

### *V. Denial of Medical Care*

Plaintiff's cause of action for denial of medical care is brought pursuant to 42 U.S.C. § 1983 and relates to the Defendants' alleged denial of medical care during the time that Plaintiff was held at the Town of Warwick police station. Although the Eighth Amendment bar to cruel and unusual punishment does not apply to Plaintiff because he was not a prisoner but was simply being held at the police station, the denial of medical care claim arises under the Due Process Clause of the Fifth Amendment instead, and as a result, the same deliberate indifference test applies. *See Cuoco v. Moritsugu, 222* F.3d 99, 106 (2d Cir. 2000); *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir. 1996) (holding that denial of medical care subsequent to an arrest is analyzed under the Due Process Clause because the arrestee was a "pretrial detainee, not a person who had been convicted, and hence the Eighth Amendment did not apply").

To sustain a claim of deliberate indifference, Plaintiff must allege that (1) objectively, the deprivation of adequate medical care was sufficiently serious, and (2) subjectively, defendants acted with deliberate indifference. *See Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Salahuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir. 2006). "The objective component requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted). For the subjective prong, the official charged with deliberate indifference must act with a "sufficiently culpable state of mind." *See Wilson v. Seiter,* 501 U.S. 294, 298 (1991). A prison official may only be found liable if "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837.

Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness —"an act or a failure to act ... that evinces a conscious disregard of a substantial risk of serious harm." *Hill,* 657 F.3d at 123 (citing *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)) (internal quotation marks omitted); *see also Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir. 1996) (observing that "negligent malpractice do[es] not state a claim of deliberate indifference"). In the instant case, it cannot be said that Plaintiff experienced deliberate indifference to his medical needs. Though Plaintiff's injury may have caused extreme pain, there is no allegation that an official knew of and disregarded a serious risk to Plaintiff's health. Specifically, while at the police station, Plaintiff was provided with a knee brace and pain medication. Therefore, Plaintiff was provided with at least some treatment, and, at most, the treatment was negligent. However, even if negligent, the treatment does not rise to a level of deliberate indifference.

**\*7**  Moreover, "[b]ecause Section 1983 imposes liability only upon those who actually cause a deprivation of rights, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999) (citation and internal quotation marks omitted). Plaintiff has not alleged that any officer or defendant, in particular, refused to provide him with medical care. Without knowing what, if any, part each defendant

2016 WL 4371750

played in providing or not providing medical care to Plaintiff, it is impossible for this Court to draw an inference that the Defendants could be liable for the alleged conduct. Because Plaintiff has not alleged personal involvement of any defendant, the denial of medical care claims must be dismissed. *See Thomas v. Ashcroft,* 470 F.3d 491, 496 (2d Cir. 2006) ("[A] plaintiff must allege that the individual defendant was personally involved in the constitutional violation").

### VI. Qualified Immunity

Defendants assert qualified immunity as a defense to all of Plaintiff's claims. Plaintiff's only remaining claims against the Individual Defendants are false arrest, excessive force, and failure to intervene. It is well established that qualified immunity may operate as a defense to false arrest and excessive force claims. *See Cowan ex rel. Estate of Cooper v. Breen,* 352 F.3d 756, 761 (2d Cir. 2003); *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995). Additionally, a police officer is not entitled to qualified immunity if his failure to intervene "permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights of which a reasonable person would have known" and "the failure to intercede [occurred] ..... under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." *Riciutti v. New York City Transit Authority,* 941 F.2d 119, 129 (2d Cir. 1991).

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. alKidd,* 131 S.Ct. 2074, 2080 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818-19. It is within the Court's discretion to determine the order in which the two prongs are analyzed. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

Having already decided that Plaintiff sufficiently alleges claims of false arrest, excessive force, and failure to intervene, the Court turns to the second prong of the test. There is no question that the rights at issue in this case—to be free from false arrest and excessive force and for an officer to intervene when witnessing a violation of constitutional rights—were clearly established at the time of the incident. *See Lennon v. Miller,* 66 F.3d 416, 423 (2d Cir. 1995) (collecting cases regarding false arrest and excessive force); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."). Thus, because Plaintiff sufficiently alleges claims of false arrest, excessive force, and failure to intervene and because the law is clearly established with regards to each of those rights, Defendants' request for qualified immunity is denied.

However, this is not to say that a defense of qualified immunity would necessarily fail at the summary judgment stage. In the case where Defendants are alleged to have violated clearly established lights, "the question of qualified immunity ... turns on whether the actions of [the officers] were objectively reasonable under the circumstances." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir. 1996), *amended* (May 21, 1996).

### VII. Monell *Claim against Town of Warwick*

**\*8** Finally, Plaintiff asserts that the Town of Warwick is liable for the constitutional violations because "it was the policy and/or custom of the Town of Warwick to inadequately supervise and train its police officers." (Amended Compl. ¶ 10.) A municipality may be sued under 42 U.S.C. § 1983 only "when execution of [the] government's policy or custom ... inflicts the injury." *Monell*, 436 U.S. at 694. Therefore, any § 1983 claim against a municipal entity must "show that the challenged acts were performed pursuant to a municipal policy or custom." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004). Courts in this Circuit apply a two prong test for § 1983 claims brought against a municipal entity. *Vippolis v. Vi11. of Haverstraw,* 768 F.2d 40, 44 (2d Cir. 1985) (internal citation omitted). First, the plaintiff must "prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer." *Id.* (internal citation omitted). Second, the plaintiff must establish a " 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation.' " *Hayes v. Cnty. of Sullivan,* 853 F. Supp. 2d 400, 439 (S.D.N.Y. 2012) (quoting *City*

2016 WL 4371750

*of Canton v. Harris,* 489 U.S. 378, 385 (1989)). "[T]he simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993); *see also Davis v. City of New York*, 2008 WL 2511734, at *6 (S.D.N.Y. June 19, 2008) (holding that "conclusory allegations that a municipality failed to train and supervise its employees" are insufficient to state a *Monell* claim absent supporting factual allegations).

Here, the complaint lacks sufficient factual details concerning *Monell* liability and contains boilerplate allegations of unconstitutional policies and practices. Specifically, Plaintiff's *Monell* claim is based on one conclusory allegation that "it was the policy and/or custom of the Town of Warwick to inadequately supervise and train its police officers." (*See* Amended Compl. ¶ 10.) As a mere recitation of failure to train is not enough to sustain a *Monell* claim, Plaintiff's claim fails.

Moreover, Plaintiff's claim relates only to a single incident. Although a plaintiff is not required to identify an express rule or regulation in order to establish a *Monell* claim and a court may infer a municipal policy from acts or omissions of the municipality's policy makers, in the absence of other evidence, a "single incident of errant behavior is an insufficient basis for finding that a municipal policy caused plaintiff's injury." *Sams v. Rotundo,* 831 F.2d 397, 402-03 (2d Cir. 1987); *see also DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.") (internal citations and quotation marks omitted). Plaintiff has not alleged any incidents of excessive force or false arrest involving the Town of Warwick Police Department prior to March 25, 2010. (*Id.*) As a result, the complaint lacks sufficient factual details concerning *Monell* liability. *See Plair v. City of New York,* 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (collecting cases that dismiss *Monell* claim where the only factual assertions in complaint were conclusory and constituted a boilerplate recitation of the elements of a *Monell* claim). Without any further factual allegations to support the existence of an unconstitutional municipal policy, Plaintiff's *Monell* claim against the Town of Warwick fails as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED in part and DENIED in part. Plaintiff's claims for false arrest, excessive force, and failure to intervene remain; the claim for denial of medical care and all of Plaintiff's claims against the Town of Warwick are dismissed. The Individual Defendants are directed to file an answer to the Complaint within 30 days of the date of this Order. The parties are directed to appear for an initial pre-trial conference on September 22, 2016 at 12:00 p.m. The parties are further directed to complete and bring a completed case management plan to the conference.

 *9  SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4371750

---

### Footnotes

1       In his papers in opposition to the current motion, Plaintiff additionally asserts an equal protection claim, "stem[ming] from the fact that even during an unlawful arrest, plaintiff should have been treated accordingly to the law and established police procedure, as any individual in the same circumstances." (Plaintiff's Opposition to the Motion to Dismiss, ECF

---

2016 WL 4371750

No. 66, at 2.) While Plaintiff uses the term "equal protection," this is not a cognizable equal protection claim as Plaintiff has not alleged he was treated differently from any class of persons or similarly situated individuals.

2      In its order of service dated March 4, 2015, the Court mistakenly determined the Town of Warwick was dropped as a defendant, because Plaintiff removed the Town of Warwick from the caption in his Amended Complaint. However, Plaintiff maintained allegations concerning the Town of Warwick, and, as a result, the claims against the Town of Warwick stand. *See Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir. 2006) (the court should read the complaint "to raise the strongest arguments [it] suggests."). As a result, the Town of Warwick was not properly served, but defense counsel entered an appearance for the Town of Warwick and made arguments in the motion to dismiss on its behalf. The Court will therefore consider the arguments, and because the Court determines Plaintiff's claims against the Town of Warwick must be dismissed, there is no issue of service or lack of notice.

3      The Court notes that Defendants did not properly submit a motion to this Court. Local Civil Rule 5.2 of the United States District Courts for the Southern and Eastern Districts of New York directs the parties to "follow the instructions regarding Electronic Case Filing (ECF) published on the website of each respective Court." Local Rule 5.2(a). Pursuant to this Court's rules, all "Motion papers shall be filed via ECF." Individual Practices in Civil Cases, Judge Nelson S. Román, Rule 3(c), *available at* http://www.nysd.uscourts.gov/cases/show.php?db=judge_info&id=826. Defendants did not file a notice of motion or motion papers electronically, which resulted in significant delay for the Plaintiff in this case.

4      The New York CPLR § 203 "requirement closely tracks the federal relation-back requirement of Rule 15(c)(1)(C)," and thus, Plaintiff "fails to satisfy the state's corollary to that rule, as well." *Id.; see also Buran v. Coupal,* 87 N.Y.2d 173, 179, 638 N.Y.S.2d 405, 661 N.E.2d 978 (1995) (noting that § 203 was largely modeled after Rule 15(c) of the Federal Rules of Civil Procedure).

5      As previously explained in this district, "all *pro se* litigants are required to submit their complaints to the Pro Se Clerk, [who] reviews all complaints for form and substance [ ]." *Simpson v. Bank of New York*, No. 81 CIV. 0407 (CBM), 1981 WL 245, at * 1 (S.D.N.Y. Aug. 26, 1981) (internal citations omitted). The Pro Se Clerk determined Plaintiff's submissions were unclear or procedurally confusing for reasons unrelated to the identification of John Doe defendants. (*See* ECF No. 17 at 1; ECF No. 25 at 1.) Providing *pro se* Plaintiff with the necessary leniency in light of his attempts to name the defendants, Plaintiff should not be punished for his failed attempts to amend his complaint clearly and correctly when such attempts were (albeit, correctly) "bounced" by the Pro Se Clerk.

6      Plaintiff spelled defendant Hoffmen's name incorrectly as Hommein in the original complaint. However, in later submissions, Plaintiff refers to the defendant as "Detective Hoffmen/Hommein?" (ECF No. 17 at 2.) This clearly indicates that Plaintiff was merely mistaken about the correct spelling of defendant Hoffmen 's name.

7      It should be noted that Defendants do not explicitly make an argument that Plaintiff's excessive force claim was not adequately plead. Instead, Defendants argue that the Court "must analyze the specific actions of an individual official when addressing the qualified immunity defense" and that Plaintiff "has failed to allege action by [the Individual Defendants] that would subject them to liability." (Memorandum of Law in Support of Defendants' Motion to Dismiss, Section IV(e).) It is unclear what specifically Defendants intended to argue with regards to the sufficiency of the allegations, but the analysis in this section as well as the qualified immunity section fully address any argument that could have been made by Defendants.

---

**End of Document**                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 85 of 147

662 F.Supp.3d 289
United States District Court, N.D. New York.

Timothy LALONDE & Theresa Lalonde, Plaintiffs,

v.

CITY OF OGDENSBURG, et al., Defendants.

8:22-CV-0164 (LEK/DJS)

|

Signed March 16, 2023

**Synopsis**
**Background:** Arrestee, who was legally blind and partially disabled, and his spouse, brought action against city, city police department and officers, county, county sheriff department, and officer within department, asserting § 1983 claims for violations of Fourth and Fourteenth Amendments, claims for violations of Americans with Disabilities Act (ADA) and Rehabilitation Act, civil rights conspiracy, and state law claims. Defendants moved to dismiss.

**Holdings:** The District Court, Lawrence E. Kahn, J., held that:

arrestee plausibly alleged that municipal and county policymakers knew to moral certainty that officers would confront situations like that giving rise to arrestee's claims, as factor for determining whether municipality and county could be held liable under § 1983 for failure to train;

arrestee stated claims for civil rights conspiracy;

arrestee could maintain claim against municipal and county law enforcement officers for failure to prevent conspiracy to deprive arrestee of his civil rights;

arrestee stated claim for supervisory liability against county sheriff and municipal police chief;

arrestee state claim for violation of ADA and Rehabilitation Act;

arrestee's spouse stated claim under New York law for negligent infliction of emotional distress; and

negligent infliction of emotional distress claims were not cognizable.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

**\*302**  Jesse P. Ryder, Ryder Law Firm, East Syracuse, NY, A. Cabral Bonner, Charles A. Bonner, Law Offices of Bonner & Bonner, Sausalito, CA, Eric R. Seifert, New York, NY, for Plaintiffs.

John D. Aspland, Corey A. Ruggiero, Fitzgerald Morris Baker Firth, P.C., Glens Falls, NY, Scott Goldie, Ducharme Goldie & Adams P.C., Canton, NY, for Defendants City of Ogdensburg, City of Ogdensburg Police Department.

2023 WL 2537626

Anneliese Aliasso, John L. Murad, Jr., Hancock Estabrook, LLP, Syracuse, NY, for Defendants Saint Lawrence County, Saint Lawrence County Sheriffs' Department, Brooks Bigwarfe, Matthew Merria.

John D. Aspland, Fitzgerald Morris Baker Firth, P.C., Glens Falls, NY, Scott Goldie, Ducharme Goldie & Adams P.C., Canton, NY, for Defendants Robert Wescott, Charles Shaver, Danielle Pryce, Joshua Sirles, Scott Wilson.

### MEMORANDUM-DECISION AND ORDER

LAWRENCE E. KAHN, United States District Judge

### I. INTRODUCTION

**\*\*1** Plaintiffs Timothy Lalonde and Theresa Lalonde (collectively, "Plaintiffs") commenced this civil action on February 18, 2022, against Defendants the City of Ogdensburg, the City of Ogdensburg Police Department, Ogdensburg Police Department Chief Robert Westcott, Police Officers Charles Shaver, Danielle Pryce, Joshua Sirles, Scott Wilson, and Does 1–100 (collectively, "Ogdensburg Defendants"), as well as Saint Lawrence County, the Saint Lawrence County Sheriffs' Department, Saint Lawrence County Sheriff Brooks Bigwarfe, Sheriff Matthew Merria, and the aforementioned Does 1–100 (collectively, "Saint Lawrence Defendants").[1] Dkt. No. 1 ("Complaint").

Saint Lawrence Defendants filed a motion to dismiss for failure to state a claim pursuant to **\*303** Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 9 ("Saint Lawrence Defendants' Motion to Dismiss"). Subsequently, Ogdensburg Defendants filed a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). Dkt. No. 10 ("Ogdensburg Defendants' Motion to Dismiss"). Plaintiffs filed a response to Saint Lawrence Defendants' Motion to Dismiss, Dkt. No. 12 ("Plaintiffs' Response to Saint Lawrence Defendants"), and a response to Ogdensburg Defendants' Motion to Dismiss, Dkt. No. 17 ("Plaintiffs' Response to Ogdensburg Defendants"). Thereafter, Ogdensburg Defendants filed a reply, Dkt. No. 19 ("Ogdensburg Defendants' Reply") and Saint Lawrence Defendants filed a reply, Dkt. No. 20 ("Saint Lawrence Defendants' Reply").[2]

For the reasons that follow, the Court grants in part and denies in part Saint Lawrence Defendants' and Ogdensburg Defendants' Motions to Dismiss.

### II. BACKGROUND

The following facts, which the Court assumes to be true at this stage, are taken from the Complaint. See Vega v. Hempstead Union Free School Dist., 801 F.3d 72, 76 (2d Cir. 2015).

Timothy Lalonde "was rendered legally blind and partially disabled" because "of the aftermath of a life-threatening disease that severely diminished [his] physical abilities." Compl. ¶ 18. Specifically, "[o]n account of encountering and surviving a life-threatening flesh-eating bacteria in or around the year 2000" he "was left without his back, stomach, and right shoulder muscles which the surgeons had to remove in order to save [his] life." Id. ¶ 32. "In addition, the bacteria attacked his optic nerves which left him legally blind." Id. Thus, Plaintiff "lost the complete use of his vision, the right side of his upper body, any strength in his core torso having lost the muscles in his back, stomach and right shoulder" and experienced "chronic emotional and psychological stress from his disabled state." Id. ¶ 51.

**\*\*2** On Sunday, March 1, 2020, at approximately 12:29 A.M., Officer Shaver "responded to 510 Pleasant Avenue, Ogdensburg, NY pursuant to a neighbor's 911 call informing dispatch that two neighbors were loudly arguing in front of one of the neighbor's homes." Id. ¶ 17. Shaver "heard the tail end of an exchange" between Timothy Lalonde and "his daughter's boyfriend, Randall Outlaw, who, along with [Timothy Lalonde's] daughter Ashley, resided at [Timothy Lalonde's] second home located next door to his residence at 506 Pleasant Avenue, Ogdensburg, NY." Id.

2023 WL 2537626

Before Timothy Lalonde's argument with Outlaw that evening, Theresa Lalonde, "[Timothy Lalonde's wife,] had picked up her husband from town and drove him to their home." Id. at ¶ 18. Theresa Lalonde is "charged with having to assist [Timothy] with various tasks relating to the maintenance of his personal hygiene and sight required tasks." Id. at ¶ 51. "Upon arriving at home[,]" Timothy Lalonde "exited the car and with his long white cane, tapped on the curb and made his way over to his second house" and had the "intention of speaking with his daughter's boyfriend, Randall Outlaw ...." Id. at ¶ 19. Timothy Lalonde "found Mr. Outlaw at home and strongly criticized him for **\*304** discharging a firearm outside of [Timothy Lalonde's home] while his daughter Ashley was not home, and her three younger children were present." Id.

Thereafter, an argument between Timothy Lalonde and Outlaw ensued and "[c]oncerned with such a late-night confrontation, a nearby neighbor called 911 to report the argument." Id. ¶ 20. When Shaver arrived "the exchange between [Timothy Lalonde] and Mr. Outlaw had run its course." Id. ¶ 21. Because Timothy Lalonde is "legally blind [he] was unaware that" Shaver "had just momentarily arrived." Id. Theresa Lalonde asked Shaver "to inform her husband who he on account [of] her husband [being] unable to see." Id. At this time, Timothy Lalonde "regained his composure and the encounter between" Timothy Lalonde and Outlaw "was complete." Id. ¶ 22.

However, "[a]pproximately three minutes after both [Shaver's] arrival and the complete de-escalation of the exchange between [Timothy Lalonde] and his daughter's boyfriend, several law enforcement patrol cars came screeching to halt in front of [Timothy Lalonde's] property." Id. ¶ 23. Officers Pryce and Sirles "leaped out of their [Ogdensburg Police Department] patrol vehicles and Sheriff Merria "jumped out" of his [Saint Lawrence County Sheriffs' Department] vehicle. Id. ¶ 24. Without "acknowledgement" of or "consultation" with Shaver "who was standing at the scene in firm control of a readily deescalated event with a blind man holding a cane and wearing dark sunglasses[,]" Pryce, Sirles and Merria "surrounded" Timothy Lalonde. Id. ¶ 25.

"Despite it being readily apparent that [Timothy Lalonde] was blind and sightless," Pryce "charged towards [him] and began screaming at him while circling around him." Id. ¶ 26. "On account of being sightless" Timothy Lalonde "tracked" Pryce's voice and "turned his body in her voice's direction." Id. ¶ 27. After Timothy Lalonde turned, Sirles, Shaver, and Merria "forcefully rushed toward [Timothy Lalonde] and slammed his body with such force that [his] body came to rest upon a driveway on the opposite side of the street." Id. ¶ 28. Upon "[h]earing the commotion," Theresa Lalonde "stormed out of her house screaming to" Pryce, Sirles, Shaver, and Merria "that her husband is blind and that 'you're killing my husband.' " Id. ¶ 29.

Sirles, Shaver, and Merria "pounced onto [Timothy Lalonde's] back," while Pryce "with her knee lifted, dropped her knee downward onto [his] ear[,] shattering and lacerating its inner cartilage." Id. ¶ 30. While these officers were "bashing [Timothy Lalonde's] head against the pavement," Merria "was yanking [his] left arm [and] ordering him to release it from under the weight of his body." Id. ¶ 31. However, Timothy Lalonde "responded that he couldn't do it as he was disabled." Id. Timothy Lalonde "screamed that he was unable to comply with [Pryce, Sirles, Shaver, and Merria's] commands to move his body in order to free up his immobilized arm." Id. ¶ 33. As noted above, Timothy Lalonde "was left without his back, stomach, and right shoulder muscles" because surgeons had removed them in order to save his life after he encountered "a life-threatening flesh-eating bacteria ...." Id. ¶ 32.

**\*\*3** Although Shaver "had just minutes before witnessed the de-escalation of [Timothy Lalonde's] encounter with his daughter's boyfriend[,]" including Plaintiff's "complete return to composure[,]" Shaver "inflicted two taser shots that jolted [Timothy Lalonde's] body." Id. ¶ 34. At the same time, Merria "ignor[ed Timothy Lalonde's] assertion that his disability prevented him from moving" and Merria "began aggressively **\*305** yanking on [Timothy Lalonde's] left wrist, elbow and arm resulting in an audible 'pop' that left [him] numb with excruciating pain and a shattered broken wrist, fractured and dislocated elbow, and torn rotator cuff." Id. ¶ 35.

"With blood pouring from his ear and [Timothy Lalonde] grimacing with pain [while] crying out that his arm, elbow and wrist were broken," Pryce, Sirles, Shaver, and Merria "dragged him to the patrol car." Id. ¶ 36. However, because Timothy Lalonde "lacked stomach and back muscles to keep him upright when shackled with his handcuffs behind his back," Pryce, Sirles, Shaver,

and Merria " 'improvised' by lifting [Timothy Lalonde's] body and throwing him laterally into the patrol car[,] sending his head crashing against the opposite passenger door." Id. ¶ 37. "To secure [Timothy Lalonde] in the back of the patrol car," Pryce, Sirles, Shaver, and Merria "cuffed [his] right wrist and extending out his previously disabled right arm, attached it to the vehicle's ceiling while [he] lay prone across the back seats shivering with pain and repeatedly requesting medical assistance." Id. ¶ 38.

Pryce, Sirles, Shaver, and Merria arrived at the police station with Timothy Lalonde and "yanked [his] feet to pull him out from his prone position in the backseat of the patrol car" but "forg[ot] that they had secured [his] right arm and wrist to the back passenger ceiling ...." Id. ¶ 39. "After several forceful tugs that resulted in straining his previously disabled right arm, rotator cuff, and wrist that was attached to the vehicle['s] ceiling," Pryce, Sirles, Shaver, and Merria finally "recalled the means by which they secured him to the patrol car and released the handcuff from the ceiling." Id. Thereafter, Pryce, Sirles, Shaver, and Merria "yank[ed]" Plaintiff "out of the patrol car by his feet wherein he forcefully crashed to the ground in a heap." Id. ¶ 40. Then Pryce, Sirles, Shaver, and Merria "yanked [him] off the ground by his belt and back of his pants with such force that his jeans ripped and his leather belt tore in half." Id.

Despite the "knowledge" that Timothy Lalonde "was legally and categorically blind," the Defendant law enforcement officials "intentionally and mockingly refused to accommodate [Timothy Lalonde's] disability" as they brought him "into the police department to complete his arrest processing." Id. ¶ 41. Plaintiff was disoriented and "[w]ithout guiding [him] to a chair," Pryce, Sirles, Shaver, and Merria "watched [him] attempt to orient himself in the office seeking to locate a place to sit down." Id. While he was disoriented, Timothy Lalonde "accidentally brushed against" one of the Defendant officers "who screamed, 'don't touch me or I'll shoot you.' " Id.

During this time, Officers Does 1–100 and Chief Westcott "persisted in ridiculing and refusing to accommodate [Timothy Lalonde] by requiring him to stand facing the wall with his hands stretched out touching the wall while they interrogated and booked him on charges of disorderly conduct and resisting arrest." Id. ¶ 42. Throughout "[t]he entirety of this time, blood from [Timothy Lalonde's] ruptured cartilage continued to trickle out from his ear while he additionally experienced excruciating pain of a broken wrist, elbow and torn rotator cuff." Id. ¶ 43. When Plaintiff "repeatedly requested medical attention" he was "repeatedly ignored." Id.

 **4 Subsequently, Timothy Lalonde was interrogated, during which time Defendant law enforcement officials "fabricated" an "incident meant to provide an alternative explanation to account for [Plaintiff's] injuries ...." Id. ¶ 44. Defendant officers, including Wilson and Chief Westcott, "concocted a fallacious series of events that *306 served to justify the grounds for their arrest and/or infliction of 'reasonable' force, i.e., [Plaintiff's] injuries occurred on account of his being drunk and inciting the [officers] to beat him, while purportedly claiming earlier in the evening that he was God and wanted to die, and that previous to his police encounter, he was 'jumped' by four unidentified men on Patterson Street in Ogdensburg." Id. ¶¶ 44, 91.

"After being made to stand against the stationhouse wall for one hour" while Defendant officers "attempted to have [Timothy Lalonde] subscribe and 'confess' to their fabrications, [Plaintiff] was finally permitted to obtain medical attention." Id. ¶ 45. When Plaintiff "was transported to Claxon-Hepburn Medical Center in Ogdensburg" the "Claxon-Hepburn medical staff rapidly evaluated that [his] medical condition was so severe and dire that he needed immediate transport to Upstate Medical University in Syracuse, New York, some three hours away." Id. ¶ 46. "After medical evaluation, it was determined that [Timothy Lalonde] incurred a severe cervical sprain, a broken left wrist, concussion syndrome, a torn rotator cuff tendon, a dislocated and fractured left elbow, and torn inner ear cartilage." Id. ¶ 47.

Subsequently, "[i]n order to substantiate [Timothy Lalonde's] arrest without probable cause and the unwarranted and patently unreasonable force inflicted upon him, the [Saint Lawrence County] District Attorney, upon reliance" of Defendant officers' "fabricated police reports, persisted in charging [Timothy Lalonde] with disorderly conduct and resisting arrest." Id. ¶ 48. "After defending the fabricated charges by having to appear before the criminal court on approximately five court appearances, [Timothy Lalonde's] charges were dismissed on or about July 21, 2020." Id. ¶ 49.

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 89 of 147

Plaintiff asserts that the aforementioned conduct "has had an exponentially debilitative impact on [his] previous disabled state." Id. ¶ 50. Among the injuries Timothy Lalonde experienced were: "sustained brain damage, a torn left side rotator cuff tendon, a dislocated and fractured left elbow, and a torn cartilage in his right ear." Id. ¶ 52. "These injuries required [him] to undergo three surgeries resulting in the almost total incapacitation of his left upper body which previous to March 1, 2020 was his only functional and operational side on account of the damages caused by the flesh-eating bacteria." Id. This has rendered him "fully dependent on his wife [Theresa Lalonde's] assistance for all aspects of his daily needs." Id. Accordingly, Timothy Lalonde asserts that he "will require such complete and full care assistance, as well as requiring continuing medical treatment, for the balance of his life." Id. ¶ 53. Furthermore, Timothy Lalonde states that he has "incurred a loss of hearing on account of [Pryce's] ... assault with her knee" and he has also "been exponentially afflicted by anxiety, mental and emotional distress, humiliation, fear, loss of enjoyment, psychic injuries, headaches, nightmares, insomnia, and an unceasing sense of doom and misery." Id. ¶ 54.

The charges against Timothy Lalonde were dismissed on or about July 21, 2020. Id. ¶ 49. However, on or about April 1, 2021, "approximately one year" after the aforementioned conduct and "eight months after his criminal charges were dismissed," id. ¶ 55, "[u]pon the direction of" the Ogdensburg Police Department and Chief Westcott, Officer Wilson "was ordered to make a service call to [Timothy Lalonde's] residence" and Wilson requested Timothy Lalonde "accompany him to the Police station[,]" id. ¶ 56. Wilson "informed [Plaintiff] that for some undisclosed reason, the [Ogdensburg Police Department] failed to **\*307** take [his] fingerprints, mugshots, and gather other information with respect to [Plaintiff's] March 1, 2020 arrest and subsequent prosecution." Id. Wilson told Plaintiff that "if he refused to accompany him to the Police station, that the [Ogdensburg Police Department] would seek a warrant for his appearance." Id. "Upon requesting an accommodation on account of his disability, [Wilson] vehemently refused." Id.

**\*\*5** Timothy Lalonde "agreed to be taken to the Police station where" Wilson and Chief Westcott "commenced with re-interrogating him regarding the March 1, 2020 arrest" including the "utter fabrications" Plaintiffs allege had been previously made to attempt to justify the conduct of Shaver, Pryce, Sirles, and Merria. Id. ¶ 57. During this time, Plaintiff "experienc[ed] post traumatic and emotional distress under the circumstances ...." Id. Plaintiff asserts that Wilson and Chief Westcott were pursuing "an ongoing attempt to secure a coverup for their actions on [March 1, 2020], perpetuating the fabrication that [Timothy Lalonde] was attacked by four unidentified assailants on Patterson Street in Ogdensburg on the same evening that" Shaver, Pryce, Sirles, and Merria "attacked [Plaintiff] in front of his house." Id. ¶ 58.

Plaintiffs assert: (1) 42 U.S.C. § 1983 ("Section 1983") claims pursuant to the Fourth Amendment for false arrest, assault, battery, false imprisonment, and excessive force against Shaver, Pryce, Sirles, Merria, Wilson, Chief Westcott, and Does 1–100; (2) Section 1983 claims pursuant to the Fourth and Fourteenth Amendment for failure to intervene against Shaver, Pryce, Sirles, Merria, Chief Westcott, and Does 1–100; (3) Section 1983 claims pursuant to the Fourteenth Amendment for deliberate indifference to medical needs against Shaver, Pryce, Sirles, Merria, Chief Westcott, and Does 1–100; (4) Section 1983 conspiracy claims against Shaver, Pryce, Sirles, Merria, Wilson, Chief Westcott, and Does 1–100; (5) Section 1983 claims pursuant to the Fourteenth Amendment for fabrication of evidence against Shaver, Pryce, Sirles, Merria, Chief Westcott, and Does 1–100; (6) Section 1983 municipal liability claims pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) against the City of Ogdensburg and Saint Lawrence County; (7) Section 1983 supervisory liability claims against Chief Westcott, Sheriff Bigwarfe, and Does 1–100; (8) claims for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq., and the Rehabilitation Act ("RA"), 29 U.S.C. §§ 701, et seq., against all Defendants; (9) 42 U.S.C. § 1985(3) ("Section 1985(3)") claims for conspiracy to deprive rights against all Defendants; (10) 42 U.S.C. § 1986 ("Section 1986") claims for neglect to prevent conspiracy to deprive rights against all Defendants; (11) New York State law claims for negligent infliction of emotional distress against Shaver, Pryce, Sirles, Merria, and Does 1–100; (12) New York State law claims for intentional infliction of emotional distress against Shaver, Pryce, Sirles, Merria, and Does 1–100; (13) New York State law claims for negligence against all Defendants; (14) a New York State law trespass claim against Wilson; and (15) New York State law claims for loss of consortium with respect to Theresa Lalonde against all Defendants. Id. ¶¶ 60–182. Plaintiffs also request injunctive relief. Id. at 36–38.

**III. LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b), "a party may assert the following [defense] by motion: ... (6) failure to state a claim upon which relief can be granted ...." Fed. R. Civ. P. 12(b)(6). In order to **\*308** survive a motion to dismiss for failure to state a claim, a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955). This plausibility standard, "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 556, 127 S.Ct. 1955). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (citing Twombly, 550 U.S. at 555, 127 S.Ct. 1955). The Supreme Court has stated that while "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' ... it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955).

 **\*\*6** "[A] defendant has the burden of proof on a Rule 12(b)(6) motion[.]" A.S. v. City Sch. Dist. of Albany, 585 F. Supp. 3d 246, 272 (N.D.N.Y. 2022); see also Pearl River Union Free Sch. Dist. v. Duncan, 56 F. Supp. 3d 339, 351 (S.D.N.Y. 2014) (" '[T]he movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6).' " (quoting Gonzalez v. Option One Mortg. Corp., No. 12-CV-1470, 2014 WL 2475893 at \*2, 2014 U.S. Dist. LEXIS 76789 at \*7 (D. Conn. June 3, 2014))). Moreover, in the context of a Rule 12(b)(6) motion the Court "construe[s] plaintiffs' complaint liberally, 'accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiffs' favor.' " Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009) (quoting Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 124 (2d Cir. 2008)).

## IV. DISCUSSION

### A. Defendants' Arguments as to Plaintiffs' Assault and Battery and False Imprisonment Claims
Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States] shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

Saint Lawrence Defendants argue, "[w]ith respect to assault and battery claims, there is no federal common law for such torts, and thus, there can be no assault and battery claim grounded in § 1983." Dkt. No. 9-3 at 6 ("Saint Lawrence Defendants' Memorandum of Law"). Saint Lawrence Defendants assert: "Instead, such claims are construed as an excessive force claim." Id. Additionally, Saint Lawrence Defendants state: "Likewise, claims for false arrest and false imprisonment are cut from the same cloth, and the false imprisonment claim is dismissed **\*309** in favor of the false arrest claim." Id. at 6–7. Ogdensburg Defendants reiterate the arguments "noted in co-defendant St. Lawrence County's Memorandum of Law." Dkt. No. 10-1 at 3 ("Ogdensburg Defendants' Memorandum of Law").

Plaintiffs respond:

2023 WL 2537626

> Despite ... wide breadth of protection afforded under Section 1983 claims grounded on Fourth Amendment protections and the distinction between the kinds of seizures that the Amendment protects, district courts in New York effectively conflate, as one cause of action, the otherwise distinct Fourth Amendment violations of false arrest and false imprisonment under the guise that these two seizures are effectively the same, i.e., that in the interest of sound judicial administration, the diminishment of the breadth and reach of the rights afforded are otherwise justified.

Pls.' Resp. to Saint Lawrence Defs.' at 3. Furthermore, Plaintiffs assert that Saint Lawrence Defendants "have misconstrued Plaintiffs' first cause of action as seeking separate Section 1983 claims under the Fourth Amendment, when instead, Plaintiffs have elicited the various means by which Defendants violated Mr. Lalonde's rights under the Fourth Amendment in order to advance the full breadth of his rights despite the court's limitation thereof on account of sound judicial discretion." Id. at 3–4.

**\*\*7** The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

" '[W]hether or not a search is reasonable within the meaning of the Fourth Amendment,' [the Supreme Court has] said, never 'depend[ed] on the law of the particular State in which the search occurs." Virginia v. Moore, 553 U.S. 164, 172, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008) (quoting California v. Greenwood, 486 U.S. 35, 43, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988)). "While '[i]ndividual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution,' state law did not alter the context of the Fourth Amendment." Moore, 553 U.S. at 172, 128 S.Ct. 1598 (citation omitted) (quoting Greenwood, 486 U.S. at 43, 108 S.Ct. 1625). The Supreme Court "ha[s] applied the same principle in the seizure context." Moore, 553 U.S. at 172, 128 S.Ct. 1598. As the Supreme Court stated in Moore: "We thought it obvious that the Fourth Amendment's meaning did not change with local law enforcement practices—even practices set by rule. While those practices 'vary from place to place and from time to time,' Fourth Amendment protections are not 'so variable' and cannot 'be made to turn upon such trivialities.' " 553 U.S. at 172, 128 S.Ct. 1598 (quoting Whren v. United States, 517 U.S. 806, 815, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)).

"[A] free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person ... are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard ...." Graham v. Connor, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Thus, "[e]very person has a Fourth Amendment right to be free **\*310** from excessive force by police officers, including during the course of an arrest." Jackson v. Cnty. of Ulster, No. 22-CV-148, 2022 WL 2954370, at \*2, 2022 U.S. Dist. LEXIS 132123, at \*5 (N.D.N.Y. July 26, 2022) (citing Graham, 490 U.S. at 395, 109 S.Ct. 1865). "As in other Fourth Amendment contexts ... the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397, 109 S.Ct. 1865. "Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' ... its proper application requires careful attention to the facts and circumstances at issue, whether the subject poses an immediate threat to the safety of the officers or others and whether he is actively resisting arrest or attempting

2023 WL 2537626

to evade arrest by flight." Id. at 396, 109 S.Ct. 1865 (citation omitted) (quoting Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

Thus, the Supreme Court has stated that the reasonableness of searches and seizures under the Fourth Amendment does not depend on state law. See Moore, 553 U.S. at 172, 128 S.Ct. 1598. It is true that "a number of courts ... have held that the Fourth Amendment excessive force standard applies to assault and battery claims against a police officer under New York State law." Jackson, 2022 WL 2954370, at *9, 2022 U.S. Dist. LEXIS 132123, at *27; see also Posr v. Doherty, 944 F.2d 91, 95 (2d Cir. 1991) (stating that "except for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims] [a]re substantially identical" under New York State law). [3] However, the starting point for such analysis is "the Graham Fourth Amendment standard" which is "based upon the use of excessive force by the police." Jackson, 2022 WL 2954370, at *9, 2022 U.S. Dist. LEXIS 132123, at *27. Accordingly, in Jackson, the court found that "because Plaintiff has stated a plausible Fourth Amendment claim against [a police-officer-defendant] based on the use of excessive force, and because Plaintiff's excessive force and battery claims are based upon the same factual circumstances, Plaintiff has stated a plausible civil battery claim against [the police-officer-defendant]." Id. at *9, 2022 U.S. Dist. LEXIS 132123, at *27–28. Based on the plaintiff's plausible statement of a Fourth Amendment claim, the Jackson court said that "the civil battery claim will be allowed to proceed." Id. at *9, 2022 U.S. Dist. LEXIS 132123, at *28.

**8** Here, Saint Lawrence Defendants and Ogdensburg Defendants do not contest Plaintiffs' claims as to Fourth Amendment excessive force. Saint Lawrence Defs.' **311** Mem. of Law at 6–7; Ogdensburg Defs.' Mem. of Law at 3. Indeed, both Saint Lawrence Defendants and Ogdensburg Defendants ask only for "partial dismissal" of the assault and battery claims. Saint Lawrence Defs.' Mem. of Law at 6; Ogdensburg Defs.' Mem. of Law at 3 (emphasis omitted). Saint Lawrence Defendants and Ogdensburg Defendants argue that this is necessary because such claims could be considered duplicative. Saint Lawrence Defs.' Mem. of Law at 7; Ogdensburg Defs.' Mem. of Law at 3.

Because Saint Lawrence Defendants and Ogdensburg Defendants appear to concede that Plaintiffs have plausibly stated Section 1983 Fourth Amendment excessive force claims "and because Plaintiff's excessive force and [assault and] battery claims are based upon the same factual circumstances[,]" the Court finds that "Plaintiff[s] ha[ve] stated a plausible [civil assault and] civil battery claim against" Shaver, Pryce, Sirles, Merria, Wilson, Chief Westcott, and Does 1–100. Jackson, 2022 WL 2954370, at *9, 2022 U.S. Dist. LEXIS 132123, at *27–28. Therefore, in addition to Plaintiffs' Section 1983 Fourth Amendment excessive force claims, which are allowed to proceed, the Court also finds that the civil assault and "the civil battery claim[s] will be allowed to proceed" under New York State law. Id. at *9, 2022 U.S. Dist. LEXIS 132123, at *28. [4]

"The *common law tort of false arrest is a species of false imprisonment*, an action 'derived from the ancient common-law action of trespass [that] protects the personal interest of freedom from restraint of movement.' " Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) (emphasis added) (quoting Broughton v. State of New York, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (N.Y. 1975)). Therefore, "Section 1983 claims for false arrest and false imprisonment are 'substantially the same' in all relevant respects as claims for false arrest and false imprisonment under state law." Levantino v. N.Y. State Police, 56 F. Supp. 3d 191, 199 (E.D.N.Y. 2014) (citing Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003)). Indeed, "[i]n New York, the tort of false arrest is synonymous with false imprisonment." Williams v. Olsen, No. 18-CV-1446, 638 F.Supp.3d 204, 223, 2022 U.S. Dist. LEXIS 198224 at *40 (N.D.N.Y. Nov. 1, 2022) (Kahn, J.) (citing Jacques v. Sears, Roebuck & Co., 30 N.Y.2d 466, 473, 334 N.Y.S.2d 632, 285 N.E.2d 871 (N.Y. 1972) and Posr, 944 F.2d at 96). [5]

**312** **9** Similar to Plaintiffs' excessive force and assault and battery claims, Saint Lawrence Defendants and Ogdensburg Defendants do not dispute that Plaintiffs have plausibly stated claims as to Fourth Amendment false arrest. Saint Lawrence Defs.' Mem. of Law at 6–7; Ogdensburg Defs.' Mem. of Law at 3. As stated above, both Saint Lawrence Defendants and Ogdensburg Defendants request "partial dismissal" of the false imprisonment claims. Saint Lawrence Defs.' Mem. of Law at 6; Ogdensburg Defs.' Mem. of Law at 3 (emphasis omitted). Similarly, Saint Lawrence Defendants and Ogdensburg Defendants argue that false arrest and false imprisonment claims are duplicative. Saint Lawrence Defs.' Mem. of Law at 7; Ogdensburg Defs.' Mem. of Law at 3.

However, because "false arrest and false imprisonment are synonymous causes of action because the elements of the claims are identical[,]" Levantino, 56 F. Supp. 3d at 200, the Court sees no need to dismiss the false imprisonment claims. Since Saint Lawrence Defendants and Ogdensburg Defendants appear to concede that Plaintiffs have plausibly stated Section 1983 Fourth Amendment false arrest claims, and because "Section 1983 claims for false arrest and false imprisonment are 'substantially the same' in all relevant respects as claims for false arrest and false imprisonment under state law[,]" Levantino, 56 F. Supp. 3d at 199, the Court finds that Plaintiffs' Section 1983 Fourth Amendment false arrest claims and New York State false imprisonment claims are allowed to proceed.

In addition, Saint Lawrence Defendants assert that "Plaintiff failed to allege any specific acts Officer Merria took which acted as a violation of Mr. Lalonde's rights." Saint Lawrence Defs.' Mem. of Law at 7. Saint Lawrence Defendants argue that Plaintiffs have not specifically identified the officer who dragged Timothy Lalonde into the patrol car, handcuffed him, or removed him from the patrol car upon arrival at the police station. Id. Similarly, Ogdensburg Defendants argue with regard to Pryce, Shaver, and Sirles, that "[n]o specific officer is identified" as to the aforementioned conduct. Ogdensburg Defs.' Mem. of Law at 3.

Under Federal Rule of Civil Procedure 8(d): "A party may set out two or more statements of a claim or defense alternatively or hypothetically, either a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). Rule 8(d) also states: "A party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Thus, "[w]ith respect to inconsistent pleadings, 'a complaint may plead in the alternative.' " Ajinomoto Co. v. CJ Cheiljedang Corp., No. 16-CV-03498, 2021 WL 4430200, at *3, 2021 U.S. Dist. LEXIS 184945, at *7 (S.D.N.Y. Sept. 27, 2021) (quoting Astroworks, Inc. v. Astroexhibit, Inc., 257 F. Supp. 2d 609, 616 n.10 (S.D.N.Y. 2003)). "The inconsistency may lie either in the statement of the facts or in the legal theories adopted ...." Henry v. Daytop Village, 42 F.3d 89, 95 (2d Cir. 1994) (quotations omitted). [6] This "flexibility ... is especially appropriate in civil rights cases, in which complex inquiries into the parties' intent may sometimes justify **\*313** raising multiple, inconsistent claims." Id. "A plaintiff may not, however, be able to recover on both theories if the allegations conflict." Ajinomoto, 2021 WL 4430200, at *3, 2021 U.S. Dist. LEXIS 184945, at *7. "When viewed as alternative claims in the initial pleading stage on a motion to dismiss, Rule 8(d)(2) allows the Court 'to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party as [the Court must do on] motions to dismiss ...." Id. at *4, 2021 U.S. Dist. LEXIS 184945, at *9 (quoting Adler v. Pataki, 185 F.3d 35, 41 (2d Cir. 1999)). [7]

**\*\*10** Accordingly, because Plaintiffs have properly alleged at least one constitutional violation, Plaintiffs are permitted to plead in the alternative as to Defendants, and Plaintiffs are entitled to discovery to determine which officers participated directly in the constitutional violation. See Moore, 2019 WL 251725, at *4, 2019 U.S. Dist. LEXIS 8342, at *11 (finding under Rule 8(d)(2) and Henry, 42 F.3d at 95 that "it would be most appropriate to construe Plaintiff's pleadings—which indicate that Plaintiff is unsure of which officer [was] Officer Russel and which [was] Officer Brunson—to allege that the Caucasian officer who arrested him was *either* Brinson *or* Russell" (emphasis in original) (citations and quotations omitted)).

### B. Defendants' Arguments as to Plaintiffs' Failure-to-Intervene and Fabrication of Evidence Claims

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). Saint Lawrence Defendants and Ogdensburg Defendants both concede this proposition. Saint Lawrence Defs.' Mem. of Law at 7; Ogdensburg Defs.' Mem. of Law at 4. However, Saint Lawrence Defendants contend that Plaintiffs cannot allege that Merria was both a direct participant in the alleged conduct and that he failed to intervene, arguing that "an officer who is alleged to have used excessive force cannot also be held liable for failure to intervene, because the officer's conduct as a direct participant in the violation of Plaintiff's rights precludes a finding that the officer passively collaborated in the deprivation of rights by a fellow officer." Saint Lawrence Defs.' Mem. of Law at 7–8. Likewise, Ogdensburg Defendants argue that Plaintiffs cannot allege that Pryce, Shaver, and Sirles, or other Ogdensburg Police Officers were both direct participants in the purported conduct and also failed to intervene. Ogdensburg Defs.' Mem. of Law at 4. Additionally, both Saint Lawrence Defendants and Ogdensburg

Defendants reiterate **\*314** their arguments that Plaintiffs did not specifically identify which officers were involved in dragging Plaintiff from the car or fabrication of evidence. Saint Lawrence Defs.' Mem. of Law at 8–10; Ogdensburg Defs.' Mem. of Law at 4–5.

As discussed above, where plaintiffs have properly alleged at least one constitutional violation, courts regularly permit such plaintiffs to plead in the alternative as to multiple defendants, finding that such plaintiffs are entitled to discovery to determine which officers participated directly in the constitutional violation. See, e.g., Matthews v. City of New York, 889 F. Supp. 2d 418, 444 (E.D.N.Y. 2012) ("Because plaintiffs properly allege at least one constitutional violation, plaintiffs are entitled to discovery to determine which officers participated directly in the alleged constitutional violation and which officers were present and failed to intervene."); Durr v. Slator, 558 F. Supp. 3d 1, 26 (N.D.N.Y. 2021) ("Plaintiff does not allege that either Defendant in particular acted with deliberate indifference by transporting Plaintiff to the Oneida Police Station rather than the Upstate Emergency Department. As such, Plaintiff is permitted to plead in the alternative that Defendants Clark and Slator failed to intervene in the alleged constitutional violation."). Moreover, under Rule 8(d) "[e]ven if [a plaintiff's] claims were somehow inconsistent ... [a court] could and would entertain them both." Henry, 42 F.3d at 95–96. This "flexibility ... is especially appropriate in civil rights cases, in which complex inquiries into the parties' intent may sometimes justify raising multiple, inconsistent claims." Id.

**\*\*11** Accordingly, the Court finds that Plaintiffs are permitted to plead in the alternative as to Defendants with regard to the failure-to-intervene claims, and are entitled to discovery to determine which officers participated directly in the constitutional violations. See Matthews, 889 F. Supp. 2d at 444; Durr, 558 F. Supp. 3d at 26.

" 'It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer.' " Harris v. City of New York, 222 F. Supp. 3d 341, 351 (S.D.N.Y. 2016) (quoting Zahrey v. Coffey, 221 F.3d 342, 355 (2d Cir. 2000)). Saint Lawrence Defendants and Ogdensburg Defendants do not contest Plaintiffs' fabrication of evidence claims against Chief Westcott, Compl. ¶ 44, Defendants argue that Plaintiffs did not specifically identify which other officers were involved in the alleged fabrication of evidence. Saint Lawrence Defs.' Mem. of Law at 9–10; Ogdensburg Defs.' Mem. of Law at 5. [8] Because Defendants do not challenge that Plaintiffs have properly alleged at least one constitutional violation of fabrication of evidence, the Court finds that Plaintiffs are permitted to plead in the alternative as to Defendants with regard to the fabrication of evidence claims, and are entitled to discovery to determine which officers participated directly in the constitutional violations. As the Second Circuit has stated, this "flexibility ... is especially appropriate in civil rights cases, in which complex inquiries into the parties' intent may sometimes justify raising multiple, inconsistent claims." Henry, 42 F.3d at 95–96.

### **\*315 C. Defendants' Arguments as to Plaintiffs' Monell Claims**

In Monell, the Supreme Court concluded that "Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." Monell, 436 U.S. at 690, 98 S.Ct. 2018 (emphasis omitted). However, the Supreme Court also stated that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Id. (emphasis in original). Municipalities are "liable under § 1983 to be sued as 'persons' within the meaning of that statute, when the alleged unlawful action implemented or was executed pursuant to a governmental policy or custom." Reynolds v. Giuliani, 506 F.3d 183, 190 (2d Cir. 2007). "Constitutional deprivations actionable under § 1983 need not be contained in an explicitly adopted rule or regulation." Sorlucco v. New York City Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992). "Constitutional deprivations actionable under § 1983 may be 'visited pursuant to the governmental custom even though such custom has not received formal approval through the body's official decisionmaking channels.' " Id. (cleaned up) (quoting Monell, 436 U.S. at 691, 98 S.Ct. 2018).

"[T]o hold [municipalities] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007) (citing Batista v. Rodriguez, 702 F.2d 393,

397 (2d Cir. 1983)). "A plaintiff may satisfy the 'policy, custom or practice' requirement in one of four ways." Brandon v. City of New York, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010). Accordingly,

> **\*\*12**  [t]he plaintiff may allege the existence of (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

Id. at 276–77 (citations omitted).

"[T]hree requirements ... must be met before a municipality's failure to train or supervise constitutes deliberate indifference to the constitutional rights of citizens." Walker v. City of New York, 974 F.2d 293, 297 (2d Cir. 1992). The Second Circuit has defined these three requirements:

> First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation. Thus, a policymaker does not exhibit deliberate indifference by failing to train employees for rare or unforeseen events.

> Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. Whether to use deadly force in apprehending a fleeing suspect qualifies as a "difficult choice" because more than the application of common sense is required. Instead, police officers must adhere to **\*316**  the rule of Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), that deadly force may constitutionally be applied to a fleeing suspect only when the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm and when, where possible, some warning has been given. A choice might also be difficult where, although the proper course is clear, the employee has powerful incentives to make the wrong choice.

> Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. Thus, municipal policymakers may appropriately concentrate training and supervision resources on those situations where employee misconduct is likely to deprive citizens of constitutional rights.

Id. at 297–98 (citations omitted) (quotations omitted). "Where the plaintiff establishes all three elements, then ... it can be said with confidence that the policymaker should have known that inadequate training or supervision was 'so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need.' " Id. at 298 (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Saint Lawrence Defendants argue that "Plaintiffs fail to allege any similar constitutional violations that could even conceivably demonstrate a pattern of unconstitutional conduct." Saint Lawrence Defs.' Mem. of Law at 15. Saint Lawrence Defendants cite to Buari v. City of New York, 530 F. Supp. 3d 356 (S.D.N.Y. 2021), asserting that "[t]he decision in Buari, although the Monell liability claim was upheld on a motion to dismiss, provides helpful guidance to this Court." Saint Lawrence Defs.' Mem. of Law at 15. Saint Lawrence Defendants argue that Buari stands for the principle that a plaintiff must plead systemic corruption in order to proceed on a Monell claim, arguing: "Not once do the Plaintiffs allege that there were other instances of misconduct and Plaintiffs do not identify any other lawsuits, report, complaints, or other evidence to support their claim that the acts against Mr. Lalonde were part of a pattern." Id. at 16. Similarly, Ogdensburg Defendants assert that "there is not a single allegation

Case 5:25-cv-01168-BKS-ML   Document 7   Filed 05/13/26   Page 96 of 147
Lalonde v. City of Ogdensburg, 662 F.Supp.3d 289 (2023)
2023 WL 2537626

of instances of similar conduct or that the City of Ogdensburg knew of such prior actions by its police officers." Ogdensburg Defs.' Mem. of Law at 9.

**\*\*13** However, the Supreme Court has stated: "[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). "So long as the single challenged act was the decision of a municipal policymaker, the municipality could be held liable." Walker, 974 F.2d at 296. Accordingly, "[i]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonable be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390, 109 S.Ct. 1197. "For example, [municipal] policymakers know to a moral certainty that their officers will be required to arrest fleeing felons." Id. at 390 n.10, 109 S.Ct. 1197.

The Court turns to the three-prong test set forth in Walker. Under the first prong **\*317** of Walker, "the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation." 974 F.2d at 297. The Court finds that Saint Lawrence Defendants' characterization of the Buari case is unavailing. In Buari, the court inferred that the "Bronx DA [("district attorney")] officials plainly knew, to a moral certainty, that ADAs [("assistant district attorneys")] would make probable cause assessments, offer testimonial evidence in court, confront false or misleading testimony, and acquire Brady[ v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] material 'because these are basic facets of an ADA's job.' " Buari, 530 F. Supp. 3d at 406 (quoting Bertuglia v. City of New York, 839 F. Supp. 2d 703, 738 (S.D.N.Y. 2012)). Likewise, the Court infers here that Saint Lawrence County and City of Ogdensburg policymakers plainly knew to a moral certitude that Saint Lawrence County sheriffs and City of Ogdensburg police officers would make reasonable suspicion and probable cause determinations, seize and arrest individuals, provide medical care to detainees, and transmit evidence to prosecutors, "because these are basic facets" of law enforcement officials' jobs. Buari, 530 F. Supp. 3d at 406 (quoting Bertuglia, 839 F. Supp. 2d at 738) Therefore, the Court finds that Plaintiffs have plausibly pled the first prong of Walker.

Saint Lawrence Defendants and City of Ogdensburg did not address the second or third prongs of Walker in their Motions to Dismiss. See generally Saint Lawrence Defs.' Mem. of Law; Ogdensburg Defs.' Mem. of Law. Saint Lawrence Defendants raised the second prong of Walker in their Reply. Saint Lawrence Defs.' Reply at 10–11. However, "[a]rguments may not be made for the first time in a reply brief." Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993); Chevron Corp. v. Donziger, 325 F. Supp. 3d 371, 379 n.21 (S.D.N.Y. 2018) ("It is well established, of course, that arguments first raised in reply briefs are forfeited or waived."). As noted above, the "movant[,] bears the burden of pro[ving no cognizable claim has been stated] on a motion to dismiss under Rule 12(b)(6)." Leon v. Rockland Psychiatric Ctr., 232 F. Supp. 3d 420, 426–27 (S.D.N.Y. 2017); see also United Rentals, Inc. v. Wilper, 626 F.Supp.3d 546 (D. Conn. 2022) ("The defendant bears the burden of proof on a motion to dismiss for failure to state a claim under Rule 12(b)(6)."). Because Saint Lawrence Defendants and City of Ogdensburg Defendants have not met their burden of proving that Plaintiffs have not stated cognizable Monell claims under Rule 12(b)(6), Defendants' Motions to Dismiss are denied as to Plaintiffs' Monell claims.

### D. Defendants' Arguments as to Plaintiffs' Section 1983 Conspiracy Claims, Section 1985(3) Conspiracy Claims, and Section 1986 Neglect to Prevent Conspiracy Claims

#### 1. Section 1983 Conspiracy Claims

**\*\*14** "To prevail on a Section 1983 conspiracy claim, the plaintiff must establish: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Fiedler v. Incandela, 222 F. Supp. 3d 141, 165 (E.D.N.Y. 2016) (quotations omitted). "To sustain a claim for conspiracy under Section 1983, a plaintiff must demonstrate that [the] defendant[s] 'acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds, that violated the plaintiff's rights ... secured by the constitution or federal courts.' " **\*318** Morpurgo v. Inc. Vill. of Sag Harbor, 697 F. Supp. 2d 309, 331

(E.D.N.Y. 2010) (quoting Malsh v. Corr. Officer Austin, 901 F. Supp. 757, 765 (S.D.N.Y. 1995)), report and recommendation adopted by 697 F. Supp. 2d 309 (E.D.N.Y. 2010).

Saint Lawrence Defendants argue that Plaintiffs have failed to plausibly plead a factual basis supporting a meeting of the minds, arguing that Plaintiffs' allegations that "Defendant Officers 'acted in concert' and 'reached a mutual understanding[,]' " Saint Lawrence Defs.' Mem. of Law at 10 (quoting Compl. ¶¶ 88, 93), "are conclusory and are not entitled to the presumption of truth." Saint Lawrence Defs.' Mem. of Law at 10. Additionally, Saint Lawrence Defendants argue that "the only reason Plaintiffs allege that they believe there was a conspiracy under § 1983 is because the Defendant Officers arrived on scene at the same time and confronted Mr. Lalonde at the same time and in the same manner." Id. Saint Lawrence Defendants contend: "In essence, Plaintiffs are asking this Court to believe that because the officers acted the same way in responding to the scene, they must have conspired." Id. at 10–11. Ogdensburg Defendants reiterate the arguments that "co-defendant St. Lawrence County points out in its brief ...." Ogdensburg Defs.' Mem. of Law at 6.

Plaintiffs argue that "[a] plaintiff is not required to list the place and date of defendants' meeting and summary of their conversations but the existence of an agreement can be inferred from circumstantial evidence of an agreement and concerted action." Pls.' Resp. to Saint Lawrence Defs.' at 9. According to Plaintiffs, "[w]hile it is imperative that a plaintiff must allege a mutual understanding or meeting of the minds in order to set out a prima facie claim for conspiracy, it is well established that such meeting of the minds can take the form of a 'tacit understanding' rather than an explicit agreement." Id. at 8 (quoting LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 427 (2d Cir. 1995)).

The Court agrees with Plaintiffs. While " 'there are legal limitations upon the inferences which may be drawn from circumstantial evidence[,]' " Puglisi v. Underhill Park Taxpayer Assoc., 947 F. Supp. 673, 706 (S.D.N.Y. 1996) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 580, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), "a conspiracy is often difficult to prove and ... the court, may at times, have to rely on circumstantial evidence of a conspiracy," Puglisi, 947 F. Supp. at 706. Moreover, "a conspiracy 'need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct[.]' " Foskey v. Northrup, No. 20-CV-0504, 2021 WL 1146217, at *5, 2021 U.S. Dist. LEXIS 56684, at *12 (N.D.N.Y. Mar. 25, 2021) (Kahn, J.) (quotations omitted) (quoting LeBlanc-Sternberg, 67 F.3d at 427).

In Foskey, this Court observed that in the context of a Section 1983 conspiracy claim, "a meeting of the minds is plausibly suggested by the coordinated nature of the alleged attack, and the fact that the attack was not a spontaneous reaction to any instant threat." Foskey, 2021 WL 1146217, at *5, 2021 U.S. Dist. LEXIS 56684, at *11–12. The Court finds a similar situation here. The Defendant officers allegedly attacked Plaintiff in a manner that was not a spontaneous reaction to any threat—as Plaintiffs aver, Shaver "was standing at the scene in firm control of a readily deescalated event with a blind man holding a cane wearing dark sunglasses." Compl. ¶ 25. Moreover, as described above in great detail, Plaintiffs lay out extensive factual allegations pleading that the attack was coordinated, with various Defendant **\*319** officers acting in concert. See, e.g., Compl. ¶¶ 25–45. Therefore, the Court finds that Plaintiffs have plausibly pled a meeting of the minds as to Section 1983 conspiracy. Accordingly, Defendants have not met their burden, and Defendants' Motions to Dismiss are denied with regard to Plaintiffs' Section 1983 conspiracy claims.

*2. Section 1985(3) Conspiracy Claims*

**15** The relevant portion of Section 1985(3) states:

> If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for

> the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). Thus,

> [t]o state a civil rights conspiracy under § 1985(3), a plaintiff must allege: 1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

Britt v. Garcia, 457 F.3d 264, 269 n.4 (2d Cir. 2006) (quoting Gray v. Town of Darien, 927 F.2d 69, 73 (2d Cir. 1991)). Section 1985(3) "is applicable only if the plaintiff can show that 'some racial, or perhaps otherwise class-based invidiously discriminatory animus [lay] behind the conspirators' action.' " LeBlanc-Sternberg, 67 F.3d at 427 (quoting Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)).

"Establishment of a § 1985(3) claim requires proof of a conspiracy between 'two or more persons.' " LeBlanc-Sternberg, 67 F.3d at 427. "A conspiracy, for these purposes, need not be shown by proof of an explicit agreement but can be established by showing that the 'parties have a tacit understanding to carry out the prohibited conduct.' " Id. (quoting United States v. Rubin, 844 F.2d 979, 984 (2d Cir. 1988)); see also Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003) ("In order to maintain an action under Section 1985, a plaintiff 'must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.' ") (quoting Romer v. Morgenthau, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)). "The term 'persons' for the purposes of § 1985(3) includes municipalities, and a claim under § 1985(3) may be established against a state if 'it is proved that the State is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the state[.]' " LeBlanc-Sternberg, 67 F.3d at 427 (citations omitted) (quoting United Brotherhood of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott, 463 U.S. 825, 830, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)) (citing *320 Owens v. Haas, 601 F.2d 1242, 1247 (2d Cir. 1979), cert. denied, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979)).

**16 Saint Lawrence Defendants argue that "Plaintiffs fail to allege any facts by which this Court could infer discriminatory intent behind Defendants['] actions." Saint Lawrence Defs.' Mem. of Law at 12. Specifically, Saint Lawrence Defendants assert that Plaintiffs have not explained why failure to consult with Shaver was motivated by discriminatory animus, id., and argue that "the act of ordering Mr. Lalonde to remove his arm from behind his back" was "motivationally neutral[,]" id. Similarly, Ogdensburg Defendants argue that "there is no factual assertion that the Ogdensburg Police Officers were motivated by a discriminatory animus." Ogdensburg Defs.' Mem. of Law at 7.

Plaintiffs plead that under Section 1985(3), Timothy Lalonde was protected in order "to be free from discrimination based upon disability ...." Compl. ¶ 139. "[T]he Second Circuit has recognized mental disability as a class protected by Section 1985 ...." B.D.S. v. Southold Union Free Sch. Dist., No. 08-CV-1864, 2009 WL 1875942, at *20 n.8, 2009 U.S. Dist. LEXIS 55981, at *61 n.8 (E.D.N.Y. June 24, 2009) (citing People by Abrams v. 11 Cornwell Co., 695 F.2d 34, 42–43 (2d Cir. 1982), vacated in part on other grounds, 718 F.2d 22 (2d Cir. 1983)). "[T]hus, it logically follows that persons with other types of disabilities, i.e., learning and developmental disabilities, would also be part of a class protected by Section 1985." B.D.S., 2009 WL 1875942, at

*20 n.8, 2009 U.S. Dist. LEXIS 55981, at *61 n.8. Likewise, "it logically follows that persons with other types of disabilities[,]" id., such as Timothy Lalonde's blindness and other physical disabilities, Compl. at ¶¶ 32, 51, would be a part of a class protected by Section 1985(3).

The Second Circuit has stated that a plaintiff's "§ 1985(3) action cannot be judged groundless" where the plaintiff "stood a reasonable chance of inducing a court to find that [the defendant's] actions were based on a[ ] [class-based] animus ...." Colombrito v. Kelly, 764 F.2d 122, 130 (2d Cir. 1985). Plaintiffs plead that it was "readily apparent that [Timothy Lalonde] was blind and sightless[,]" Compl. ¶ 26, because Timothy Lalonde was "holding a cane wearing dark sunglasses" at night when Defendant officers were present, id. ¶ 25. Moreover, after Timothy Lalonde was allegedly "slammed" onto the ground by Defendant officers, id. ¶ 28, Theresa Lalonde "scream[ed] to the Defendant Officers that 'her husband is blind ....' " Id. ¶ 29. In addition, after Merria "was yanking upon [Timothy Lalonde's] left arm ordering him to release it from under the weight of his body [Timothy Lalonde] responded that he couldn't do it as he was disabled." Id. ¶ 31. Timothy Lalonde "screamed that he was unable to comply with the [Defendant officers'] commands to move his body in order to free up his immobilized arm." Id. ¶ 33. Thereafter, Defendant officers "inflicted two taser shots" on Timothy Lalonde, id. ¶ 34, "ruthlessly ignor[ed Timothy Lalonde's] assertion that his disability prevented him from moving" and instead "aggressively yank[ed Timothy Lalonde's] left wrist, elbow and arm resulting in an audible 'pop' that left [him] numb with excruciating pain and a shattered broken wrist, fractured and dislocated elbow, and torn rotator cuff[,]" id. ¶ 35. In addition, due to Timothy Lalonde's "lack[ ] [of] stomach and back muscles to keep him upright when shackled with handcuffs behind his back" the Defendant officers " 'improvised' by lifting [his] body and throwing him laterally into the patrol car sending his head crashing against the opposite passenger door[,]" id. ¶ 37.

**\*321** Subsequently, Defendant officers "intentionally and mockingly refused to accommodate [Timothy Lalonde's] disability when they ushered him into the police department to complete his arrest processing[,]" id. ¶ 41, Doe Officers and Chief Westcott "persisted in ridiculing and refusing to accommodate [Timothy Lalonde] by requiring him to stand facing the wall with his hands stretched out touching the wall while they interrogated and booked him[,]" id. ¶ 42, and forced Timothy Lalonde "to stand against the stationhouse for one hour while [the officers] attempted to have [Timothy Lalonde] subscribe and 'confess' to their fabrications[,]" id. ¶ 45. Accordingly, the Court finds that Plaintiffs' pleading demonstrates that Plaintiffs "st[an]d a reasonable chance of inducing a court to find that [Defendants'] actions were based on a[ ] [class-based] animus[,]" based on disability—here, the impairment of blindness and physical disability. Colombrito, 764 F.2d at 130.

**\*\*17** Saint Lawrence Defendants and Ogdensburg Defendants also contend that Plaintiffs have not alleged a meeting of the minds with regard to Section 1985(3) conspiracy. Saint Lawrence Defs.' Mem. of Law at 11; Ogdensburg Defs.' Mem. of Law at 6–7. However, as noted above, "[a] conspiracy, for these purposes, need not be shown by proof of an explicit agreement but can be established by showing that the 'parties have a tacit understanding to carry out the prohibited conduct.' " LeBlanc-Sternberg, 67 F.3d at 427 (quoting Rubin, 844 F.2d at 984). Plaintiffs have alleged that the Defendant officers carried out a coordinated attack outside his home and continued their actions in concert when transporting him to the police station, Compl. ¶¶ 25–40, that the Defendant officers acted in concert as they "intentionally and mockingly refused to accommodate [Timothy Lalonde's] disability when they ushered him into the police department to complete his arrest processing[,]" id. ¶ 41, and that Doe Officers and Chief Westcott together "persisted in ridiculing and refusing to accommodate [Timothy Lalonde] by requiring him to stand facing the wall with his hands stretched out touching the wall while they interrogated and booked him[,]" id. ¶ 42. The Court concludes that Plaintiffs have plausibly pled that the "parties have a tacit understanding to carry out the prohibited conduct[,]" thereby plausibly pleading meeting of the minds under Section 1985(3). LeBlanc-Sternberg, 67 F.3d at 427 (quotations omitted). Therefore, Defendants have not met their burden, and Defendants' Motions to Dismiss are denied with respect to Plaintiffs' Section 1985(3) claims.

### 3. Section 1986 Neglect to Prevent Conspiracy Claims

The relevant portion of Section 1986 states:

2023 WL 2537626

"Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in the preceding section [42 U.S.C. § 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action ...."

42 U.S.C. § 1986. "[A] valid § 1986 claim must be predicated upon a valid § 1985 claim." Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1088 (2d Cir. 1993).

**\*322** Here, Saint Lawrence Defendants state that "if the Court agrees with the County Defendants that Plaintiffs' § 1985 conspiracy claim should be dismissed, then Plaintiffs' § 1986 failure to prevent conspiracy clam should also be dismissed." Saint Lawrence Defs.' Mem. of Law at 13. Similarly, Ogdensburg Defendants assert: "This court must dismiss Plaintiffs' section 1986 claim that Defendants failed to prevent a conspiracy to deprive the Plaintiffs of their rights if it dismisses their Section 1985 conspiracy claim." Ogdensburg Defs.' Mem. of Law at 8.

Because the Court did not dismiss Plaintiffs' Section 1985(3) conspiracy claim, and because Saint Lawrence Defendants' and Ogdensburg Defendants' arguments hinge on this, the Court finds that Defendants have not met their burden, and Defendants' Motions to Dismiss are denied with regard to Plaintiffs' Section 1986 claims.

### E. Defendants' Arguments as to Plaintiffs' Supervisory Liability Claims

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" Iqbal, 556 U.S. at 676, 129 S.Ct. 1937. "[A]fter Iqbal, there is no special test for supervisory liability." Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020). "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " Id. (quoting Iqbal, 556 U.S. at 676, 129 S.Ct. 1937).

Saint Lawrence Defendants and Ogdensburg Defendants make generalized arguments, asserting that Plaintiffs have failed to plausibly plead claims of supervisory liability as to Sheriff Bigwarfe and Chief Westcott. Regarding Sheriff Bigwarfe, Saint Lawrence Defendants argue that "not one paragraph in the Complaint alleges that Sheriff Bigwarfe had any role in arresting Mr. Lalonde, was present for the arrest, or was present or played a role in any of the alleged post-arrest deprivations." Saint Lawrence Defs.' Mem. of Law at 17. Ogdensburg Defendants assert that "[t]here is no particularity in the allegations with respect to what policy Chief Westcott is even alleged to have created or condoned, let alone the conduct he deliberately disregarded." Ogdensburg Defs.' Mem. of Law at 11.

**\*\*18** "Tangreti makes clear that, 'after Iqbal, [a p]laintiff can no longer succeed on a § 1983 claim against [a d]efendant by showing that a supervisor behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, *unless* that is the same state of mind required for the constitutional deprivation." Myers v. Davenport, No. 21-CV-0922, 2022 WL 3017367, at \*5, 2022 U.S. Dist. LEXIS 134752, at \*12 (N.D.N.Y. July 29, 2022) (Kahn, J.) (emphasis in original) (quoting Tangreti, 983 F.3d at 618). "Thus, an official's conduct in making and executing policy, or failing to make or execute policy, may satisfy Iqbal's requirement of personal involvement if such conduct meets the elements required to establish an underlying constitutional violation and is undertaken with the required state of mind." Myers, 2022 WL 3017367, at \*5, 2022 U.S. Dist. LEXIS 134752, at \*12. "Accordingly, a plaintiff may establish a policy-making official's personal involvement by, first, alleging facts from which it may be reasonably inferred the official was responsible for making relevant policies, and thus there was a tangible connection between their policymaking conduct and the alleged harm." Id. at \*5, 2022 U.S. Dist. LEXIS 134752, at \*12–13. "Second, a plaintiff must establish the elements of the underlying **\*323** claim directly against each defendant." Id. at \*5, 2022 U.S. Dist. LEXIS 134752, at \*13.

Here Plaintiffs bring, inter alia, Fourteenth Amendment failure-to-protect claims. Plaintiffs plead that Sheriff Bigwarfe was "a supervisory person with the [County of Saint Lawrence's Sheriff's Department] with oversight for training, hiring, screening, instruction, supervision and discipline of [Merria] ...." Compl. ¶ 118. Plaintiffs also plead that Chief Westcott "was, at the relevant times, supervisory personnel with Defendant [City of Ogdensburg Police] with oversight responsibility for training, hiring, screening, instruction, supervision and discipline of [Pryce, Sirles, Shaver, and Wilson] ...." Id. ¶ 117. According to Plaintiffs, Sheriff Bigwarfe and Chief Westcott "were reckless in their failure to supervise their respective subordinates and either knew or should have known that they were deliberately failing to effectuate connotationally permissible arrests with probable cause, seizures, detentions, transportation, imprisonments ...." Id. ¶ 120. Plaintiffs also assert that "[a]s a direct and proximate result of the unconstitutional actions, omissions, customs, polices, practices and procedures of [Sheriff Bigwarfe and Chief Westcott] ... [Timothy Lalonde] has suffered: brain damage, a severe cervical sprain, whiplash, a broken left wrist, concussion syndrome, a torn left side rotator cuff tendon, a dislocated and fractured left elbow, torn cartilage in his right ear, hearing loss, anxiety, mental and emotional distress, humiliation, fear, discomfort, loss of enjoyment of life, psychic injuries, headaches, nightmares, insomnia, and an unceasing sense of doom and misery." Id. ¶ 123. Thus, the Court finds that Plaintiffs have plausibly pled that Sheriff Bigwarfe and Chief Westcott "were responsible for implementing and maintaining policies to protect ... against constitutional deprivations and abuse ...." Myers, 2022 WL 3017367, at *6, 2022 U.S. Dist. LEXIS 134752, at *14. Accordingly, the Court finds that these facts plausibly show that Sheriff Bigwarfe and Chief Westcott were policymakers.

"The Supreme Court [has] extended the protections for prisoners established in Estelle [v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)] to civil detainees under the Due Process Clause of the Fourteenth Amendment, reasoning that persons in civil detention deserve at least as much protection as those who are criminally incarcerated." Charles v. Orange Cnty., 925 F.3d 73, 82 (2d Cir. 2019). "[D]eliberate indifference means the same thing for each type of claim under the Fourth Amendment[,]" "such as from unconstitutional conditions of confinement, or the failure-to-protect ...." Darnell v. Pineiro, 849 F.3d 17, 33 n.9 (2d Cir. 2017); see also Charles, 925 F.3d at 87.

To plead a Section 1983 failure-to-protect Fourteenth Amendment claim, "[a] pretrial detainee" plaintiff must "show[ ] that the officers acted with deliberate indifference ...." Darnell, 849 F.3d at 29. The "pretrial detainee must satisfy two prongs to prove a claim, an 'objective prong' showing that the [failure-to-protect was] sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong'—perhaps better classified as a '*mens rea* prong' or 'mental element prong'— showing that the officer acted with at least deliberate indifference to the challenged conditions." Id. To show this mens rea or mental element prong, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant knew, or should have **\*324** known, that the condition posed an excessive risk to health or safety." Id. at 35. Thus, "the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively[,]" id., and "deliberate indifference, in the context of a Fourteenth Amendment due process claim, can be shown by something akin to recklessness, and does not require proof of a malicious or callous state of mind[,]" Charles, 925 F.3d at 86.

 **\*\*19** To plead the first objective prong, "the deprivation alleged must be, objectively, 'sufficiently serious,' " Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)), and "[f]or a claim ... based on a failure to prevent harm" the detainee "must show that he is [detained] under conditions posing a substantial risk of serious harm[,]" Farmer, 511 U.S. at 834, 114 S.Ct. 1970. "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' " Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Pretrial detainees have even more stringent constitutional protections under the Fourteenth Amendment than prisoners do under the Eighth Amendment, because "most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.' " Kingsley v. Hendrickson, 576 U.S. 389, 400, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015) (citing Ingraham v. Wright, 430 U.S. 651, 671–72 n.40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) and Graham, 490 U.S. at 395 n.10, 109 S.Ct. 1865).

Here, the Court finds that Plaintiffs' factual allegations, asserting that Timothy Lalonde was maliciously and sadistically attacked by several Defendant Officers outside his home and was further abused at the police station during his detention, Compl. ¶

26–45, plausibly show that Timothy Lalonde was detained under conditions posing a substantial risk of serious harm. Thus, Plaintiffs have plausibly pled the objective deliberate indifference prong.

Under the second mens rea or mental element prong, "[w]hether the state knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Charles, 925 F.3d at 87. " 'A factfinder may conclude that a [government] official knew of a substantial risk from the very fact that the risk was obvious." Charles, 925 F.3d at 87 (quoting Farmer, 511 U.S. at 842, 114 S.Ct. 1970).

"Federal Rule of Civil Procedure 9(b) provides a relaxed standard for pleading intent or knowledge at the motion to dismiss stage." Myers, 2022 WL 3017367, at *7, 2022 U.S. Dist. LEXIS 134752, at *16; see also Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Therefore, "[a] complaint is allowed to contain general allegations as to a defendant's knowledge, because 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.' " Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 864 (2d Cir. 2021) (citations omitted) (citing Fed. R. Civ. P. 9(b)) (quoting Connecticut Nat'l Bank v. Flour Corp., 808 F.2d 957, 962 (2d Cir. 1987)). "[P]laintiffs are required to include allegations of the facts or events they claim give rise to an inference of knowledge." Kaplan, 999 F.3d at 864.

Here, Plaintiffs have alleged that Sheriff Bigwarfe and Chief Westcott "were reckless in their failure to supervise their respective subordinates and either knew or **\*325** should have known that they were deliberately failing to effectuate constitutionally permissible arrests with probable cause, seizures, detentions, transportation, imprisonments ...." Id. ¶ 120. As noted above, Plaintiffs also assert that "[a]s a direct and proximate result of the unconstitutional actions, omissions, customs, polices, practices and procedures of [Sheriff Bigwarfe and Chief Westcott][,]" Timothy Lalonde has suffered numerous serious injuries. Id. ¶ 123. The Court finds that Plaintiffs have alleged facts sufficient to infer that Sheriff Bigwarfe and Chief Westcott "knew, or should have known, that" violent attacks carried out by police officers "posed an excessive risk to health or safety" and that they needed to take corrective action to prevent such attacks. Darnell, 849 F.3d at 29. The Court finds that Sheriff Bigwarfe and Chief Westcott knew or should have known of this risk " 'from the very fact that the risk was obvious.' " Charles, 925 F.3d at 87 (quoting Farmer, 511 U.S. at 842, 114 S.Ct. 1970).

 **\*\*20**  Accordingly, Plaintiffs have plausibly stated "a tangible connection between" Sheriff Bigwarfe and Chief Westcott's "policymaking conduct and the alleged harm," Myers, 2022 WL 3017367, at *5, 2022 U.S. Dist. LEXIS 134752, at *13, and have plausibly stated "the elements of the underlying claim directly against each defendant[,]" id. Thus, Plaintiffs have plausibly stated Fourteenth Amendment failure-to-protect supervisory liability claims against Sheriff Bigwarfe and Chief Westcott.

Defendants' arguments are phrased in general terms, arguing that Plaintiffs' Complaint has a "sheer lack of factual allegations[,]" Saint Lawrence Defs.' Mem. of Law at 17, and that "there is no particularity in the allegations with respect to what policy Chief Westcott is even alleged to have created or condoned[,]" Ogdensburg Defs.' Mem. of Law at 11. Thus, Defendants assert generically that Plaintiffs failed to provide factual allegations to plausibly state a claim, but did not address which specific claims they are contesting. While "a defendant has the burden of proof on a Rule 12(b)(6) motion[,]" A.S., 585 F. Supp. 3d at 272, Defendants did not explain which supervisory claims they were contesting, and as a result the Court finds that because Plaintiffs have, at a minimum, plausibly stated a Fourteenth Amendment failure-to-protect supervisory liability claim against Sheriff Bigwarfe and Chief Westcott, Defendants' general arguments that Plaintiffs have failed to state a supervisory liability claim are insufficient. Thus, the Court need not address other supervisory liability claims as to Sheriff Bigwarfe and Chief Westcott brought by Plaintiffs, such as Plaintiffs' Fourteenth Amendment deliberate medical indifference claims, although the Court would likely arrive at similar conclusions to those set forth above. See, e.g., Charles, 925 F.3d at 87 (stating that "the same [deliberate indifference] standard applies to claims for deliberate indifference to medical needs because 'deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment") (quoting Darnell, 849 F.3d at 33 n.9).

Accordingly, the Court agrees with the Tenth Circuit's conclusion in Dodds v. Richardson, which the Second Circuit cited approvingly in Tangreti, 983 F.3d at 618:

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 103 of 147
Lalonde v. City of Ogdensburg, 662 F.Supp.3d 289 (2023)
2023 WL 2537626

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the **\*326** defendant-supervisor or his subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights ... secured by the Constitution ...."

Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010) (quoting 42 U.S.C. § 1983). Thus, Defendants' Motions to Dismiss are denied with regard to Plaintiffs' supervisory claims as to Sheriff Bigwarfe and Chief Westcott.

### F. Defendants' Arguments as to Plaintiffs' ADA and RA Claims

"As a remedial statute, 'the ADA must be broadly construed to effectuate its purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.' " Nat'l Fed'n of the Blind v. Scribd Inc., 97 F. Supp. 3d 565, 573 (D. Vt. 2015) (quoting Mary Jo C. v. New York State and Local Ret. Sys., 707 F.3d 144, 160 (2d Cir. 2013)).

 **\*\*21**  "Under Title II of the ADA, 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.' " Fera v. City of Albany, 568 F. Supp. 2d 248, 259 (N.D.N.Y. 2008) (Kahn, J.) (quoting 42 U.S.C. § 12132). "Section 504 of the Rehabilitation Act similarly provides in pertinent part that '[n]o otherwise qualified individuals with a disability ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." Fera, 568 F. Supp. 2d at 259 (quoting 29 U.S.C. § 794).

"In order to establish a violation under the ADA, the plaintiffs must demonstrate that (1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities." Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003). "Additionally, to establish a violation under the Rehabilitation Act, a plaintiff must show that the defendants receive federal funding." Id.

"To recover monetary damages, a plaintiff must demonstrate intentional discrimination." Fera, 568 F. Supp. 2d at 259. "Intentional discrimination does not require personal animosity or ill will[,]" id., and "[a] plaintiff may recover under Title II [of the ADA] or Section 504 upon a showing of a statutory violation resulting from deliberate indifference to the rights secured the disabled by the acts[,]" id. (quotations omitted); see also Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 275 (2d Cir. 2009) (stating that "[t]he standard for intentional violations is deliberate indifference to the strong likelihood of a violation" and that "intentional discrimination against the disabled does not require personal animosity or ill will" (internal quotations omitted)).

Saint Lawrence Defendants argue that "Title II of the ADA does not allow actions against a person in their individual capacity." Saint Lawrence Defs.' Mem. of Law at 19. Ogdensburg Defendants reiterate the arguments that "co-defendant St. Lawrence County well points out in its brief ...." Ogdensburg Defs.' Mem. of Law at 12. Saint Lawrence Defendants contend that "Plaintiffs, as a matter of law, cannot state a claim for relief for violations of the ADA against Officers Merria, nor Sherriff [sic] Bigwarfe[,]" Saint Lawrence Defs.' Mem. of Law at 19, and Ogdensburg **\*327** Defendants assert that "Plaintiffs cannot legally state a claim for relief under the Americans with Disabilities Act against Chief Robert Westcott, and Officers Charles Shaver, Danielle Pryce, Joshua Sirles and Scott Wilson[,]" Ogdensburg Defs.' Mem. of Law at 12.

The Court agrees with Defendants that, to the extent that Plaintiffs are suing the *individual Defendants* in their *individual capacities*, "neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suit ...." Fera, 568 F. Supp. 2d at 259 (quotations omitted).

However, Defendants do not address Plaintiffs' suit against Defendants insofar as Plaintiffs are suing Defendants in their *official capacities*. "Sovereign immunity does not ... extend to local governments or municipalities." Leitner v. Westchester Cmty. College, 779 F.3d 130, 134 (2d Cir. 2015).[9] Therefore, the Court dismisses Plaintiffs' ADA and RA claims with regard to Merria, Sheriff Bigwarfe, Shaver, Pryce, Sirles, Wilson, and Chief Westcott to the extent that as Plaintiffs are suing these individual Defendants in their individual capacities. However, Plaintiffs' claims may proceed under the ADA and RA insofar as Plaintiffs are brining claims against Merria, Sheriff Bigwarfe, Shaver, Pryce, Sirles, Wilson, and Chief Westcott in their official capacities.

**\*\*22** Saint Lawrence Defendants and Ogdensburg Defendants "do[ ] not argue that Plaintiff [Timothy Lalonde] is not a qualified individual with a disability or that [they] are not a public entity." Fera, 568 F. Supp. 2d at 259; see also Gorman v. Bartch, 152 F.3d 907, 912 (8th Cir. 1998) (stating that under the ADA "[a] local police department falls 'squarely within the statutory definition of public entity' ") (quotations omitted) (quoting Pa. Dep't of Corrs. v. Yeskey, 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998)).

Saint Lawrence Defendants argue that Plaintiffs must allege "allege facts showing that a policy maker acted with ill will or personal animosity toward him because of his disability" to satisfy deliberate indifference under Title II of the ADA. Saint Lawrence Defs.' Mem. of Law at 22 (quoting Vassenelli v. State Univ. of N.Y., No. 17-CV-00082, 2018 WL 1406629 at \*5, 2018 U.S. Dist. LEXIS 44200 at \*8 (N.D.N.Y. Mar. 19, 2018)). Ogdensburg Defendants offer a similar argument and also cite to **\*328** Vassenelli. Ogdensburg Defs.' Mem. of Law at 14.

The Court first addresses the standard discussed in Vassenelli. When stating the standard under Title II of the ADA, Vassenelli stated: "To prove intentional discrimination under Title II, a plaintiff must allege facts showing that a policymaker acted with ill will or personal animosity toward him because of his disability or that the policy maker acted with deliberate indifference to his rights under the ADA." 2018 WL 1406629, at \*3, 2018 U.S. Dist. LEXIS 44200, at \*8 (quotations omitted). The urtext for this principle is Garcia v. State Univ. of N.Y. Health Scis. Ctr., 280 F.3d 98, 115 (2d Cir. 2001), which Vassenelli cited to when setting forth the aforementioned standard, see 2018 WL 1406629, at \*3, 2018 U.S. Dist. LEXIS 44200, at \*8. However, immediately after citing to Garcia, Vassenelli then stated that "[d]eliberate indifference does not require personal animosity or ill will." Id. at \*3, 2018 U.S. Dist. LEXIS 44200, at \*8 (citing Loeffler, 582 F.3d at 275). Clearly, these two standards are at odds—it would require the plaintiff to plead that a policymaker acted with ill will or personal animosity while at the same time it would not require personal animosity or ill will. This contradiction can be resolved, however, because the Garcia standard no longer governs Title II ADA suits.

The Second Circuit case Bartlett v. New York State Bd. of Law Exm'rs set forth the standard for intentional discrimination under the RA, although Bartlett appeared to treat the ADA and RA interchangeably: "In the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will." 156 F.3d 321, 331 (2d Cir. 1998), vacated on other grounds by 527 U.S. 1031, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999). However, Garcia argued that deliberate indifference under the ADA was a different standard than under the RA. Garcia stated that "[i]n enacting Title II [of the ADA], Congress purported to rely on its authority under both the Commerce Clause of Article I and § 5 of the Fourteenth Amendment." 280 F.3d at 108. Garcia argued that "Title II in its entirety exceeds Congress's authority under § 5 [of the Fourteenth Amendment]" but said that "Title II need only comport with Congress's § 5 authority to the extent that the title allows private damage suits against states for violations." Id. at 110. Garcia asserted: "The question, therefore, is how Title II monetary claims against the states can be limited so as to comport with Congress's § 5 authority. The answer, we believe, is to require plaintiffs bringing such suits to establish that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiffs' disability." Id. at 111. Garcia argued that "unlike Title II of the ADA, § 504 [of the RA] was enacted pursuant to Congress's authority under the Spending Clause of Article I." Id. at 113 (citing U.S. Const. art. I, § 8, cl. 1). Because of this purported difference, Garcia stated that it "alter[ed] that holding [in Bartlett] by requiring proof of discriminatory animus or ill will for Title II damage claims brought against states ...." Id. at 115.

Case 5:25-cv-01168-BKS-ML   Document 7   Filed 05/13/26   Page 105 of 147
Lalonde v. City of Ogdensburg, 662 F.Supp.3d 289 (2023)
2023 WL 2537626

**\*\*23** However, subsequently the Supreme Court issued <u>Tennessee v. Lane</u>, 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) and <u>United States v. Georgia</u>, 546 U.S. 151, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006), and "[i]t [became] far from clear whether the discriminatory animus requirement [set forth in <u>Garcia</u>] remains in place following the Supreme Court's decisions in <u>Lane</u> and <u>Georgia</u>." <u>Goonewardena</u>, 475 F. Supp. 2d at 324 n.2. As discussed above in note 7, courts have "concluded that abrogation [of Eleventh **\*329** Amendment sovereign immunity] under Title II [of the ADA] is a valid exercise of Congressional power under section 5 [of the Fourteenth Amendment] ...." <u>Id.</u> at 327; <u>see also</u> <u>Ali v. Hogan</u>, No. 12-CV-0104, 2013 WL 5503321, at \*11, 2013 U.S. Dist. LEXIS 141239, at \*30 (N.D.N.Y. Sept. 11, 2013) (adopting the approach taken in <u>Goonewardena</u>), <u>report and recommendation adopted by</u> 2013 WL 5466302, 2013 U.S. Dist. LEXIS 142001 (N.D.N.Y. Sept. 30, 2013). Accordingly, in light of <u>Lane</u> and <u>Georgia</u>'s displacement of <u>Garcia</u>'s finding as to § 5 of the Fourteenth Amendment, it appears that <u>Garcia</u>'s discriminatory animus requirement no longer governs Title II actions brought under the ADA, which this Court has made clear: "Intentional discrimination [under Title II of the ADA and under the RA] does not require personal animosity or ill will." <u>Fera</u>, 568 F. Supp. 2d at 259. To find otherwise would run counter to the well-settled principle that "[a]s a remedial statute, 'the ADA must be broadly construed to effectuate its purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.' " <u>Scribd</u>, 97 F. Supp 3d at 573 (quoting <u>Mary Jo C.</u>, 707 F.3d at 160).

Accordingly, to plead intentional discrimination under the RA and Title II of the ADA, Plaintiffs must demonstrate deliberate indifference, which does not require personal animosity or ill will. <u>See</u> <u>Fera</u>, 568 F. Supp. 2d at 259. Therefore, the Court finds that Defendants err in arguing that a plaintiff needs to plead animosity or ill will in the context of a Title II claim under the ADA.

In addition, Saint Lawrence Defendants argue that "Plaintiffs' Complaint does not plead facts sufficient to infer that the [Saint Lawrence] County Defendants were directly or vicariously involved in any alleged discrimination, nor that Plaintiff was discriminated against because of his disability." Saint Lawrence Defs.' Mem. of Law at 20. Similarly, Ogdensburg Defendants contend that "Plaintiffs do not plead facts sufficient to infer that the City of Ogdensburg or its officers were involved in any alleged discrimination or that Mr. Lalonde was discriminated against because of his disability." Ogdensburg Defs.' Mem. of Law at 12.

"[I]ntentional discrimination may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy ... [or] custom." <u>Bartlett</u>, 156 F.3d at 331 (quotations omitted). Furthermore, it is well-settled that vicarious liability principles apply under the ADA. <u>See</u> <u>Morales v. City of New York</u>, No. 13-CV-7667, 2016 WL 4718189, at \*7, 2016 U.S. Dist. LEXIS 121471, at \*22 (S.D.N.Y. Sept. 7, 2016) ("[T]he law is clear that municipalities may be held vicariously liable for violations of Title II of the ADA and Section 504 of the Rehabilitation Act committed by their agents."); <u>Bowen v. Rubin</u>, 385 F. Supp. 2d 168, 180 (E.D.N.Y. 2005) (stating that "[g]eneral common law agency principles apply to the ADA" and finding at the summary judgment stage that "applying the principles of vicarious liability, the plaintiffs have demonstrated a genuine issue of material fact as to whether the ... defendants may be held liable under the ADA and the Rehabilitation Act").

Here, Plaintiffs plead that it was "readily apparent that [Timothy Lalonde] was blind and sightless[,]" Compl. ¶ 26, because Timothy Lalonde was "holding a cane wearing dark sunglasses" in the middle of the night when Defendant officers were present, <u>id.</u> ¶ 25. In addition, Plaintiffs aver that after Timothy Lalonde was "slammed" onto the ground by Defendant **\*330** officers, <u>id.</u> ¶ 28, Theresa Lalonde "scream[ed] to the Defendant Officers that 'her husband is blind ....' " <u>Id.</u> ¶ 29. Furthermore, as Merria "was yanking upon [Timothy Lalonde's] left arm ordering him to release it from under the weight of his body [Timothy Lalonde] responded that he couldn't do it as he was disabled." <u>Id.</u> ¶ 31. [10] Timothy Lalonde "screamed that he was unable to comply with the [Defendant officers'] commands to move his body in order to free up his immobilized arm." <u>Id.</u> ¶ 33. Defendant officers then "inflicted two taser shots" on Timothy Lalonde, <u>id.</u> ¶ 34, "ruthlessly ignor[ed Timothy Lalonde's] assertion that his disability prevented him from moving" and instead "aggressively yank[ed Timothy Lalonde's] left wrist, elbow and arm resulting in an audible 'pop' that left [him] numb with excruciating pain and a shattered broken wrist, fractured and dislocated elbow, and torn rotator cuff[,]" <u>id.</u> ¶ 35, and because of Timothy Lalonde's "lack[ ] [of] stomach and back muscles to keep him upright when

shackled with handcuffs behind his back" the Defendant officers " 'improvised' by lifting [his] body and throwing him laterally into the patrol car sending his head crashing against the opposite passenger door[,]" id. ¶ 37.

**24  Thereafter, Defendant officers "intentionally and mockingly refused to accommodate [Timothy Lalonde's] disability when they ushered him into the police department to complete his arrest processing[,]" id. ¶ 41, Doe Officers and Chief Westcott "persisted in ridiculing and refusing to accommodate [Timothy Lalonde] by requiring him to stand facing the wall with his hands stretched out touching the wall while they interrogated and booked him[,]" id. ¶ 42, and compelled Timothy Lalonde "to stand against the stationhouse for one hour while [the officers] attempted to have [Timothy Lalonde] subscribe and 'confess' to their fabrications[,]" id. ¶ 45. Based on these numerous factual allegations, the Court finds that "intentional discrimination may be inferred" here because Plaintiffs' allegations plausibly show that Defendants "acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights w[ould] result" under the ADA and RA from Defendants' actions. Bartlett, 156 F.3d at 331. [11]

Finally, Saint Lawrence Defendants argue that the Second Circuit case Tardif v. City of New York, 991 F.3d 394 (2d Cir. 2021), as interpreted by a different court in this District in Butchino v. City of Plattsburgh, No. 20-CV-796, 2022 WL 137721, 2022 U.S. Dist. LEXIS 7995 (N.D.N.Y. Jan. 14, 2022), precludes Plaintiffs' ADA claims as they relate to excessive force. Saint Lawrence Defs.' Mem. of Law at 20–22. Ogdensburg Defendants reiterate Saint Lawrence Defendants' argument. *331 Ogdensburg Defs.' Mem. of Law at 13.

As Butchino explained the reasoning of Tardif:

> In Tardif, the plaintiff, a pre-arraignment detainee, was on a strict medication schedule for epilepsy and informed an officer of her medical needs. Although the plaintiff received her first dose, she did not receive her second dose, had a seizure, and was transported to the hospital. The Second Circuit held that Tardif's epilepsy did not cause a deprivation of medical services, it was just the motivation for seeking out such services.

Butchino, 2022 WL 137721, at *12, 2022 U.S. Dist. LEXIS 7995, at *32 (citations omitted). Tardif based this holding on the principle that " '[t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability.' " Id. (quoting Tardif, 991 F.3d at 406).

Based on the principle that the ADA prohibits discrimination because of disability but not inadequate treatment for disability, Butchino states: "Tardif would preclude an ADA claim for excessive force itself, not the failure to provide a reasonable accommodation," Butchino, 2022 WL 137721, at *12, 2022 U.S. Dist. LEXIS 7995, at *32. Butchino asserted that a reasonable accommodation in an excessive force situation could include "a cooling off period[,]" id., and stated that "[t]he failure to provide such a reasonable accommodation is squarely cognizable under the ADA[,]" id. at *12, 2022 U.S. Dist. LEXIS 7995, at *32–33. Thus, Butchino found that a plaintiff could bring an ADA claim based on failure to provide a reasonable accommodation in the context of an excessive force situation. As Butchino explains: "Whereas the failure to provide medical care is a generalized issue that applies beyond the ambit of disability law, the failure to provide reasonable accommodation to a service or benefit —a cooling off period for an individual with PTSD—is a quintessential failure to accommodate disability claim." Id. at *12, 2022 U.S. Dist. LEXIS 7995, at *33. Accordingly, the Court finds that Defendants' arguments as to Butchino and Tardif are misplaced. Butchino actually demonstrates that a plaintiff can bring an ADA claim in the context of an excessive force situation, as long as that situation involved discrimination because of disability.

**25  Moreover, Butchino does not definitively foreclose an ADA claim predicated on excessive force, but instead merely states: "Plaintiff does not bring an ADA claim to remain free from excessive force, which would *likely* fail following Tardif." Id. (emphasis added). As the Second Circuit in Tardif stated: "[W]here an individual challenges 'the substance of the services

provided'—rather than 'illegal discrimination'—there is no ADA violation." Tardif, 991 F.3d at 405 (quoting Doe v. Pfrommer, 148 F.3d 73, 84 (2d Cir. 1998)). Thus, neither Butchino nor Tardif foreclose an excessive force claim pursuant to the ADA that is predicated on illegal discrimination based on disability.

However, the Court need not address this question because Plaintiffs argue: "Defendants are misguided in their assertion that Mr. Lalonde's ADA claim is simply founded on his belief that the entirety of his claim relies upon a theory that he has a right to a reasonable accommodation to be free from excessive force." Pls.' Resp. to Saint Lawrence Defs.' at 20. Saint Lawrence Defendants asserted: "Plaintiffs argument is that because Mr. Lalonde is blind, he should never have been subjected to force." Saint Lawrence Defs.' Mem. of Law at 22. Ogdensburg Defendants reiterate this argument, stating that Plaintiffs argue "[i]n essence because he is blind, **\*332** Mr. Lalonde should not be subjected to force." Ogdensburg Defs.' Mem. of Law at 13. Plaintiffs argue that, instead, that they are arguing that Defendants failed to reasonably accommodate Timothy Lalonde's disabilities throughout his encounter with Saint Lawrence County and City of Ogdensburg law enforcement officials. For example, Plaintiffs assert: "Defendant officers should have considered Mr. Lalonde's sight impairment, i.e., accommodated for it by engaging in a verbal exchange to assess the necessity of having to assume a tactical arrest formation." Pls.' Resp. to Saint Lawrence Defs.' at 21. Additionally, Plaintiffs argue that "Defendant Officers ... intentionally refused to accommodate Mr. Lalonde's physical disability which prevented him from sitting upright in the back of Defendants' squad car." Id. at 22.

Plaintiffs' reasonable accommodation claims are precisely the types of ADA claims courts in this Circuit have found are cognizable. See Williams v. City of New York, 121 F.Supp.3d 354, 368 (S.D.N.Y. 2015) (stating that when law enforcement officials carry out on-the-street interactions, "the only reasonable interpretation of Title II [of the ADA] is that law enforcement officers who are acting in an investigative or custodial capacity are performing services, programs, or activities within the scope of Title II" (quotations omitted)); Nicholas v. City of Binghamton, No. 10-CV-1565, 2012 WL 3261409, at *13, 2012 U.S. Dist. LEXIS 111736, at *34 (N.D.N.Y. Aug. 7, 2012) ("An arrest or seizure of an individual, including post arrest transportation and investigation is a service, activity, or benefit of a police department and is thus covered under the ADA." (quotations omitted)); cf. Ryan v. Vt. State Police, 667 F. Supp. 2d 378 (D. Vt. 2009) ("The ADA requires police officers to take appropriate steps to ensure that communication between deaf arrestees, and the police is at least as effective as communication that would occur between the police and hearing arrestees.").

Because Defendants' arguments as to Butchino and Tardif are misplaced, and because Plaintiffs' ADA claims based on Defendants' failure to provide reasonable accommodations are the types of ADA claims courts regularly permit, the Court finds that Defendants have not met their burden. Therefore, Defendants' Motions to Dismiss are denied with regard to Plaintiffs' ADA claims,[12] insofar as Plaintiffs are not suing individual Defendants in their individual capacities.

### G. Defendants' Arguments as to Plaintiffs' State Law Claims for Negligent Infliction of Emotional Distress

**\*\*26** Under New York State law the New York State Court of Appeals has

> h[e]ld that where a defendant negligently exposes a plaintiff to an unreasonable risk of bodily injury or death, the plaintiff may recover, as a proper element of his or her damages, damages for injuries suffered in the consequence of the observation of the serious injury or death of a member of his or her immediate family—assuming ... that it is established that the defendants' conduct was a substantial factor in bringing about such injury or death.

Bovsun v. Sanperi, 61 N.Y.2d 219, 231, 473 N.Y.S.2d 357, 461 N.E.2d 843 (N.Y. 1984). This is governed by the "zone-of-danger rule, which allows one who is himself or **\*333** herself threatened with bodily harm in consequence of the defendant's negligence to recover for emotional distress resulting from the viewing of the death or serious physical injury of a member of his or her immediate family ...." Id. at 228, 473 N.Y.S.2d 357, 461 N.E.2d 843. Moreover, "the emotional disturbance suffered must

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 108 of 147
Lalonde v. City of Ogdensburg, 662 F.Supp.3d 289 (2023)
2023 WL 2537626

be serious and verifiable." Id. at 231, 473 N.Y.S.2d 357, 461 N.E.2d 843 (citation omitted). "Additionally, the compensable emotional distress must be tied, as a matter of proximate causation, to the observation of the serious injury or death of the family member and such injury or death must have been caused by the conduct of the defendant." Id. at 231–32, 473 N.Y.S.2d 357, 461 N.E.2d 843.

Here, Saint Lawrence Defendants assert that "Plaintiffs have failed to even make a conclusory allegation that [Theresa] Lalonde's physical safety was threatened or endangered, and there are no facts to suggest that Mrs. Lalonde was in any way part of her husband's interaction with the officers ...." Saint Lawrence Defs.' Mem. of Law at 23. Likewise, the Ogdensburg Defendants argue: "There are no facts alleged suggesting that Mrs. Lalonde was in any way part of her husband's interaction with the officers such that she feared for her own safety." Ogdensburg Defs.' Mem. of Law at 14.

Plaintiffs averred in the Complaint that Theresa Lalonde "stormed out of her house" to accost the Defendant Officers for attacking her husband, Compl. ¶ 29, and Plaintiffs argue that "Theresa Lalonde was in the immediate vicinity as her husband[,]" Pls.' Resp. to Saint Lawrence Defs.' at 24, and that "there is more than reasonable chance that she herself would have been physically accosted and threatened with a similar beating as her husband[,]" id.

"Whether a plaintiff was in the 'zone of danger,' ... may raise factual questions that must be resolved by a jury." Sullivan v. Ford Motor Co., No. 97-CV-0593, 2000 WL 343777 at *8, 2000 U.S. Dist. LEXIS 4114 at *24 (S.D.N.Y. Mar. 31, 2000) (citing Leverock v. Hall & Fuhs, Inc., 245 A.D.2d 550, 551, 666 N.Y.S.2d 729 (N.Y. App. Div. 1997) and Malstrom v. Mackey, 182 A.D.2d 1006, 1006–07, 583 N.Y.S.2d 28 (N.Y. App. Div. 1992)). "[D]rawing all reasonable inferences in the plaintiffs' favor[,]" Holmes, 568 F.3d at 335 (citation omitted), and noting that the zone of danger analysis is a factual matter better suited to later stages in the litigation when such facts have been more fully developed, the Court finds that Plaintiffs have plausibly pled Theresa Lalonde's presence in the zone of danger as to their negligent infliction of emotional distress claims. Accordingly, because Defendants argue only that "Plaintiffs failed to plead one element of this cause of action," Saint Lawrence Defs.' Mem. of Law at 24; see also Ogdensburg Defs.' Mem. of Law at 14, the Court finds that Defendants have not met their burden under Rule 12(b)(6), and Defendants' Motions to Dismiss are denied as to Plaintiffs' negligent infliction of emotional distress claims.

**H. Defendants' Arguments as to Plaintiffs' State Law Claims for Intentional Infliction of Emotional Distress**

**\*\*27** Saint Lawrence Defendants and Ogdensburg Defendants contend that Plaintiffs' state law claim for intentional infliction of emotional distress is time barred by the relevant statute of limitations. Saint Lawrence Defs.' Mem. of Law at 24; Ogdensburg Defs.' Mem. of Law at 15.

While "[i]n section 1983 actions, the applicable limitations period is found in **\*334** the 'general or residual [state] statute [of limitations] for personal injury actions,' " which is "three years" under New York State law, Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d Cir. 2002) (quoting Owens v. Okure, 488 U.S. 235, 249–50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989)), Plaintiffs' state law claims for intentional infliction of emotional distress may be governed by either New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") § 215 or New York General Municipal Law § 50-i, see Durr, 558 F. Supp. 3d at 37. Under N.Y. C.P.L.R. § 215, "an action against a sheriff ... or constable, upon a liability incurred by him by doing an act in his official capacity or by omission of an official duty ..." "shall be commenced within one year ...." N.Y. C.P.L.R. § 215(1). Under New York General Municipal Law § 50-i:

> No action or special proceeding shall be prosecuted or maintained against a city, county, town, village, fire district or school district for personal injury ... alleged to have been sustained by reason of the negligence or wrongful act of such city, county, village, fire district or school district of any officer, agent or employee thereof ... unless (c) the action or special proceeding shall be commenced within one year and ninety days after the happening of the event upon which the claim is based ....

N.Y. Gen. Mun. § 50-i(c). "Whether the statute of limitations outlined in [N.Y.] GML § 50-i(c) or NY CPLR § 215 applies 'depends upon who is the real party in interest.' " Durr, 558 F. Supp. 3d at 37 (quoting Coe v. Town of Conklin, 94 A.D.3d 1197, 1198, 942 N.Y.S.2d 255 (N.Y. App. Div. 2012)). "Where an individual 'was acting solely on his own behalf' NY CPLR § 215 applies." Durr, 558 F. Supp. 3d at 37 (quoting Coe, 94 A.D.3d at 1198, 942 N.Y.S.2d 255). "Where an individual is alleged to have been 'acting within the scope of his employment with the Town, however, the Town may be liable for his conduct and would thus be the real party in interest; in those circumstances, General Municipal Law § 50-i(c) would apply.' " Durr, 558 F. Supp. 3d at 37–38 (quoting Coe, 94 A.D.3d at 1198–99, 942 N.Y.S.2d 255).

Defendants appear to assume that N.Y. C.P.L.R. § 215(1) applies to this case, rather than N.Y. Gen. Mun. § 50-i(c), although they do not explain why this is the case or address who is the real party in interest under New York State law. Saint Lawrence Defs.' Mem. of Law at 24; Ogdensburg Defs.' Mem. of Law at 15.

"It is well established that '[c]omplaints need not anticipate, or attempt to plead around, potential affirmative defenses.' " Kattu v. Metro Petroleum, Inc., No. 12-CV-54, 2013 WL 4015342, at *4, 2013 U.S. Dist. LEXIS 110413, at *10 (W.D.N.Y. Aug. 6, 2013) (quoting High Falls Brewing Co., LLC v. Boston Beer Corp., 852 F. Supp. 2d 306, 310 (W.D.N.Y. 2011)). "Accordingly, 'a statute of limitations is an affirmative defense that need not be addressed in the complaint,' and plaintiffs are not required to allege facts in their complaint to rebut a potential statute of limitations affirmative defense that might be waived." Kattu, 2013 WL 4015342, at *4, 2013 U.S. Dist. LEXIS 110413, at *11 (quoting E.E.O.C. v. Davis, No. 07-CV-6434, 2008 WL 4415177, at *6, 2008 U.S. Dist. LEXIS 72911, at *18 (W.D.N.Y. Sept. 24, 2008)). "Requiring plaintiffs to allege in a complaint facts sufficient to overcome a statute of limitations affirmative defense would shift the burden to raise and prove the affirmative defense from defendants, as their burden is allocated and imposed by Rule 8(c)(1) of the Federal Rules of Civil Procedure, to plaintiffs." Kattu, 2013 WL 4015342, at *4, 2013 U.S. Dist. LEXIS 110413, at *11.

 **\*335  \*\*28** "Determining a statute of limitations defense ordinarily 'requires a consideration of the merit of both parties' claims and defenses.' " Id. at *4, 2013 U.S. Dist. LEXIS 110413, at *12 (quoting Addison v. Reitman Blacktop, Inc., 283 F.R.D. 74, 83 (E.D.N.Y. 2011)). "A 'motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6) ... generally cannot reach the merits of an affirmative defense' except in the 'rare' circumstance in which facts sufficient to rule on the affirmative defense are alleged in the complaint." Acosta v. Jardon & Howard Techs., Inc., No. 18-CV-16, 2018 WL 5779506 at *2, 2018 U.S. Dist. LEXIS 187927 at *4 (E.D.N.Y. Nov. 2, 2018) (quoting Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (en banc)); Kattu, 2013 WL 4015342, at *4, 2013 U.S. Dist. LEXIS 110413, at *12 ("Because the [statute of limitations] defense requires consideration on the merits, it is heavily fact dependent, which makes a statute of limitations '[d]ismissal under Rule 12(b)(6) ... irregular.' " (quoting Davis, 2008 WL 4415177, at *6, 2008 U.S. Dist. LEXIS 72911, at *18)).

Plaintiffs argue that the statute of limitations defense does not apply here because of the "continuing violation doctrine ...." Pls.' Resp. to Saint Lawrence Defs.' at 25. Plaintiffs assert that "that Defendant Merria, Shaver, Pryce, and Sirles engaged in a conspiracy" and allege that the "co-conspirator[s] and co-Defendants[ ] Chief Robert Westcott and Ogdensburg police officer Scott Wilson ... on or about April 1, 2021, resuscitated the conspiracy's false narratives in order to bolster their conspiracy's coverup" by "order[ing] Timothy] Lalonde, under threat of warrant, to return to the [Ogdensburg Police Department] stationhouse to purportedly retake fingerprints and mugshots despite his criminal case being dismissed in July 21, 2020." Id. During this time, Plaintiffs state that "co-conspirators Westcott and Wilson proceeded to re-interrogate Mr. Lalonde regarding their fantastical fabricated narrative ....." Id.

Under New York State law, the New York State Supreme Court, Appellate Division, First Department, has found that based on "a pattern of harassment, intimidation, humiliation and abuse" an "intentional infliction of emotional distress" action "was not barred by the one-year Statute of Limitations (CPLR 215)" and "was instead governed by the continuing tort doctrine" which "permit[s] the plaintiff to rely on wrongful conduct occurring more than one year prior to commencement of the action, so long as the final actionable event occurred within one year of the suit." Shannon v. MTA Metro-North R.R., 269 A.D.2d 218, 219, 704 N.Y.S.2d 208 (N.Y. App. Div. 2000). Accordingly, under Plaintiffs' argument, the statute of limitations did not commence

until on or about April 1, 2021, and therefore, Plaintiffs' filing of the Complaint on February 18, 2022, was well within the statute of limitations time period set forth by N.Y. C.P.L.R. § 215(1) or N.Y. Gen. Mun. § 50-i(c). See generally Compl.

Thus, for the purposes of resolving Defendants' Motions to Dismiss, the Court finds that Plaintiffs' intentional infliction of emotional distress claims are not time barred by the statute of limitations, and the Court will not shift the burden of pleading and proving facts that underpin the potential statute of limitations defense from Defendants onto Plaintiffs. Cf. Kattu, 2013 WL 4015342, at *5, 2013 U.S. Dist. LEXIS 110413, at *13–14 ("In this action, some of plaintiffs' claims may have accrued before the two- or three-year statute of limitations bar date, but plaintiffs sufficiently raise equitable tolling in response to defendant['s] ...Rule 12(b)(6) motion to dismiss to avoid the dismissal of their **\*336** claims for failure to state a claim. In light of plaintiff[s'] response to the motion to dismiss, it is not clear from the complaint that any of plaintiffs' claims are time-barred. On the other hand, undisputed facts may later justify a motion for summary judgment to significantly narrow the issue for trial. At this juncture, the Court will not shift the burden of pleading and proving facts that underlie the potential statute of limitations defense, a defense that is waived if not alleged in an answer, from defendant to plaintiffs."). Accordingly, Defendants' Motions to Dismiss are denied as to Plaintiffs' intentional infliction of emotional distress claims.

### I. Defendants' Arguments as to Plaintiffs' Negligence Claims

**\*\*29** Saint Lawrence Defendants and Ogdensburg Defendants both argue that because conduct cannot be both negligent and intentional, the Court should dismiss Plaintiffs' negligence claims. Saint Lawrence Defs.' Mem. of Law at 24–25; Ogdensburg Defs.' Mem. of Law at 15. As discussed at length above, it is well-settled that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Accordingly, the Court finds that Defendants' arguments with regard to inconsistency of pleadings are inapposite under Rule 8.

Saint Lawrence Defendants assert that "Plaintiffs' negligence claim must also be dismissed because plaintiffs may not recover in negligence where a law enforcement officer fails to exercise some requisite amount of care in effectuating an arrest or initiating a prosecution." Saint Lawrence Defs.' Mem. of Law at 25. Ogdensburg Defendants reiterate the same argument: "[N]egligence claims must be dismissed where it is alleged that the law enforcement officer was negligent by failing to exercise certain care in effectuating the arrest or initiating prosecution." Ogdensburg Defs.' Mem. of Law at 15. Both groups of Defendants cite to the Second Circuit decision Bernard v. United States, which stated: "Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effectuating an arrest or initiating a prosecution." 25 F.3d 98, 102 (2d. Cir. 1994); Saint Lawrence Defs.' Mem. of Law at 25; Ogdensburg Defs.' Mem. of Law at 15.

Bernard relies on Boose v. City of Rochester, 71 A.D.2d 59, 421 N.Y.S.2d 740 (N.Y. App. Div. 1979), a decision issued by the New York State Supreme Court, Appellate Division, Fourth Department, in support of its finding. See Bernard, 25 F.3d at 102. Boose stated: "Plaintiff may not recover under broad general principles of negligence ... but must proceed by way of the traditional remedies of false arrest and imprisonment and malicious prosecution." 71 A.D.2d at 62, 421 N.Y.S.2d 740. However, a plaintiff may proceed with negligence claims brought against law enforcement officials if such claims are not duplicative of false arrest, false imprisonment, or malicious prosecution. See Woods v. Town of Cheektowaga, No. 11-CV-343, 2012 WL 5288767, at *7, 2012 U.S. Dist. LEXIS 152229, at *22–23 (W.D.N.Y. Oct. 23, 2012) (addressing "Defendants['] argume[ment] that this claim [for negligence] must be dismissed because the negligence alleged is based upon activities relating to an arrest, [and] therefore Plaintiffs must resort to the traditional remedies of false imprisonment and malicious prosecution and cannot recover under the broader principles of negligence" but finding that "[u]nlike the cases on which Defendants rely, however, Plaintiffs' negligence claim here is not duplicative of a false arrest or malicious prosecution **\*337** claim" (citations omitted) (quotations omitted)).

Accordingly, the Court agrees with Defendants that Plaintiffs may not pursue negligence claims against Pryce, Sirles, Shaver, Wilson, Merria, and Chief Westcott for actions and omissions that are properly construed as false arrest and false imprisonment claims. Therefore, these claims are dismissed. However, insofar as Plaintiffs seek to bring other negligence claims that are not duplicative of false arrest and false imprisonment, those claims may proceed because Defendants have not met their burden with

regard to those other negligence claims. Thus, Defendants' Motions to Dismiss are denied as to Plaintiffs' negligence claims that are not duplicative of false arrest and false imprisonment.

### J. Ogdensburg Defendants' Arguments as to Plaintiffs' Trespass Claim Against Wilson

**\*\*30** Ogdensburg Defendants argues that the Court should dismiss Plaintiffs' trespass claim against Wilson. Ogdensburg Defs.' Mem. of Law at 16–17. Ogdensburg Defendants contend that two New York State Court of Appeals cases support their argument, specifically Valdez v. City of New York, 18 N.Y.3d 69, 936 N.Y.S.2d 587, 960 N.E.2d 356 (N.Y. 2011), and McLean v. City of New York, 12 N.Y.3d 194, 878 N.Y.S.2d 238, 905 N.E.2d 1167 (N.Y. 2009). Ogdensburg Defs.' Mem. of Law at 16. However, the two cases that Ogdensburg Defendants cite address *municipal liability* whereas Plaintiffs' Complaint seeks to bring a trespass claim only against Wilson. Compl. ¶¶ 171–76. For example, the passage of Valdez quoted by Ogdensburg Defendants states: " 'A public employee's discretionary acts—meaning conduct involving the exercise of a reasoned judgment—may not result in the *municipality's liability* even when the conduct is negligent.' " Ogdensburg Defs.' Mem. of Law at 16 (emphasis added) (quoting Valdez, 18 N.Y.3d at 76, 936 N.Y.S.2d 587, 960 N.E.2d 356). Likewise, McLean states that "discretionary *municipal acts* may never be a basis for liability, while ministerial acts may support liability only where a special duty is found." McLean v. City of New York, 12 N.Y.3d at 202, 878 N.Y.S.2d 238, 905 N.E.2d 1167. Thus, the Valdez and McLean cases are inapplicable in the context of Plaintiffs' trespass claim against Wilson. Accordingly, Ogdensburg Defendants have failed to meet their burden of proving that Plaintiffs have not stated a cognizable claim against Wilson for trespass, and Ogdensburg Defendants' Motion to Dismiss is denied with regard to Plaintiffs' trespass claim against Wilson.

### V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Saint Lawrence Defendants' Motion to Dismiss (Dkt. No. 9) is **GRANTED in part**, pursuant to Rule 12(b)(6), to the extent that Plaintiffs are seeking to sue individual Defendants in their individual capacities under the ADA; however, Saint Lawrence Defendants' Motion to Dismiss is **DENIED** with regard to all of Plaintiffs' other ADA claims against Defendants—including those claims brought against Defendants in their official capacities—and Plaintiffs' other ADA claims may proceed; and it is further

**ORDERED**, that Saint Lawrence Defendants' Motion to Dismiss is **GRANTED in part**, pursuant to pursuant to Rule 12(b)(6), insofar as Plaintiffs are seeking to sue Defendants for negligence for acts or omissions that are properly construed as false arrest and false imprisonment; however, Saint Lawrence Defendants' Motion to Dismiss is **DENIED** with regard to all **\*338** of Plaintiffs' other negligence claims that are not duplicative of false arrest and false imprisonment, and Plaintiffs' other negligence claims are permitted to proceed; and it is further

**ORDERED**, that Saint Lawrence Defendants' Motion to Dismiss is **DENIED** as to all other claims Saint Lawrence Defendants seek to dismiss; and it is further

**ORDERED**, that Ogdensburg Defendants' Motion to Dismiss (Dkt. No. 10) is **GRANTED in part**, pursuant to Rule 12(b)(6), to the extent that Plaintiffs are seeking to sue individual Defendants in their individual capacities under the ADA; however, Ogdensburg Defendants' Motion to Dismiss is **DENIED** with regard to all of Plaintiffs' other ADA claims against Defendants—including those claims brought against Defendants in their official capacities—and Plaintiffs' other ADA claims may proceed; and it is further

**ORDERED**, that Ogdensburg Defendants' Motion to Dismiss is **GRANTED in part**, pursuant to pursuant to Rule 12(b)(6), insofar as Plaintiffs are seeking to sue Defendants for negligence for acts or omissions that are properly construed as false arrest and false imprisonment; however, Ogdensburg Defendants' Motion to Dismiss is **DENIED** with regard to all of Plaintiffs' other negligence claims that are not duplicative of false arrest and false imprisonment, and Plaintiffs' other negligence claims are permitted to proceed; and it is further

**ORDERED**, that Ogdensburg Defendants' Motion to Dismiss is **DENIED** as to all other claims Ogdensburg Defendants seek to dismiss; and it is further

**ORDERED**, that the Clerk of the Court is respectfully directed to serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

662 F.Supp.3d 289, 2023 WL 2537626

---

**Footnotes**

1       The Court refers to the Ogdensburg Defendants and the Saint Lawrence Defendants collectively as "Defendants."

2       Saint Lawrence Defendants and Ogdensburg Defendants requested oral argument with respect to the Motions to Dismiss. Saint Lawrence Defs.' Mot. to Dismiss at 1; Ogdensburg Defs.' Mot. to Dismiss at 1. Local Rule 7.1(a) states: "Motions are decided without oral argument unless scheduled by the Court. Parties may make a written request for oral argument, which is subject to the discretion of the presiding judge." L.R. 7.1(a). The Court denies these requests for oral argument.

3       "Under New York Law, a civil assault is an intentional placing of another person in fear of imminent harm or offensive conduct." Jackson, 2022 WL 2954370, at *9, 2022 U.S. Dist. LEXIS 132123, at *25–26 (citing Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001)). "To recover damages for assault, there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact." Jackson, 2022 WL 2954370, at *9, 2022 U.S. Dist. LEXIS 132123, at *26 (citing Morgan v. City of Utica, No. 20-CV-1424, 2021 WL 2036680, at *5, 2021 U.S. Dist. LEXIS 97271, at *11–12 (N.D.N.Y. May 21, 2021)). "A civil battery is an intentional wrongful physical contact with another person without consent, and may be accomplished either personally or by means of an instrumentality ...." Jackson, 2022 WL 2954370, at *9, 2022 U.S. Dist. LEXIS 132123, at *27 (citations omitted) (citing Girden, 262 F.3d at 203 and Relf v. City of Troy, 169 A.D.3d 1223, 1226, 94 N.Y.S.3d 672 (N.Y. App. Div. 2019)).

4       Supplemental jurisdiction is governed by 28 U.S.C. § 1367(a), which states: "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Under § 1367(a), claims " 'form part of the same case or controversy' " if these claims, " 'derive from a common nucleus of operative fact.' " Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 245 (2d Cir. 2011) (quoting Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. 2004)). Pursuant to § 1367(a), "a federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise." Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639, 129 S.Ct. 1862, 173 L.Ed.2d 843 (2009). The Court exercises this subject matter jurisdiction over all of Plaintiffs' New York State law claims.

5       "In order to establish a claim for false arrest or false imprisonment under New York State law, a plaintiff must show that: (1) the defendant intentionally confined the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise justified." Levantino, 56 F. Supp. 3d at 200.

---

6    "Rule 8(d)[ ] [was] formerly Rule 8(e) ...." St. John's Univ. v. Bolton, 757 F. Supp. 2d 144, 183 (E.D.N.Y. 2010). While "[t]he court in Henry cited to former Rule 8(e)(2) .... [t]he relevant provision was restyled as Rule 8(d)(2)–(3) in 2007 ...." Moore v. Samuel S. Stratton VAH, No. 16-CV-475, 2019 WL 251725, at *4 n.3, 2019 U.S. Dist. LEXIS 8342, at *12 n.3 (N.D.N.Y. Jan. 17, 2019) (Kahn, J.).

7    Some courts also look to Rule 20 when addressing pleading in the alternative when a plaintiff pleads claims against multiple defendants. Rule 20(a)(2) states: "Persons ... may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2)(A)–(B). Applying Rule 20(a)(2)(A), the Eleventh Circuit permitted a plaintiff to plead in the alternative as to three law enforcement officials, although plaintiff could not identify which specific official had struck him: "Because we conclude that [plaintiff] sufficiently alleged that one of the three agents struck him in violation of his Fourth Amendment rights, and that all three agents were present at the time, [plaintiff] can plead in the alternative and pursue discovery to uncover the identity of the agent who allegedly struck him." Saunders v. Duke, 766 F.3d 1262, 1268 n.2 (11th Cir. 2014).

8    Saint Lawrence Defendants only argue against Plaintiffs' fabrication of evidence claims as they relate to Merria. Saint Lawrence Defs.' Mem. of Law at 9–10. Ogdensburg Defendants only argue against Plaintiffs' fabrication of evidence claims as they relate to "Shaver, Pryce, Sirles and Wilson ...." Ogdensburg Defs.' Mem. of Law at 5.

9    Even if sovereign immunity were at issue, the Court notes that "abrogation [of Eleventh Amendment sovereign immunity] under Title II [of the ADA] is a congruent and proportional response to the history of discrimination against the disabled ...." Goonewardena v. New York, 475 F. Supp. 2d 310, 326 (S.D.N.Y. 2007). Because "abrogation under Title II [of the ADA] is a valid exercise of Congressional power under section 5 [of the Fourteenth Amendment], sovereign immunity is not a ground which bars" a plaintiff's claims against the State. Id. Additionally, where "the immunity of the individual defendants sued in their official capacities parallels that of the State[,]" because "sovereign immunity does not shield [the State], it does not shield the individual defendants in their official capacities." Id. at 326–27.

Likewise, even if sovereign immunity were at issue in this case, it would not bar a plaintiff's claims for injunctive relief brought against state actors in their official capacities. "Neither § 504 nor Title II [of the ADA] displays any intent by Congress to bar a suit against state officials in their official capacities for injunctive relief, nor does either create a remedial scheme so elaborate that it could be thought to preclude relief under Ex parte Young[, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)]." Henrietta D., 331 F.3d at 289. Accordingly, ("there is no basis for holding that the ADA or Rehabilitation Act intended to create the kind of comprehensive enforcement scheme that would preclude prospective injunctive relief against a state official in her official capacity.").

10    Saint Lawrence Defendants regard Plaintiffs' factual claims as to this incident as inconsistent, Saint Lawrence Defs.' Mem. of Law at 20, but the Court reiterates what it stated above—under Rule 8, a plaintiff's pleadings may have inconsistencies and "[t]he inconsistency may lie either in the statement of the facts or in the legal theories adopted ...." Henry, 42 F.3d at 95.

11    Insofar as Ogdensburg Defendants assert that "no facts have been alleged that [Chief Westcott] was a 'policy maker,' " Ogdensburg Defs.' Mem. of Law at 14, the Court finds that this argument is inapposite. See Wilson v. Robert Riley Baucom, No. 20-CV-311, 2021 WL 7081523 at *8, 2021 U.S. Dist. LEXIS 253806 at *25 (W.D. Tex. Jan. 25, 2021) ("Neither a policymaker nor an official policy need be identified for ADA claims; a public entity 'is liable for the vicarious acts of any of its employees as specifically provided by the ADA.' " (quoting Leeper v. Travis Cnty., No. 16-CV-819, 2018 WL 5892377, at *8, 2018 U.S. Dist. LEXIS 191755, at * (W.D. Tex. Nov. 19, 2018))).

12    To the extent that Saint Lawrence Defendants again reiterate their argument as to inconsistencies in Plaintiffs' Complaint, in the context of these ADA claims, Saint Lawrence Defs.' Mem. of Law at 22, the Court again finds that Plaintiffs may plead in the alternative under Rule 8.

---

**End of Document**                                   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Weilburg v. Rodgers, Not Reported in Fed. Supp. (2022)

2022 WL 2751619

2022 WL 2751619
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Daro C. WEILBURG, Plaintiff,

v.

John S. RODGERS, et al., Defendants.

5:22-cv-435 (BKS/TWD)
|
Signed July 14, 2022

**Attorneys and Law Firms**

Plaintiff pro se: Daro C. Weilburg, Munnsville, NY 13409.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

 **\*1** Plaintiff pro se Daro C. Weilburg brought this action on May 4, 2022, against Assistant District Attorney John S. Rodgers, New York State Trooper Ethan C. Koss, Norman Button, and Doe Defendants alleging that he was falsely arrested and prosecuted for misdemeanor criminal trespass in the second degree, in violation of NY Penal Law 140.15(1). (Dkt. No. 1). This matter was referred to United States Magistrate Judge Thérèse Wiley Dancks who, on May 31, 2022, issued a Report-Recommendation recommending that Plaintiff's false arrest claim against Defendant Trooper Koss survive *sua sponte* review; that Plaintiff's malicious prosecution claim against Defendant ADA John S. Rodgers be dismissed with leave to amend; and that Defendants Norman Button, Jane Doe, and John Doe be dismissed. (Dkt. No. 6). Plaintiff filed a timely objection to the Report-Recommendation. (Dkt. No. 7). For the reasons set forth below, the Report-Recommendation is adopted in part and denied in part: Plaintiff's false arrest claim against Defendant Trooper Koss survives sua sponte review; any claim against Defendant ADA Rodgers arising from Rodgers' prosecutions of Plaintiff is barred by the doctrine of prosecutorial immunity; and Plaintiff's remaining claims against the remaining Defendants are dismissed with leave to amend.

**II. STANDARD OF REVIEW**

This court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue,* 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1) (C). "A proper objection is one that identifies the specific portions of the [report-recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (internal quotation marks omitted). Properly raised objections must be "specific and clearly aimed at particular findings" in the report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal...." *Machicote v. Ercole*, No. 06-cv-13320, 2011 WL 3809920 at \*2, 2011 U.S. Dist. LEXIS 95351 (S.D.N.Y. Aug. 25, 2011) (citation omitted). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

**III. DISCUSSION**

  **A. Background**

2022 WL 2751619

In his complaint, Plaintiff alleges that Defendant Trooper Koss arrested him for misdemeanor trespass knowing that it was based on false information provided by Richard Castellane [1] and Defendant Norman Button, Castellane's employee. (Dkt. No. 1). Plaintiff alleges that he told Defendant Trooper Koss that he had access to the building as a caretaker, and that he went inside the residence to fix the internet and feed the dog. (*Id.* at 5). Plaintiff also asserts that Defendants Norman Button and Trooper Koss had him arrested because he is a Jehovah's Witness and that Defendant ADA Rodgers is prosecuting Plaintiff because he is a Jehovah's Witness. (*Id.* at 8). Plaintiff alleges that Defendant ADA Rodgers "did not provide the entire discovery," and that he "filed for a Temporary Protection Order against" Plaintiff because an attorney, "Jacobson," asked ADA Rodgers to file it. (Dkt. No. 71, at 7-8).

**\*2** Plaintiff attached to the complaint an information dated March 12, 2022, which charges him with misdemeanor criminal trespass, second degree, for unlawfully entering the dwelling of Richard Castellane. (Dkt. 1-1, at 1). Plaintiff also attached: (1) an order of protection dated March 23, 2022, which directs Plaintiff to, inter alia, refrain from any contact with Richard Castellane, and (2) what appears to be a February 2, 2022 email from Richard Castellane to Plaintiff questioning "how many calls on a daily basis" Plaintiff made from Castellane's residence "extolling Jehovah Witnesses," and whether Plaintiff had ever sought permission to use the premises for that purpose. (Dkt. No. 1-1, at 4-5).

In the Report-Recommendation Magistrate Judge Dancks concluded that Plaintiff's false arrest claim against Defendant Trooper Koss survives initial review, but that to the extent Plaintiff seeks to bring a malicious prosecution claim it should be dismissed with leave to amend because he failed to allege that the criminal proceeding was terminated in his favor—an essential element of that claim. (Dkt. No. 6, at 5-6). Magistrate Judge Dancks recommended dismissal of the Doe Defendants and Defendant Norman Button because "the Complaint fails to allege any facts reflecting that [these defendants] were involved in any of violation of Plaintiff's rights under 28 U.S.C. § 1983." (*Id.* at 6).

In his objection, Plaintiff argues that there was "a conspiracy to violate his civil rights under § 1985 ... by all of the defendants listed and defendants not yet known." (Dkt. No. 7, at 2). He asserts that a bodycam video that he obtained through a FOIL request "clearly shows that the Plaintiff had every right to go into the Castellane residence to reset the router"; that Defendant Trooper Koss suborned perjury from Castellane; that Defendant Norman Button and his wife, Diane Button, provided false information to Defendant Trooper Koss; and that Defendant ADA Rodgers should have dismissed the misdemeanor charge after having received the bodycam videos. (*Id.* at 2-3, 5).

Plaintiff has also asserted new facts arising out of a second arrest, on May 17, 2022, after this action was filed, for violating the protective order. (Dkt. No. 7, at 4-10). Plaintiff asserts that Defendant Koss conspired with unknown persons to block the path to Plaintiff's apartment with a sheet of plywood; that the obstruction was placed there "so the Plaintiff would remove it and be arrested"; and that Defendants Koss, ADA Rodgers, Richard Castellane and other New York State Police Officers "had the Plaintiff arrested" on May 17, 2022 for violating the order of protection. (*Id.* at 4-5). Plaintiff asserts that this arrest was in retaliation for filing this action. (*Id.* at 4, 6). Plaintiff alleges that Defendant ADA Rodgers filed the misdemeanor charge knowing that it was based on false pretenses and "got a temporary order of protection under false pretenses." (Dkt. No. 7, at 5-6).

**B. Analysis**

While Plaintiff has not set forth a specific objection to the Report-Recommendation, he has asserted additional facts and claims that he seeks to bring, beyond the facts and claims set forth in his complaint. The Court has therefore reviewed the Report-Recommendation for clear error, but construing Plaintiff's submission liberally, has considered his additional facts and claims and will, as set forth below, give Plaintiff an opportunity to file an amended complaint. *See Crum v. Dodrill*, 562 F. Supp. 2d 366, 373–74 & n.13 (N.D.N.Y. 2008) (discussing "the mandate to read the papers of pro se litigants generously"). The Court thus discusses the law applicable to the claims Plaintiff has asserted in his objection.

**\*3** "In order to state a conspiracy claim under 42 U.S.C. 1985(3), a plaintiff must show: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 117 of 147

Weilburg v. Rodgers, Not Reported in Fed. Supp. (2022)
2022 WL 2751619

and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007). A plaintiff must also show that that the conspiracy was "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus." (*Id.*). Religious discrimination satisfies the class-based animus requirement of 1985(3). *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 291 (2d Cir. 1992).

To state a § 1983 conspiracy, plaintiff must plausibly allege: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).

Mere conclusory or general allegations of a conspiracy, however, are insufficient to state a claim of conspiracy. *Walker v. Jastremski*, 430 F.3d 560, 564 n.5 (2d Cir. 2005); *see Ciambriello v. Cty of Nassau,* 292 F.3d 307, 325 (2d Cir. 2002) ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffusive and expansive allegations are insufficient, unless amplified by specific instances of misconduct") (citation omitted). To state a viable conspiracy claim, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2013) (internal quotation marks and citations omitted).

Moreover, Defendant ADA Rodgers has absolute immunity "for those prosecutorial activities intimately associated with the judicial phase of the criminal process," unless he "proceeds in the clear absence of all jurisdiction." *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987). Absolute immunity protects a prosecutor from liability "for virtually all acts, regardless of motivation, associated with his function as an advocate," but not to a prosecutor's acts of investigation or administration." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (prosecutor has absolute immunity for allegedly conspiring to present false evidence at a criminal trial). "[A] prosecutor's function depends chiefly on whether there is pending or in preparation a court proceeding in which the prosecutor acts as an advocate." *Warney v. Monroe Cnty.*, 587 F.3d 113, 123 (2d Cir. 2009).

A prosecutor "enjoys absolute immunity when determining which offenses to charge [or] initiating a prosecution." *Anilao v. Spota*, 27 F.4th 855, 864 (2d Cir. 2022). A prosecutor's delay in producing discovery materials during a prosecution is protected by prosecutorial immunity. *See Hill v. City of New York*, 45 F.3d 653, 662 (2d Cir. 1995). Courts have found that seeking an order of protection falls within the traditional prosecutorial functions for which a prosecutor is entitled to absolute immunity. *See Thomas v. Cnty. Of Putnam*, 262 F. Supp. 2d 241, 249 (S.D.N.Y. 2003). Because absolute immunity attaches to a prosecutor's function as an advocate, it extends even to a prosecutor who conspires to do something not properly within his role, such as conspiring to present false evidence at a criminal trial. *Anilao*, 27 F.4th at 864.[2] Thus, claims against ADA Rodgers arising from the prosecution of Plaintiff for criminal mischief, the obtainment of an order of protection during the course of that prosecution, or the prosecution of Plaintiff for violating the protective order, are barred by the doctrine of prosecutorial immunity. *See Urena v. Roy*, No. 22-cv-2384, 2022 WL 1557042, at *3, 2022 U.S. Dist. LEXIS 87999 (S.D.N.Y. May 16, 2022).[3]

**\*4** To plead a First Amendment retaliatory arrest claim regarding his arrest on May 17, 2022, for violating the order of protection, Plaintiff must plausibly allege that: "(1) he has a right protected by the First Amendment;[4] (2) the defendant's actions were motivated or substantially caused by the exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). Plaintiff must provide more than mere conclusory allegations; he must allege facts that plausibly support an inference of the requisite causal connection between his lawsuit and Defendant Koss's arrest on May 17, 2022. *See Grossi v. City of New York*, No. 08-cv-1083, 2009 WL 4456307, at *7, 2009 U.S. Dist. LEXIS 110695 (E.D.N.Y. Nov. 4, 2009) (collecting cases where insufficient facts alleged to render causal connection plausible), *report and recommendation adopted by* 2009 WL 4456307, 2009 U.S. Dist. LEXIS 110694 (E.D.N.Y. Nov. 30, 2009). And Plaintiff also must plead and prove the absence of probable cause for the arrest unless he was arrested in circumstances where "otherwise similarly situated individuals not engaged in the same sort of protected speech" had not been arrested. *Nieves v. Bartlett*, ––– U.S. ––––, 139 S. Ct. 1715, 1727, 204 L.Ed.2d 1 (2019).

### C. Leave to Amend

While Plaintiff has not set forth facts in his complaint or in his objection from which the Court could plausibly infer: (1) that any of the Defendants agreed, either expressly or implicitly to have Plaintiff arrested because he is a Jehovah's Witness, in violation of 42 U.S.C. § 1985(3), or (2) that there was any understanding and agreement between a state actor and any nonstate actor to have Plaintiff falsely arrested for trespass, in violation of 42 U.S.C. § 1983, or (3) that there is a causal connection between Plaintiff's filing of this lawsuit and Defendant Trooper Koss's arrest of Plaintiff on May 17, 2022, as required for a First Amendment retaliation claim, in light of Plaintiff's pro se status, the Court will give him an opportunity to amend the complaint. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). And, the Court concurs in Magistrate Dancks' recommendation that Plaintiff be given an opportunity to amend the complaint to allege a malicious prosecution claim: to do so Plaintiff must plausibly allege facts in support of each of the elements of that claim, including that the prosecution ended without a conviction. (Dkt. No. 6, at 5-6).

To the extent Plaintiff seeks to amend the complaint, Plaintiff must allege facts showing what any named defendant, including any Jane Doe or John Doe defendant, did to violate his rights. As Magistrate Judge Dancks noted, dismissal is appropriate for defendants who are listed in the caption "but the body of the complaint fails to indicate what the defendant did to the plaintiff." *Cipriani v. Burrardi*, No. 06-cv-0889, 2007 WL 607341, at *1, 2007 U.S. Dist. LEXIS 11727 (N.D.N.Y. Feb. 20, 2007). The Court therefore adopts Magistrate Judge Dancks' recommendation to dismiss the John Doe and Jane Doe Defendants, who are not referred to at all in the body of the complaint, as well as Defendant Norman Button, against whom the complaint fails to state a cause of action. [5]

 **\*5**  Finally, Plaintiff is advised that an amended complaint will completely replace the original complaint in this action, and render the original complaint "of no legal effect." *International Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977). Any amended complaint must therefore include all of the allegations against each of the defendants so that it may stand alone as the sole complaint in this action.

The Court has reviewed the remaining portions of the report for clear error and found none. Accordingly, the Report-Recommendation is adopted in part and denied in part, for the reasons stated above.

### IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Magistrate Judge Dancks' Report-Recommendation (Dkt. No. 6) is **ADOPTED** in part and **DENIED** in part, as set forth above; and it is further

**ORDERED** that Plaintiff's false arrest claim against Defendant Trooper Ethan C. Koss arising out of Plaintiff's March 12, 2022 arrest survives sua sponte review; and it is further

**ORDERED** that any claims against Defendant ADA Rodgers arising from Rodgers' prosecution of Plaintiff for trespass, obtaining a protective order during the course of the trespass prosecution, or prosecuting Plaintiff for violating the protective order, are barred by the doctrine of prosecutorial immunity, and that Defendant ADA Rodgers is therefore **DISMISSED**; and it is further

**ORDERED** that Defendants Norman Button, and the Jane Doe and John Doe Defendants are **DISMISSED with leave to amend**, and Plaintiff is granted leave to file an amended complaint within thirty (30) days of the date of this Order. Any amended complaint must be a complete pleading which will replace the current complaint in total; and it is further

**ORDERED** that if Plaintiff files an amended complaint within thirty (30) days of the date of this Order, the amended complaint shall be referred to Magistrate Judge Dancks for review; and it is further

Case 5:25-cv-01168-BKS-ML    Document 7    Filed 05/13/26    Page 119 of 147

Weilburg v. Rodgers, Not Reported in Fed. Supp. (2022)

2022 WL 2751619

**ORDERED** that if no amended complaint is filed within thirty (30) days of the date of this Order, the Clerk shall issue a summons and forward it with copies of the complaint and a packet containing General Order 25, which sets forth this district's Civil Case Management Plan, to the United States Marshal for service upon Defendant New York State Trooper Ethan C. Koss. Defendant Koss must file a formal response to Plaintiff's complaint (Dkt. No. 1) as provided for in the Federal Rules of Civil Procedure subsequent to service of process; and it is further

**ORDERED** that all pleadings, motions, and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with all requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with rule 7.1 of the Local Rules of Practice for the Northern District of New York in filing motions. Motions will be decided on submitted papers, without oral argument, unless otherwise ordered by this Court. Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so may result in the dismissal of this action; and it is further

 **\*6** **ORDERED** that the Clerk serve a copy of this Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 2751619

---

### Footnotes

1       Richard Castellane is not a named defendant.

2       To the extent Plaintiff claims that Defendant ADA Rodgers failed to prosecute Defendant Koss for suborning perjury or Richard Castellane for making a false statement, it is well-established that private citizens do not have standing to bring actions against prosecutors contesting decisions regarding whether—and whom—to prosecute. *See*, *e.g.*, *Brady v. Schneiderman*, No. 15-cv-09141, 2016 WL 3906737, at \*3, 2016 U.S. Dist. LEXIS 91654 (S.D.N.Y. July 13, 2016), *aff'd*, 714 F. App'x 60 (2d Cir. 2018).

3       The Court has provided Plaintiff with a copy of the unpublished decisions.

4       Filing a lawsuit is constitutionally protected speech. *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 152 (2d Cir. 2006).

5       The fact that Defendant Norman Button provided false information to Defendant Trooper Koss, (Dkt. No. 1, at 5), is, by itself, insufficient to state a false arrest claim against Norman Button. "Generally, a civilian defendant who furnishes information to law enforcement authorities who are then free to exercise their own independent judgment as to whether an arrest will be made and criminal charges filed will not be held liable for false arrest or false imprisonment." *Barua v. Barua*, No. 14-cv-5107, 2015 WL 4925028, at \*5, 2015 U.S. Dist. LEXIS 108970 (E.D.N.Y. Aug. 18, 2015) (citation and internal marks omitted) (collecting authorities). "A private individual may be held liable for false arrest if he knowingly makes false statement to investigators with the intent of having the plaintiff be arrested or confined, or otherwise gives advice or encouragement to the authorities or importunes them to act." *Id.* at \*5, 2015 WL 4925028, at \*4, 2015 U.S.

**Weilburg v. Rodgers, Not Reported in Fed. Supp. (2022)**

2022 WL 2751619

Dist. LEXIS 108970, at *14 (collecting authorities). A similar analysis applies to a civilian's liability for malicious prosecution. *Id.* at *5, 2015 WL 4925028, at *4, 2015 U.S. Dist. LEXIS 108970, at *14

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 4456307

2009 WL 4456307
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

John GROSSI and Lori Grossi, Plaintiffs,

v.

The CITY OF NEW YORK, Michael R. Bloomberg, individually and in his official capacity, PO Michael
Rice, individually and in his official capacity, PO John Doe 1, individually and in his official capacity, PO
John Doe 2, individually and in his official capacity, Staten Island University Hospital, Dr. John Doe 3,
individually and in his official capacity, and Jane Doe 1, individually and in her official capacity, Defendants.

No. 08–CV–1083 (RRM)(ALC).
|
Nov. 30, 2009.

**Attorneys and Law Firms**

Steven A. Morelli, Anthony Christopher Giordano, Elaine R. Sammon, The Law Office of Steven A. Morelli, P.C., Carle Place,
NY, for Plaintiffs.

Susan P. Scharfstein, Diana M. Murray, The City of New York Law Department, Office of Corporation Counsel, New York,
NY, Judd Cohen, Shaub, Ahmuty, Citrin & Spratt, LLP, New Hyde Park, NY, for Defendants.

*ORDER*

MAUSKOPF, District Judge.

**\*1** By Motion filed July 1, 2009 (Docket Entry No. 39), Defendants the City of New York, Michael R. Bloomberg, and Police
Officer Michael Rice (collectively, the "City Defendants") moved to dismiss Plaintiffs' Amended Complaint in part pursuant to
Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). By Order entered July 15, 2009, this Court referred that motion to the
assigned Magistrate Judge, the Honorable Andrew L. Carter, for a Report and Recommendation. On November 4, 2009, Judge
Carter issued a Report and Recommendation (the "R & R") that the City Defendants' motion be granted. Judge Carter reminded
the parties that, pursuant to Rule 72(b), any objection to the R & R was due within ten days. Neither party has filed any objection.

Pursuant to 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72, the Court has reviewed the R & R for clear error and,
finding none, adopts the R & R in its entirety. *See Covey v. Simonton,* 481 F.Supp.2d 224, 226 (E.D.N.Y.2007). Accordingly,
it is hereby ORDERED that the City Defendants' motion to dismiss the Amended Complaint in part is GRANTED. Plaintiffs'
First Cause of Action is DISMISSED, insofar as it relates to the landmark designation of Plaintiffs' property, for failure to state
a claim on which relief may be granted. Plaintiffs' Second and Third Causes of Action are DISMISSED, insofar as they relate
to the landmark designation of Plaintiffs' property, because they are unripe for adjudication and fail to state a claim on which
relief may be granted. Plaintiffs' Fourth Cause of Action is DISMISSED, insofar as it relates to the landmark designation of
Plaintiffs' property, because it is unripe for adjudication.

SO ORDERED.

REPORT AND RECOMMENDATION

ANDREW L. CARTER, JR., United States Magistrate Judge.

Plaintiffs John and Lori Grossi, through counsel, commenced the instant litigation against the City of New York, Michael R. Bloomberg (individually and in his official capacity as the mayor of New York City), and Michael Rice of the New York City Police Department, (collectively referred to as the "City"); the Staten Island University Hospital, and various police officers and hospital personnel based upon damages that the Plaintiffs sustained, in part, when their property was landmarked by the New York City Landmarks Preservation Commission. The Plaintiffs' Amended Complaint, dated November 21, 2008, ("Amended Complaint" or "Compl."), contains twelve counts, some of which allege constitutional violations by the Defendants. The City moves this Court to dismiss counts I—IV of the Amended Complaint, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), insofar as those counts relate to the decision to landmark the property. Specifically, the City requests that the Court dismiss counts I—IV pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction because those claims are unripe for adjudication. In the alternative, the City requests that the Court dismiss counts I–III pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

**\*2** For the following reasons, I conclude, and respectfully recommend, granting the City's motion to dismiss counts II—IV insofar as they arise from the decision to landmark the Plaintiffs' property because those claims are unripe for adjudication. I also find that counts II and III, as they relate to the landmark designation, fail to state a cognizable claim pursuant to Fed.R.Civ.P. 12(b)(6). Finally, I recommend granting the City's motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), count I of the Amended Complaint to the extent that it relates to the landmark designation because it fails to state a claim.

### I. Background

The Court infers the following facts from the Plaintiffs' Amended Complaint and assumes the truth of these facts for the purpose of the instant motion. On or around January 25, 2005, John Grossi purchased land in Tottenville, Staten Island, New York (the "Amboy property") with the intention of developing the Amboy property by demolishing existing structures on the land and building affordable housing in its place. *See* Compl. at ¶¶ 1, 18, 19. On or around February 19, 2005, members of the Tottenville Historic Society organized a march to protest Grossi's plan to develop the Amboy property. *See id.* at ¶¶ 2, 21. Shortly thereafter, Grossi was notified that there was a delay approving the necessary permits for the demolition and construction that he had planned for the Amboy property. *See id.* at ¶ 21. In response to the community protestors and the delay in approving the permits, Grossi painted portions of the house located on the Amboy property (the "Bedell house") in "Technicolor." *See id.* at ¶¶ 2, 23.

On or around March 22, 2005, during a stop on the campaign trail in Tottenville, Mayor Bloomberg noticed the attention directed towards the Amboy property and made public statements to the community about his desire to see the property designated as a landmark. *See id.* at ¶¶ 3, 24. The day after Mayor Bloomberg's comments, Plaintiffs allege that the Amboy property "began to be patrolled with twenty-four-hour-a-day" surveillance by members of the New York City Police Department. *Id.* at ¶¶ 25–26. On or around March 30, 2005, the Amboy property was calendared for landmark designation and two weeks later, the New York City Landmarks Preservation Commission officially designated the Amboy property as a landmark. *See id.* at ¶ 27. Plaintiffs allege that due to the landmark designation, the Amboy property was no longer valuable for any useful purpose. *See id.* at ¶¶ 30–31. Plaintiffs further allege that Grossi sustained damages, including, but not limited to, a loss of his real estate investment, loss of wages, loss of profits, and an "inability to perform at or to maintain his trade/business." *Id.* at ¶ 48. [1]

Plaintiffs raise certain constitutional claims against the City under 42 U.S.C. § 1983 pertaining to the landmark designation of the Amboy property. Specifically, Plaintiffs allege in their first cause of action that the City violated Grossi's First Amendment rights by designating the Amboy property as a landmark in retaliation for Grossi painting the Bedell house in "Technicolor." *See id.* at ¶¶ 23, 27, 50. [2] Plaintiffs allege in their second cause of action that, in violation of Grossi's Equal Protection rights under the Fourteenth Amendment, Grossi was "selectively prosecuted" based upon his profession as a developer and his plan

to build affordable housing for disadvantaged families. *See id.* at ¶ 51. They allege that the City had a desire to harm Grossi and to retaliate against him for exercising his constitutional rights. *See id.* Plaintiffs' third cause of action alleges that Grossi was denied, in violation of his Due Process rights, meaningful notice and an opportunity to be heard before the landmark designation of the Amboy property. *See id.* at ¶¶ 27, 52. Plaintiffs allege in their fourth cause of action that the landmark designation of the Amboy property violated Grossi's substantive Due Process rights and that the City confiscated the property without reasonable compensation. *See id.* at ¶ 53.

## II. Discussion

### A. Fed.R.Civ.P. 12(b)(1)

#### i. Standard of Review

 **\*3**  When considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), the Court will accept the facts alleged in the Amended Complaint as true, but it does not need to draw all reasonable inferences in the Plaintiffs' favor. *See J.S. ex rel. N.S. v. Attica Cent. Sch.,* 386 F.3d 107, 110 (2d Cir.2004); *see also Donelli v. County of Sullivan,* 07–cv–2157, 2009 WL 2365551, at \*1 (S.D.N.Y. Jul.31, 2009). Rather, "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir.2005); *see also Donelli,* 2009 WL 2365551, at \*1; *Homefront Org., Inc. v. Motz,* 570 F.Supp.2d 398, 404 (E.D.N.Y.2008) (dismissing plaintiffs' § 1983 action for lack of subject matter jurisdiction). Where parties dispute subject matter jurisdiction, the Court can consider matters outside the pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists. *See J.S. ex rel. N.S.,* 386 F.3d at 110; *APWU v. Potter,* 343 F.3d 619, 627 (2d Cir.2003); *Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 932 (2d Cir.1998). However, the Court will not consider "conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S.,* 386 F.3d at 110; *see also Homefront Org.,* 570 F.Supp.2d at 404.

#### ii. The Ripeness Doctrine

"In the area of land use, the doctrine of ripeness is intended to avoid premature adjudication of administrative action." *Country View Estates @ Ridge LLC v. Town of Brookhaven,* 452 F.Supp.2d 142, 148 (E.D.N.Y.2006) (internal quotation marks and citation omitted); *see also Kittay v. Giuliani,* 112 F.Supp.2d 342, 348 (S.D.N.Y.2000) (dismissing land use claims because, as an initial matter, for the claims to be justiciable, they must be ripe), *aff'd,* 252 F.3d 645 (2d Cir.2001). The Supreme Court has developed specific ripeness requirements applicable to land use disputes. *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.E.2d 126 (1985). In *Williamson County,* the plaintiff sued a regional planning commission alleging that the commission's application of various zoning laws and regulations to the plaintiff's property amounted to an unconstitutional "taking" under the Fifth Amendment. *See id.* at 175. The Court held that a plaintiff alleging a Fifth Amendment taking of a property interest must satisfy a two-prong test and show that (1) the state regulatory agency has rendered a final decision on the issue, and (2) the plaintiff has sought just compensation by means of an available state procedure. *See id.* at 186–88, 194–95. Though the planning commission rejected the plaintiff's development plan, the Court argued that the plaintiff could have sought a variance or a permit from a local government agency that would have resolved many of the commission's objections. *See id.* at 188. Because the plaintiff did not apply for such a variance, the Court found that he had not received a "final, definitive" decision regarding how the commission would allow the property to be developed. *See id.* at 191, 199–200. Therefore, the Court reasoned that it could not measure the effects of the land regulations and declined to reach the merits of the action. *See id.*

 **\*4**  A "final decision" is a "definitive position on the issue that inflicts an actual, concrete injury." *Id.* at 186, 193. "In order to have a final decision, a development plan must be submitted, considered and rejected by the governmental entity. Even when the plaintiff applies for approval of a subdivision plan and is rejected, a claim is not ripe until plaintiff also seeks variances that would allow it to develop the property." *Goldfine v. Kelly,* 80 F.Supp.2d 153, 159 (S.D.N.Y.2000) (internal quotations and citations omitted). "The rationale behind the finality requirement is that a court cannot determine whether a Plaintiff has been deprived of property arbitrarily or otherwise, until it has a final definitive position before it on how the administrative

Grossi v. City of New York, Not Reported in F.Supp.2d (2009)
2009 WL 4456307

agency will apply the regulation at issue to the particular land in question." *R–Goshen LLC v. Village of Goshen,* 289 F.Supp.2d 441, 448 (S.D.N.Y.2003), *aff'd sub nom, R–Goshen LLC v. Andrews,* 115 Fed.Appx. 465 (2d Cir.2004); *see also* Williamson County, 473 U.S. at 186–89 (explaining that until a final decision is reached "it is impossible to tell whether the land retains any reasonable beneficial use").

Federal courts have diligently applied the *Williamson County* doctrine and recognized that policies of federalism and judicial restraint require that plaintiffs seek relief from local authorities before entering the federal courts. *See Murphy v. New Milford Zoning Comm'n,* 402 F.3d 342, 348 (2d Cir.2005). Moreover, local administrative authorities are better situated to resolve land use disputes. *See id.* at 348–49 ("Requiring a property owner to obtain a final, definitive position from zoning authorities evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution."); *Homefront Org.,* 570 F.Supp.2d at 400 (recognizing that the ripeness doctrine is important in land use disputes because such disputes are "are properly left in the first instance to local bodies that are better equipped than federal courts to address and resolve such issues"); *Spence v. Zimmerman,* 873 F.2d 256, 262 (11th Cir.1989) ("We stress that federal courts do not sit as zoning boards of review and should be most circumspect in determining that constitutional rights are violated in quarrels over zoning decisions.").

Here, the Plaintiffs do not make a single allegation in the Amended Complaint that after the landmark designation, Grossi applied for special permits to develop the Amboy property as originally planned and that the City Planning Commission denied his application. *See Kittay,* 112 F.Supp.2d at 349 (dismissing the complaint in part because the complaint failed to allege that the plaintiff sought any approval of his development plan or relief from the land use regulations from the government agencies). Nor do the Plaintiffs dispute their failure to seek a permit in their opposition to the City's motion to dismiss. Rather, the Plaintiffs contend that the landmark designation constitutes a final decision by the local authorities. The Court disagrees. The gravamen of the Plaintiffs' Amended Complaint is that Grossi had specific visions for the use of the Amboy property and the landmark designation impeded these visions. However, a landmark designation does not, by itself, deprive Grossi from developing the Amboy property. *See Adrian v. Town of Yorktown,* 03–cv–6604, 2007 WL 1467417, at *8 (S.D.N.Y. May 16, 2007) (reasoning that the town's designation of the plaintiff's property as "wetlands" did not deprive the plaintiff of its right to develop the property), *aff'd* in part and *rev'd* in part, 08–cv–4077, 2009 WL 2380078 (2d Cir. Aug.3, 2009). A special permit from the City Planning Commission allows Grossi to proceed as originally planned. *See* Exhibit O attached to the Declaration of Diane Murray (a special permit pursuant to Section 74–111 of the Zoning Resolution permits the modification of certain properties that contain a landmark designated by the New York City Landmarks Preservation Commission).

 **\*5**  Furthermore, a decision on the permit by the City Planning Commission would supply clearer guidance as to how the landmark designation would affect the Amboy property and what injuries Grossi indeed suffered. *See Kittay,* 112 F.Supp.2d at 349 (noting that without a final agency decision regarding the applicability of the land use regulations, plaintiffs alleged injury is, "for Article III purposes, speculative"); *Country View Estates,* 452 F.Supp.2d at 150 (same). Though the City acknowledges that Grossi began the application process for a special permit, Plaintiffs do not dispute that Grossi failed to complete the paperwork and file the application with the appropriate offices. *See* Affirmation of Leonard Garcia, at ¶¶ 9, 13–14; *see also* New York City Charter § 197–c; *Goldfine,* 80 F.Supp.2d at 160 ("Informal efforts to gain approval for land development are insufficient, by themselves, to constitute final government action."). Clearly, there has been no final, definitive decision—alleged either in the Amended Complaint or in Plaintiffs' opposition papers—prohibiting Grossi from developing and using the Amboy property as he originally envisioned. *See Dougherty v. Town of North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 89 (2d Cir.2002); *Homefront Org.,* 570 F.Supp.2d at 410; *Goldfine,* 80 F.Supp.2d at 159.

Plaintiffs allude in their opposition papers that the first prong of the *Williamson County* ripeness inquiry is inapplicable because their claims are premised upon immediate injuries. Indeed, certain claims, such as purely procedural Due Process and First Amendment claims, may not be subject to the ripeness inquiry because in some circumstances, the injury incurred is immediate. *See Adrian,* 2007 WL 1467417, at *4. However, there is no blanket rule limiting the final decision requirement solely to Fifth Amendment takings claims. It is well settled that the final decision requirement is applicable to violations of Equal Protection rights, substantive and procedural Due Process claims, and to First Amendment claims. *See Murphy,* 402 F.3d at 350 (applying

2009 WL 4456307

ripeness inquiry to First Amendment claim); *Dougherty,* 282 F.3d at 89 (Equal Protection and Due Process claims arising from a denial of a permit dismissed in the absence of a final determination); *Southview Assocs., Ltd. v. Bongartz,* 980 F.2d 84, 96–97 (2d Cir.1992) (applying ripeness test to substantive Due Process claims); *Homefront Org.,* 570 F.Supp.2d at 406 (Equal Protection, Due Process, and First Amendment claims); *Country View Estates,* 452 F.Supp.2d at 149 (Equal Protection and Due Process claims). Moreover, when "takings, due process and equal protection claims ... arise out of the same factual events ..., the Court will apply the same ripeness inquiry to plaintiff's takings, due process, and equal protection claims." *Country View Estates,* 452 F.Supp.2d at 149. Here, the Plaintiffs' constitutional claims arise from a set of facts common to their takings claims, i.e., the landmark designation. Therefore, as discussed above, the Court finds that the ripeness test bars Plaintiffs' Equal Protection and Due Process claims from continuing in federal court (*see infra* for discussion on First Amendment claims).

**\*6** In limited circumstances, a property owner is excused from obtaining a final decision if a local agency lacks discretion to grant relief or "has dug its heels and made clear that all such applications will be denied." *Murphy,* 402 F.3d at 349; *see also Southview Assocs., Ltd.,* 980 F.2d at 98–99; *Homefront Org.,* 570 F.Supp.2d at 407. Plaintiffs allege that Grossi was banned from entering the city buildings to secure a permit. *See* Compl. at ¶ 47. However, the futility exception is inapplicable here because, among other reasons, there is no indication that Grossi was prohibited from applying for the permits. *See Homefront Org.,* 570 F.Supp.2d at 408 (allegations of hostility exhibited by the town officials towards the plaintiffs' development plan is insufficient to invoke the futility exception); *Kittay,* 112 F.Supp.2d at 350 (holding that to invoke the futility exception, at a minimum, plaintiff must make at least one meaningful application for development). [3] In fact, as discussed above, Grossi started the application process for a special permit but failed to complete it. Accordingly, I respectfully conclude that the Court lacks jurisdiction over counts II—IV of the Amended Complaint because they are not yet ripe for adjudication.

### B. Fed.R.Civ.P. 12(b)(6)

#### i. Standard of Review

When reviewing the City's motion to dismiss pursuant to Fed.R.Civ .P. 12(b)(6), the Court accepts the allegations in the Amended Complaint as true, draws all inferences in the Plaintiffs' favor, and construes the Amended Complaint liberally. *See Dougherty,* 282 F.3d at 87; *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001). To withstand dismissal, the Amended Complaint must plead "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see ialso Zerilli–Edelglass v. N.Y. City Transit Auth.,* 333 F.3d 74, 79 (2d Cir.2003). Moreover, "formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555; *see also Ashcroft v. Iqbal,* 556 U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (May 18, 2009). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. The Court limits its analysis to the facts stated in the Amended Complaint, documents attached to the Amended Complaint as exhibits, and documents incorporated by reference in the Amended Complaint. *See Country View Estates,* 452 F.Supp.2d at 148.

#### ii. Retaliation Claim

As noted above, the ripeness doctrine is not applied as stringently to First Amendment claims where, in some instances, injuries are immediate. *See Dougherty,* 282 F.3d at 90; *but see Murphy,* 402 F.3d at 350 (recognizing that in some circumstances, courts should apply the *Williamson* prong-one ripeness test to First Amendment claims); *Homefront Org.,* 570 F.Supp.2d at 406 n. 4 (holding that plaintiffs' First Amendment claims were not ripe for review). Assuming, *arguendo,* that Plaintiffs' First Amendment claim that the landmark designation was made in retaliation for Grossi exercising his rights is ripe for adjudication, *see Dougherty,* 282 F.3d at 90 (plaintiff suffered an immediate injury at the moment the defendants revoked his building permit), I respectfully conclude that count I fails as a matter of law because Plaintiffs have not adequately stated a claim upon which relief can be granted. *See Rosendale v. Brusie,* 07–cv–8149, 2009 WL 778418, at *8–l 1 (S.D.N.Y. Mar. 25, 2009) (assuming for argument's sake that plaintiff's First Amendment claims are ripe for review, but dismissing part of the claims pursuant to Fed.R.Civ.P. 12(b)(6)).

2009 WL 4456307

**\*7** To establish a retaliation claim under § 1983, Plaintiffs must show (1) that Grossi's conduct was protected by the First Amendment and (2) that such conduct prompted or substantially caused the City's action. *See Dougherty,* 282 F.3d at 91.[4] Plaintiffs claim that the Amboy property was landmarked in retaliation for Grossi painting the Bedell house in "Technicolor," thereby violating Grossi's First Amendment rights. *See* Compl. at ¶ 51. The City contends that the First Amendment's protection does not extend to the painting of the house. The Court disagrees with the City's interpretation.

The First Amendment's protection extends to symbols and expressive conduct. *See Virginia v. Black,* 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003); *Muhammad v. Bonner,* 05–cv–1851, 2008 WL 926574, at \*6 (E.D.N.Y. Mar.31, 2008). In addition, Plaintiffs bear the burden of demonstrating that the First Amendment applies and must allege more than a mere "plausible contention" that Grossi's conduct is expressive. *See Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Whether particular conduct is worthy of the First Amendment's protection depends on whether Grossi intended "to convey a particularized message," and whether the surrounding circumstances are such that "the likelihood was great that the message would be understood by those who viewed it." *Spence v. State of Wash.,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). The Amended Complaint alleges that Grossi, instead of yielding to the community's discontent, painted the Bedell house in vibrant colors to protest and to garner attention. *See* Compl. at ¶¶ 2, 23. These allegations suffice at this initial pleading stage. While community members may not understand the literal reasons behind Grossi's conduct, given the circumstances, it is plausible to infer that they understood he was deliberately challenging the community's wishes about maintaining the historic character of the Bedell house.

Nevertheless, the Plaintiffs' First Amendment claim fails because they have not alleged a causal connection between the painting of the Bedell house and the decision to have it designated as a landmark. For a causal connection to exist, the conduct should have played a substantial factor in the City's decision. *See Cronin v. St. Lawrence,* 08–cv–6346, 2009 WL 2391861, at \*5 (S.D.N.Y. Aug.5, 2009) (internal citations omitted). Instead, Plaintiffs simply surmise that the City retaliated against Grossi for painting the Bedell house. *See Butler v. City of Batavia,* 08–cv–1361, 2009 WL 910194, at \*1 (2d Cir. Apr.6, 2009) (dismissing complaint because it was devoid of factual allegations showing that defendants' actions were "motivated or substantially caused by" plaintiffs' exercise of their First Amendment rights); *Rosendale,* 2009 WL 778418, at \*9 (dismissing partially plaintiff's First Amendment claims because it failed to plead facts sufficient to render the claims plausible and made only vague and conclusory allegations in its complaint).

**\*8** Though Plaintiffs cite the relative quickness of the landmark designation, admissions made in the Amended Complaint contradict the Plaintiffs' arguments that the painting played a substantial role in the landmark designation, rather than the community's wish to preserve a piece of historic architecture. *See generally Holmes v. Poskanzer,* 08–cv–14750, 2009 WL 2171326, at \*2 (2d Cir. Jul.21, 2009) ("Regardless of any retaliatory motive, the plaintiff cannot prevail if a defendant can show he or she would have taken the same action even in the absence of the allegedly improper reason."). For example, the Amended Complaint clearly indicates that the community members had a strong interest in preserving the Amboy property *before* the painting occurred. *See* Compl. at ¶¶ 2, 23–24. Plaintiffs admit that before the painting took place, members of the Tottenville Historic Society organized a march in protest of Grossi's planned development of the Amboy property and that the application for the demolition and building permits was "put on hold ..." *Id.* at ¶¶ 21–22. Plaintiffs also allege that Mayor Bloomberg, in hopes of securing votes from those "against 'over-development' on Staten Island," promised to landmark the Amboy property so that the Bedell house could not be demolished. *Id.* at ¶¶ 3, 24; *see also Razzano v. County of Nassau,* 599 F.Supp.2d 345, 352 (E.D.N.Y.2009) (dismissing complaint in part because, although the court assumed the truth of the plaintiff's allegations, it was clear from the pleadings that the defendants' actions were not motivated by the plaintiff's exercise of his First Amendment rights). Thus, Plaintiffs' allegations bar their First Amendment claim from crossing the threshold of plausibility.[5] Accordingly, I recommend dismissing count I as a matter of law. *See Ashcroft,* 129 S.Ct. at 1950 ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss).[6]

### iii. Surveillance Claim

Plaintiffs allege that the City maintained a surveillance system of Grossi's property and that police officers used harassing language and requested identification from him whenever he attempted to enter the Amboy property. *See* Compl. at ¶¶ 25–26. It is settled law that mere surveillance by government authorities without a showing of illegality and cognizable injury does not give rise to an action for violation of rights guaranteed by the First Amendment. *See Laird v. Tatum,* 408 U.S. 1, 13, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (holding that in order to assert a claim grounded on surveillance conducted by the government, plaintiff must assert specific present objective harm or a threat of specific future harm); *Fifth Avenue Peace Parade Comm. v. Gray,* 480 F.2d 326, 331 (2d Cir.1973) (organizers who alleged FBI surveillance failed to show any specific harm and therefore failed to present a justiciable controversy); *Gaston v. Gavin,* 97–cv–1645, 1998 WL 7217, at *4 (S.D.N.Y. Jan.8, 1998) (dismissing plaintiff's First Amendment claim because he failed to show that the government's investigation discouraged him from exercising his First Amendment rights and that as a result, he suffered a concrete and demonstrable injury). Here, Plaintiffs' claim fails because there are no facts in the Amended Complaint indicating that the surveillance discouraged Grossi from exercising his rights. Plaintiffs allege that Grossi suffered harm from the police surveillance on the Amboy property, i.e., harassing language and requests for identification to enter his own property. [7] *See* Compl. at ¶ 26. These allegations are insufficient to support a First Amendment claim. *See Nour v. New York City Police Dept.,* 92–cv–7066, 1995 WL 42319, at *3 (S.D.N.Y. Feb.2, 1995) (finding that plaintiff's allegations of alleged surveillance was "nerve [racking]" and "shocking," that he no longer had a "private life," and that he suffered mental anguish, emotional distress, fear, and pain were insufficient assertions of the required objective injury during the motion to dismiss phase). [8] Plaintiffs' reliance on *Mason v. Ward* is misplaced because, there, plaintiffs alleged an objective injury. 88–cv–4704, 1991 WL 143713, at *7 (S.D.N.Y. Jul.20, 1991) (plaintiffs' allegation that the surveillance damaged their reputation and caused them to lose business was sufficient to survive a motion to dismiss). Accordingly, I recommend dismissing Plaintiffs' claim that the alleged police surveillance of the Amboy property violated Grossi's First and Fourth Amendment rights.

### iv. Equal Protection Claim

**\*9** The City has moved to dismiss Plaintiffs' Equal Protection claim on the grounds of both ripeness and a failure to state a claim. Although count II is not ripe for adjudication, *see supra,* for the sake of completeness, I will analyze the claim pursuant to a Fed .R.Civ.P. 12(b)(6) standard.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In order to establish an Equal Protection claim under 42 U.S.C. § 1983, a party must show that:

> (1) the person, compared with others similarly situated, was selectively treated; and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.

*R–Goshen LLC,* 289 F.Supp.2d at 453; *see also Butler,* 2009 WL 910194, at *1 (dismissing Equal Protection claims because the plaintiffs did not plead sufficient facts to make the violations plausible); *Puckett v. City of Glen Cove,* 08–cv–3594, 2009 WL 1916275, at *6 (E.D.N.Y. Jun.30, 2009).

Plaintiffs contend that Grossi was "selectively prosecuted on the basis of his status as a "developer" and his "desire to build affordable housing for disadvantaged and minority families." Compl. at ¶ 51. Plaintiffs further contend that the City punished Grossi for exercising his constitutional rights. *See id.* These arguments fail as a matter of law. A "developer" is not a protected class as contemplated under the Equal Protection Clause. *See Frooks v. Town of Cortlandt,* 997 F.Supp. 438, 453 (S.D.N.Y.1998) (holding that classifications of "developers" or "commercial landowners" are not suspect under the Equal Protection Clause). Plaintiffs also fail to allege sufficient facts that Grossi was treated differently from any other developer or property owner in the

2009 WL 4456307

town. *See Puckett,* 2009 WL 1916275, at *6 (dismissing plaintiff's complaint because there was no allegation in the complaint that other similarly situated homeowners were more favorably treated than the plaintiff). In fact, Plaintiffs do not make a single reference to individuals who are similarly situated to Grossi with respect to the landmark designation. *See id.* They fail to allege that the City permitted other landowners with similar properties to develop their land as originally planned because those owners did not paint their houses in protest or engaged in expressive conduct protected by the First Amendment. *See Gagliardi v. Village of Pawling,* 18 F.3d 188, 193 (2d Cir.1994); *Puckett,* 2009 WL 1916275, at *6 (holding that "an Equal Protection claim is stated only by showing substantial similarity, coupled with disparate treatment that is either arbitrary or motivated by ill will").[9] Rather, Plaintiffs make conclusory statements that the City had a desire to harm Grossi and to retaliate against him for exercising his constitutional rights. Because the Plaintiffs fail to assert a viable Equal Protection claim, I find count II fails as a matter of law.[10]

### v. Procedural Due Process Claim

**\*10** The City has moved to dismiss count III on the grounds of both ripeness and a failure to state a claim. Although the count is not ripe for adjudication, *see supra,* for the sake of completeness, I will analyze the claim pursuant to a Fed.R.Civ.P. 12(b)(6) standard.

To demonstrate a violation of procedural Due Process rights based upon a land regulation, Plaintiffs must first demonstrate the possession of a federally protected property right to the relief sought and the insufficiency of any state remedy. *See Puckett,* 2009 WL 1916275, at *8. Moreover, "postdeprivation remedies made available by the State can satisfy the Due Process Clause" and "predeprivation notice and opportunity to be heard is pretermitted if the State provides a postdeprivation remedy." *Parratt v. Taylor,* 451 U.S. 527, 538, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

It is well established in the Second Circuit that the availability of an Article 78 proceeding provides homeowner plaintiffs with all of the procedural Due Process rights to which they are due. *See Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 881–82 (2d Cir.1996) (noting "that there *is no* constitutional violation (and no available § 1983 action) when there is an adequate state postdeprivation procedure to remedy a random, arbitrary deprivation of property or liberty") (italics in the original); *Puckett,* 2009 WL 1916275, at *10 (finding that the plaintiff cannot prevail on a Due Process argument because he could have availed himself to an Article 78 proceeding); *Rector, Wardens, and Members of the Vestry of St. Bartholomew's Church v. City of New York,* 728 F.Supp. 958, 965 n. 12 (S.D.N.Y.1989) (declining to decide whether the Landmarks Preservation Commission denied the plaintiff its procedural Due Process rights because any defects should have been addressed through an Article 78 hearing in state court). Plaintiffs have not indicated that they pursued an Article 78 hearing or that other state remedies have been insufficient. Accordingly, I find count III fails as a matter of law.

### III. Conclusion

For the reasons set forth above, I respectfully recommend granting the City's motion to dismiss, without prejudice, counts II–IV insofar as they relate to the landmark designation because those claims are not ripe for adjudication. I also find that counts II and III fail to state a cognizable claim pursuant to Fed.R.Civ.P. 12(b)(6). Finally, I recommend granting the City's motion to dismiss, without prejudice, count I of the Amended Complaint as it relates to the landmark designation pursuant to Fed.R.Civ.P. 12(b) (6) for failure to state a claim.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 6 and 72 of the Fed.R.Civ.P., the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court. Failure to file timely objections will preclude appellate review of any order of judgment that will be entered.

**\*11 SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 4456307

---

## Footnotes

1    Because the City's motion requests that the Court dismiss counts I–IV of the Amended Complaint insofar as they relate to the landmark designation, no elaboration of the facts relevant to Plaintiffs' remaining contentions is necessary.

2    The Court also construes count I to include a violation of Grossi's First and Fourth Amendment rights relating to the police surveillance of the Amboy property. *See* Compl. at ¶¶ 25–26, 50.

3    Even if the Plaintiffs could invoke the futility exception to the final decision requirement, their claims would not be ripe because of their failure to show that New York State does not provide a remedy for the alleged violations. *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 194, 105 S.Ct. 3108, 87 L.E.2d 126 (1985); *TZ Manor, LLC v. Daines,* 08–cv–3293, 2009 WL 2242436, at *5 (S.D.N.Y. Jul.28, 2009) (settled law that New York does have reasonable provisions for obtaining compensation); *Country View Estates @ Ridge LLC v. Town of Brookhaven,* 452 F.Supp.2d 142, 156 (E.D.N.Y.2006) (same); *Goldfine v. Kelly,* 80 F.Supp.2d 153, 161–62 (S.D.N.Y.2000).

4    Recent decisions in the Second Circuit also require the additional element that Plaintiffs prove that the City's actions chilled the exercise of Grossi's First Amendment rights. *See Butler v. City of Batavia,* 08–cv–1361, 2009 WL 910194, at *1 (2d Cir. Apr.6, 2009); *Curley v. Vill. of Suffern,* 268 F.3d 65, 73 (2d Cir.2001); *Rosendale v. Brusie,* 07–cv–8149, 2009 WL 778418, at *18 (S.D.N.Y. Mar.25, 2009); *D'Angelo–Fenton v. Town of Carmel,* 470 F.Supp.2d 387, 398 (S.D.N.Y.2007); *Estate of Morris ex rel. Morris v. Dapolito,* 297 F.Supp.2d 680, 691–92 (S.D.N.Y.2004); *but see Puckett v. City of Glen Cove,* 08–cv–3594, 2009 WL 1916275, at * 12 (E.D.N.Y. Jun.30, 2009) (finding that the "chilling element" is not required in this land use case).

5    The purpose of a landmark designation is to preserve the aesthetic and historical charm of a community, not to punish someone for merely painting his house. *See* N.Y.C. Administrative Code, § 25–301 *et seq.* (matter of public policy to protect the city's historic, aesthetic and cultural heritage); *see also Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 129, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

6    Count I of the Amended Complaint encompasses more than the landmark claims. As the City's motion is limited to those claims resulting from the landmark decision, notwithstanding the surveillance claim, I recommend dismissing count I only to that extent that Plaintiffs claim the City landmarked the property in retaliation for Grossi painting the Bedell house.

7    As Plaintiffs have not alleged in their Amended Complaint that the surveillance took place on private property, this Court notes that there is no trespass violation alleged in relation to the surveillance claim.

8    The Amended Complaint does not state a proper Fourth Amendment violation because the Plaintiffs do not allege that Grossi was prohibited from leaving or entering the Amboy property. *See Nour v. New York City Police Dept.,* 92–cv–7066, 1995 WL 42319, at *3 (S.D.N.Y. Feb.2, 1995) ("A person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" (internal quotation marks and citations omitted)).

9    Plaintiffs' claim is not a "class of one" argument because they make clear in their opposition papers that Grossi's rights were violated because he exercised his First Amendment right when painting the house in "Technicolor." If Plaintiffs

---

**Grossi v. City of New York, Not Reported in F.Supp.2d (2009)**

2009 WL 4456307

intended to argue a "class of one" theory for selective treatment, their argument also fails as a matter of law because they have not sufficiently alleged that Grossi was intentionally treated differently from other property owners in all material aspects and that there was no rational basis for such treatment. *See, e.g., Harlen Assocs. v. Inc. Village of Mineola,* 273 F.3d 494, 499 (2d Cir.2001).

10    The holding is limited to the allegations based upon the landmark designation.

---

**End of Document**                                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 4456307
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

John GROSSI and Lori Grossi, Plaintiffs,

v.

The CITY OF NEW YORK, Michael R. Bloomberg, individually and in his official capacity, PO Michael Rice, individually and in his official capacity, PO John Doe 1, individually and in his official capacity, PO John Doe 2, individually and in his official capacity, Staten Island University Hospital, Dr. John Doe 3, individually and in his official capacity, and Jane Doe 1, individually and in her official capacity, Defendants.

No. 08–CV–1083 (RRM)(ALC).
|
Nov. 30, 2009.

**Attorneys and Law Firms**

Steven A. Morelli, Anthony Christopher Giordano, Elaine R. Sammon, The Law Office of Steven A. Morelli, P.C., Carle Place, NY, for Plaintiffs.

Susan P. Scharfstein, Diana M. Murray, The City of New York Law Department, Office of Corporation Counsel, New York, NY, Judd Cohen, Shaub, Ahmuty, Citrin & Spratt, LLP, New Hyde Park, NY, for Defendants.

*ORDER*

MAUSKOPF, District Judge.

**\*1** By Motion filed July 1, 2009 (Docket Entry No. 39), Defendants the City of New York, Michael R. Bloomberg, and Police Officer Michael Rice (collectively, the "City Defendants") moved to dismiss Plaintiffs' Amended Complaint in part pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). By Order entered July 15, 2009, this Court referred that motion to the assigned Magistrate Judge, the Honorable Andrew L. Carter, for a Report and Recommendation. On November 4, 2009, Judge Carter issued a Report and Recommendation (the "R & R") that the City Defendants' motion be granted. Judge Carter reminded the parties that, pursuant to Rule 72(b), any objection to the R & R was due within ten days. Neither party has filed any objection.

Pursuant to 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72, the Court has reviewed the R & R for clear error and, finding none, adopts the R & R in its entirety. *See Covey v. Simonton,* 481 F.Supp.2d 224, 226 (E.D.N.Y.2007). Accordingly, it is hereby ORDERED that the City Defendants' motion to dismiss the Amended Complaint in part is GRANTED. Plaintiffs' First Cause of Action is DISMISSED, insofar as it relates to the landmark designation of Plaintiffs' property, for failure to state a claim on which relief may be granted. Plaintiffs' Second and Third Causes of Action are DISMISSED, insofar as they relate to the landmark designation of Plaintiffs' property, because they are unripe for adjudication and fail to state a claim on which relief may be granted. Plaintiffs' Fourth Cause of Action is DISMISSED, insofar as it relates to the landmark designation of Plaintiffs' property, because it is unripe for adjudication.

SO ORDERED.

## REPORT AND RECOMMENDATION

ANDREW L. CARTER, JR., United States Magistrate Judge.

Plaintiffs John and Lori Grossi, through counsel, commenced the instant litigation against the City of New York, Michael R. Bloomberg (individually and in his official capacity as the mayor of New York City), and Michael Rice of the New York City Police Department, (collectively referred to as the "City"); the Staten Island University Hospital, and various police officers and hospital personnel based upon damages that the Plaintiffs sustained, in part, when their property was landmarked by the New York City Landmarks Preservation Commission. The Plaintiffs' Amended Complaint, dated November 21, 2008, ("Amended Complaint" or "Compl."), contains twelve counts, some of which allege constitutional violations by the Defendants. The City moves this Court to dismiss counts I—IV of the Amended Complaint, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), insofar as those counts relate to the decision to landmark the property. Specifically, the City requests that the Court dismiss counts I—IV pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction because those claims are unripe for adjudication. In the alternative, the City requests that the Court dismiss counts I–III pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

**\*2** For the following reasons, I conclude, and respectfully recommend, granting the City's motion to dismiss counts II—IV insofar as they arise from the decision to landmark the Plaintiffs' property because those claims are unripe for adjudication. I also find that counts II and III, as they relate to the landmark designation, fail to state a cognizable claim pursuant to Fed.R.Civ.P. 12(b)(6). Finally, I recommend granting the City's motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), count I of the Amended Complaint to the extent that it relates to the landmark designation because it fails to state a claim.

### I. Background

The Court infers the following facts from the Plaintiffs' Amended Complaint and assumes the truth of these facts for the purpose of the instant motion. On or around January 25, 2005, John Grossi purchased land in Tottenville, Staten Island, New York (the "Amboy property") with the intention of developing the Amboy property by demolishing existing structures on the land and building affordable housing in its place. *See* Compl. at ¶¶ 1, 18, 19. On or around February 19, 2005, members of the Tottenville Historic Society organized a march to protest Grossi's plan to develop the Amboy property. *See id.* at ¶¶ 2, 21. Shortly thereafter, Grossi was notified that there was a delay approving the necessary permits for the demolition and construction that he had planned for the Amboy property. *See id.* at ¶ 21. In response to the community protestors and the delay in approving the permits, Grossi painted portions of the house located on the Amboy property (the "Bedell house") in "Technicolor." *See id.* at ¶¶ 2, 23.

On or around March 22, 2005, during a stop on the campaign trail in Tottenville, Mayor Bloomberg noticed the attention directed towards the Amboy property and made public statements to the community about his desire to see the property designated as a landmark. *See id.* at ¶¶ 3, 24. The day after Mayor Bloomberg's comments, Plaintiffs allege that the Amboy property "began to be patrolled with twenty-four-hour-a-day" surveillance by members of the New York City Police Department. *Id.* at ¶¶ 25–26. On or around March 30, 2005, the Amboy property was calendared for landmark designation and two weeks later, the New York City Landmarks Preservation Commission officially designated the Amboy property as a landmark. *See id.* at ¶ 27. Plaintiffs allege that due to the landmark designation, the Amboy property was no longer valuable for any useful purpose. *See id.* at ¶¶ 30–31. Plaintiffs further allege that Grossi sustained damages, including, but not limited to, a loss of his real estate investment, loss of wages, loss of profits, and an "inability to perform at or to maintain his trade/business." *Id.* at ¶ 48. [1]

Plaintiffs raise certain constitutional claims against the City under 42 U.S.C. § 1983 pertaining to the landmark designation of the Amboy property. Specifically, Plaintiffs allege in their first cause of action that the City violated Grossi's First Amendment rights by designating the Amboy property as a landmark in retaliation for Grossi painting the Bedell house in "Technicolor." *See id.* at ¶¶ 23, 27, 50. [2] Plaintiffs allege in their second cause of action that, in violation of Grossi's Equal Protection rights under the Fourteenth Amendment, Grossi was "selectively prosecuted" based upon his profession as a developer and his plan

2009 WL 4456307

to build affordable housing for disadvantaged families. *See id.* at ¶ 51. They allege that the City had a desire to harm Grossi and to retaliate against him for exercising his constitutional rights. *See id.* Plaintiffs' third cause of action alleges that Grossi was denied, in violation of his Due Process rights, meaningful notice and an opportunity to be heard before the landmark designation of the Amboy property. *See id.* at ¶¶ 27, 52. Plaintiffs allege in their fourth cause of action that the landmark designation of the Amboy property violated Grossi's substantive Due Process rights and that the City confiscated the property without reasonable compensation. *See id.* at ¶ 53.

## II. Discussion

### A. Fed.R.Civ.P. 12(b)(1)

#### i. Standard of Review

**\*3** When considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), the Court will accept the facts alleged in the Amended Complaint as true, but it does not need to draw all reasonable inferences in the Plaintiffs' favor. *See J.S. ex rel. N.S. v. Attica Cent. Sch.,* 386 F.3d 107, 110 (2d Cir.2004); *see also Donelli v. County of Sullivan,* 07–cv–2157, 2009 WL 2365551, at *1 (S.D.N.Y. Jul.31, 2009). Rather, "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir.2005); *see also Donelli,* 2009 WL 2365551, at *1; *Homefront Org., Inc. v. Motz,* 570 F.Supp.2d 398, 404 (E.D.N.Y.2008) (dismissing plaintiffs' § 1983 action for lack of subject matter jurisdiction). Where parties dispute subject matter jurisdiction, the Court can consider matters outside the pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists. *See J.S. ex rel. N.S.,* 386 F.3d at 110; *APWU v. Potter,* 343 F.3d 619, 627 (2d Cir.2003); *Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 932 (2d Cir.1998). However, the Court will not consider "conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S.,* 386 F.3d at 110; *see also Homefront Org.,* 570 F.Supp.2d at 404.

#### ii. The Ripeness Doctrine

"In the area of land use, the doctrine of ripeness is intended to avoid premature adjudication of administrative action." *Country View Estates @ Ridge LLC v. Town of Brookhaven,* 452 F.Supp.2d 142, 148 (E.D.N.Y.2006) (internal quotation marks and citation omitted); *see also Kittay v. Giuliani,* 112 F.Supp.2d 342, 348 (S.D.N.Y.2000) (dismissing land use claims because, as an initial matter, for the claims to be justiciable, they must be ripe), *aff'd,* 252 F.3d 645 (2d Cir.2001). The Supreme Court has developed specific ripeness requirements applicable to land use disputes. *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.E.2d 126 (1985). In *Williamson County,* the plaintiff sued a regional planning commission alleging that the commission's application of various zoning laws and regulations to the plaintiff's property amounted to an unconstitutional "taking" under the Fifth Amendment. *See id.* at 175. The Court held that a plaintiff alleging a Fifth Amendment taking of a property interest must satisfy a two-prong test and show that (1) the state regulatory agency has rendered a final decision on the issue, and (2) the plaintiff has sought just compensation by means of an available state procedure. *See id.* at 186–88, 194–95. Though the planning commission rejected the plaintiff's development plan, the Court argued that the plaintiff could have sought a variance or a permit from a local government agency that would have resolved many of the commission's objections. *See id.* at 188. Because the plaintiff did not apply for such a variance, the Court found that he had not received a "final, definitive" decision regarding how the commission would allow the property to be developed. *See id.* at 191, 199–200. Therefore, the Court reasoned that it could not measure the effects of the land regulations and declined to reach the merits of the action. *See id.*

**\*4** A "final decision" is a "definitive position on the issue that inflicts an actual, concrete injury." *Id.* at 186, 193. "In order to have a final decision, a development plan must be submitted, considered and rejected by the governmental entity. Even when the plaintiff applies for approval of a subdivision plan and is rejected, a claim is not ripe until plaintiff also seeks variances that would allow it to develop the property." *Goldfine v. Kelly,* 80 F.Supp.2d 153, 159 (S.D.N.Y.2000) (internal quotations and citations omitted). "The rationale behind the finality requirement is that a court cannot determine whether a Plaintiff has been deprived of property arbitrarily or otherwise, until it has a final definitive position before it on how the administrative

agency will apply the regulation at issue to the particular land in question." *R–Goshen LLC v. Village of Goshen,* 289 F.Supp.2d 441, 448 (S.D.N.Y.2003), *aff'd sub nom, R–Goshen LLC v. Andrews,* 115 Fed.Appx. 465 (2d Cir.2004); *see also* Williamson County, 473 U.S. at 186–89 (explaining that until a final decision is reached "it is impossible to tell whether the land retains any reasonable beneficial use").

Federal courts have diligently applied the *Williamson County* doctrine and recognized that policies of federalism and judicial restraint require that plaintiffs seek relief from local authorities before entering the federal courts. *See Murphy v. New Milford Zoning Comm'n,* 402 F.3d 342, 348 (2d Cir.2005). Moreover, local administrative authorities are better situated to resolve land use disputes. *See id.* at 348–49 ("Requiring a property owner to obtain a final, definitive position from zoning authorities evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution."); *Homefront Org.,* 570 F.Supp.2d at 400 (recognizing that the ripeness doctrine is important in land use disputes because such disputes are "are properly left in the first instance to local bodies that are better equipped than federal courts to address and resolve such issues"); *Spence v. Zimmerman,* 873 F.2d 256, 262 (11th Cir.1989) ("We stress that federal courts do not sit as zoning boards of review and should be most circumspect in determining that constitutional rights are violated in quarrels over zoning decisions.").

Here, the Plaintiffs do not make a single allegation in the Amended Complaint that after the landmark designation, Grossi applied for special permits to develop the Amboy property as originally planned and that the City Planning Commission denied his application. *See Kittay,* 112 F.Supp.2d at 349 (dismissing the complaint in part because the complaint failed to allege that the plaintiff sought any approval of his development plan or relief from the land use regulations from the government agencies). Nor do the Plaintiffs dispute their failure to seek a permit in their opposition to the City's motion to dismiss. Rather, the Plaintiffs contend that the landmark designation constitutes a final decision by the local authorities. The Court disagrees. The gravamen of the Plaintiffs' Amended Complaint is that Grossi had specific visions for the use of the Amboy property and the landmark designation impeded these visions. However, a landmark designation does not, by itself, deprive Grossi from developing the Amboy property. *See Adrian v. Town of Yorktown,* 03–cv–6604, 2007 WL 1467417, at *8 (S.D.N.Y. May 16, 2007) (reasoning that the town's designation of the plaintiff's property as "wetlands" did not deprive the plaintiff of its right to develop the property), *aff'd* in part and *rev'd* in part, 08–cv–4077, 2009 WL 2380078 (2d Cir. Aug.3, 2009). A special permit from the City Planning Commission allows Grossi to proceed as originally planned. *See* Exhibit O attached to the Declaration of Diane Murray (a special permit pursuant to Section 74–111 of the Zoning Resolution permits the modification of certain properties that contain a landmark designated by the New York City Landmarks Preservation Commission).

 **\*5**  Furthermore, a decision on the permit by the City Planning Commission would supply clearer guidance as to how the landmark designation would affect the Amboy property and what injuries Grossi indeed suffered. *See Kittay,* 112 F.Supp.2d at 349 (noting that without a final agency decision regarding the applicability of the land use regulations, plaintiffs alleged injury is, "for Article III purposes, speculative"); *Country View Estates,* 452 F.Supp.2d at 150 (same). Though the City acknowledges that Grossi began the application process for a special permit, Plaintiffs do not dispute that Grossi failed to complete the paperwork and file the application with the appropriate offices. *See* Affirmation of Leonard Garcia, at ¶¶ 9, 13–14; *see also* New York City Charter § 197–c; *Goldfine,* 80 F.Supp.2d at 160 ("Informal efforts to gain approval for land development are insufficient, by themselves, to constitute final government action."). Clearly, there has been no final, definitive decision—alleged either in the Amended Complaint or in Plaintiffs' opposition papers—prohibiting Grossi from developing and using the Amboy property as he originally envisioned. *See Dougherty v. Town of North Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 89 (2d Cir.2002); *Homefront Org.,* 570 F.Supp.2d at 410; *Goldfine,* 80 F.Supp.2d at 159.

Plaintiffs allude in their opposition papers that the first prong of the *Williamson County* ripeness inquiry is inapplicable because their claims are premised upon immediate injuries. Indeed, certain claims, such as purely procedural Due Process and First Amendment claims, may not be subject to the ripeness inquiry because in some circumstances, the injury incurred is immediate. *See Adrian,* 2007 WL 1467417, at *4. However, there is no blanket rule limiting the final decision requirement solely to Fifth Amendment takings claims. It is well settled that the final decision requirement is applicable to violations of Equal Protection rights, substantive and procedural Due Process claims, and to First Amendment claims. *See Murphy,* 402 F.3d at 350 (applying

Grossi v. City of New York, Not Reported in F.Supp.2d (2009)

2009 WL 4456307

ripeness inquiry to First Amendment claim); *Dougherty,* 282 F.3d at 89 (Equal Protection and Due Process claims arising from a denial of a permit dismissed in the absence of a final determination); *Southview Assocs., Ltd. v. Bongartz,* 980 F.2d 84, 96–97 (2d Cir.1992) (applying ripeness test to substantive Due Process claims); *Homefront Org.,* 570 F.Supp.2d at 406 (Equal Protection, Due Process, and First Amendment claims); *Country View Estates,* 452 F.Supp.2d at 149 (Equal Protection and Due Process claims). Moreover, when "takings, due process and equal protection claims ... arise out of the same factual events ..., the Court will apply the same ripeness inquiry to plaintiff's takings, due process, and equal protection claims." *Country View Estates,* 452 F.Supp.2d at 149. Here, the Plaintiffs' constitutional claims arise from a set of facts common to their takings claims, i.e., the landmark designation. Therefore, as discussed above, the Court finds that the ripeness test bars Plaintiffs' Equal Protection and Due Process claims from continuing in federal court (*see infra* for discussion on First Amendment claims).

**\*6** In limited circumstances, a property owner is excused from obtaining a final decision if a local agency lacks discretion to grant relief or "has dug its heels and made clear that all such applications will be denied." *Murphy,* 402 F.3d at 349; *see also Southview Assocs., Ltd.,* 980 F.2d at 98–99; *Homefront Org.,* 570 F.Supp.2d at 407. Plaintiffs allege that Grossi was banned from entering the city buildings to secure a permit. *See* Compl. at ¶ 47. However, the futility exception is inapplicable here because, among other reasons, there is no indication that Grossi was prohibited from applying for the permits. *See Homefront Org.,* 570 F.Supp.2d at 408 (allegations of hostility exhibited by the town officials towards the plaintiffs' development plan is insufficient to invoke the futility exception); *Kittay,* 112 F.Supp.2d at 350 (holding that to invoke the futility exception, at a minimum, plaintiff must make at least one meaningful application for development).[3] In fact, as discussed above, Grossi started the application process for a special permit but failed to complete it. Accordingly, I respectfully conclude that the Court lacks jurisdiction over counts II—IV of the Amended Complaint because they are not yet ripe for adjudication.

## B. Fed.R.Civ.P. 12(b)(6)

### i. Standard of Review

When reviewing the City's motion to dismiss pursuant to Fed.R.Civ .P. 12(b)(6), the Court accepts the allegations in the Amended Complaint as true, draws all inferences in the Plaintiffs' favor, and construes the Amended Complaint liberally. *See Dougherty,* 282 F.3d at 87; *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001). To withstand dismissal, the Amended Complaint must plead "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see ialso Zerilli–Edelglass v. N.Y. City Transit Auth.,* 333 F.3d 74, 79 (2d Cir.2003). Moreover, "formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555; *see also Ashcroft v. Iqbal,* 556 U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (May 18, 2009). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. The Court limits its analysis to the facts stated in the Amended Complaint, documents attached to the Amended Complaint as exhibits, and documents incorporated by reference in the Amended Complaint. *See Country View Estates,* 452 F.Supp.2d at 148.

### ii. Retaliation Claim

As noted above, the ripeness doctrine is not applied as stringently to First Amendment claims where, in some instances, injuries are immediate. *See Dougherty,* 282 F.3d at 90; *but see Murphy,* 402 F.3d at 350 (recognizing that in some circumstances, courts should apply the *Williamson* prong-one ripeness test to First Amendment claims); *Homefront Org.,* 570 F.Supp.2d at 406 n. 4 (holding that plaintiffs' First Amendment claims were not ripe for review). Assuming, *arguendo,* that Plaintiffs' First Amendment claim that the landmark designation was made in retaliation for Grossi exercising his rights is ripe for adjudication, *see Dougherty,* 282 F.3d at 90 (plaintiff suffered an immediate injury at the moment the defendants revoked his building permit), I respectfully conclude that count I fails as a matter of law because Plaintiffs have not adequately stated a claim upon which relief can be granted. *See Rosendale v. Brusie,* 07–cv–8149, 2009 WL 778418, at \*8–l 1 (S.D.N.Y. Mar. 25, 2009) (assuming for argument's sake that plaintiff's First Amendment claims are ripe for review, but dismissing part of the claims pursuant to Fed.R.Civ.P. 12(b)(6)).

**\*7** To establish a retaliation claim under § 1983, Plaintiffs must show (1) that Grossi's conduct was protected by the First Amendment and (2) that such conduct prompted or substantially caused the City's action. *See Dougherty,* 282 F.3d at 91. [4] Plaintiffs claim that the Amboy property was landmarked in retaliation for Grossi painting the Bedell house in "Technicolor," thereby violating Grossi's First Amendment rights. *See* Compl. at ¶ 51. The City contends that the First Amendment's protection does not extend to the painting of the house. The Court disagrees with the City's interpretation.

The First Amendment's protection extends to symbols and expressive conduct. *See Virginia v. Black,* 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003); *Muhammad v. Bonner,* 05–cv–1851, 2008 WL 926574, at \*6 (E.D.N.Y. Mar.31, 2008). In addition, Plaintiffs bear the burden of demonstrating that the First Amendment applies and must allege more than a mere "plausible contention" that Grossi's conduct is expressive. *See Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Whether particular conduct is worthy of the First Amendment's protection depends on whether Grossi intended "to convey a particularized message," and whether the surrounding circumstances are such that "the likelihood was great that the message would be understood by those who viewed it." *Spence v. State of Wash.,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). The Amended Complaint alleges that Grossi, instead of yielding to the community's discontent, painted the Bedell house in vibrant colors to protest and to garner attention. *See* Compl. at ¶¶ 2, 23. These allegations suffice at this initial pleading stage. While community members may not understand the literal reasons behind Grossi's conduct, given the circumstances, it is plausible to infer that they understood he was deliberately challenging the community's wishes about maintaining the historic character of the Bedell house.

Nevertheless, the Plaintiffs' First Amendment claim fails because they have not alleged a causal connection between the painting of the Bedell house and the decision to have it designated as a landmark. For a causal connection to exist, the conduct should have played a substantial factor in the City's decision. *See Cronin v. St. Lawrence,* 08–cv–6346, 2009 WL 2391861, at \*5 (S.D.N.Y. Aug.5, 2009) (internal citations omitted). Instead, Plaintiffs simply surmise that the City retaliated against Grossi for painting the Bedell house. *See Butler v. City of Batavia,* 08–cv–1361, 2009 WL 910194, at \*1 (2d Cir. Apr.6, 2009) (dismissing complaint because it was devoid of factual allegations showing that defendants' actions were "motivated or substantially caused by" plaintiffs' exercise of their First Amendment rights); *Rosendale,* 2009 WL 778418, at \*9 (dismissing partially plaintiff's First Amendment claims because it failed to plead facts sufficient to render the claims plausible and made only vague and conclusory allegations in its complaint).

**\*8** Though Plaintiffs cite the relative quickness of the landmark designation, admissions made in the Amended Complaint contradict the Plaintiffs' arguments that the painting played a substantial role in the landmark designation, rather than the community's wish to preserve a piece of historic architecture. *See generally Holmes v. Poskanzer,* 08–cv–14750, 2009 WL 2171326, at \*2 (2d Cir. Jul.21, 2009) ("Regardless of any retaliatory motive, the plaintiff cannot prevail if a defendant can show he or she would have taken the same action even in the absence of the allegedly improper reason."). For example, the Amended Complaint clearly indicates that the community members had a strong interest in preserving the Amboy property *before* the painting occurred. *See* Compl. at ¶¶ 2, 23–24. Plaintiffs admit that before the painting took place, members of the Tottenville Historic Society organized a march in protest of Grossi's planned development of the Amboy property and that the application for the demolition and building permits was "put on hold ..." *Id.* at ¶¶ 21–22. Plaintiffs also allege that Mayor Bloomberg, in hopes of securing votes from those "against 'over-development' on Staten Island," promised to landmark the Amboy property so that the Bedell house could not be demolished. *Id.* at ¶¶ 3, 24; *see also Razzano v. County of Nassau,* 599 F.Supp.2d 345, 352 (E.D.N.Y.2009) (dismissing complaint in part because, although the court assumed the truth of the plaintiff's allegations, it was clear from the pleadings that the defendants' actions were not motivated by the plaintiff's exercise of his First Amendment rights). Thus, Plaintiffs' allegations bar their First Amendment claim from crossing the threshold of plausibility. [5] Accordingly, I recommend dismissing count I as a matter of law. *See Ashcroft,* 129 S.Ct. at 1950 ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss). [6]

### iii. Surveillance Claim

2009 WL 4456307

Plaintiffs allege that the City maintained a surveillance system of Grossi's property and that police officers used harassing language and requested identification from him whenever he attempted to enter the Amboy property. *See* Compl. at ¶¶ 25–26. It is settled law that mere surveillance by government authorities without a showing of illegality and cognizable injury does not give rise to an action for violation of rights guaranteed by the First Amendment. *See Laird v. Tatum,* 408 U.S. 1, 13, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (holding that in order to assert a claim grounded on surveillance conducted by the government, plaintiff must assert specific present objective harm or a threat of specific future harm); *Fifth Avenue Peace Parade Comm. v. Gray,* 480 F.2d 326, 331 (2d Cir.1973) (organizers who alleged FBI surveillance failed to show any specific harm and therefore failed to present a justiciable controversy); *Gaston v. Gavin,* 97–cv–1645, 1998 WL 7217, at *4 (S.D.N.Y. Jan.8, 1998) (dismissing plaintiff's First Amendment claim because he failed to show that the government's investigation discouraged him from exercising his First Amendment rights and that as a result, he suffered a concrete and demonstrable injury). Here, Plaintiffs' claim fails because there are no facts in the Amended Complaint indicating that the surveillance discouraged Grossi from exercising his rights. Plaintiffs allege that Grossi suffered harm from the police surveillance on the Amboy property, i.e., harassing language and requests for identification to enter his own property. [7] *See* Compl. at ¶ 26. These allegations are insufficient to support a First Amendment claim. *See Nour v. New York City Police Dept.,* 92–cv–7066, 1995 WL 42319, at *3 (S.D.N.Y. Feb.2, 1995) (finding that plaintiff's allegations of alleged surveillance was "nerve [racking]" and "shocking," that he no longer had a "private life," and that he suffered mental anguish, emotional distress, fear, and pain were insufficient assertions of the required objective injury during the motion to dismiss phase). [8] Plaintiffs' reliance on *Mason v. Ward* is misplaced because, there, plaintiffs alleged an objective injury. 88–cv–4704, 1991 WL 143713, at *7 (S.D.N.Y. Jul.20, 1991) (plaintiffs' allegation that the surveillance damaged their reputation and caused them to lose business was sufficient to survive a motion to dismiss). Accordingly, I recommend dismissing Plaintiffs' claim that the alleged police surveillance of the Amboy property violated Grossi's First and Fourth Amendment rights.

### iv. Equal Protection Claim

**\*9** The City has moved to dismiss Plaintiffs' Equal Protection claim on the grounds of both ripeness and a failure to state a claim. Although count II is not ripe for adjudication, *see supra,* for the sake of completeness, I will analyze the claim pursuant to a Fed .R.Civ.P. 12(b)(6) standard.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In order to establish an Equal Protection claim under 42 U.S.C. § 1983, a party must show that:

> (1) the person, compared with others similarly situated, was selectively treated; and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.

*R–Goshen LLC,* 289 F.Supp.2d at 453; *see also Butler,* 2009 WL 910194, at *1 (dismissing Equal Protection claims because the plaintiffs did not plead sufficient facts to make the violations plausible); *Puckett v. City of Glen Cove,* 08–cv–3594, 2009 WL 1916275, at *6 (E.D.N.Y. Jun.30, 2009).

Plaintiffs contend that Grossi was "selectively prosecuted on the basis of his status as a "developer" and his "desire to build affordable housing for disadvantaged and minority families." Compl. at ¶ 51. Plaintiffs further contend that the City punished Grossi for exercising his constitutional rights. *See id.* These arguments fail as a matter of law. A "developer" is not a protected class as contemplated under the Equal Protection Clause. *See Frooks v. Town of Cortlandt,* 997 F.Supp. 438, 453 (S.D.N.Y.1998) (holding that classifications of "developers" or "commercial landowners" are not suspect under the Equal Protection Clause). Plaintiffs also fail to allege sufficient facts that Grossi was treated differently from any other developer or property owner in the

town. *See Puckett,* 2009 WL 1916275, at *6 (dismissing plaintiff's complaint because there was no allegation in the complaint that other similarly situated homeowners were more favorably treated than the plaintiff). In fact, Plaintiffs do not make a single reference to individuals who are similarly situated to Grossi with respect to the landmark designation. *See id.* They fail to allege that the City permitted other landowners with similar properties to develop their land as originally planned because those owners did not paint their houses in protest or engaged in expressive conduct protected by the First Amendment. *See Gagliardi v. Village of Pawling,* 18 F.3d 188, 193 (2d Cir.1994); *Puckett,* 2009 WL 1916275, at *6 (holding that "an Equal Protection claim is stated only by showing substantial similarity, coupled with disparate treatment that is either arbitrary or motivated by ill will"). [9] Rather, Plaintiffs make conclusory statements that the City had a desire to harm Grossi and to retaliate against him for exercising his constitutional rights. Because the Plaintiffs fail to assert a viable Equal Protection claim, I find count II fails as a matter of law. [10]

### v. Procedural Due Process Claim

**\*10** The City has moved to dismiss count III on the grounds of both ripeness and a failure to state a claim. Although the count is not ripe for adjudication, *see supra,* for the sake of completeness, I will analyze the claim pursuant to a Fed.R.Civ.P. 12(b)(6) standard.

To demonstrate a violation of procedural Due Process rights based upon a land regulation, Plaintiffs must first demonstrate the possession of a federally protected property right to the relief sought and the insufficiency of any state remedy. *See Puckett,* 2009 WL 1916275, at *8. Moreover, "postdeprivation remedies made available by the State can satisfy the Due Process Clause" and "predeprivation notice and opportunity to be heard is pretermitted if the State provides a postdeprivation remedy." *Parratt v. Taylor,* 451 U.S. 527, 538, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

It is well established in the Second Circuit that the availability of an Article 78 proceeding provides homeowner plaintiffs with all of the procedural Due Process rights to which they are due. *See Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 881–82 (2d Cir.1996) (noting "that there *is no* constitutional violation (and no available § 1983 action) when there is an adequate state postdeprivation procedure to remedy a random, arbitrary deprivation of property or liberty") (italics in the original); *Puckett,* 2009 WL 1916275, at *10 (finding that the plaintiff cannot prevail on a Due Process argument because he could have availed himself to an Article 78 proceeding); *Rector, Wardens, and Members of the Vestry of St. Bartholomew's Church v. City of New York,* 728 F.Supp. 958, 965 n. 12 (S.D.N.Y.1989) (declining to decide whether the Landmarks Preservation Commission denied the plaintiff its procedural Due Process rights because any defects should have been addressed through an Article 78 hearing in state court). Plaintiffs have not indicated that they pursued an Article 78 hearing or that other state remedies have been insufficient. Accordingly, I find count III fails as a matter of law.

### III. Conclusion

For the reasons set forth above, I respectfully recommend granting the City's motion to dismiss, without prejudice, counts II–IV insofar as they relate to the landmark designation because those claims are not ripe for adjudication. I also find that counts II and III fail to state a cognizable claim pursuant to Fed.R.Civ.P. 12(b)(6). Finally, I recommend granting the City's motion to dismiss, without prejudice, count I of the Amended Complaint as it relates to the landmark designation pursuant to Fed.R.Civ.P. 12(b) (6) for failure to state a claim.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 6 and 72 of the Fed.R.Civ.P., the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court. Failure to file timely objections will preclude appellate review of any order of judgment that will be entered.

**\*11  SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 4456307

---

**Footnotes**

1    Because the City's motion requests that the Court dismiss counts I–IV of the Amended Complaint insofar as they relate to the landmark designation, no elaboration of the facts relevant to Plaintiffs' remaining contentions is necessary.

2    The Court also construes count I to include a violation of Grossi's First and Fourth Amendment rights relating to the police surveillance of the Amboy property. *See* Compl. at ¶¶ 25–26, 50.

3    Even if the Plaintiffs could invoke the futility exception to the final decision requirement, their claims would not be ripe because of their failure to show that New York State does not provide a remedy for the alleged violations. *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 194, 105 S.Ct. 3108, 87 L.E.2d 126 (1985); *TZ Manor, LLC v. Daines,* 08–cv–3293, 2009 WL 2242436, at *5 (S.D.N.Y. Jul.28, 2009) (settled law that New York does have reasonable provisions for obtaining compensation); *Country View Estates @ Ridge LLC v. Town of Brookhaven,* 452 F.Supp.2d 142, 156 (E.D.N.Y.2006) (same); *Goldfine v. Kelly,* 80 F.Supp.2d 153, 161–62 (S.D.N.Y.2000).

4    Recent decisions in the Second Circuit also require the additional element that Plaintiffs prove that the City's actions chilled the exercise of Grossi's First Amendment rights. *See Butler v. City of Batavia,* 08–cv–1361, 2009 WL 910194, at *1 (2d Cir. Apr.6, 2009); *Curley v. Vill. of Suffern,* 268 F.3d 65, 73 (2d Cir.2001); *Rosendale v. Brusie,* 07–cv–8149, 2009 WL 778418, at *18 (S.D.N.Y. Mar.25, 2009); *D'Angelo–Fenton v. Town of Carmel,* 470 F.Supp.2d 387, 398 (S.D.N.Y.2007); *Estate of Morris ex rel. Morris v. Dapolito,* 297 F.Supp.2d 680, 691–92 (S.D.N.Y.2004); *but see Puckett v. City of Glen Cove,* 08–cv–3594, 2009 WL 1916275, at * 12 (E.D.N.Y. Jun.30, 2009) (finding that the "chilling element" is not required in this land use case).

5    The purpose of a landmark designation is to preserve the aesthetic and historical charm of a community, not to punish someone for merely painting his house. *See* N.Y.C. Administrative Code, § 25–301 *et seq.* (matter of public policy to protect the city's historic, aesthetic and cultural heritage); *see also Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 129, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

6    Count I of the Amended Complaint encompasses more than the landmark claims. As the City's motion is limited to those claims resulting from the landmark decision, notwithstanding the surveillance claim, I recommend dismissing count I only to that extent that Plaintiffs claim the City landmarked the property in retaliation for Grossi painting the Bedell house.

7    As Plaintiffs have not alleged in their Amended Complaint that the surveillance took place on private property, this Court notes that there is no trespass violation alleged in relation to the surveillance claim.

8    The Amended Complaint does not state a proper Fourth Amendment violation because the Plaintiffs do not allege that Grossi was prohibited from leaving or entering the Amboy property. *See Nour v. New York City Police Dept.,* 92–cv–7066, 1995 WL 42319, at *3 (S.D.N.Y. Feb.2, 1995) ("A person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" (internal quotation marks and citations omitted)).

9    Plaintiffs' claim is not a "class of one" argument because they make clear in their opposition papers that Grossi's rights were violated because he exercised his First Amendment right when painting the house in "Technicolor." If Plaintiffs

2009 WL 4456307

intended to argue a "class of one" theory for selective treatment, their argument also fails as a matter of law because they have not sufficiently alleged that Grossi was intentionally treated differently from other property owners in all material aspects and that there was no rational basis for such treatment. *See, e.g., Harlen Assocs. v. Inc. Village of Mineola,* 273 F.3d 494, 499 (2d Cir.2001).

10    The holding is limited to the allegations based upon the landmark designation.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

1997 WL 599355

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional Facility; Joseph Williams, Warden, Lincoln Work–Release Center; Francis J. Herman, Senior Parole Officer Interstate Bureau; T. Stanford, Senior Parole Officer; Deborah Stewart, Parole Officer; John Doe # 1, Parole Agent, Watertown Correctional Facility; John Doe # 2, Parole Agent, Lincoln Work Release Center; Susan Bishop, Director of Interstate Compact, South Carolina; Cecil Magee, Parole Officer, South Carolina; Frank Barton, Parole Officer, South Carolina; John McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The Capitol Albany, NY, for defendants Peters, Herman Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant Attorney General, Carl N. Lundberg, Chief Legal Counsel, South Carolina Department of Probation, Columbia, SC, for defendants Bishop, Magee, Barton, McMahan, and Stanford, Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Daniel Scanlon, Jr., duly filed on April 17, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil rights action on November 17, 1995. On February 12, 1996, Magistrate Judge Scanlon ordered Brown to submit an amended complaint alleging the specific acts committed by the individuals named as defendants which Brown claimed violated his constitutional rights. Brown filed an amended complaint on March 21, 1996. In his amended complaint, Brown alleged that defendants violated his rights under the Eighth and Fourteenth Amendments by failing to process properly his interstate compact paperwork, resulting in Brown being imprisoned pursuant to a parole hold when in fact he had never violated the conditions of his parole. For a more complete statement of Brown's claims, see his amended complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On August 19, 1996, defendants Bishop, Magee, Barton, and McMahan made a motion to dismiss the complaint against them or, in the alternative, for summary judgment. Dkt. No. 20. On October 17, 1996, defendants Herman, Stewart, and Stanford made a motion to dismiss for failure to state a claim. Dkt. No 34. On April 17, 1996, Magistrate Judge Scanlon recommended that all defendants' motions to dismiss be granted and that the complaint be dismissed. Dkt. No. 50.

Brown v. Peters, Not Reported in F.Supp. (1997)

1997 WL 599355

On June 9, 1997, Brown filed objections to the magistrate judge's report-recommendation, having been granted additional time in which to do so. Dkt. No. 52. In addition, Brown filed on June 9, 1997, a motion for leave to file a second amended complaint and a copy of his proposed amended complaint. Dkt. No. 53. I turn first to the last motion filed, Brown's motion for leave to amend his complaint a second time.

Brown seeks to file a second amended complaint "setting forth in detail the personal involvement of each defendant and how their acts of commission and omission served to deprive plaintiff of Constitutionally secured rights." Dkt. No. 53. The district court has discretion whether to grant leave to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

 **\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are

1997 WL 599355

wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

## CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

## ORDER and REPORT–RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*

## BACKGROUND

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process,

1997 WL 599355

he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

1997 WL 599355

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

1997 WL 599355

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

 **\*7**  Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

**D. Plaintiff's "John Doe" Claims.**

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

**E. Discovery Motions.**

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

**CONCLUSION**

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**Brown v. Peters, Not Reported in F.Supp. (1997)**

Case 5:25-cv-01168-BKS-ML   Document 7   Filed 05/13/26   Page 147 of 147

1997 WL 599355

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

---

**Footnotes**

1        I note, however, that the report-recommendation would survive even *de novo* review.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.